UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


JOHNNY TRAWEEK                                      CIVIL ACTION

v.                                                  NO. 19-1384

MARLIN GUSMAN, ET AL.                               SECTION "F"


ORDER AND REASONS

Before the Court are two motions by Louisiana Department of
Safety & Corrections Secretary James LeBlanc and employee Ashely
Jones: (1) Rule 12(b)(1) and Rule 12(b)(6) motion to dismiss; and
(2) motion to stay discovery.  For the reasons that follow, the
motion to dismiss is GRANTED in part and DENIED in part; and the
motion to stay discovery is DENIED as moot.

**Background**

This civil rights lawsuit arises from Johnny Traweek's claim
that bureaucratic incompetence delayed the processing of his
"time-served" judgment, causing him to be unlawfully imprisoned in
Orleans Parish Prison almost three weeks beyond his court-ordered
release date.

On October 2, 2017, Johnny Traweek was arrested on suspicion
of aggravated battery and detained in Orleans Parish Sheriff's
Office custody at Orleans Parish Prison.  He could not make bail.

1

Seven months later, on Wednesday, May 2, 2018, Mr. Traweek appeared in state court, pled guilty to aggravated battery, and was sentenced to seven months in the custody of the Orleans Parish Sheriff, with credit for time served.[1] But Mr. Traweek was not immediately released.[2] The next day, Mr. Traweek remained in custody; Orleans Parish Sheriff's Office created a Letter of Credit showing that Mr. Traweek had served his entire seven-month sentence.

When Mr. Traweek remained in custody a week later, on May 9, 2018, Mr. Traweek's attorney, Stas Moroz, emailed Monique Filmore and Blake Arcuri[3] at the Orleans Parish Sheriff's Office asking why Mr. Traweek had not been released. Ms. Filmore responded defiantly: "First of all Johnny Traweek was just sentenced on 5/2/18 so his paperwork has not went up yet." On Monday, May 14, 2018, Mr. Moroz again wrote to Ms. Filmore and Mr. Arcuri: "Mr.

---

[1] In rendering sentence, Judge Willard stated: "Seven months Orleans Parish Prison. Give him credit for time served, all to run concurrent. State has agreed to no multiple bill. This does qualify as a crime of violence." However, for some reason, the docket sheet entry indicated that Mr. Traweek was in the custody of the Louisiana Department of Corrections: ">SENTENCE: >AS TO COUNT 1, >7 MONTHS, AT DOC >CONCURRENT WITH THESE CASES: ANY/ALL SENTENCES NOW SERVING. >INCLUDES A CRIME OF VIOLENCE. >CREDIT FOR TIME SERVED."

[2] Upon his return from court to Orleans Parish Prison, in anticipation of his immediate release, Mr. Traweek gave away his commissary items and possessions.

[3] Blake Arcuri is enrolled in this lawsuit as lead counsel for Marlin Gusman and Monique Filmore.

Traweek is still in jail.  Could you please ensure that he is released? I understand that the paperwork has to be send (sic) to [the Louisiana Department of Public Safety & Corrections, or DOC], but he has now been detained 12 days past his full term date." Mr. Arcuri unhelpfully responded that the Orleans Parish Sheriff's Office could not release Mr. Traweek since he was a Louisiana Department of Safety & Corrections, or "DOC" inmate.[4]  Still defiant, Ms. Filmore replied: "He can't get released until DOC sends him a release.  The whole process takes about 2 weeks.  He has to wait!!!!"

On May 16, 2018, the Louisiana Department of Public Safety & Corrections (DPSC or DOC) confirmed that the Orleans Parish Sheriff's Office had not even begun the process of transferring Mr. Traweek.[5]  It was not until May 17, 2018 that the DOC received Mr. Traweek's release paperwork from the Orleans Parish Sheriff's Office.

Although Mr. Traweek's paperwork "arrived" at the DOC on Thursday, May 17, four days passed before DOC began to process his

---

[4] Mr. Traweek characterizes Mr. Arcuri's response as inaccurate given that the state trial court ordered Mr. Traweek to a sentence in the custody of the Sheriff.  Regardless, Mr. Traweek alleges that the Sheriff's Office failed either to release him or deliver him to the custody of the State.

[5] Mr. Moroz contacted Traci DiBenedetto at the Department of Corrections and learned that Mr. Traweek's information had yet to be sent to the DOC.

release. On Monday, May 21, 2018, DOC employee Ashley Jones started working on Mr. Traweek's paperwork. It is alleged that she began computing Mr. Traweek's credit for time-served and she performed other searches relevant to his release. But she did not finish Mr. Traweek's paperwork that day. The next day, on May 22, Mr. Moroz filed a writ of habeas corpus and motion for immediate release on behalf of Mr. Traweek.[6] Later that same day, Ms. Jones created Mr. Traweek's certificate of release and, at about 3:30 p.m., Mr. Traweek was released from custody. Twenty days after he was sentenced to time-served and eligible for release from custody.

On February 14, 2019, Mr. Traweek filed this civil rights lawsuit under 42 U.S.C. § 1983, followed by an amended complaint on May 16, 2019, naming as defendants, in their individual and official capacities, Marlin Gusman (as Sheriff) and Monique Filmore (as an employee) of the Orleans Parish Sheriff's Office as well as James LeBlanc (as Secretary) and Ashley Jones (as an employee) of the Louisiana Department of Public Safety and Corrections.[7] Mr. Traweek seeks to recover for a Fourteenth

---

[6] Mr. Moroz filed a petition for Writ of Habeas Corpus, Motion for Immediate Release, and Motion to Amend/Reconsider Sentence to convert the Department of Corrections time to Orleans Parish Prison time.

[7] LeBlanc and Jones were first named as defendants in Mr. Traweek's June 2019 amended complaint; they were served on August 1, 2019. Mr. Traweek also sues unknown individuals in their individual and official capacities as John Does 1 to 10.

Amendment Due Process Clause constitutional violation underlying his § 1983 claims; he also asserts <u>Monell/Hinojosa</u> failure to train/supervise liability against Gusman and LeBlanc, as well as various state constitutional and state law claims including false imprisonment (against Gusman, Filmore, Jones, and Does 1-10), negligence and failure to intervene (as to all defendants), and respondeat superior (against Gusman). He seeks declaratory relief, compensatory damages, special damages, attorney's fees, and a permanent injunction, as well as "indemnification" (as to Gusman only).[8]

Mr. Traweek alleges that, for years, the Orleans Parish Sheriff's Office[9] and the Louisiana Department of Safety and Corrections have held prisoners indefinitely beyond their release date, releasing prisoners only after their attorneys file habeas

---

[8] Mr. Traweek alleges that he suffered physical harm due to his overdetention, including an exacerbation of edema, depression, and anxiety.

