## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JOHNNY TRAWEEK, | ) Civil Action No. 19-1384 |
| | ) |
| Plaintiff, | ) Section "F" 1 |
| v. | ) |
| | ) |
| MARLIN GUSMAN, *et al.* | ) |
| | ) |
| Defendants. | ) |

## THIRD AMENDED COMPLAINT

COMES NOW Plaintiff Johnny Traweek, by and through undersigned counsel, to file this Third Amended Complaint against the Defendants. In support, he states the following:

### I.   INTRODUCTION

1.      This case arises out of Defendants' unlawful imprisonment of Johnny Traweek for 20 days beyond his court-ordered release date.

2.      On October 2, 2017, Johnny Traweek was arrested in New Orleans and sent to Orleans Parish Prison.

3.      He could not make bail, and so Mr. Traweek spent the next seven months in jail.

4.      On May 2, 2018, Mr. Traweek appeared in front of Judge Benedict J. Willard and pled guilty to a battery charge.

5.      Judge Willard sentenced Mr. Traweek to seven months in the custody of the Orleans Parish Sheriff, with credit for time served.

6.      Because Mr. Traweek received a seven-month credit-for-time-served sentence and had been in prison for seven months already, he should have been immediately released.

7.      But Mr. Traweek was not released.

8.      On May 7, 2018, five days after Mr. Traweek was sentenced to time served, Mr.

Traweek's attorney, Stas Moroz of the Orleans Public Defenders Office sent an email stating that

Mr. Traweek was full term, eligible for release, and asking when he would be released. He

followed up on that email on May 8, 2018, ando sent another email to Monique Filmore and

Blake Arcuri at the Orleans Parish Sheriff's Office asking, in part, why Mr. Traweek was still in

Orleans Parish Prison on May 9, 2018. Mr. Moroz also emailed Tracy Dibenedetto, the

Executive Management Officer at DOC, on May 8, 2019, and she responded on May 9, 2019 that

she had not received anything about Mr. Traweek from the DOC. Ms. Dibenedetto's job duties

included overseeing administrative remedy procedure, policy implementation and legislation. As

part of her job duties, she was an expert in all areas of the prisons, including time calculation.

She was a point of contact for defense counsel seeking assistance with time calculation of

inmates.

9.      Ms. Filmore also responded to Mr. Moroz's email on May 9, 2018 that "First of

all Johnny Traweek was just sentenced on 5/2/18 so his paperwork has not went up yet." On May

14, 2018, Mr. Moroz again contacted Ms. Filmore and Mr. Arcuri, stating: "Mr. Traweek is still

in jail. Could you please ensure that he is released? I understand that the paperwork has to be

send to DOC, but he has now been detained 12 days past his full term date." Mr. Arcuri

responded that the Orleans Parish Sheriff's Office could not release Mr. Traweek since he was a

Department of Corrections inmate.[1] Ms. Filmore responded that "He can't get released until

DOC sends him a release. The whole process takes about 2 weeks. He has to wait!!!!"

---

[1] This was wrong. The judge ordered Mr. Traweek to a sentence in the custody of the Sheriff. The court's minutes incorrectly suggested that Mr. Traweek was to serve his sentence in the custody of the State.  But it doesn't matter whose custody Mr. Traweek was supposed to be in - the Sheriff's Office *neither* released Mr. Traweek *nor* delivered him to the custody of the State. They just continued to hold him.

10.     But on May 16, 2018, Ms. Dibenedetto of the Department of Corrections confirmed that neither the DOC nor the Orleans Sheriff's office had not even **begun** the process of transferring Mr. Traweek.

11.     On May 17, 2018, for the first time, the Department of Corrections received paperwork regarding Mr. Traweek's release from OPSO.

12.     On May 21, 2018, Ashley Jones, a Department of Corrections employee, began computing Mr. Traweek's credit for time serve, and performing other searches relevant to his release. She did not complete these until May 22, 2018. Another DOC employee instructed the OPSO on May 21st that Mr. Traweek was full term, and to be released on May 22, 2018 on the afternoon of May 21, 2018.

13.     On May 22, 2018, Mr. Moroz filed a Writ of Habeas Corpus and Motion for Immediate Release on behalf of Mr. Traweek.

14.     Later on May 22, 2018, Ms. Jones created Mr. Traweek's Certificate of Release.

15.     At approximately 3:00 pm on May 22, 2018, Mr. Traweek was finally released.

16.     The law is clear that jailors may not imprison inmates beyond their sentences. *See Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) ("There is a Clearly Established Right to Timely Release from Prison").

17.     Once a person's sentence has been served, jailors have a reasonable time in which to process and release the individual. Courts have repeatedly held that any time in excess of 48 hours is considered unreasonable. Any detention that exceeds that 48-hour timeframe is considered "overdetention" and constitutes a violation of the individual's state and federal constitutional rights. *See Powell v. Barrett*, 376 F. Supp. 2d 1340, 1354 (N.D.Ga. 2005) ("The Court has been unable to find any case, whether within or outside of the Eleventh Circuit, in

which the detainment of a properly identified individual for *days* beyond his scheduled release date was held constitutionally permissible."). In some cases, juries have found overdentions as short as thirty minutes to be a constitutional violation. *Davis v. Hall*, 375 F.3d 703, 713 (8th Cir. 2004).

