## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

JOHNNY TRAWEEK                                    CIVIL ACTION

VERSUS                                           NO. 19-1384-MLCF-JVM

MARLIN GUSMAN, ET AL.                            SECTION: "F" (1)

---

### OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

---

### INTRODUCTION

Mr. Traweek filed this lawsuit because all parties agree that he was held for twenty days past the time he was legally required to be released. R. Doc. 1.

He has a pattern and practice claim against Defendant Secretary James LeBlanc of the Louisiana Department of Public Safety & Corrections ("DOC"), as well as claims against Ashley Jones and Tracy Dibenedetto, two DOC employees who were personally put on notice Plaintiff was being overdetained.

In their Motion for Summary Judgment (R. Doc. 107), Defendants ask this Court to grant them qualified immunity for their roles in Plaintiff's undisputed overdetention. If that sounds familiar, it is because Defendants LeBlanc and Jones already sought – and already were denied – qualified immunity at the pleading stage. This Court held that "Mr. Traweek has pled facts that, **if true**, would permit the inference that LeBlanc and Jones are liable under § 1983 for a Fourteenth Amendment violation and would overcome their assertion of qualified immunity."[1]

Defendants now seek qualified immunity again. This is a curious choice, considering that they do not offer any evidence that the allegations previously presented to the Court were untrue. In fact, the evidence now is substantially *worse* for Defendants. For example, the parties now know that it took Ashley Jones <u>four days</u> to issue a certificate of release for Mr. Traweek after receiving

---

[1] R. Doc. 41 at 23. Emphasis added.

his paperwork, rather than the one day that was sufficient for this Court to deny qualified immunity at the motion to dismiss stage. If a one-day delay is sufficient for this Court to deny qualified immunity, then *a fortiori* a four-day delay must be sufficient.

Similarly, the case against Secretary LeBlanc is stronger now than it was at the pleading stage. In addition to all the evidence showing that Secretary LeBlanc knew of and failed to fix a pattern of thousands of inmates per year being overdetained, Mr. Traweek now has the testimony of the Executive Director of the Louisiana Clerk of Courts Association. The Executive Director testifies that she met with Secretary LeBlanc in 2016 and suggested a simple solution to mitigate overdetention – that the clerks begin email documents directly to the DOC. The response? The DOC said it did not have "the capability to receive the documents via email" because it "might cause more work for them."[2]

For these reasons and those detailed herein, Plaintiff respectfully requests that the motion be denied.

## LEGAL STANDARD

"[S]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Wheat v. Fla. Par. Juvenile Justice Comm'n,* 811 F.3d 702, 705 (5th Cir. 2016) (*quoting* Fed. R. Civ. P. 56(a)). Summary judgment is only appropriate when the moving party identifies material facts not in dispute, "and the nonmoving party fails to produce or identify in the record summary judgment evidence sufficient to sustain a finding in its favor respecting such of those facts as to which it bears the trial burden of proof." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 521 (5th Cir. 1999). This Court will view "the evidence and all justifiable inferences in the light most favorable to the non-moving party." *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 225 (5th Cir. 2004).

---

[2] Ex. D (Dep. of Executive Director of Clerk of Courts Association) at 26-27.

## ARGUMENT

### I.     Defendants' Motion Should Be Denied Because It Relies on Disputed Facts.

In order to prevail on summary judgment, the moving party must "demonstrate the absence of any genuine issue of material fact."[3]

Here, Defendants have failed to do so. Plaintiff disputes eight of Defendants' Facts (Numbers 8, 9, 30, 36, 48, 51, 61, and 74).

These eight disputed facts are at the very core of the case at bar. For example, Defendants contend in Fact 30 – without explanation – that Ms. Jones "was unable" to begin processing Mr. Traweek's file on a Friday, and so just left it alone for the weekend. Plaintiff absolutely disputes that Ms. Jones was "unable" to start on a Friday, especially considering that (1) it was a task that took less than forty minutes[4] and (2) the DOC has testified that its employees are supposed to prioritize casefiles like Mr. Traweek's with a short sentence and large amount of jail credit.[5]

Similarly, Defendants contend in Fact 74 that it is an "undisputed fact" that it is "reasonable for a pre-class packet received on a Thursday to not be completed until the following Tuesday."[6] But that is the very core of Mr. Traweek's claim against Ms. Jones: whether it was reasonable for Ms. Jones to take four days to complete a task that took less than an hour.

Defendants further contend that it is "undisputed" that time calculation was not part of Ms. Dibenedetto's "official" job duties, although she has testified precisely to the contrary.[7] She has further testified that when she identifies someone as eligible for immediate release she does not need to "get approval from anyone" to effect their release.[8]

---

[3] *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (1986).
[4] Ms. Jones completed her time calculation at 2:13 p.m. R. Doc. 107-2 at ¶ 43. She then walked it to her supervisor, who reviewed it and confirmed by 2:55 P.M. that Mr. Traweek was entitled to immediate release. *Id. at ¶¶* 44-45.
[5] Ex. A (30(b)(6) (Deposition of Angela Griffin) at pp. 33 to 34.
[6] R. Doc. 107-2 at ¶ 74
[7] Ex. B (Dep. of Tracy Dibenedetto) at pg. 9 (testifying that as "administrative remedy you have to become an expert in all areas of the prison, including time calculation," and so she has performed "thousands" of time calculations).
[8] *Id.* at pg. 30.

And finally, Defendants contend in Facts 48 and 51 that the "release process was started immediately" for Mr. Traweek. That is incorrect: it took two weeks for the release process to begin after the DOC was put on notice of Mr. Traweek's overdetention,[9] and four days after the DOC received Mr. Traweek's paperwork.[10] If the DOC had started the release process immediately after being put on notice of Mr. Traweek's overdetention, he would have been released weeks earlier than he was. Because disputed material facts exist, summary judgment must be denied.

## II.     Defendants are Not Entitled to Qualified Immunity

Defendants argue that they are each entitled to qualified immunity as to Plaintiff's due process claims arising under the Louisiana Constitution and Fourteenth Amendment of the U.S. Constitution and Section 1983. Public officials are not entitled to qualified immunity if "(1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation."[11]

Defendants admit that Plaintiff has satisfied the first element and that it "indisputabl[e], a prisoner has a constitutional right to 'timely release' from prison."[12] Defendants also admit that Plaintiff was released from prison twenty days after his release date.[13] The question then is whether each Defendant's actions were objectively unreasonable.