[9] Mr. Traweek alleges that (and names) numerous OPP inmates were detained beyond their release dates. Traweek alleges:

> When [a] person in Orleans Parish is sentenced to the custody of the Department of Corrections, OPSO does not immediately hand that person over to the DOC. Instead, they drive that person's paperwork to the DOC and then hold the person indefinitely in OPP until the DOC sends for them to be processed and have their sentence calculated. This sequence can take weeks or more, and OPSO does not deviate from it even when they know that a person is entitled to immediate release.

corpus petitions.[10]  Mr. Traweek alleges that these widespread over

detention practices violate his civil rights and confer municipal

liability and supervisory liability.  The State Defendants (LDSC

Secretary LeBlanc and employee Jones) now move to dismiss the

plaintiff's claims against them, invoking Eleventh Amendment

immunity, <u>Heck v. Humphrey</u>, and qualified immunity; they also move

to stay discovery pending the Court's ruling on their motion to

dismiss.

---

[10] Specific to the LeBlanc and the DOC, Mr. Traweek alleges that
the DOC has a well-documented pattern of overdetention.  He points
to testimony by DOC employees who state that they typically observe
at least one case of overdetention each week.  In addition to DOC
employee statements acknowledging such a pattern, Mr. Traweek
notes that Attorney General Jeff Landry wrote an opinion piece
published a couple months before Mr. Traweek's state court plea
and sentencing hearing in which Landry conceded that there "is a
layer of incompetence so deep that the Corrections Department
doesn't know where a prisoner is on any given day of the week or
when he should actually be released from prison."   Mr. Traweek
alleges that in 2012 Secretary LeBlanc himself championed a project
to improve performance and the implementing study concluded that,
as of January 2012, DOC had a "1446 backlog of cases to have time
computed," resulting in an average processing delay of 110 days.
Once those inmates finally had their time calculated, more than
83% of them were eligible for "immediate release upon processing."
Mr. Traweek alleges that the overdetention problem at DOC has not
been fixed; to the contrary, an investigation revealed in 2017 DOC
"had an average of 200 cases per month considered an 'immediate
release' due to" calculation and data errors.  Even so, Secretary
LeBlanc admitted that there has not been any "discipline or adverse
employment activity for DOC employees who have incorrectly
computed sentences or release dates."  Finally, Mr. Traweek alleges
that, in February 2019, DOC general counsel noted that "231 people
across the state ... waited an average 44 days to be released after
a judge ordered them free."

I.

A.

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge a federal district court's subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). The Louisiana Department of Public Safety and Corrections challenges this Court's subject matter jurisdiction under Rule 12(b)(1), invoking the Eleventh Amendment's doctrine of sovereign immunity with respect to the plaintiff's § 1983 claims seeking monetary damages against LeBlanc and Jones in their official capacities. The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Choice Inc. of Texas v. Greenstein, 627 F.3d 710, 714 (5th Cir. 2010)(citations omitted). The Court may find a plausible set of facts to support subject matter jurisdiction by considering any of the following: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Barrera-Montenegro v. United States, 74 F.3d 657, 659 (5th Cir. 1996).

*B.*

The other ground for dismissal advanced by the defendant is dismissal for failure to state a claim, under Rule 12(b)(6). The standard of review applicable to motions to dismiss under Rule 12(b)(1) is similar to that applicable to motions to dismiss under Rule 12(b)(6).[1]

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. Such a motion is rarely granted because it is viewed with disfavor. See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)(citing Fed.R.Civ.P. 8). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-

---

[1] See Williams v. Wynne, 533 F.3d 360, 364-65 n.2 (5th Cir. 2008)(observing that the Rule 12(b)(1) and Rule 12(b)(6) standards are similar, but noting that applying the Rule 12(b)(1) standard permits the Court to consider a broader range of materials in resolving the motion).

defendant-unlawfully-harmed-me accusation." Id. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

Thus, in considering a Rule 12(b)(6) motion, the Court "accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" See Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit, 369 F.3d 464 (5th Cir. 2004) (quoting Jones v. Greninger, 188 F.3d 322, 324 (5th Cir. 1999)). But, in deciding whether dismissal is warranted, the Court will not accept conclusory allegations in the complaint as true. Kaiser, 677 F.2d at 1050. Indeed, the Court must first identify allegations that are conclusory and, thus, not entitled to the assumption of truth. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). A corollary: legal conclusions "must be supported by factual allegations." Id. at 678. Assuming the veracity of the well-pleaded factual allegations, the Court must then determine "whether they plausibly give rise to an entitlement to relief." Id. at 679.

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)(quoting Iqbal, 556 U.S. at 678)(internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even

9

if doubtful in fact)." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544,
555 (2007) (citations and footnote omitted). "A claim has facial
plausibility when the plaintiff pleads factual content that allows
the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 ("The
plausibility standard is not akin to a 'probability requirement,'
but it asks for more than a sheer possibility that a defendant has
acted unlawfully.").

## II.

DOC Secretary LeBlanc and DOC employee Jones advance three
grounds for the dismissal of Mr. Traweek's § 1983 claims.[11]  First,
LeBlanc and Jones invoke sovereign immunity insofar as Mr. Traweek
asserts claims against them in their official capacities.  Second,
LeBlanc and Jones submit that <u>Heck v. Humphrey</u>'s favorable
termination rule procedurally bars Mr. Traweek's § 1983 claims.
Finally, LeBlanc and Jones invoke qualified immunity insofar as
Mr. Traweek seeks money damages from them in their individual
capacities.  The Court takes up sovereign immunity first.

---

[11] The defendants do not mention Mr. Traweek's state law claims.

*A.*

LeBlanc and Jones submit that the plaintiff's claims against them in their official capacities as Secretary and employee of the Louisiana Department of Public Safety & Corrections must be dismissed because the DOC enjoys sovereign immunity from suit. The plaintiff concedes that dismissal of his official capacity claims against LeBlanc and Jones is required. The Court agrees.