18.     Mr. Traweek endured approximately 20 days of incarceration at Orleans Parish Prison beyond his lawful release date as a direct result of Defendants' failure to timely process his paperwork, causing him to suffer emotional and other damages.

## II.     JURISDICTION AND VENUE

19.     Plaintiff's claim arises under the Constitution and the laws of the United States. This Court has jurisdiction over Plaintiff's claims of federal rights violations, enforceable under the Fourteenth Amendment and 42 U.S.C. § 1983, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). This Court has jurisdiction over Plaintiff's Louisiana false imprisonment claim in accordance with 28 U.S.C. § 1367.

20.     The venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claim occurred in Orleans Parish, Louisiana situated in the Eastern District of Louisiana.

## III.     THE PARTIES

*Plaintiff*

21.     Plaintiff **Johnny Traweek** is of suitable age and capacity to file this suit. At all relevant time during this suit, Plaintiff was a resident of Orleans Parish in the Eastern District of Louisiana.

*Defendants*

22.     Defendant **Marlin Gusman** is the Sheriff for the Orleans Parish Sheriff's Office and a final policymaker. He is sued in his individual and official capacity. On information and belief, he is domiciled in Orleans Parish in the Eastern District of Louisiana.

23.     Defendant **Sheila Crader** is a supervisor in the Orleans Parish Sheriff's Office and the direct supervisor of Monique Filmore. She is sued in her individual and official capacity. On information and belief, she is domiciled in Orleans Parish in the Eastern District of Louisiana.

24.     Defendant **Monique Filmore** is an employee of the Orleans Parish Sheriff's Office. She is sued in her individual and official capacity. On information and belief, she is domiciled in Orleans Parish in the Eastern District of Louisiana.

25.     Defendant **James LeBlanc**, Secretary of the Louisiana Department of Public Safety and Corrections and is the final policy maker for the Department. He is sued in his individual capacity.

26.     Defendant **Ashley Jones** is a Louisiana Department of Public Safety and Corrections employee. She is the Corrections ARDC Specialist. She is sued in her individual capacity. On information and belief, she is domiciled in Orleans Parish in the Eastern District of Louisiana.

27.     Defendant **Tracy Dibenedetto** was a Louisiana Department of Public Safety and Corrections employee. She is sued in her individual capacity. On information and belief, she is domiciled in East Baton Rouge Parish.

28.     Defendants **Does 1 to 10** are as-yet unknown individuals or entities involved in the overdetention of Johnny Traweek. They are sued in their official and individual capacities.

## IV.    FACTS

**A.  Johnny Traweek was sentenced to seven months with credit for time served for aggravated assault. His release date should have been May 2, 2018, but he was imprisoned until May 22, 2018.**

29.  On October 2, 2017, Johnny Traweek was arrested in New Orleans under suspicion of aggravated battery and sent to Orleans Parish Prison.

30.  Mr. Traweek could not post bond and remained incarcerated at Orleans Parish Prison.

31.  On May 2, 2018, Mr. Traweek appeared before Judge Benedict J. Willard and pled guilty to an aggravated battery charge.

32.  At the hearing, Judge Willard sentenced Mr. Traweek to "Seven months Orleans Parish Prison. Give him credit for time served, all to run concurrent. State has agreed to no multiple bill. This does qualify as a crime of violence."

33.  Despite being sentenced to Orleans Parish Prison, Mr. Traweek's sentence was entered on Docketmaster as in the custody of the Department of Corrections, reading: ">SENTENCE:  >AS TO COUNT 1,  >7 MONTHS, AT DOC  >CONCURRENT WITH THESE CASES: ANY/ALL SENTENCES NOW SERVING.  >INCLUDES A CRIME OF VIOLENCE.  >CREDIT FOR TIME SERVED."

34.  After being told that he was set for release, Mr. Traweek returned to Orleans Parish Prison where he gave away all his commissary items and other possessions in anticipation of his release.

35.  The next morning, an Orleans Parish Prison guard told Mr. Traweek that he could not be released until they received paperwork from the Department of Corrections.

36.  On May 3, 2018, the Orleans Parish Sheriff's Office created a Letter of Credit for Mr. Traweek showing that he served his entire seven-month sentence.

37.     The morning of May 7, 2018, Stas Moroz of the Orleans Public Defenders Office emailed Mr. Acuri: "I'm writing about Johnny Traweek, DOB 4/18/1952, Folder No. 2458584. He pled to 7 months DOC (he's been in since 10/2/17) so he's already past his full term date. I just called records and was told that the only other hold was a medical hold. I understand he was sentenced to DOC time, but since he's past his full term date and there's no longer a basis for his detention, could you please help expedite his release?"

38.     Having received no response to his previous email, on the morning of May 8, 2018, Mr. Moroz emailed Mr. Acuri again requesting an update.