For Defendants LeBlanc and Jones, that question has already been answered at the motion to dismiss stage when this Court denied them qualified immunity.[14] Accordingly, they can only prevail here if they can show that the facts proven are so different from the facts alleged in the complaint as to change this Court's legal analysis.

---

[9] R. Doc. 107-2 at paragraph 5 (May 8, 2018 email to DOC).

[10] R. Doc. 107-2 at paragraph 20 ("on May 17, 2018 the DPSC received Plaintiff's pre-class packet from OPSO").

[11] *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011).

[12] R. Doc. 107 -1, Memorandum in Support of Motion for Summary Judgment, p. 4.

[13] In the statement of undisputed facts, Defendants admit that "Mr. Traweek was incarcerated in Orleans Parish Prison, and on May 2, 2018 he was brought before Judge Benedict J. Willard where he pled guilty," and that "Judge Willard sentenced the plaintiff to serve seven months in the parish jail with credit for time served – an amount equal to the seven months Mr. Traweek had already spent in incarceration" but it was not until "approximately 3:00 P.M. on May 22, 2018, Mr. Traweek was released from custody." R. Doc. 107-2, ¶¶ 2-3, 76.

[14] R. Doc. 41.

4

**A. The Motion Should Be Denied Because Defendants Have Not Offered Any Evidence Showing that this Court's Prior Denial of Qualified Immunity to Secretary LeBlanc Was Based on Untrue Facts.**

At the pleading stage, this Court denied qualified immunity to Secretary LeBlanc. It did so after reviewing the facts showing that Secretary LeBlanc has known since 2012 about a continuing pattern of thousands of inmates being held per year past their release date. This Court held that:

> It is alleged that LeBlanc has known about the DOC's pattern of overdetention for years and yet has failed to adopt policies to correct this problem . . . Mr. Traweek also alleges that, consistent with the known delays inherent in processing releases at DOC, it took DOC four days to even begin "computing" Traweek's time and then another day to effect his release. This suffices to overcome LeBlanc's invocation of qualified immunity at the pleadings stage.[15]

Accordingly, in order to obtain qualified immunity for Secretary LeBlanc, Defendants would need to show that the relevant alleged facts underlying the Court's motion to dismiss decision were untrue.[16] But in their Motion for Summary Judgment, Defendants make no effort to do so. That is because the allegations underlying the Court's ruling are true.

It is true that Secretary LeBlanc has known since 2012 that thousands of inmates are being held past their release date each year. In that year, the DOC had a team of a dozen of its staff perform a "Lean Six Sigma"[17] review of its inmate time calculation processes.[18] Secretary LeBlanc was a "champion" of the project.[19] The Lean Six Sigma review found a widespread pattern of people being held past their legal release date. Specifically, it found that when the DOC calculated the release date of inmates, 83% were eligible for "immediate release . . . due to an earlier release date."[20] By the DOC's own admission, this 83% of inmates were all being

---

[15] R. Doc. 41 at 34-35.
[16] R. Doc. 41 at 23 ("Mr. Traweek has pled facts that, **if true**, would permit the inference that LeBlanc and Jones are liable under § 1983 for a Fourteenth Amendment violation and would overcome their assertion of qualified immunity.") (Emphasis added.)
[17] "Lean Six Sigma is a team-focused managerial approach that seeks to improve performance by eliminating waste and defects." Will Kenton, <u>Lean Six Sigma</u>, Investopedia.com (Feb. 5, 2018).
[18] Ex. E (DOC's Six Sigma Report).
[19] *Id.* at 3.
[20] *Id.* at 4

"overdetained."[21] Some of the delay came from the time it took to receive documents from the clerks' and sheriffs' offices. But it was primarily because the DOC was taking approximately seventy-nine days to calculate an inmate's sentence after receiving their documents.[22]

How widespread was this problem? The DOC Six Sigma review found that it was overdetaining **2,252 inmates per year**, with an average of **71.69 "Overdue days" per inmate**.[23] This was, as the DOC concedes, "a lot of overdetention."[24]

The DOC did not fix the overdetention problem. It did not even set for itself a *goal* of fixing the problem. The goal the DOC set for itself was to overdetain only 450 persons per year by an average of 31 days per person.[25] The team estimated that if it could hit that self-set goal, it would save the state $3.7 million dollars per year.[26] TheDOC implemented interventions that "modestly improved," but did not eliminate the problem.[27]

After the DOC Six Sigma team's interventions, the number of these overdetained persons was reduced from 2,252 per year to 1,612, and the average number of overdue days was reduced

---

[21] Ex. K (DOC 30(b)(6) Deposition) at 17-18:

Q.   I use the word "overdetention" to describe someone who should have been released in the past but wasn't. Will you understand me if I use that term?
A.   Yes.
Q.   So these people who were found to have an earlier release date, they were being overdetained, right?
A.   By your definition of overdetention, yes.
Q.   So this investigation found that 83.44 percent of these cases, once their time was computed, were found to have been overdetained, correct?
A.   By your definition, yes.

[22] *Id.* at 33 ("Q. So this approximately 79-day number represents the DOC's, to the best of its knowledge in 2012, about how long it was taking for documents to wait at the DOC to be calculated? A. Correct.") *See also* Ex. L (DOC Frequently Asked Questions) ("If a person has recently been sentenced to DOC custody, it can take up to 12 weeks to calculate a date as the Department has to receive official paperwork from the sentencing court in order to calculate the offender's release date.")

[23] Ex. E at 18, 20; *see also* Ex. P at RFA 69 ("It is admitted that the 2012 Lean Six Sigma found an average of 71.70 'overdue days' for inmates found to be eligible for immediate release upon time calculation."), RFA 70 ("It is admitted that the 2012 Lean Six Sigma project found that approximately 2252 inmates per year were eligible for immediate release upon time calculation.")

[24] Ex. K at 20.

[25] Ex. E at 5; Ex. K at 18. That would be 38 years of overdetention per year (450*31/365).

[26] Ex. E at 19.