"Sovereign immunity is the privilege of the sovereign not to be sued without its consent." Va. Office for Prot. & Advocacy v. Stewart, 131 S. Ct. 1632, 1637 (2011); Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004)(citing Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996)).[3] A federal district court lacks subject matter jurisdiction where the named defendant is protected by Eleventh Amendment immunity. See Wagstaff v. U.S. Dep't of Educ., 509 F.3d 661, 664 (5th Cir. 2007)(per curiam). This jurisdictional bar applies regardless of the nature of the relief sought and extends to a state's agencies and departments with identities sufficiently aligned with the state. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100-01 (1984), *superseded*

_____

[3] The Eleventh Amendment instructs that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign State."

*by statute on other grounds*, 28 U.S.C. § 1367; <u>Regents of the Univ.</u>
<u>of California v. Doe</u>, 519 U.S. 425, 429 (1997); <u>Vogt v. Bd. of</u>
<u>Comm'rs of Orleans Levee Dist.</u>, 294 F.3d 684, 688-89 (5th Cir.
2002)("Even in cases where the State itself is not named a
defendant, the State's Eleventh Amendment immunity will extend to
any state agency or other political entity that is deemed the
'alter ego' or 'arm' of the State.").[12] Not only does the Eleventh
Amendment preclude individuals from suing a state in federal court
for money damages, it also bars injunctive and declaratory suits
against the state, unless the state consents to suit, or its
immunity is otherwise overcome by application of waiver,
abrogation, or <u>Ex parte Young</u> doctrines. <u>See</u> <u>Halderman</u>, 465 U.S.
at 100-01; <u>see</u> <u>also</u> <u>Cory v. White</u>, 457 U.S. 85, 91 (1982).

The Eleventh Amendment bar to suits by private citizens
against a state in federal court extends to protect state actors
who are acting in their official capacities. <u>K.P. v. LeBlanc</u>, 627
F.3d 115, 124 (5th Cir. 2010)(citing <u>Hutto v. Finney</u>, 437 U.S.
678, 700 (1978)); <u>Will v. Michigan Dept. of State Police</u>, 491 U.S.
21, 25 (1991)(A suit against a state official in an official

_____

[12] The State's Department of Public Safety and Corrections is
indisputably an "arm of the state." <u>See</u> <u>Champagne v. Jefferson</u>
<u>Parish Sheriff's Office</u>, 188 F.3d 312, 314 (5th Cir. 1999)(applying
six factor test and concluding that the Louisiana Department of
Public Safety and Corrections is an "arm of the state").

capacity for monetary damages is treated as a suit against the
state and is therefore barred by the Eleventh Amendment.).

There is a narrow exception to this immunity from suit: the
Ex parte Young exception, which "is based on the legal fiction
that a sovereign state cannot act unconstitutionally[; t]hus,
where a state actor enforces an unconstitutional law, he is
stripped of his official clothing and becomes a private person
subject to suit." See K.P. v. LeBlanc, 627 F.3d at 124 (emphasis
added)(citing Ex parte Young, 209 U.S. 123 (1908)); see also Will
v. Michigan Dep't of State Police, 491 U.S. 58, 71 n.10
(1989)(noting "[o]f course a state official in his or her official
capacity, when sued for injunctive relief, would be a person under
§ 1983 because 'official-capacity actions for prospective relief
are not treated as actions against the State'").

Ex parte Young thus limits the plaintiff to prospective relief
and bars money damages. Verizon Md. Inc. v. Pub. Serv. Comm'n of
Md., 535 U.S. 635, 645 (2002). To determine whether Ex parte
Young's mandate is satisfied, "a court need only conduct a
straightforward inquiry into whether [the] complaint alleges an
ongoing violation of federal law and seeks relief properly
characterized as prospective." See id. (internal quotation marks
and citations omitted)(alteration in original); see also
Delaughter v. Woodall, 909 F.3d 130, 137 (5th Cir. 2018).

Here, it is undisputed that the plaintiff seeks only money damages against LeBlanc and Jones in their official capacities as Secretary and employee of the State Department of Public Safety and Corrections; LeBlanc and Jones have thus permissibly invoked sovereign immunity and Ex parte Young is not implicated. Mr. Traweeks's claims against LeBlanc and Jones in their official capacities must be dismissed as barred by the Eleventh Amendment.

*B.*

LeBlanc and Jones next contend that plaintiff's individual capacity § 1983 claims are procedurally barred by Heck v. Humphrey, 512 U.S. 477 (1994), and its progeny. In Heck, the United States Supreme Court held that a convicted person cannot collect damages for unconstitutional conviction or imprisonment under § 1983 unless "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . . , or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486-87. The complaint must be dismissed if a "judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." Id. at 487. By seeking to impose the Heck procedural bar to Mr. Traweek's claims, the defendants emphasize form over substance, begin from a faulty assumption, and ignore a critical component of Heck that is absent here. If Mr. Traweek succeeds on

14

the merits, neither his underlying conviction for aggravated battery nor his seven-month sentence will be impliedly invalidated. See id. at 486 (the favorable termination rule does not bar a § 1983 suit when "the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff."). Here, Mr. Traweek challenges neither his conviction nor his sentence. He accepts both. Therefore, the reasoning underlying Heck's favorable termination prerequisite is simply not implicated: it would be illogical to require Mr. Traweek to first seek to invalidate his conviction or sentence in order to proceed in this lawsuit. The constitutional violation he advances here is that he was imprisoned 20 days past his release date; he does not take issue with his criminal judgment of conviction or the sentence rendered, but, rather, challenges the constitutionality of the administration of his release after he had served his sentence. Mr. Traweek alleges that his jailers failed to timely release him once the legal basis to incarcerate him had expired by court order. The only conduct the factfinder will probe is that performed by jail officials in administering his release after his release date.