39.     On May 8, 3019, Mr. Moroz emailed Tracy Dibenedetto, a Louisiana Department of Public Safety and Corrections Employee. The subject of the email was: "Johnny Traweek- in past full term date." In the email he further explained that "Johnny Traweek (DOB 4/18/1952), who is past his full term date . . .  was sentenced to 7 months DOC custody on 5/2/18 on case number 538-680 in Orleans Parish Criminal Court, Section C. He has been in custody since 10/2/17, so he has completed his full term sentence, but is still in custody. Could you please have his release expedited?"

40.     On May 9, 2019, Ms. Dibenedetto responded to Mr. Moroz's email: "same for him. Have not received anything from OPP."

41.     Also on May 9, 2018, , Mr. Moroz sent an email to Monique Filmore and Mr. Arcuri at the Orleans Parish Sheriff's Office asking, in part, why Mr. Traweek was still in Orleans Parish Prison. Among other things, Ms. Filmore was responsible for collecting, reviewing, processing, and transmitting paperwork for inmates to be release, including Mr. Traweek.

42.     Monique Filmore was supervised by Sheila Crader. Ms. Crader was responsible for ensuring that Ms. Filmore performed her job duties properly and responsible for supervising, disciplining, investigating and training Ms. Filmore in her performance of her job duties. Ms. Crader was also solely responsible for supervising pre-classification information for inmates. Ms. Crader was also responsible for getting inmate information and packets to the DOC to calculate their release dates.

43.     Ms. Filmore responded to Mr. Moroz's email: "First of all Johnny Traweek was just sentenced on 5/2/18 so his paperwork has not went up yet."

44.     One May 10, 2018, Mr. Traweek's DNA sample was taken.

45.     On May 14, 2018, Mr. Moroz again contacted Ms. Filmore and Mr. Arcuri, stating: "Mr. Traweek is still in jail. Could you please ensure that he is released? I understand that the paperwork has to be send to DOC, but he has now been detained 12 days past his full term date."

46.     Mr. Arcuri responded to Mr. Moroz's email that the Orleans Parish Sheriff's Office could not release Mr. Traweek since he was a Department of Corrections inmate. Ms. Filmore also responded to Mr. Moroz's email, saying: "He can't get released until DOC sends

---

**From:** Filmore, Monique <filmorem@opso.us>
**Sent:** Monday, May 14, 2018 11:26 AM
**To:** Stanislav Moroz
**Cc:** Arcuri, Blake
**Subject:** RE: Johnny Traweek, Rodney Hulbert

Sir,

He can't get released until DOC sends him a release.  The whole process takes about 2 weeks.  He has to wait!!!!

---

**From:** Stanislav Moroz [mailto:smoroz@opdla.org]
**Sent:** Monday, May 14, 2018 10:08 AM
**To:** Arcuri, Blake
**Cc:** Filmore, Monique
**Subject:** Re: Johnny Traweek, Rodney Hulbert

Mr. Arcuri and Ms. Filmore:

Mr. Traweek is still in jail. Could you please ensure that he is released? I understand that the paperwork has to be sent to DOC, but he has now been detained 12 days past his full term date.

Thank you,

Stas Moroz
Orleans Public Defenders

---

him a release. The whole process takes about 2 weeks. He has to wait!!!!" See Figure 1, below.

**Figure 1:** Email correspondence between Traweek's lawyer and the Sheriff's office.

47.     On May 15, 2018, Mr. Moroz contacted Ms. DiBenedetto again and learned that Mr. Traweek's information still had not been sent to the DOC, despite having been overdetained two weeks at that point.

48.     On May 17, 2018, for the first time, the Department of Corrections received paperwork regarding Mr. Traweek's release from OPSO.

9

49.     On May 21, 2018, Ashley Jones, a Department of Corrections employee, began computing Mr. Traweek's credit for time serve, and performing other searches relevant to his release. She did not complete these until May 22, 2018.

50.     Also on May 21, 2018, at 2:50 pm DOC employee Sharita Spears wrote to Defendants Filmore and Crader to "[p]lease remove  the above offender from the orders, he will be a full-term release on tomorrow" and emailed again at 3:14 pm noting: "Johnny Traweek, 733115   Full-Term Release on 5/22/18."

51.     On May 22, 2018, Mr. Moroz filed a Writ of Habeas Corpus, Motion for Immediate Release, and Motion to Amend/Reconsider Sentence to convert the Department of Corrections time to Orleans Parish Prison time on behalf of Mr. Traweek.

52.     On May 22, 2018, Ms. Jones created Mr. Traweek's Certificate of Release.

53.     At approximately 3:00 pm on May 22, 2018, Mr. Traweek was finally released, 20 days past the day he should have been a free man.

54.     Mr. Traweek's depression and anxiety issues were also exacerbated by his stay in Orleans Parish Prison, especially during his period of overdetention during which he did not understand why he was still incarcerated or how long it would be until he would be released.

**C.     Defendants have exhibited a continuing pattern of overdetention in Orleans Parish.**

55.     Defendants have a policy and practice of holding certain people indefinitely – even those they know should be free.