[27] Ex. K at 33.

from 71.7 to 60.52 days – still a major constitutional violation.[28]

The DOC did take some steps to try to improve things after that. They centralized their PreClass department, and made "some adjustment and updates to the Uniform Commitment Order."[29] In 2015 the "department did attempt an offender [electronic records] management system, which was not a success. It never went into full production. It was tested for a bit and then found to be inoperable."[30] As a result, the "functional processes" around the transmission of documents "remain as antiquated as they were in 1996."[31]

Instead of continuing to try to find a solution, the DOC accepted and institutionalized the problem into its public-facing identity. On its website, the DOC posted a statement: "If a person has recently been sentenced to DOC custody, it can take up to 12 weeks to calculate a date as the Department has to receive official paperwork from the sentencing court in order to calculate the offender's release date."[32] The DOC put on its voicemail an audio statement that it "takes at least 90 days after sentencing" for the department to calculate how much time a person must serve.[33]

And so the problem continued, year after year. In 2017, the DOC did an internal investigation and confirmed that overdetention was ongoing. In a grant application to the U.S. Department of Justice, the Louisiana DOC disclosed that in 2017, it "had an average of **200 cases per month** considered an 'immediate release' due to these deficiencies."[34] According to the DOC, these people were held an "average of 49 days past the end of their sentences."[35] The DOC concluded that this pattern of overdetention was costing the state "$2.8M per year in housing costs alone."[36] According to the DOC, this is "taxpayer money" that the "DOC should not have

---

[28] Ex. E at 18.
[29] Ex. M at 22.
[30] *Id.*
[31] *Id.* at 29.
[32] Ex. L at 3. Secretary LeBlanc testified that this "12 weeks is ridiculous" and "just absurd." Ex. J at 90.
[33] Ex. M (DOC 30(b)(6) Deposition) at 12-13
[34] Ex. O at 4 (emphasis added); Ex. L at 31-32 (testifying that it is true that in "2017, DPS&C had an average of 200 cases per month considered an 'immediate release' due to these deficiencies.")
[35] Ex. M at 34, 38 ("Q. So it's a true statement that the DOC found that in 2017 it had an average of 200 inmates per month held an average of 49 days past the end of their sentence, correct? A. Yes.")
[36] Ex. M at 35.

to spend."[37]

The problem still has not been solved. The most recent large-scale data the DOC has released is from February 2019. In that month, according general counsel for the Department of Corrections, "231 people across the state were affected. Those people waited an average 44 days to be released after a judge ordered them free."[38] Despite all this, there has not been a single example of "discipline or adverse employment activity for DOC employees who have incorrectly computed sentences or release dates, from 2000 to the present."[39]

As a result of all of the above, it is routine in Louisiana for the DOC to hold people like Johnny Traweek past their release date. In fact, the DOC testified that <u>it is "rare" for them to be released on time</u>.[40] The head of the DOC's Pre-Class department testified that she "can't say positively" if she has *ever* seen someone like that released on time.[41]

Secretary LeBlanc personally presided over all of this. He has been Secretary of the Department of Public Safety & Corrections since 2008.[42] He admits that in 2012, through the Six Sigma process, he learned that thousands of people in his custody were being overdetained:

```
Q.    But you learned that thousands of people in
      the custody of the Department of
      Corrections for whatever reason were being
      held past their release date, correct?
A.    I did.
                                            43
```

---

[37] *Id.*
[38] Ex. Q at 5. *See also* Ex. P at RFA 76 ("It is admitted that in February of 2019, 231 people were found to be held past the release date, with an average of 44 days waiting for release.") The list of 231 inmates is attached here as Exhibit F, with names redacted.
[39] Ex. R at Int. 17; *see also* Ex. H at 48-49 (no employee was fired, demoted, docked pay, or reprimanded as a result of the discovery that 'thousands of people . . . were being held past their release date.")
[40] *Ex. A* at 30-31.
[41] Id. at 31.
[42] Ex. J (Dep. of James LeBlanc) at 91-92.
[43] Exhibit J, Deposition of Secretary LeBlanc, at 48.

Even after the Six Sigma interventions, he understood that the DOC still had "people being held an average of about two months past their release date."[44] Secretary LeBlanc agrees this was "a big problem."[45] But he did not fire anyone. He did not demote anyone. He did not dock anyone's pay. He did not even reprimand anyone.[46]

Secretary LeBlanc admits that five years after the Six Sigma project, overdetention was still "a problem."[47] He testified that in 2017, it was "costing the state $239,022 per month" to hold "people who should be out."[48] As of 2019, Secretary LeBlanc testified that there was still a problem.[49] He acknowledges that even now, "once the DOC gets the documents, it takes an average of ten days to process the release."[50]

Thus, the allegations "that LeBlanc has known about the DOC's pattern of overdetention for years and yet has failed to adopt policies to correct this problem"[51] that caused this Court to deny qualified immunity are true.

Most of this this was known at the pleading stage. And now, the factual state of affairs for denying qualified immunity to Secretary LeBlanc is *stronger* now than it was at the pleading stage. Plaintiff now has testimony showing that Secretary LeBlanc actively and personally rejected proposals to mitigate overdetention. That testimony comes from Debbie Hudnall, Executive Director of the Louisiana Clerks of Courts Association, who explains that in 2016 she met with Secretary LeBlanc and proposed the solution that clerks of court could email documents directly to the DOC.[52] Her proposal was rejected on the premise that the DOC did not have "the capability to receive the documents via email" because it "might cause more work for them."[53]

---

[44] Ex. J at 45; *see also id*. at 27 ("Q. Right, and the problem with immediate releases is that people are being held past the end of their sentence, correct? A. Correct.")
[45] *Id.* at 41.
[46] Ex. J at 48-49.
[47] Ex. J (Dep. of Secretary LeBlanc) at 58.
[48] *Id.* at 58-59, 60.
[49] *Id.* at 77.
[50] *Id.* at 81.
[51] R. Doc. 41 at 34-35.
[52] Ex. D (Deposition of Debbie Hudnall) at 26-28.
[53] Ex. D (Deposition of Debbie Hudnall) at 26-28.