Another Section of this Court has rejected Secretary LeBlanc's attempt to invoke Heck in a factually-similar overdetention context, Grant v. Gusman, 17-cv-02797, R. Doc. 46 (E.D. La. March

15

27, 2018)(Brown, C.J.).  There, the plaintiff, who had served seven years in state custody, was arrested upon his release based on a warrant issued years earlier for a different crime predating the one for which he served the seven-year prison term.  The plaintiff pled guilty and the state court sentenced him to "a one year sentence, with credit for time served for the seven years he had just served." Id. at 3.  Like Mr. Traweek, an administrative logjam between OPSO and DOC caused the plaintiff to be detained an additional 27 days after his sentencing, notwithstanding the state trial court's order (and the judge's email directly to OPSO's attorney directing) that Grant's release be expedited. Id. at 3-5. In moving to dismiss Grant's § 1983 claims, Secretary LeBlanc also invoked Heck. Chief Judge Brown rejected the argument, noting "[p]laintiff does not argue that his conviction or sentence were invalid. . . . [H]e contends that DOC Defendants violated his constitutional rights by failing to release him from prison. Therefore, Heck v. Humphrey is not applicable to this case." Id. at 32.  This reasoning applies equally to Mr. Traweek, who, like Grant, challenges neither his conviction nor the length of his court-ordered sentence; he simply alleges that the overdetention by his jailers' failure to timely process his release following

his court-ordered time-served judgment exceeds constitutional bounds.[13]

Mr. Traweek's lawsuit, if successful, will <u>not</u> demonstrate or imply the invalidity of any criminal judgment or court-imposed sentence. He simply alleges that the procedures and action (or inaction) that caused him to be incarcerated for 20 days longer than his criminal judgment permitted unconstitutionally deprived him of his right to due process. <u>Heck</u>'s procedural bar is patently inapplicable.

---

[13] Nor does Mr. Traweek dispute his jailers' substantive calculation of his time-served sentence. There is simply nothing for him to dispute given his allegations (accepted as true) that he was sentenced to serve seven months, with credit for time served, on the first day of his seventh month in custody. Many of the district court decisions invoked by the defendants to support their <u>Heck</u> argument are distinguishable because the plaintiffs in those other cases alleged that their sentences had been miscalculated and, thus, those plaintiffs indeed challenged the substantive duration of their confinement. (There is no quarrel that the Supreme Court extended <u>Heck</u> to the prison discipline context in <u>Edwards v. Balisok</u>, 520 U.S. 641 (1997)). Mr. Traweek does not allege that the defendants miscalculated his release date by improperly calculating credits. Nor does he challenge the criminal judgment itself or the punishment imposed. Rather, he challenges the administrative morass that caused him to be detained, without legal process, beyond his undisputed release date.

III.

*A.*

Title 42, United States Code, Section 1983 creates a damages remedy for the violation of federal constitutional or statutory rights under color of state law; it provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

Because § 1983 merely provides a remedy for designated rights, rather than creating any substantive rights, "an underlying constitutional or statutory violation is a predicate to liability." Harrington v. Harris, 118 F.3d 359, 365 (5th Cir. 1997)(citation omitted). To plead a § 1983 claim, the plaintiff must allege facts demonstrating:

(1)  deprivation of a right secured by the U.S. Constitution or federal law,

(2)  that occurred under color of state law, and

(3)  was caused by a state actor.

Victoria W. v. Larpenter, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted).

This case is about state and municipal actors' alleged knowing, deliberate choices not to process Mr. Traweek's release, or adhering to (or failing to adopt) policies deliberately

18

indifferent to his overdetention plight, despite it being clear on the face of his paperwork compared to his state sentencing judgment that he was entitled to immediate release. Mr. Traweek charges that DOC Secretary LeBlanc and DOC employee Jones deprived him of his right to due process by unreasonably prolonging his detention after his court-ordered release. When, as here, a plaintiff seeks money damages for alleged violations of constitutional rights, government officials sued in their individual capacities may invoke the defense of qualified immunity. LeBlanc and Jones now do so.

*B.*

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)(noting that "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"). Once invoked, the plaintiff has the burden of negating the defense of qualified immunity. <u>Collier v. Montgomery</u>, 569 F.3d 214, 217 (5th Cir. 2009). When defendants invoke qualified immunity at the pleadings stage, the Court "must first find 'that

19

the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity.'" <u>Backe v. LeBlanc</u>, 691 F.3d 645, 648 (5th Cir. 2012)(citation omitted)("[A] plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat qualified immunity with equal specificity."); <u>Fleming v. Tunica Cty. Miss.</u>, 497 Fed.Appx. 381, 388 (5th Cir. 2012)(citation omitted)("[n]egating qualified immunity 'demands more than bald allegations and conclusionary statements.") If the plaintiff's pleadings meet this requirement, but the Court is not able to rule on the immunity defense without additional facts, the Court "may issue a discovery order 'narrowly tailored to uncover only those facts needed to rule on the immunity claim.'" <u>Backe</u>, 691 F.3d at 648 (citation omitted). If the Court denies a motion to dismiss asserting qualified immunity, the government officials are not precluded from litigating the immunity issue on summary judgment. <u>McGee v. Carrillo</u>, 297 Fed.Appx. 319, 321-22 (5th Cir. 2008).

Resolving immunity defenses calls for application of a bifurcated test: "[q]ualified immunity shields...state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of

the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735

(2011)(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).[14]

The Court may consider these prongs in either sequence and need

not consider both. See *Pearson*, 555 U.S. at 232-36.

What does it mean for a right to be clearly established? This

is a "demanding standard," which requires "precedent [so]

clear...that *every* reasonable official would interpret it to

---

[14] "The second prong of the qualified immunity test," the Fifth Circuit has observed, "is better understood as two separate inquires: whether the allegedly violated constitutional rights were *clearly established at the time of the incident*; and, if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law." *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998)(citations omitted, emphasis in original). "[L]aw is clearly established," the Fifth Circuit has observed, "if it puts an objectively reasonable official on fair warning that his conduct is unlawful." *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 469 n.2 (5th Cir. 2014)(citation omitted). This thorny second prong has instigated scholarly criticism and debate and its misapplication has precipitated many summary reversals by the Supreme Court. See, e.g., *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019)(citing cases and cautioning in an excessive force case that "we must think twice before denying qualified immunity"; noting that, although "[t]he Supreme Court reserves 'the extraordinary remedy of summary reversal' for decisions that are 'manifestly incorrect[,]'" the Supreme Court "routinely wields this remedy against denials of qualified immunity."); *Cole v. Carson*, 935 F.3d 444, 472, 473-74 (5th Cir. 2019)(en banc court holding that it was clearly established in 2010 that officers' use of deadly force without warning where officers were not in immediate danger violated Fourth Amendment, but fact issues persisted as to whether officers had time to give the plaintiff warning to disarm before shooting him)(Willett, J., dissenting; Ho, J., dissenting)(citations omitted).