56.     When person in Orleans Parish is sentenced to the custody of the Department of Corrections, OPSO does not immediately hand that person over to the DOC. Instead, it is OPSO policy drive that person's paperwork to the DOC and then hold the person indefinitely in OPP until the DOC sends for them to be processed and have their sentence calculated. This sequence

can take weeks or more, and OPSO does not deviate from it even when they know that a person is entitled to immediate release.

57.     As a result of this and other policies and practices, the Orleans Parish Sheriff's Office has routinely overdetained inmates. Often inmates are illegally held, and then released immediately after their attorneys file *habeas corpus* motions. Some non-exclusive examples include:

58.     <u>Rodney Grant</u>. On June 30, 2016, Rodney appeared for arraignment in Orleans Parish Criminal District Court on a fifteen-year-old warrant. Judge Camille Buras allowed Rodney to plead guilty to a one-year sentence, with credit for time served for seven years he had served at Dixon Correctional Facility. Because seven years is more than one year, Rodney's sentence was immediately complete and he should have walked free that day or the next. But even though they knew that Rodney "shouldn't have to actually serve any time," OPSO did not release Rodney. Instead, they held him at the Orleans Parish Prison for thirteen days before handing him over to the DOC.

59.     <u>Antonio Ocampo</u>: On February 20, 2010, Antonio Ocampo was arrested in Orleans Parish. He plead guilty to two counts of simple battery, and was sentenced to two concurrent five-month sentences and given credit for time served. His sentence was completed on August 12, 2010. At some point, an ICE hold was issued for Mr. Ocampo, which could have extended his incarceration by 48 hours. But the Orleans Parish Sheriff continued to hold him until November 15, 2010, when a judge of the U.S. District Court of Eastern Louisiana granted the writ of habeas corpus of Antonio Ocampo. The judge held that the Sheriff had unlawfully detained Ocampo, and ordered Ocampo's immediate release. Ocampo v. Gusman, No. 10-04309 (Nov. 15, 2010). This Court held that "if the prisoner was entitled to be released in August, to

hold him past the due date of the detainer would violate his due process right because he was at that point entitled to be released."  During the period of his overdetention, Mr. Ocampo filed repeated written grievances in which he requested to be released.

60.    Mario Cacho: Mario Cacho completed his sentence for disturbing the peace, New Orleans Municipal Code 54-405, on August 21, 2009. Upon expiration of his criminal sentence, Orleans Parish Sheriff Gusman continued to hold Plaintiff Cacho in his custody. Cacho remained in the custody of Orleans Parish Sheriff Gusman until February 5, 2010, on the purported basis of a 48-hour ICE hold. Despite filing a grievance with Orleans Parish Prison officials requesting release, Mr. Cacho was only able to secure his release from Orleans Parish Prison by filing a federal civil rights complaint with the Department of Homeland Security's Office for Civil Rights and Civil Liberties.

61.    Eddie Copelin: On December 5, 2015, Eddie Copelin was arrested and placed in the custody of the Orleans Parish Sheriff's office. On October 14, 2016, Mr. Copelin was sentenced in Orleans Parish Case No. 527-992 to a two-year sentence, with one year suspended and one year executory, credit for time served. Thus, even without accounting for good-time credit or other sentence reductions, Mr. Copelin's sentence should have been completed as of December 5, 2016. But Mr. Copelin was not released at that time; he continued to be held at River Bend. On January 12, 2017, the Roderick & Solange MacArthur Justice Center filed a Petition for Writ of Habeas Corpus on Mr. Copelin's behalf. By the next day, Mr. Copelin was released.  He has filed a civil suit – *Copelin v. Gusman*, M. D. La. 17-cv-602.

62.    Phillip Dominick III. Dominick was arrested in 2010. He was a pretrial detainee from 2010 to 2016. On Sept. 1, 2016, he was sentenced to serve five years DOC (state) time on September 1, 2016, in case no. 499077. The minute entry from this date explicitly provides that

he is given credit for time served from June 1, 2010, through June 1, 2015. Because Plaintiff
Dominick had been in custody for longer than five years, he was immediately entitled to release.
Instead, OPSO sent him to River Bend. Defendants did not release Mr. Dominick until
December 7, 2016. He has filed a civil suit – *Copelin v. Gusman*, M. D. La. 17-cv-602.

63.     Donald Guidry. On December 23, 2014, Mr. Guidry was arrested and placed in
the custody of the Orleans Parish Sheriff's Office; this arrest is associated with Orleans Parish
Criminal District Court case no. 523577.  On July 12, 2016 the Orleans Parish Criminal District
Court sentenced Mr. Guidry to serve five years DOC (state) time, three years suspended. The
Court awarded him credit for time served from December 23, 2014.  Having been awarded credit
for time served from his arrest, and being eligible for good time under state law, Mr. Guidry was
entitled to release on September 4, 2016. But OPSO chose to "release" him to East Carroll Parish
without taking the steps necessary to ensure his September 2016 release. OPSO did not process
Mr. Guidry's "DOC letter of credit" until January 13, 2017. Defendants did not release Mr.
Guidry until January 24, 2017.