Instead of trying to attack the factual basis for this Court's prior ruling, Defendants make two other arguments.[54] First, they argue that Secretary LeBlanc should not be held liable for the two weeks it took for the paperwork to get to the DOC, because Secretary LeBlanc is not the policymaker for the Orleans Parish Sheriff's Office.[55] This argument ignores the Court's prior holding that LeBlanc's handling of the "system of administrative processing"[56] – a system that passively waits for weeks to receive paperwork from other actors – may result in unconstitutional overdetention sufficient to deny qualified immunity. Specifically, Secretary LeBlanc admits that a concrete thing the DOC could do "to mitigate the problem of people being held past their release date"[57] would be for the DOC to "actually go out and get the paperwork," rather than waiting for sheriffs and clerks to bring it to them.[58]

Under Secretary LeBlanc, the DOC has never tried that.[59]

And that is what happened to Mr. Traweek – the DOC waited for weeks to receive his paperwork, which resulted in his overdetention. As another Court recently ruled, "The state of affairs at the DOC, where DOC's staff were passive and essentially flying blind unless contacted by a concerned family member, evinces a reckless disregard for the likelihood of overdetention in the DOC system."[60] On these facts, Louisiana courts have repeatedly denied qualified immunity to Secretary LeBlanc.[61]

Defendants next argument is that Secretary LeBlanc should not be held liable for the five days from the DOC receiving Mr. Traweek's paperwork to them sending a certificate of

---

[54] R. Doc. 107-1.
[55] R. Doc. 107-1 at 16-18.
[56] R. Doc. 34 at 41.
[57] Ex. J (Depositon of Sec. LeBlanc) at 100-101.
[58] *Id.* at 80.
[59] *Id.* at 80.
[60] *Crittindon v. Gusman*, 17-cv-00512-SDD-EWD, R. Doc. 168 at 33. (M.D. La. 4/13/2020)
[61] *Id.* (denying qualified immunity to Secretary LeBlanc), *Grant v. Gusman*, 17-cv-02797-NJB-DEK, R. Doc. 66 (E.D. La. 08/14/18 ) ("Plaintiff has alleged facts, which if taken as true, make it plausible that Secretary LeBlanc engaged in a policy of unconstitutionally over-detaining persons"), *Hicks v. DPS&C*, 19-cv-00108-SDD-RLB, R. Doc. 47 (denying qualified immunity to Secretary LeBlanc).

release.[62] They argue that there is not a sufficiently similar set of examples of overdetention to establish a pattern and practice claim. Defendants already made this argument, nearly verbatim, at the pleadings stage,[63] and had that argument rejected by this Court.[64] (As a factual matter, Mr. Traweek's five-day delay of processing his paperwork falls squarely within the wide-spread problems identified in the 2012 Six Sigma Report,[65] problems that were proven to be ongoing by the February 2019 Pull Document,[66] and personally admitted to by Secretary LeBlanc.[67])

Defendants also argue that the five-day paperwork processing period was the "normal process," and "simply took longer than the Plaintiff believes it should have."[68] This is, however, not an exoneration of Secretary LeBlanc; it is a devastating indictment. This Court, in ruling on the Motion to Dismiss, quoted *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 276 (D.D.C. 2011), holding that "courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon."[69] Thus, the fact that Secretary LeBlanc has set up a "normal process" that exceeds the maximum constitutional threshold by 250% necessitates denial of qualified immunity. The motion should be denied.

### B. Defendant Tracy Dibenedetto's Actions were Objectively Unreasonable and her Claim of Qualified Immunity Should be Denied.

Defendant Tracy Dibenedetto argues that she is entitled to qualified immunity because her only actions were "receiving and responding to two emails from Plaintiff's attorney[.]"[70] But the fact that she did nothing more than that after being put on notice of Mr. Traweek's overdetention is the reason why qualified immunity should be denied, not granted.

---

[62] R. Doc. 107-1 at 18 to 21.
[63] R. Doc. 27-1 at 17-18.
[64] R. Doc. 41.
[65] Ex. E at page 8 (showing average of 7.27 days from paperwork received to time computed).
[66] Ex. F (the "RECEIV TO COMP" column shows that in a single month, dozens of inmates experienced a five-day or more period from paperwork received to time computed).
[67] Ex. J at 81.
[68] R. Doc. 107-1 at 20.
[69] R. Doc. 41 at 38.
[70] R. Doc. 107 -1, Memorandum in Support of Motion for Summary Judgment, p. 5.

Defendant Dibenedetto is the DOC's Administrative Remedy Procedure Program Director, and her job duties included "maintaining, reviewing, and responding to Administrative Remedy Procedure ('ARP') grievances at the DPSC Headquarters level."[71]

She argues that her job duties did not include reviewing and responding to e-mails she received from Mr. Traweek's attorney, and therefore, she is entitled to qualified immunity. However, Defendant Dibenedetto's Affidavit, her deposition testimony from another case, and the arguments of her counsel in the Memorandum in Support of Summary Judgment demonstrate that Defendant Dibenedetto's job duties included responding to emails from attorneys regarding overdetained inmates. Ms. Dibenedetto stated in her Affidavit that "families and attorneys occasionally contacted me with questions regarding ARPs and time calculation disputes" and "answered their inquiries to the best of my ability, and occasionally forwarded questions to other persons in DPSC who were better equipped to provide the correct answer."[72] She also included that "I occasionally received questions from attorneys at the Orleans Parish Public Defender Office."[73] Defendant Dibenedetto also signed an affidavit in 2015 stating that "[p]art of my duties is to compute prisoner time and sentences."[74] Further, Defendant Dibenedetto testified in 2015 that as part of her job duties she has performed sentence calculations for the DOC since 2003, and has calculated "thousands" of sentences.[75] She has performed these sentence calculations in response to "[a]dministrative remedy procedure[s], appeal court cases, and to aid in sentence determination either by district attorneys or defense attorneys."[76] She further testified that when she identifies someone as eligible for immediate release she does not need to "get approval from anyone" to effect their release.[77]

---

[71] R. Doc. 107-1, Memorandum, p. 5; R. Doc. 107-6, Affidavit of Dibenedetto, ¶ 2.
[72] Doc. 107-6, Affidavit of Dibenedetto, ¶ 3.
[73] *Id.* at ¶ 4.
[74] Ex. B at 43, 2015 Affidavit of Dibenedetto, at p. 1.
[75] Ex. B, 2015 Deposition of Tracy Dibenedetto 9:22-25; 10:1-2.
[76] *Id.* at 10:3-9.
[77] *Id.* at 30.