establish the particular rule the plaintiff seeks to apply."
District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)(citations
omitted, emphasis added). "Clearly established" law is "settled
law" that "place[s] the constitutionality of the officer's conduct
'beyond debate.'" Id. (citation omitted). Although the Supreme
Court does not require "a case directly on point," the legal
principle must be specific, not general, and either "controlling
authority" has adopted the rule, or there is "a robust consensus
of cases of persuasive authority" embracing it. Id. at 589-90
(citation omitted). Stated another way, "[a] [g]overnment
official's conduct violates clearly established law when, at the
time of the challenged conduct, '[t]he contours of [a] right [are]
sufficiently clear' that every 'reasonable official would [have
understood] that what he [or she] is doing violates that right.'"
al-Kidd, 563 U.S. at 741 (quoting Anderson v. Creighton, 483 U.S.
635, 640 (1987)). This demanding second prong thus ensures that
"government officials [have] breathing room to make reasonable but
mistaken judgments about open legal questions." Id. at 743.
Indeed, "the qualified immunity standard 'gives ample room for
mistaken judgments' by protecting 'all but the plainly incompetent
or those who knowingly violate the law.'" Mendenhall v. Riser,
213 F.3d 226, 230 (5th Cir. 2000)(quoting Malley v. Briggs, 475
U.S. 335, 343 (1986)).

Applying these principles, Mr. Traweek has pled facts that, if true, would permit the inference that LeBlanc and Jones are liable under § 1983 for a Fourteenth Amendment violation and would overcome their assertion of qualified immunity.

1. Traweek plausibly alleges that LeBlanc and Jones violated his Fourteenth Amendment right to timely release from confinement.

The Fourteenth Amendment forbids states from "depriv[ing] any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. "The touchstone of due process is protection of the individual against arbitrary action of government." Jauch v. Choctaw Cty., 874 F.3d 425, 430 (5th Cir. 2017)(quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)). "The procedural due process analysis starts with one inquiry: whether the state has 'deprived the individual of a protected interest[.]'" Id. Quite obviously, the Supreme Court has recognized that the "loss of personal liberty through imprisonment" is sufficient to trigger due process protections. Id. (quoting Turner v. Rogers, 564 U.S. 431, 445 (2011)).[15]

---

[15] In Jauch, by county policy, Jessica Jauch was detained in the sheriff's custody without an arraignment or bond hearing until the next court term convened, 96 days after she was taken into custody. A case of "confinement with process deferred." Id. at 431. The Fifth Circuit held that Jauch's prolonged detention without legal process violated the detainee's Fourteenth Amendment right to due process. Id.

Mr. Traweek alleges that LeBlanc's failure to adopt safeguards despite knowing DOC's pattern of overdetaining inmates and Jones's direct failure to timely process his release despite knowing he was overdue to be released violated his right to timely release from custody. Because Mr. Traweek has a right to be timely released from custody, his over detention, or detention absent (or beyond the expiration of) legal process, violates an incarcerated person's right to due process. See id.

2.  Traweek plausibly alleges that his right to timely release from custody was clearly established at the time that LeBlanc and Jones received his release paperwork and that their delay in securing his release was objectively unreasonable in light of the clearly established law.

There is no dispute that an incarcerated person's right to timely release from custody is clearly established and was so, well before 2018 at the time that Traweek remained in custody despite the court order mandating his release. See id. (citations omitted). In addition to determining that Jauch's 96-day detention without a hearing deprived her of liberty without legal or due process, the Fifth Circuit determined that the law had been clearly established in Jones v. City of Jackson, 203 F.3d 875 (5th Cir. 2000);[16] thus, the court denied qualified immunity to the sheriff

---

[16] Joseph Jones was held on a bench warrant for nine months without a court appearance. There, the Fifth Circuit held that Jones's right to due process was violated because "[p]rohibition against

24

in whose custody the plaintiff remained for 96 days.  Jauch, 874
F.3d at 436 (finding that the sheriff's attempt to shift blame to
immune judicial officers was misdirected given that sheriff's
actions and decisions caused constitutional injury: "[e]ither
Sheriff Halford is plainly incompetent, or he knowingly violated
the law.").

Even before Jauch and Jones -- to underscore just how clear
the law was -- the Fifth Circuit had instructed that the Fourteenth
Amendment forbids the intentional tort of "false arrest," and a
prisoner has a Fourteenth Amendment due process right to timely
release from prison.  See, e.g., Whirl v. Kern, 407 F.2d 781 (5th
Cir. 1968)(holding that a jailer has a duty to effect a prisoner's
timely release).[17]  Whirl, who remained in jail for nine months
after all charges against him had been dismissed, sued the sheriff
for deprivation of civil rights under § 1983 and Texas law false
imprisonment.  Id. at 786.  The jury returned a verdict for the

improper use of the 'formal restraints imposed by the criminal
process' lies at the heart of the liberty interests protected by
the Fourteenth Amendment due process clause."  Id. at 880.
[17] William Whirl was arrested for felony theft and was transferred
to custody in Harris County jail.  On November 4, 1962, the
indictments against Whirl were dismissed by a Harris County judge.
Id. at 785.  The court minutes and a list of dismissals were
purportedly sent to the sheriff's office, but the sheriff says he
was not apprised of the proceedings; there was apparently some
miscommunication between the district clerk's office and the
sheriff's office. Id. at 785-86.

sheriff.   The Fifth Circuit reversed, holding that the district
court erred in failing to grant the plaintiff's motion for directed
verdict as to liability because the sheriff was "chargeable with
constructive notice of the termination of all proceedings against
Whirl, or alternatively, that absence of such notice was not a
legal justification for Whirl's continued imprisonment."   Id. at
793.[18]

Notwithstanding   the   Whirl   v.   Kern   panel's   ostensible
dismissal of immunity prospects for jailers in a false imprisonment
civil   rights   case,[19]   the   en banc   Fifth   Circuit   revisited   the

---

[18] The Fifth Circuit observed that the sheriff's duty to the
prisoner:

> is not breached until the expiration of a reasonable
> time for the proper ascertainment of the authority upon
> which his prisoner is detained.   We are not to be
> interpreted as holding that a sheriff commits an instant
> tort at the moment when his prisoner should have been
> released.   However, in the present case what is or is
> not a reasonable time is not at issue.   It may safely be
> said that [the sheriff's] ignorance for nine long months
> after the termination of all proceedings against Whirl
> was, as a matter of law, ignorance for an unreasonable
> time.

Id. at 792.