64.     Jessie Crittindon: On July 2, 2014, Jessie Crittindon was arrested and placed in
the custody of the Orleans Parish Sheriff's office. On August 2, 2016, Mr. Crittindon was
sentenced to two years in case number 521-975, and six months of concurrent time win Case No.
521-590, both with credit for time served. Because Mr. Crittindon had been in custody for longer
than two years, he should have been immediately released. But he continued to be held at the
River Bend Detention Center. Over the next six months, Mr. Crittindon's family repeatedly
called the Orleans Parish Sheriff's office in an effort to secure his release. His mother contacted
East Carroll Parish (where  OPSO was holding him) approximately once a week. The family was
told that Mr. Crittondon was eligible for release, but his paperwork was "being processed." On

January 12, 2017, the Roderick & Solange MacArthur Justice Center filed a Petition for Writ of Habeas Corpus on Mr. Crittindon's behalf. By the next day, Mr. Crittindon was released. He has filed a civil suit – *Crittindon v. Gusman*, M.D. La. 17-cv-512.

65.     Leon Burse. On July 8, 2015, Mr. Burse was arrested and placed in OPSO custody. On August 8, 2016, he was sentenced to serve five (5) years DOC (state) time, four (4) years suspended in case no. 526057. The Court awarded him credit for time served. Because Plaintiff Burse had been in custody for longer than one year, he was immediately eligible for release. On August 18, 2016, ten (10) days after Mr. Burse was entitled to release, the OPSO Defendants inexplicably transported Mr. Burse to the River Bend Detention Center. Defendants did not release Mr. Burse until January 11, 2017. Because of the actions and inactions of the Defendants, he was held in custody 156 days (over five months) past his eligible release date. *Crittindon*, R. Doc. 1 at 1. He has filed a civil suit – *Crittindon v. Gusman*, M.D. La. 17-cv-512.

66.     Others Similarly Situated to Copelin and Crittindon: According to the Times-Picayune, "attorneys with the Roderick and Solange MacArthur Justice Center say they believe more than a 100 individuals who were sentenced in New Orleans but are being held out of parish at the Riverbend Detention Center in East Carroll Parish are similarly affected by paperwork problems. Some of those other individuals are being held past their release dates, like Crittindon and Copelin, the attorneys say, and others are being held without any legal classification." Emily Lane, *2 freed after being illegally jailed, but 'over 100' others affected by missing paperwork: lawyers.* New Orleans Times-Picayune, Jan. 13, 2017. Perry Stagg, Deputy Assistant Secretary of the Department of Public Safety & Corrections, acknowledged this, saying "we know there are others." *Id.*

67.     <u>Monica Jenkins</u>: On December 7, 2016, Monica Jenkins was arrested in Orleans Parish on one count of misdemeanor aggravated assault. She came to a first appearance in municipal court on December 8, 2017, where she pled guilty and was ordered released. As of December 13, 2016, she was still in Defendants' custody.  It is unknown when she was finally released.

68.     <u>Garland Johnson</u>: On October 7th, 2016, Mr. Garland was arrested on two separate municipal cases (1203262 and 1201624) in Orleans Parish. The court ordered him released to participate in CAP, the municipal court mental health program. On October 13th, Mr. Garland missed a CAP check-in, and so an attachment is issued for him. The same day, he was arrested on a new charge. On October 14, he was arraigned for the new charge. The court ordered him released to the hospital because he was so mentally ill. Instead of taking him to the hospital, the Sheriff rebooked him for the attachment related to the missed CAP check-in and shipped him out of the parish for detention. The Sheriff stopped bringing him to court dates, and so Mr. Johnson sat in prison for six months– even though a judge ordered him released for mental health treatment. He was only released in March 2017 when his mother convinced attorneys intervene on his behalf.

69.     <u>Jonathan Square</u>: On May 2, 2017, Mr. Square plead to probation. As of May 5, 2017, he was still in Defendants' custody. It is unknown when he was finally released.

70.     <u>Melvin Sylvan</u>: On April 25, 2017, Melvin Sylvan plead guilty and was given credit for time served. The judge gave him a sentence less than the time he had served. His minute entry expressly stated that "release ordered" and that the executory portion of his sentence was "satisfied." The next day, Mr. Sylvan's attorney noted that he hadn't been released

and contacted counsel for the Sheriff. Melvin was released at approximately 5:30 p.m. on April 26, 2017.

71.     <u>Quinton Cruse</u>: On April 8, 2017, Mr. Cruse was to be released from Orleans Parish Sheriff Office's custody. As of May 15, 2017, he was still in OPSO custody at the East Carroll Parish Detention Center. It is unknown when he was finally released.

72.     <u>Lonnie Kent</u>: On September 18, 2017, Lonnie Kent (Folder: 2454366) was given a sentence that included 120 days executory in OPP. That was case No. 535668 in Section F. He got credit for time served, and had already served three months by that point. He should have been released on October 17, 2017. He was actually released on October 19, 2017, at 11:30 a.m. Defense counsel contacted the Sheriff's lawyer and had to file a Petition for Writ of Habeas Corpus before Mr. Kent was released.