Defendant Dibenedetto's testimony shows that she was well aware that inmates were frequently overdetained. She testified that in reviewing the sentence calculations done by others at the DOC, Defendant Dibenedetto found "at least once a week[]" an inmate needed to be released, and in those instances she would "usually immediately call the staff that is in charge of doing the release, [and] order their time recomputed[.]"[78]

Additionally, in an Affidavit in support of this Motion, Defendant Dibenedetto admits that as part of her job duties, she undertook the tasks of reviewing and responding to inquiries concerning Mr. Traweek's overdetention which came from Mr. Traweek's attorney, Stanislaz Moroz, from the Orleans Parish Public Defenders Office. She states in her affidavit that she "personally reviewed,"[79] and responded to, e-mails she received from Mr. Moroz. She admits she received the May 8, 2018 email from Mr. Moroz, which stated "[Mr. Traweek] was sentenced to 7 months DOC on 5/2/18. . . .  He has been in custody since 10/2/17, so he has completed his full term sentence but is still in custody. Could you please have his release expedited?"[80]

Ms. Dibenedetto therefore knew Mr. Traweek was overdetained by six days, and stated  in her affidavit that she then "attempted to assist Mr. Moroz by pulling up CAJUN and checking to see if there was an issue with Mr. Traweek's release."[81] Based upon review of CAJUN, she determined that Mr. Traweek had not been released because the DOC had not yet received the pre-classification paperwork from Orleans Parish Sheriff's Office ("OPSO").[82] Defendant Dibenedetto informed Mr. Moroz the the DOC "[h]ave no received anything form OPP," but did nothing else.[83] Although in her affidavit she stated that she was "not a part of the Pre-Classification Department" and has "no authority to expedite the release of an offender,"[84] she did not provide any of that

---

[78] *Id*. at 29:14-25, 30:1-11.
[79] *Id*. at ¶5,
[80] R. Doc. 107-6, Emails between Dibenedetto and Moroz; Doc. 107-6, Affidavit of Dibenedetto, ¶ 7.
[81] Doc. 107-6, Affidavit of Dibenedetto, ¶ 11.
[82] *Id*. at ¶¶ 11-12.
[83] *Id.* at ¶13.
[84] *Id. at* ¶¶. 8, 10.

information to Mr. Moroz despite his request for her to expedite his release. Instead, she provided a brief response suggesting that she was the best point of contact and had looked into the issue.[85]

On May 14, 2018, Defendant Dibenedetto received another email from Mr. Moroz asking if "your office received anything form OPP about Mr. Traweek yet?"[86] Defendant Dibenedetto took no action, and did not respond to the e-mail.[87] Mr. Moroz e-mailed again on May 15, 2018: "following up to see whether DOC has received the pre-classification documentation yet."[88] The next day, Defendant Dibenedetto again checked for Mr. Traweek in CAJUN, and again determined he had not been released because the DOC did not yet have the Pre-Classification Paperwork from OPSO.[89] On May 16, 2018, Defendant Dibenedetto replied to Mr. Moroz's email and informed him that the DOC had still not received Mr. Traweek's Pre-Classification paperwork.[90] Again, her response suggested that she was the best point of contact and had looked into the issue.

Defendant Dibenedetto claims in her Affidavit that she had "no authority to expedite the release of an offender[.]"[91] However, this is directly contradicted by the Affidavit of Angela Griffin, who stated that "[i]f the Pre-Classification Department is notified of an offender sentenced who may be an immediate release, we attempt to get the paperwork from the Sheriff's Office of the Parish of conviction."[92] Therefore, if Defendant Dibenedetto had reached out to Pre-Classification with Mr. Moroz's reports of overdetention, Pre-Classification would have attempted to get the paperwork from OPSO as early as May 8, 2018, which was nine days before the DOC actually received the paperwork. Defendant Dibenedetto's claim that she lacked the "authority to expedite[,]" is also completely contrary to her deposition testimony that she can affect the release of an overdetained inmate, and does not not need to "get approval from anyone" to do it.[93]

---

[85] R. Doc. 107-6, Emails between Dibenedetto and Moroz.
[86] R. Doc. 107-7, Emails between Dibenedetto and Moroz, at p. 2.
[87] *Id.;* Doc. 107-6, Affidavit of Dibenedetto.
[88] *Id.*, at p. 4.
[89] Doc. 107-6, Affidavit of Dibenedetto, ¶ 14-15.
[90] R. Doc. 107-7, Emails between Dibenedetto and Moroz.
[91] Doc. 107-6, Affidavit of Dibenedetto, ¶ 10.
[92] R. Doc. 107- 5, Affidavit of Angela Griffin, ¶. 31.
[93] Ex. B at 30.

Defendant Dibenedetto admits that it was her "general practice to refer such inquiries to the head of the Pre-Classification Department."[94] Despite this, Defendant Dibenedetto provided no evidence that she ever referred Mr. Moroz's inquires to the Pre-Classification Department.[95] Nor do the affidavits of Defendants Jones, or Angela Griffin indicate Defendant Dibenedetto ever called to alert them as to Mr. Traweek's overdetention.[96]

Additionally, in both responses to Mr. Moroz, Defendant Dibenedetto never informed Mr. Moroz that she did not work in Pre-Classification, even after he asked if "your office" had received Mr. Traweek's pre-classification packet, and chose not to share contact information for those individuals working in pre-classficiation with him. R. Doc. 107-7, Exhibit 4, Emails between Dibenedetto and Moroz. As a result, Defendant Dibenedetto caused Mr. Traweek to continue to be overdetained by failing to notify the Pre-Classification Department about Mr. Traweek, or inform Mr. Moroz to reach out to that department, or to use her own authority to affect his release.

"Unlike h[er] prisoner, the jailer has the means, the freedom, and the duty to make necessary inquiries." *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968). Here, Defendant Dibenedetto made no inquiry to anyone. As a result, her conduct was objectively unreasonable on May 8, 2018 when she first learned that Mr. Traweek was six days overdetained, and every day after that. Her conduct was even more unreasonable once she knew he was still overdetained on May 14 and 15, 2018. The failure to take <u>any</u> action beginning on May 8, 2018, despite knowing that Mr. Traweek was overdetained and that the DOC had not even started processing his sentence, was objectively unreasonable. Further, it was objectively unreasonable to present to Mr. Moroz that she was responding to his concerns about Mr. Traweek's email while withholding the information that she did not work in Pre-Classification, and failing to give him any information for a contact in Pre-Classification.  Even worse, after May 16, 2018, she took no action at all. She

---

[94] Doc. 107-6, Affidavit of Dibenedetto, ¶ 17.
[95] *Id.* at ¶ 18 (failing to note whether she recalled calling by phone but noting that "[b]ased on a review of my email records, any referral of this matter to the Pre-Classification was done by phone.").
[96] R. Doc. 107-5, Affidavit of Angela Griffin; R. Doc. 107-3, Jones Affidavit.

sent no e-mails, made no phone calls, and did nothing from May 16, 2018 to May 21, 2018 when Mr. Traweek was finally released.