[19] The court rejected invocation of a good faith defense for
unlawful imprisonment, observing:

> The responsibility for a failure of communication
> between the courts and the jailhouse cannot justifiably
> be placed on the head of a man immured in a lockup when
> the action of the court has become a matter of public
> record.   Ignorance and alibis by a jailer should not
> vitiate the rights of a man entitled to his freedom.   A
> jailer, unlike a policeman, acts at his leisure.   He is
> not subject to the stresses and split second decisions

availability of qualified immunity to a jailer and held that, indeed, "a defense of official immunity is available to a jailer who has acted in reasonable good faith[.]" Bryan v. Jones, 530 F.2d 1210, 1214 (5th Cir. 1976)(en banc).[20]  But, the court concluded, "the standard of reasonableness by which the availability of qualified immunity to an official would be gauged varie[s] according to the degree of discretion that he exercise[s]." Douthit v. Jones, 619 F.2d 527, 535 (5th 1980)(citing

---

of an arresting officer, and his acts in discharging a prisoner are purely ministerial.  Moreover, unlike his prisoner, the jailer has the means, the freedom, and the duty to make necessary inquiries.  While not a surety for the legal correctness of a prisoner's commitment, he is most certainly under an obligation, often statutory, to carry out the functions of his office.  Those functions include no only the duty to protect a prisoner, but also the duty to effect his timely release....  Failure to know of a court proceeding terminating all charges against one held in custody is not, as a mater of law, adequate legal justification for an unauthorized restraint.

Whirl, 407 F.2d at 792 (internal citations omitted).

[20] There, Henry Lee Bryan sued the Dallas County Sheriff and others after he remained in custody until April 7, 1972, despite the charges against him being dismissed on March 3, 1972.  Id. at 1211-12.  Although the sheriff received notice that the indictment was dismissed (either on March 3 or March 13) and a separate "release notice" on March 6, the sheriff kept Bryan in custody because the records indicated that he was being held on the authority of a warrant, which had not been properly cross-indexed to Bryan's indictment.  Id.  The jury rendered a verdict in Bryan's favor against Sheriff Jones, who appealed.  The original panel remanded for retrial of damages but ruled that good faith is not an available defense.  Id. at 1211. On rehearing, the en banc court held that the defense of reasonable good faith may be raised by a jailer in § 1983 false imprisonment case.  Id. at 1215.

27

Bryan, 530 F.2d at 1215). Thus, "[w]here a plaintiff alleges that he was imprisoned without valid authority, the court ruled that it would hold the jailer to a high standard of reasonableness since he exercises no discretion and is under relatively little time pressure." Id. Whether a jailer's overdetention of a prisoner violates due process depends on context; as a matter of law, "[d]etention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process." Id. at 532.[21] The Fifth Circuit observed that "[t]he large number of incarcerated persons about whom [the jailer] must make decisions, while increasing his administrative burden, does not affect the scope of his narrow discretion to hold or release the individuals in his custody." Id. at 535.

---

[21] Troy Lee Douthit sued former Dallas sheriff, Clarence Jones and the deputy sheriff seeking damages for wrongful imprisonment under § 1983 and Texas state law. Id. at 529. The Fifth Circuit reversed the district court's judgment in favor of Jones and McCallam on the basis of the jury's finding that they had acted on a reasonable good faith belief that they had lawful authority to imprison Douthit. Id. at 535-37 (underscoring a jailer's "narrow discretion" to hold or release incarcerated persons and holding that the sheriff and deputy must present evidence of objective facts on which they could base a good faith belief that they had the legal authority to continue to hold Douthit once he had satisfied his sentence, but remanding to allow defendants the opportunity to present such evidence).

Given the above-mentioned case literature, the Fifth Circuit has since unsurprisingly expressly recognized that "there is a clearly established right to timely release from prison." <u>Porter v. Epps</u>, 659 F.3d 440, 445 (5th Cir. 2011). There, the court considered whether a jailer, Epps, the Commissioner of and policymaker for the Mississippi Department of Corrections, was entitled to qualified immunity in the face of Will Porter's claim that he was falsely imprisoned for 15 months beyond the expiration of the sentence imposed by the Mississippi state trial court. <u>Id.</u> at 443. Porter alleged that Epps implemented the policies that led to his unconstitutional detention, that Epps was aware of the MDOC records department's failure to interpret sentencing orders correctly, yet took no steps to institute procedural safeguards, train staff, or otherwise hire competent staff, and that Epps's indifference resulted in Porter's unlawful imprisonment. <u>Id.</u> at 444. After being instructed on qualified immunity and supervisory liability, the jury returned a verdict for Porter, awarding him $150,000. <u>Id.</u> The district court denied Epps' motion for judgment as a matter of law in which he invoked qualified immunity and argued that he was impermissibly found liable on a theory of *respondeat superior*. <u>Id.</u> Epps appealed, and the Fifth Circuit reversed.

Having assumed that Epps violated Porter's constitutional right and having already determined that there is a clearly established right to timely release from prison, the Fifth Circuit moved on to consider whether Epps's actions, in light of his duty to ensure Porter's timely release from prison, were objectively reasonable. The Fifth Circuit concluded that Epps, who supervised a department that made a single mistake, was entitled to qualified immunity. Id. at 447. The Fifth Circuit first summarized the relevant authority regarding supervisory liability, which applies equally to Traweek's claims against LeBlanc:

A supervisory official may be held liable ... only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." Gates v. Texas Dep't of Prot. & Reg. Servs., 537 F.3d 404, 435 (5th Cir. 2008). "In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights by their subordinates. Id. (internal quotation marks and citations omitted, alterations and emphasis in original). "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." Rhyne v. Henderson Cnty., 973 F.2d 386, 392 (5th Cir. 1992). A supervisor may also be liable for failure to supervise or train if: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to

30

deliberate indifference." Goodman v. Harris Cnty., 571
F.3d 388, 395 (5th Cir. 2009).

Id. at 446. The "stringent standard" of deliberate indifference,
which requires that a state actor disregard "a known or obvious
consequence of his actions" and often requires a pattern of similar
constitutional violations, is necessary to avoid turning failure
to train claims into "*de facto respondeat superior* liability."
Id. at 446-47 (citation and internal quotation marks omitted).
That a singular error was made in the records department did not
suffice to show that Epps's actions were objectively unreasonable
and, thus, he was entitled to qualified immunity on Porter's
failure to promulgate policy and failure to train/supervise
claims. Id. at 447-48 (there was no evidence showing that Epps's
policies or lack of policies were unreasonable; indeed, Epps could
not recall other incidents in which persons had been kept beyond
their sentences because of records department errors and Porter
presented no evidence of similar false imprisonments).