73.     <u>Defendants continue to detain additional individuals days, weeks, and months past their release date</u> in Orleans Parish.

**D.     James LeBlanc, and the Louisiana Department of Safety and Corrections, have exhibited a continuing pattern of overdetention.**

74.     The Department of Public Safety & Corrections has a well-documented pattern of overdetention. For example, in *Chowns v. LeBlanc*, La. 37th JDC 26-932, DOC employees testified as to the consistent overdetention they observed:

     a.     Tracy Dibenetto, a former DOC employee, testified that DOC staff have discovered approximately <u>one case of overdetention per week for the last nine years</u>. Ms. Dibenetto also testified that inmates are sometimes incorrectly incarcerated for periods of up to a year.

     b.     Henry Goines, a DOC employee whose job was to review sentence computations for the assistant secretary, testified that he typically discovered "one or two [inmates] a week" who were eligible for immediate release.

     c.     Cheryl Schexnayder, a DOC records analyst, testified that in the course of her job, she had looked at inmates' sentences and found that they had been done wrong

and the inmate was entitled to immediate release.

     d.   Sonja Riddick, a DOC employee, responded to the question: "Did you ever find a time when you looked at an inmate's records and you say, this man should be out now?" with the answer: "<u>Oh yes</u>."

75.    The DOC's own counsel has admitted to the DOC's pattern of overdetention. On March 8, 2018, Attorney General Jeff Landry wrote an op-ed conceding that there "is a layer of incompetence so deep that the Corrections Department doesn't know where a prisoner is on any given day of the week or when he should actually be released from prison."[2]

76.    Similarly, Defendant LeBlanc has presided over and been aware of a pattern of overdetention.

77.    In 2012, the Louisiana DOC had a team of a dozen of its staff perform a "Lean Six Sigma"[3] review of its inmate time calculation processes.

78.    Secretary James LeBlanc was one of the three "champions" of the project.

79.    The Lean Six Sigma review found that as of January 2012, the DOC had a "1446 backlog of cases to have time computed," resulting in an average processing delay of 110 days. And once those inmates had their time finally calculated, more than 83% of them were eligible for "immediate release upon processing . . . due to an earlier release date."

80.    As a result, the team found that in May 2012, there was an average of 71.7 "Overdue days" for inmates eligible for immediate release. Interventions by the Lean Six Sigma team reduced, but did not eliminate the problem. After their interventions, the "average # of days each Immediate Release is past their release date" was reduced from71.7 to 60.52 days. The team

---

[2] Sen. John Kennedy and Atty. Gen. Jeff Landry, *Criminal justice reform actually hurting public safety*, The Advocate (Mar. 8, 2018) (emphasis added).

[3] "Lean Six Sigma is a team-focused managerial approach that seeks to improve performance by eliminating waste and defects." Will Kenton, *Lean Six Sigma*, Investopedia.com (Feb. 5, 2018).

estimated that if the overdue time could be cut in half, it would save the state $3.7 million per year.

81.     Despite the cost savings, the DOC did not fix the overdetention problem. In October 2017, the Louisiana Legislative Auditor released a report detailing an audit it had conducted into the DOC. The report was entitled "Management of Offender Data: Processes for Ensuring Accuracy." The Auditor found a number of problems, including basic data errors at a rate of 26 errors per 100 inmates.

82.     Compounding this, the Auditor found that the "DOC's process for calculating offender release dates is inconsistent, which can result in errors."

83.     As a result, the Auditor found that "an offender could be held too long if the release date was miscalculated and not caught until shortly before release." For example, the Auditor "asked two DOC staff to calculate release dates on the same offender, and each staff used a different method to calculate the release date. The two results differed by 186 days."

84.     The DOC did its own investigation that year and came up with an enormously disturbing result: "In 2017, DPS&C had an average of **200 cases per month** considered an 'immediate release' due to these deficiencies."

85.     The DOC concluded that this pattern of overdetention was costing the state "$2.8M per year in housing costs alone."

86.     Despite all this, Secretary LeBlanc admitted that there has *not been a single example of* "discipline or adverse employment activity for DOC employees who have incorrectly computed sentences or release dates, from 2000 to the present."

87.     As a result, the problem continues to the current day. In February 2019, according general counsel for the Department of Corrections, "231 people across the state were affected.

18

Those people waited an average 44 days to be released after a judge ordered them free."

88.     After finding no remedy elsewhere, Petitioner has initiated this action.

## V.     CLAIMS FOR RELIEF

### Count One – Violation of Due Process Pursuant to U.S.C. 42 § 1983
### (All Defendants)

89.     The Due Process Clause of the Fourteenth Amendment is violated when a prisoner is incarcerated without legal authority. *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980).