Even if this Court found that Defendant Dibenedetto's actions were not sufficient to overcome qualified immunity, qualified immunity is also inappropriate where a defendant allowed another defendant to violate the plaintiff's constitutional rights by failing to act. In the Fifth Circuit, an individual is liable as a bystander for failing to intervene if the defendant: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (*quotations omitted*). In *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995), the Fifth Circuit upheld the denial of summary judgment based on the officer's failure to intervene because "the summary judgment evidence raises a fact issue as to whether [Defendant] had a reasonable opportunity to realize" the unconstitutional conduct that was occurring and a reasonable opportunity "to intervene to stop it," but acquiesced to the misconduct, and failed to intervene.

Here, Defendant Dibenedetto knew the DOC was violating Mr. Traweek's constitutional rights as he was already overdetained for 6 days when she first received an e-mail from Mr. Moroz, and all Parties agree that individuals have a right to timely release. She had an ongoing opportunity to prevent harm from occurring by reaching out to Pre-Classifications, or OPSO, from May 8, 2018 until Mr. Traweek's release on May 21, 2018. She also could have prevented harm by suggested Mr. Moroz reach out to the Pre-Classification Division. She failed to take any of these actions, and as a result, the DOC did not receive Mr. Traweek's Pre-Classification Packet until May 17, 2018, and he was not released until May 22, 2018. In total, Mr. Traweek was overdetained for an additional 14 days, or approximately 336 hours, after Defendant Dibenedetto first learned he was overdetained.

Defendant cites to *Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004), and *Porter v. Epps*, 659 F.3d 440 (5th Cir. 2011), in support of its position that Defendant Dibenedetto's failure to act

was not unreasonable. However, here, unlike in *Johnson,* Defendant Dibenedetto is sued for her individual failure to act, and not based on her supervisory status. Further in *Johnson*, the "record . . . show[ed] that [Defendants] responded to Johnson's complaints by referring the matter for further investigation or taking similar administrative steps. This was a reasonable discharge of their duty to protect the inmates in their care." *Johnson*, 385 F.3d at 526. Here, Defendant Dibenedetto failed to refer the matter for investigation or take similar administrative steps, therefore, failing to perform her duty to protect inmates in her care.

Further, Defendants claim that *Porter v. Epps*, 659 F.3d 440 (5th Cir. 2011), supports their position. They claim that the Fifth Circuit "found that the signature of Christopher Epps, Commissioner of the Mississippi Department of Corrections, on the third-step appeal of plaintiff's grievance regarding his overdetention, was insufficient to establish personal liability on the part of Epps."[97] However that mischaracterizes the holding of the Court, which actually found that: "Epps had for many years delegated responsibility for evaluating third-step appeals to Deputy Commissioner Emmett Sparkman. Sparkman—not Epps—signed Epps's name to the order denying Porter's appeal."[98] Here, Defendant Dibenedetto admits that she personally received, reviewed and responded to Mr. Moroz's emails, and there is no evidence or even allegation, that someone was acting on her behalf.

Based on Defendant Dibenedetto's actions and failure to intervene, qualified immunity should be denied.

### C. The Motion Should Be Denied Because This Court Already Denied Qualified Immunity to Ashley Jones Because of a One Day Delay. *A fortiori*, This Court Should Deny Qualified Immunity to Ms. Jones Because of the Now-Proven Four Day Delay.

In its order on Defendants' Motion to Dismiss, this Court denied qualified immunity  to Defendant Ashley Jones on the basis of a one-day delay: the period from when she "saw his

---

[97] R. Doc. 107-1, Memorandum in Support of Motion for Summary Judgment, p. 7.
[98] *Porter v. Epps*, 659 F.3d 440, 448 (5th Cir. 2011).

paperwork on May 21" to the time she generated his certificate of release on "the afternoon of the following day."[99] Strangely, Ms. Jones again seeks qualified immunity even though she now concedes she received Mr. Traweek's paperwork _three days earlier_ than previously stated, on May 18.[100] If this Court held that a one-day delay was sufficient to deny qualified immunity to Ms. Jones, then _a fortiori_, a four-day delay must require denial of qualified immunity. That is especially true now that Defendants undisputed facts show that it took _less than forty minutes_ to review Mr. Traweek's file and see that he was eligible for immediate release.

In assessing Ms. Jones' actions, this Court declined "to endorse a presumptive reasonable number of hours" as to when an inmate must be released after "a judicial determination that he is entitled to release."[101] Instead, this Court focused on whether the administrative delay was objectively unreasonable. The Court noted that here "a simple comparison of the jail credit letter to Mr. Traweek's sentence made it unmistakably clear that he had spent more than two weeks in custody beyond his court-ordered release date."[102] Based on this, this Court determined that "Ms. Jones's failure to certify his release" on May 21, 2018, "despite her knowledge that he was overdue for release . . . violated his clearly established right to timely release."[103] Absolutely nothing in Defendants' Motion contradicts those findings of the Court.

The new facts admitted to by Defendants are significantly worse for Ms. Jones. Defendants admit in the Motion for Summary Judgment that Defendant Jones actually had the Pre-Classification papers three days earlier than alleged in the Complaint– May 18, 2018. In the Affidavit of Angela Griffin, Administrative Program Director, Ms. Griffin admitted that the DOC received the pre-classification packet on May 17, 2018, and it was first assigned to ARDC Specialist Bianca Spradley, in the Pre-Classification Department, the same day for a criminal

---

[99] R. Doc. 41 at 39.
[100] R. Doc. 107-2 at Fact 28 ("Ms. Spradley returned the packet to her supervisor, who subsequently reassigned the packet to Ms. Jones on May 18, 2018").
[101] R. Doc. 41, p. 36-7.
[102] R. Doc. 41, p. 39-40; Doc. 107-8, Exhibit 5, Jail Credit Letter, p. 3 and Sentence of the Court, p. 5.
[103] R. Doc. 41, p. 40-41.

history check.[104] Ms. Spradley began the criminal history check at 9:01 a.m. and completed it on 9:03 a.m. on May 17, 2018.[105] Defendants provide no explanation for the failure of any individual to assess, prioritize or review Mr. Traweek's documents from 9:03 a.m. until the close of business on May 17, 2020.