Taking as true his allegations, Mr. Traweek has plausibly
alleged that his constitutional right to timely release was
violated by both the defendants. There is no dispute that
Traweek's incarceration 20 days beyond the term of his court-
ordered sentence implicates the due process clause. LeBlanc and
Jones are entitled to qualified immunity unless Traweek has alleged

facts establishing that they violated his constitutional right to timely release and their actions were objectively unreasonable in light of clearly established law.

Mr. Traweek has alleged facts sufficient to overcome LeBlanc's and Jones's assertions of qualified immunity at the pleadings stage. Mr. Traweek alleges his paperwork (including the OPSO-prepared Letter of Credit, which was created on May 3 and showed he had served his entire seven-month sentence) had not been sent to DOC by OPSO until Thursday, May 17, 2018. That paperwork sat at DOC unreviewed until Monday, May 21, when Ashley Jones "began computing" Traweek's credit and "performing other searches relevant to his release." Notwithstanding Mr. Traweek's allegations indicating that his paperwork and Letter of Credit when compared to his criminal court judgment on its face obviously entitled him to immediate release, it was not until sometime later the next day, Tuesday, May 22, after Traweek's counsel filed a petition for habeas corpus, that Ms. Jones created Mr. Traweek's Certificate of Release; he was released on 3:00 p.m. that day. Mr. Traweek alleges that LeBlanc and the DOC have "a well-documented pattern of overdetention." Mr. Traweek specifically alleges that:

- four DOC employees testified in other cases that they frequently encounter inmates who are eligible for immediate release and that the DOC staff have discovered at least one

32

or two cases each week of inmates who have been overdetained and eligible for immediate release;

- DOC's counsel, Attorney General Jeff Landry, wrote an op-ed stating that there "is a layer of incompetence so deep that the Corrections Department doesn't know where a prisoner is on any given day of the week or when he should actually be released from prison";

- LeBlanc himself championed a review project, Lean Six Sigma, which found that, as of January 2012, the DOC had a "1446 backlog of cases to have time computed," resulting in an average processing delay of 110 days and once those inmates had their time calculated, more than 83% were eligible for immediate release;

- Interventions by the Lean Six Sigma reduced but did not eliminate the problem: the average days of overdetained inmates due for immediate release was reduced from 71.7 to 60.52 days;

- LeBlanc and DOC still did not fix the overdetention problem, as determined by an October 2017 audit, reporting basic data errors at the DOC at a rate of 26 errors per 100 inmates and reporting that staff used different methods to calculate the release dates on the same offender with results differing by 186 days;

- The DOC's own 2017 investigation found that it had "an average of 200 cases per month considered an 'immediate release' due to...deficiencies"

- LeBlanc admitted that there has not been a single example of discipline or adverse employment activity for DOC employees who have incorrectly computed sentences or release dates from 2000 to the present.

*a.*

LeBlanc's § 1983 individual capacity liability is predicated solely on his supervisory role as Secretary of DOC; there are no allegations that he affirmatively participated in the acts that caused Mr. Traweek's constitutional deprivation. Thus, LeBlanc is only liable under § 1983 if Mr. Traweek plausibly alleged that he

implemented unconstitutional (or failed to implement) policies that causally resulted in his overdetention. Mr. Traweek contends that his pattern allegations overcome LeBlanc's assertion of qualified immunity and that another Section of this Court has determined that similar allegations suffice to allege a pattern of overdetention at the DOC of which LeBlanc was aware but nonetheless acted with deliberate indifference by failing to discipline or train employees or to implement any policy to correct the unconstitutional problem. See Grant v. Gusman, No. 17-2792, 2018 WL 3869494, at *10 (E.D. La. Aug. 14, 2018)(Brown, C.J.). The Court agrees. Mr. Traweek's allegations regarding DOC's pattern of overdetention and LeBlanc's deliberate failure to act or implement policies addressing the overdetention problem suffice to overcome LeBlanc's invocation of qualified immunity. Mr. Traweek alleges that the DOC's system of administrative processing, in practice, amounts to a policy of deliberate indifference. It is alleged that LeBlanc has known about the DOC's pattern of overdetention for years and yet has failed to adopt policies to correct this problem and that this failure to adopt training or disciplinary policies to address it constitutes deliberate indifference to MR. Traweek's constitutional right to timely release. Mr. Traweek also alleges that, consistent with the known delays inherent in processing releases at DOC, it took DOC four

days to even begin "computing" Traweek's time and then another day to effect his release. This suffices to overcome LeBlanc's invocation of qualified immunity at the pleadings stage.

*b.*

Ms. Jones's individual capacity liability is predicated on her conduct in processing Traweek's paperwork and delaying the preparation of his certificate of release until the day after she reviewed his paperwork. Mr. Traweek contends that controlling precedent renders it beyond debate that any reasonable official would know that failing to process Traweek's release within at least several hours or at most several days of receiving paperwork making it obvious that he was overdue for release violated his Fourteenth Amendment right to timely release. Ms. Jones argues that she acted objectively reasonably by calculating Traweek's credit and issuing his certificate of release within a one-day period. "[A]ll Ms. Jones had to do," Mr. Traweek counters, "was compare Mr. Traweek's sentence to his jail credit letter to see that his sentence was equal to his period of pre-trial detention. That could take five minutes or less." Mr. Traweek alleges that it took her a day or more[22] to process his release, which ultimately

---

[22] Mr. Traweek notes that he alleges that the DOC received his paperwork four days before Jones reviewed it. Absent discovery, Mr. Traweek says he does not know whether the papers sat on her desk unreviewed for a week.

may be deemed unreasonable by the trier of fact in the context here, where a jailer lacks discretion to keep in custody a prisoner entitled to release.

Ms. Jones argues that Mr. Traweek's allegations fail to overcome her assertion of qualified immunity because <u>Porter v. Epps</u> does not clearly establish that taking some time less than 24 hours to process an inmate's release constitutes deliberate indifference. To be sure, <u>Porter v. Epps</u> does not directly speak to what amount of time is reasonable for a jailer to process an inmate's release and <u>Whirl</u> suggests that the administrative process cannot be expected to be instantaneous. However, Mr. Traweek identifies a body of persuasive authority that clearly establishes that what amount of time is reasonable is context-specific such that continuing to detain an inmate entitled to release for as few as several hours might be unreasonable as a matter of law.