90.     Even if a prisoner is lawfully detained at the beginning of their incarceration, holding that prisoner beyond the period of their lawful sentence is a due process violation. *Whirl v. Kern*, 407 F.2d 781, 791 (5th Cir. 1968); *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1351 (N. D. Ga. 2005) (detainee has constitutional right to be free from continued detention after it was or should have been known that he was entitled to release).

91.     Once a prisoner's lawful sentence has expired, a jailer is allowed a reasonable amount of time to process and release them, but that time must be well short of forty-eight hours to be considered reasonable. *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011) ("In recognition of these facts, courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon set out in *McLaughlin*."). Once a detainee is ordered to be released, there is substantially less tolerance for "administrative delay" than in the context of arrestees awaiting probable cause determinations. *See Berry v. Baca*, 379 F.3d 764, 771-72 (9th Cir. 2004); *Brass v. County of Los Angeles*, 328 F.3d 1192, 1202 (9th Cir.2003); *Powell v. Barrett*, 376 F.Supp.2d 1340, 1353 (N.D.Ga. 2005).

92.     Even within a 48-hour period, the question of reasonableness is often left to juries

and overdetentions as brief as 30 minutes have been found to violate the constitution. *See, e.g.,*

*Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001) (resulting in $100,000 jury verdict

(upheld on appeal) for plaintiff for 1 hour overdetention at court holding cell and 2 1⁄2 hours at

jail after release order); *Barnes, supra*, ("[E]ven a thirty-minute detention after being ordered

released could work a violation of a prisoner's constitutional rights under the Fourteenth

Amendment."); *Arline v. City of Jacksonville*, 359 F.Supp.2d 1300, 1310 (M.D.Fla.2005) (two

and a half hour detention following acquittal presented jury question under Fourth Amendment).

93.     Here, Mr. Traweek's lawful sentence expired on May 2, 2018, and he should have

been released from Orleans Parish Prison that day.

94.     Mr. Moroz contacted multiple employees of Orleans Parish Prison and the

Department of Corrections as well as filed a Writ of Habeas Corpus, a Motion for Immediate

Release, and a Motion to Amend/Reconsider Sentence to correct the violation, but Mr. Traweek

was detained until May 22, 2018, 20 days beyond the expiration of lawful detention.

95.     As a result of that overdention, Mr. Traweek suffered loss of liberty, great mental

anguish, humiliation, degradation, and emotional pain and suffering, and other grievous and

continuing injuries.

96.     By depriving Mr. Traweek of his fundamental right to liberty, Defendants

violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

As Defendants were acting under the color of state law, Plaintiff's claims are actionable under 42

U.S.C. § 1983.

97.     Defendants continue to persist in this illegal overdetention of individuals.

98.     Defendants actions were undertaken with malice and with reckless disregard for Plaintiff's rights.

## Count Two – Violations of the Louisiana Constitution
### (All Defendants)

99.     Article One, Section Two of the Louisiana Constitution of 1974 guarantees that "[n]o person shall be deprived of life, liberty, or property, except by due process of law."

100.     By reason of the same conduct that violated Mr. Traweek's federal constitutional rights, Defendants violated his state constitutional rights to liberty and due process.

101.     This conduct resulted in Mr. Traweek's overdetention and caused the, emotional, and pecuniary damages as described above and below.

102.     Defendants continue to engage in this unconstitutional conduct resulting in the over detention of other individuals.

## Count Three – State Law False Imprisonment
### (All Defendants)

103.     The tort of false imprisonment in Louisiana "occur[s] when one arrests and restrains another against his will without a warrant or other statutory authority. Simply stated, it is restraint without color of legal authority." 353 So.2d 969 (La., 1977); *see also Miller v. Desoto Regional Health Sys.*, 128 So.3d 649, 655-56 (La. App. 3 Cir. 2013). This has been distilled into "the following two essential elements: (1) detention of the person; and (2) the unlawfulness of the detention." *Thomas v. Gulotta* (M.D. La., 2017); *see also Kennedy v. Sheriff of E. Baton Rouge*, 935 So.2d 669, 690 (La. 2006).

104.     There is no need that the unlawful detention be an intentional act by Defendants or that there must be evidence of malice. *Fontenot v. Lavergne*, 365 So.2d 1168 (La.App. 3d Cir.1978); *Prisk v. Palazzo*, 95–1475, pp. 4–5 (La.App. 4 Cir. 1/19/96), 668 So.2d 415, 417

("The civil cause of action for false imprisonment requires proof of restraint without color of legal authority . . . There is no requirement of proving that the confinement be intentional.").

105.    Here, Mr. Traweek was detained, which fulfills the first element.

106.    The second element – that the detention be unlawful – is fulfilled as Mr. Traweek was overdetained 20 days beyond the expiration of his lawful imprisonment. *See*, *Whirl v. Kern*, 407 F.2d 781, 791 (5th Cir. 1968); *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1351 (N. D. Ga. 2005) (detainee has constitutional right to be free from continued detention after it was or should have been known that he was entitled to release).