Defendant Jones and Ms. Griffin both admit that on May 18, 2018, Mr. Traweek's packet was assigned to Defendant Jones, an ARDC Specialist II, to complete.[106] Defendants have failed to identify when on May 18, 2018 Ms. Jones was assigned to work Mr. Traweek's release. Defendant Jones admits in her Affidavit that she did not work on Mr. Traweek's release at all on May 18, 2018.[107] She attempted to justify this failure based on her decision to "process[] other packets given to me on the same day[.]"[108] Defendant Jones did not provide any evidence as to why she spent the day processing the release of other individuals who had were not overdetained by 16 days. Further, prioritizing working on the release paperwork of other individuals was a violation of several DOC policies. DOC policy Departmental Regulation, B-02-0018, requires that "[e]ach offender  be screened for intake priority by an ARDC Specialist for . . . immediate release eligibility."[109] Defendant Jones is an ARDC Specialist, and therefore violated DOC policy if she failed to screen her cases for immediate releases on May 18, 2018 for intake priority.[110] If she did screen her cases, then she knew as of May 18, 2018 that Mr. Traweek was overdetained, and still failed to do any work to process his release that day. Ms. Griffin, who was the Administrative Program Director overseeing Pre-Classification Department, explained that DOC policy requires that when an inmate "is discovered to be eligible for 'immediate release,' the release clearance

---

[104] R. Doc. 107-5, p. 4, Griffin Affidavit ¶ 40-42.
[105] R. Doc. 107-8, p. 8-27.
[106] R. Doc. 107-5, at p. 4, Griffin Affidavit ¶ 44; R. Doc. 107-3, Jones Affidavit ¶ 9; Exhibit I, Defendant Jones' Supplemental Response to Plaintiff's Interrogatories, Response to Interrogatory No. 5.
[107] R. Doc. 107-4, Jones Affidavit ¶7.
[108] *Id.*
[109] Ex. H, Departmental Regulation, B-02-0018 at p. 3.
[110] R. Doc. 107-3, Exhibit 1, Jones Affidavit,  ¶ 3.

process begins immediately."[111] Therefore, the decision to process other inmates' paperwork over Mr. Traweek's release was a violation of DOC policy.

Ms. Jones admits that she did not "begin processing Mr. Traweek's pre-class packet until Monday, May 21, 2018."[112] On that date, she first "reviewed Mr. Traweek's entire packet to ensure that it contained all of the necessary documentation" and "noted that Mr. Traweek received a hard labor sentence by checking the sentencing minutes included in the pre-class packet."[113] It was no later than this time, that as this Court noted, "a simple comparison of the jail credit letter to Mr. Traweek's sentence made it unmistakably clear that he had spent more than two weeks in custody beyond his court-ordered release date."[114]

Even Defendant Jones admits that as of 2:13 p.m. on May 21, 2018, she "determined he was eligible for immediate release."[115] Of course, this time computation confirmed not just that Mr. Traweek was "eligible for immediate release," but also that he was overdetained by 19 days. After confirming that he was 19 days overdetained, Defendant Jones sent Mr. Traweek's information to her supervisor to review and it was returned just 42 minutes later, at 2:55 p.m. when her supervisor "instructed [her] to begin preparing Mr. Traweek's release paperwork."[116] Defendant Jones works from "8:00 p.m. to 4:30 p.m., Monday through Friday," and so had over an hour and a half left of her work day to complete Mr. Traweek's release.[117] Despite knowing that Mr. Traweek was overdetained by 19 days, Defendant Jones failed to secure Mr. Traweek's release on May 21, 2018.

She then waited until the next day to begin preparing the release clearing checklist.[118] Defendant Jones claimed she was still preparing this checklist when she emailed Shelia Crader at OPSO at 12:46 p.m. and stated "I have cleared his criminal history, but he is missing DNA. Can

---

[111] R. Doc. 105-5, Griffin Affidavit, ¶ 2, 18.
[112] Exhibit S, Requests for Admission to Defendant Jones, at RFAs No. 11-13; R. Doc. 107-3, Jones Affidavit ¶¶ 7, 9; Ex. I, Defendant Jones' Supplemental Response to Plaintiff's Interrogatories, Response to Interrogatory No. 5.
[113] Ex. I, Defendant Jones' Supplemental Response to Plaintiff's Interrogatories, Response to Interrogatory No. 5.
[114] R. Doc. 41, p. 37.
[115] R. Doc. 107-3, Jones Affidavit, at ¶25; Ex. I, Response to Interrogatory No. 5.
[116] Ex. I, Response to Interrogatory No. 5.
[117] Doc. 107-3, Exhibit 1, Jones Affidavit ¶ 5.
[118] Ex. I, Response to Interrogatory No. 5.

you have it done for me please?"[119] This e-mail was inaccurate, as Ms. Spradley had completed

the criminal history check back on May 17, 2018.[120] More problematic, just nineteen minutes later,

at 1:05 P.M., Ms. Crader informed Ms. Jones that the DNA was not even missing, and that "HE

WAS DONE ON 5/10/18[.]"[121] Ms. Crader attached a screenshot of the Master Record Inquiry

from CAJUN which showed the DNA test was completed on May 10, 2018. *Id.* at p. 34. Ms. Jones

also had access to CAJUN,[122] and did not need to wait for Ms. Crader to pull this information from

CAJUN.[123] Ms. Jones finally completed the release certificate and sent it to OPSO over an hour

and a half later.[124] Just 21 minutes later, OPSO released Mr. Traweek "[a]t approximately 3:00

P.M. on May 22, 2018, Mr. Traweek was released from custody."[125]

Here, Defendant Jones' actions resulted in Mr. Traweek being overdetained for an

additional five days, for a total of 104 hours, from May 18, 2018 at 8:00 am to May 22, 2018 at