That an inmate has a due process right to "timely" release from custody after a judicial determination that he is entitled to release begs the question: how much time is reasonable and how much tolerance is there for administrative delay attendant to processing an inmate's release? "Courts have not settled on any concrete number of permissible *hours* of delay in the context of post-release detentions." <u>Berry v. Baca</u>, 379 F.3d 764, 771 (9th

Cir. 2004)(emphasis added). Persuasive authorities have declined to endorse a presumptive reasonable number of hours. See, e.g., Berry v. Baca, 379 F.3d 764 (9th Cir. 2004)(reversing district court's grant of summary judgment dismissing official capacity claims, finding a fact issue as to whether application of county policies which resulted in 29-hour overdetentions was unreasonable under the circumstances and thus amounted to a policy of deliberate indifference to arrestees' constitutional rights); Davis v. Hall, 375 F.3d 703, 719-20 (8th Cir. 2004)(affirming denial of summary judgment as to those defendants invoking qualified immunity who had knowledge of the court order calling for inmate's release but nonetheless failed to act and noting that "even a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment."); Brass v. Cty. Of Los Angeles, 328 F.3d 1192, 1201-02 (9th Cir. 2003)(affirming dismissal of arrestee's Monell claim for failure to state a claim, finding that the 39-hour delay resulting from the discretionary custom of processing court-ordered releases at the end of the processing day after it had processed all other releases did not unreasonably violate his constitutional rights and acknowledging that the Fourteenth Amendment "permits a reasonable postponement of a prisoner's release" to allow time for processing); cf. Lewis v. O'Grady, 853

37

F.2d 1366 (7th Cir. 1988)(reversing district court's order granting a directed verdict in favor of the sheriff sued in his official capacity and remanding for the jury to consider whether the 11 hours it took the sheriff to discharge Lewis was reasonable, but granting summary judgment in favor of defendants sued in their individual capacities on the basis of qualified immunity); Barnes v. District of Columbia, 793 F. Supp. 2d 260, 276 (D.D.C. 2011)("courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon [applied in the Fourth Amendment context to detentions pending probable cause determinations after warrantless arrests in [Cnty. Of Riverside v. McLaughlin, 500 U.S. 44 (1991).]").

Insofar as Ms. Jones argues that, as a matter of law, she could not be instantly liable for Mr. Traweek's overdetention, of course the Court agrees. See, e.g., Whirl v. Kern, 407 F.2d 781, 792 (5th Cir. 1968)(a jailer does not commit "an instant tort at the moment" the prisoner should have been released, but, rather, a jailer's "duty to [her] prisoner is not breached until the expiration of a reasonable time for the proper ascertainment of the authority upon which his prisoner is detained"). However, the Court declines Ms. Jones's invitation to embrace a *per se* rule of reasonableness where persuasive case literature (which Jones

38

ignores) has reasonably declined to adopt one.[23]  At this stage of the proceedings, the Court need only consider the alleged facts and ask whether Mr. Traweek's allegations overcome her assertion of qualified immunity; that is, whether Mr. Traweek alleges facts that, if proved, demonstrate that Ms. Jones acted objectively unreasonably in light of clearly established law.  Although Ms. Jones suggests that the plaintiff fails to allege that she knew he was being detained beyond his release date, Mr. Traweek indeed alleges facts suggesting that she subjectively knew or should have known that he was entitled to release once she saw his paperwork on May 21, but that she nevertheless failed to generate his certificate of release until the afternoon of the following day. Mr. Traweek alleges facts, if proved, that a simple comparison of

---

[23] Ms. Jones contends that Mr. Traweek alleges that, within one day of beginning the process of calculating Mr. Traweek's release credit, she issued a Certificate of Release that allowed him to be released at 3:00 p.m. the next day.  And yet she then makes the puzzling argument that, to state that she was liable for overdetention "would necessarily require that the Court draw the conclusion that even if Defendant Jones had received and processed the Plaintiff's claim in less than one minute, she would still be liable for the approximately one minute of overdetention."  Not so.  Critical to determining whether Traweek's allegations overcome Jones's assertion of qualified immunity is determining the objective reasonableness of Jones' conduct in the context of the alleged circumstances confronting Jones at the time.  At the motion to dismiss stage, the Court need not indulge Ms. Jones's hypothetical; rather, the allegations of the complaint -- that she failed to generate a certificate of release on the day that she discovered that Mr. Traweek was overdue to be released -- are taken as true.

the jail credit letter to Mr. Traweek's sentence made it
unmistakably clear that he had spent more than two weeks in custody
beyond his court-ordered release date; it is Ms. Jones's failure
to certify his release despite her knowledge that he was overdue
for release that he claims constitutes deliberate indifference to
a known consequence of her action, which violated his clearly
established right to timely release.[24]  In essence, Mr. Traweek
alleges that Ms. Jones's conduct delayed the processing of his
release and that this action (or inaction) was objectively
unreasonable in light of clearly established law; he alleges facts
that, if proved, demonstrate that Ms. Jones was plainly incompetent
or knowingly violated the law.  This suffices to overcome her
invocation of qualified immunity at this stage of the proceedings.

Accordingly, for the foregoing reasons, IT IS ORDERED: that
the defendants' motion to dismiss GRANTED, in part, as to the
plaintiff's claims against Jones and LeBlanc in their official
capacities, and DENIED, in part, as to the defendants' Heck
argument and as to their invocation of qualified immunity as to

---

[24] Although "no one is entitled to an error-free bureaucracy," West
v. Tillman, 496 F.3d 1321, 1333 (11th Cir. 2007), Mr. Traweek does
not allege that Ms. Jones erred or was merely negligent. He alleges
that she knew he had been lingering in custody past his release
date and still failed in her ministerial duty to certify his
release until the next day.  Should discovery reveal that Jones
was merely negligent, the Court shall have another opportunity to
assess qualified immunity.

the plaintiff's Section 1983 claims against LeBlanc and Jones in their individual capacities.[25]   IT IS FURTHER ORDERED: that the defendants' motion to stay discovery is DENIED as moot.

New Orleans, Louisiana, October 23, 2019

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[25] The defendants did not move to dismiss the plaintiff's state law claims.