### Count Four – State Law Negligence
### (All Defendants)

107.    Plaintiff realleges and incorporates each and every foregoing paragraph.

108.    Defendants' conduct of overdetention described above caused Mr. Traweek harms as described above and below.

109.    Due to their professional roles as jailers, Defendants owed duties to avoid overdetention and other harms to persons in their custody, including Mr. Traweek.

110.    These duties were breached by Defendants' acts and omissions, including the failure to timely release Mr. Traweek even after the error was repeatedly brought to Defendants' attention by Mr. Moroz. A duty was also breached by Defendant Doe who incorrectly recorded that Mr. Traweek be sentenced to DOC time on Docketmaster and any Defendant Doe who approved that action.

111.    The risks and harms that Defendants caused were within the scope of protection afforded by the duties they owed to Mr. Traweek.

112.    As a result of Defendants' acts and omissions, Mr. Traeek suffered actual and foreseeable harm.

## Count Five – Failure to Intervene
### (All Defendants)

113.    Plaintiff realleges and incorporates each and every foregoing paragraph.

114.    In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Mr. Traweek's constitutional rights, even though they had the opportunity to do so, especially after the overdetention was brought to their attention by Mr. Moroz.

115.    As a result of Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Mr. Traweek suffered emotional distress. Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

## Count Six – *Monell/Hinojosa* and Failure to Train/Supervise
### (Defendants Marlin Gusman, Shelia Crader and James LeBlanc)

116.    Plaintiff realleges and incorporates each and every foregoing paragraph.

117.    The misconduct described above was caused by the policies, practices, and customs of Defendants, in that their employees and agents regularly overdetain persons who are subject to release.

118.    The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of Defendants, were allowed to exist because policymakers with authority over there acts exhibited deliberate indifference to the problem, thereby effectively ratifying it.

119.    The polices, practices, and customs set forth above were the driving force behind the numerous constitutional violations in this case that directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above. *See Hinojosa v. Livingston*, 807 F. 3d 657, 665 (5th Cir. 2015) ("[w]hether a prison official had the requisite

knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."), quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

120.     Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because Defendants declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents.

### Count Seven – *Respondeat Superior*
### (Defendants Marlin Gusman, James LeBlanc and Shelia Crader)

121.     Plaintiff realleges and incorporates each and every foregoing paragraph.

122.     While committing the misconduct alleged in the preceding paragraphs, some Defendants and others were employees, members, and agents of the Orleans Parish Sheriff's Office and Marlin Gusman and acting within the scope of their employment. Other Defendants were employees, members, and agents of the DOC and Defendant James LeBlanc, and acting within the scope of their employment.

123.     The Orleans Parish Sheriff's Office and Defendant Marlin Gusman and Sheila Crader, and the DOC and Defendant James LeBlanc, are therefore liable as principal for all torts committed by his agents.

### Count Eight – Indemnification
### (Defendants Marlin Gusman, Shelia Crader and James LeBlanc)

124.     Louisiana law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for actions taken in the discharge of their duties that are within the scope of their employment activities.

24

125.    While committing the misconduct alleged in the preceding paragraphs, some
Defendants and others were employees, members, and agents of the Orleans Parish Sheriff's
Office and Sheriff Marlin Gusman and acting within the scope of their employment.

126.    The Orleans Parish Sheriff's Office, and Defendants Marlin Gusman, are
therefore obligated by Louisiana statute to pay any judgment entered against its employees.

127.    While committing the misconduct alleged in the preceding paragraphs, some
Defendants and others were employees, members, and agents of the DOC and James LeBlanc
and acting within the scope of their employment.

128.    The DOC and Defendant LeBlanc are therefore obligated by Louisiana statute to
pay any judgment entered against its employees.

## VI.    RELIEF REQUESTED

129.    Wherefore Plaintiff requests judgment be entered against Defendants and that the
Court grant the following:

a.   Declaratory relief;

b.   Judgment against Defendants for Plaintiff's asserted causes of action;

c.   Award of compensatory damages;

d.   Award of special damages;

e.   Award of punitive damages;

f.   Award costs and attorney's fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205,
     28 C.F.R. § 35.175, and 29 U.S.C. § 794a(b);

g.   A permanent injunction requiring Defendants to end their practice of
     overdetention.

h.   Order such other and further relief, at law or in equity, to which Plaintiff may be

justly entitled.

130.   Plaintiff state any and all other causes of action may become known through a

trial of this matter on its merits against any and all other parties which are herein named or which

may be added later, and request any and all other damages or remedies which this Court may

seem equitable.

131.   Plaintiff reserves the right to notice of defect to this pleading and reserve the right

to amend or supplement this Petition after discovery of any additional fact, law or claim, the

amendment of which to be performed by the filing of any subsequent pleading.

Respectfully submitted,


*/s/       Casey Denson*
Casey Rose Denson (La. Bar. No. 33363)
3436 Magazine Street, Unit #7005
New Orleans, LA 70115
Telephone: (504) 224-0110
Email: cdenson@caseydensonlaw.com

*/s/           William Most*
William Most (La. Bar No. 36914)
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (650) 465-5023
Email: williammost@gmail.com

*Attorneys for Plaintiff*