3:00 p.m. Such a lengthy delay, on a straightforward release of an individual sentenced to time

served, was unreasonable. It was especially unreasonable given that Defendant Jones prioritized

other cases over Mr. Traweek's despite DOC policy that she screen cases for overdetained

individuals and handle those cases first. Further, her conduct was unreasonable because she also

delayed Mr. Traweek's while waiting for OPSO to send her DNA results that she already had

access to and could have followed up on the day before. This Court cited to a series of cases

supporting the conclusion that, under these circumstances, 104 hours is an unreasonable amount

---

[119] R. Doc. 107-8, p. 33; Ex. I, Response to Interrogatory No. 5.
[120] Doc. 107-3, Jones Affidavit ¶ 9; Ex. I, Response to Interrogatory No. 5 ("When I received Mr. Traweek's packet, I noted that the criminal history had been completed as was required to verify Mr. Traweek's identity.").
[121] R. Doc. 107-8, p. 33.
[122] R. Doc. 107-3, Jones Affidavit ¶¶ 21-23,
[123] Further, Defendant Jones stated in response to interrogatories that she "reviewed Mr. Traweek's entire packet to ensure that it contained all of the necessary documentation." Ex. I, Response to Interrogatory No. 5. Therefore, if the DNA was missing, she should have requested it on May 21, 2020, instead of delaying another 24 hours to complete the packet.
[124] Ex. I, Response to Interrogatory No. 5; Exhibit G, May 22, 2020 Email from Jones to Crader, Subject: "JOHNNY TRAWEEK - Release certificate attached" (sent at 2:39 p.m. on May 22, 2018).
[125] R. Doc. 107-2, Statement of Undisputed Facts, ¶ 76.

of time to release an inmate,[126] and is well beyond the court consensus that "the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon."[127] Based on her conduct, this Court should again deny qualified immunity to Ms. Jones.

### III.   The Motion Should Be Denied Because Secretary LeBlanc is the Employer or Master of Those Under His Command, and Because the DOC Caused Mr. Traweek's False Imprisonment.

Defendants make two arguments for dismissing Plaintiff's state law tort claims.

First, they argue that Secretary LeBlanc is not the employer of DOC employees, and so cannot be held vicariously liable for their acts.[128] That argument does not, of course, address the fact that Secretary LeBlanc is also sued in tort for his *own* tortious actions, such as his negligence in setting up a system which results in the overdetention of thousands of inmates per year. That argument is also contrary to Fifth Circuit case law. In the context of Fair Labor Standards Act and Family and Medical Leave Act, the Fifth Circuit held that public officials sued in their individual capacities qualify as employers of employees of their department and the Eleventh Amendment immunity does not attach.[129] Louisiana law offers a broader definition of employer than these federal laws.[130] Defendants may be correct, as they argue in their brief, that the State is obligated by State law to indemnify Secretary LeBlanc or the other DOC employees, but that does not determine whether LeBlanc is the "master" or "employer" of those under his command.

Second, Defendants argue they cannot be responsible for Mr. Traweek's false imprisonment because he was in the "physical" and "legal" custody of the sheriff's office.[131] But that argument completely fails to engage with the fact that all parties understood the DOC to be

---

[126] R. Doc. 41, pp. 38-9, citing *Berry v. Baca*, 379 F.3d 764 (9th Cir. 2004) (29-hour overdetention was unreasonable under the circumstances); *Davis v.   Hall*, 375 F.3d 703, 719-20 (8th Cir. 2004) (noting that "even a thirty-minute detention after being ordered released could work a violation of a  prisoner's  constitutional  rights  under  the Fourteenth Amendment.");
[127] *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011).
[128] R. Doc. 107-1
[129] *Modica v. Taylor*, 465 F.3d 174, 183-184 and 187 (5th Cir. 2006); *Lee v. Coahoma County, Miss.,* 937 F.2d 220, 226 (5th Cir. 1991), *amended by* 37 F.3d 1068 (5th Cir. 1993).
[130] La. Civil Code art. 2320 ("Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.").
[131] R. Doc. 107-1 at 22-23.

the entity determining when Mr. Traweek should be released. The sheriff's office said they had "no authority" to release Mr. Traweek without approval from the DOC.[132] And the DOC put Mr. Traweek through their "normal process" for processing and release.[133] Indeed, the DOC concedes that they "approved [Mr. Traweek's] final release" and that Ms. Jones personally "transmitted the release certificate."[134] Considering that the DOC took upon itself to decide Mr. Traweek's release date, it can hardly escape responsibility for when he was released.[135]

Defendants' motion should be denied.

## CONCLUSION

WHEREFORE, Defendants' Motion for Summary Judgment should therefore be denied.

Respectfully submitted,

*/s/ Casey Denson*
Casey Rose Denson (La. Bar. No. 33363)
3436 Magazine Street, Unit #7005
New Orleans, LA 70115
Telephone: (504) 224-0110
Email: cdenson@caseydensonlaw.com

/s/ *William Most*
Law Office of William Most, L.L.C.
William Most (La. Bar No. 36914)
williammost@gmail.com
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
T: (504) 509-5023

---

[132] Ex. C.

[133] R. Doc. 107-1 (Plaintiff subject to the DOC's "normal process" for "release processes"); *see also* R. Doc. 107-2 (detailing DOC's release processes applied to Mr. Traweek).

[134] R. Doc. 107-2 at ¶¶ 68-69.

[135] The tort of false imprisonment occurs when one "restrains another against his will without a warrant or other statutory authority. Simply stated, it is restraint without color of legal authority." *Kyle v. City of New Orleans*, 353 So.2d 969, 971 (La., 1977); *see also Miller v. Desoto Regional Health Sys.*, 128 So.3d 649, 655-56 (La. App. 3d Cir. 2013). There is no requirement of personal restraint. That restraint can occur by directing the actions of a third party. *See, e.g., Ewans v. Wells Fargo Bank*, 389 F. App'x 383, 388 (5th Cir. 2010) ("in Texas... liability for false imprisonment extends beyond those who willfully participate in detaining the complaining party to those who request or direct the detention. False imprisonment's first element may thus be satisfied by conduct that is intended to cause one to be detained, and in fact causes the detention, even when the actor does not participate in the detention.")