UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOHNNY TRAWEEK                                    CIVIL ACTION

v.                                               NO. 19-1384

MARLIN GUSMAN, ET AL.                            SECTION "F"


ORDER AND REASONS

Before the Court is the defendants' motion for summary judgment on each of the plaintiff's outstanding claims.  For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

**Background**

In this civil rights action, the plaintiff Johnny Traweek claims that bureaucratic incompetence caused him to be unlawfully detained in Orleans Parish Prison for twenty days beyond his court-ordered release date.  See Traweek v. Gusman, 414 F. Supp. 3d 847, 853–55 (E.D. La. 2019).[1]

In the time since Traweek filed his original complaint on February 14, 2019, he has amended his pleadings three times and the Court has dismissed certain claims against certain defendants.

---

[1]    For a thorough description of the circumstances giving rise to this case, see Traweek, 414 F. Supp. 3d 847.  For sake of efficiency, the Court assumes familiarity with the background provided there.

1

See id. at 869.   Remaining now are a total of thirteen claims against three defendants in their individual capacities: James LeBlanc (the Secretary of the Louisiana Department of Public Safety & Corrections), and Tracy DiBenedetto and Ashley Jones, employees of LeBlanc's Department who allegedly acted unlawfully in slow-rolling the processing of Traweek's release after being "personally put on notice" of Traweek's ongoing overdetention. See Opp'n at 1.

Contending that the undisputed material facts surrounding Traweek's unfortunate overdetention entitle them to judgment as a matter of law, the defendants collectively move for summary judgment on - and dismissal of - each of Traweek's remaining claims.

I.

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate where the record reveals no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine dispute of fact exists where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  A genuine dispute of fact exists only "if the evidence is such that

2

a reasonable jury could return a verdict for the nonmoving party."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Supreme Court has emphasized that the mere assertion of
a factual dispute does not defeat an otherwise properly supported
motion.  See id.  Therefore, where contradictory "evidence is
merely colorable, or is not significantly probative," summary
judgment remains appropriate.  Id. at 249-50 (citation omitted).
Likewise, summary judgment is appropriate where the party opposing
the motion fails to establish an essential element of his case.
See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In
this regard, the nonmoving party must do more than simply deny the
allegations raised by the moving party.  See Donaghey v. Ocean
Drilling & Expl. Co., 974 F.2d 646, 649 (5th Cir. 1992).  Instead,
it must come forward with competent evidence, such as affidavits
or depositions, to buttress its competing claim.  Id.  Hearsay
evidence and unsworn documents that cannot be presented in a form
that would be admissible at trial do not qualify as competent
opposing evidence.  FED. R. CIV. P. 56(c)(2); Martin v. John W.
Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987) (per
curiam).

Finally, in evaluating a summary judgment motion, the Court
must read the facts in the light most favorable to the nonmoving
party.  Anderson, 477 U.S. at 255.

3

II.

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Urged at this phase in the proceedings, the defendants' motion for summary judgment reads and functions like a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. In essence, the defendants assert that the undisputed facts in the record, even when read in the light most favorable to Traweek, do not establish that Traweek has a viable legal claim against the defendants. If the defendants are correct, then the Court must indeed grant summary judgment in their favor and dismiss Traweek's claims as legally baseless. See id.

The Court accordingly proceeds to evaluate Traweek's ability to state a viable claim on the developed factual record at hand. Traweek's claims fall into two categories: first, constitutional claims for asserted violations of Traweek's due process rights under the Federal and Louisiana Constitutions, and second, garden-variety tort claims under Louisiana law – specifically, for false imprisonment, negligence, and (against LeBlanc only) respondeat

superior.  The Court assesses each defendant's possible liability with regard to both sets of claims in turn.

### A.   Traweek's Constitutional Claims

Traweek sues each defendant under 42 U.S.C. § 1983 for violations of his Fourteenth Amendment due process and Article I, Section 2 the Louisiana Constitution, which "provides the same due process protections as . . . the United States Constitution." See Cripps v. La. Dep't of Agric. & Forestry, 819 F.3d 221, 232 (5th Cir. 2016).  Because the Louisiana Constitution's due process guarantee is coextensive with that of the Federal Constitution, the qualified immunity defense available to state officials sued under § 1983 applies with equal force to Traweek's federal and state constitutional claims.  See Burge v. Parish of St. Tammany, 187 F.3d 452, 482 (5th Cir. 1999); Moresi v. State ex rel. Dep't of Wildlife & Fisheries, 567 So. 2d 1081, 1093 (La. 1990).

In the simplest of terms, qualified immunity "protects officers from liability for damages unless they violate clearly established law." See Samuel L. Bray, Foreword: The Future of Qualified Immunity, 93 NOTRE DAME L. REV. 1793, 1793 (2018); see also Pearson v. Callahan, 555 U.S. 223, 231 (2009) ("The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'" (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982))). Qualified immunity thus "operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.'" <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002) (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 206 (2001)).

The Supreme Court has "mandated a two-step sequence for resolving government officials' qualified immunity claims." <u>Id.</u> at 232.

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of [the] defendant's alleged misconduct.

<u>Id.</u> (citations omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." <u>Saucier</u>, 533 U.S. at 202, *overruled in part on other grounds by* <u>Pearson</u>, 555 U.S. at 236.

Here, each defendant claims entitlement to qualified immunity. Because the defendants do so "in good faith, the burden shifts to [Traweek] to rebut" each particular defendant's qualified immunity. <u>See</u> <u>Disraeli v. Rotunda</u>, 489 F.3d 628, 631

(5th Cir. 2007).  Where Traweek has failed to do so with sufficient particularity,[2] his constitutional claims must be dismissed; but where the facts in the record *do* afford Traweek a provable

---

[2]    As detailed below, the greatest weakness in Traweek's case is not factual, but legal.  In the papers he has submitted throughout this litigation, Traweek paints a startling picture of a department of corrections in calamitous disarray.  See Opp'n at 5–11.  Indeed, as Traweek persuasively illustrates, incompetence in the Department seems to run rampant – and worse yet, the Department seems to be well aware of that reality.  See id.  Unfortunately for Traweek, that fact has little bearing on the Court's constitutionally limited task in presiding over Traweek's particular case.  Thus, the (near-)fatal flaw in Traweek's papers is an overarching failure to bring to the Court's attention "clearly established law" on the unlawfulness of the *particular* actions of *these* defendants in *this* case.

With a dearth of on-point cases to support his cause, Traweek concentrates on demonstrating the unreasonableness of the defendants' actions in light of the clearly established constitutional rule "that a jailer has a duty to ensure that inmates are timely released from prison." See Porter v. Epps, 659 F.3d 440, 445 (5th Cir. 2011).  The second prong of the qualified immunity analysis seldom permits such generality, however.  This is because the Court is required to determine whether "*all* reasonable officials in the defendant's circumstances would have *then* known that the defendant's conduct" violated the plaintiff's clearly established rights.  See, e.g., Thompson v. Upshur County, 245 F.3d 447, 457 (5th Cir. 2001) (some emphasis added).  In other words, the "contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (emphasis added).  So here, the fact that reasonable officials in the defendants' positions would have known of Traweek's general entitlement to timely release does not make their acts and omissions – no matter how frustrating in hindsight – "objectively unreasonable" under the standards that govern this Court's analysis.

constitutional claim, such claims must be preserved for trial.[3]
Cf. Celotex, 477 U.S. at 322.

The Court expounds on its findings with respect to each
individual defendant below.  See Meadours v. Ermel, 483 F.3d 417,
421 (5th Cir. 2007) (noting that the Fifth Circuit has
"consistently examined the actions of defendants individually in
the qualified immunity context").

1.   Tracy DiBenedetto

The Court begins with Traweek's constitutional claims against
Tracy DiBenedetto.

---

[3]   Before proceeding further, two additional notes on themes
that pervade much of Traweek's opposition to the defendants'
motion:

First, while Traweek makes much of the fact that the Court
previously denied qualified immunity to LeBlanc and Jones at
the motion to dismiss stage, he fails to account for inherent
procedural nuances that make an important difference.  At the
motion to dismiss stage, the Court was required to accept Traweek's
allegations as true and determine whether those allegations
afforded Traweek a "plausible" shot at relief such that discovery
could continue.  Now, armed with a fuller record, the Court must
determine whether the movant is entitled to judgment as a matter
of law in light of the undisputed *facts* the plaintiff has
unearthed.

Second, while Traweek argues that material disputes of fact
preclude summary judgment, the defendants are correct that Traweek
"does not genuinely dispute the actions of the Defendants," but
instead disputes the *reasonableness* of those actions.  See Reply
at 1.  The pertinent question is not *what* actions the defendants
took, but whether those actions were objectively unreasonable such
that the defendants are not entitled to qualified immunity.

8

DiBenedetto heads the Department's "Administrative Remedy Procedure" program.  Traweek claims that DiBenedetto "did nothing more" than providing cursory responses and conducting a half-hearted investigation after receiving emails from Traweek's attorney that put her "on notice of Mr. Traweek's overdetention" - in addition to a litany of allegations concerning DiBenedetto's slow response and apparent unwillingness to see to it that Traweek was promptly released.  See Opp'n at 11-17.  In a similar vein, Traweek asserts that DiBenedetto is liable as a "bystander" for failing to intervene in defense of Traweek's constitutional rights.

Whatever the strength of his factual allegations, Traweek cites no law that clearly establishes that DiBenedetto's chosen course of action was objectively unreasonable under the circumstances.  While Traweek cites a Fifth Circuit case for the abstract principle that "unlike his prisoner, the jailer has the means, the freedom, and the duty to make necessary inquiries" on the prisoner's behalf, glaringly absent from Traweek's argument is any detail whatsoever on the parameters of the "jailer's . . . duty to make necessary inquiries" – even assuming that a mid-ranking bureaucrat like DiBenedetto qualifies as a "jailer" to

begin with. See Whirl v. Kern, 407 F.2d 781, 792 (5th Cir. 1968).[4]
To be sure, DiBenedetto *did* make *some* inquiries: indeed, she
checked the "CAJUN" database, responded to Traweek's attorney, and
performed some investigation into the matter.

As such, any failure by DiBenedetto to move heaven and earth
to secure Traweek's release the moment she supposedly learned of
his overdetention is not cognizable for purposes of negating
DiBenedetto's entitlement to the broad qualified immunity afforded
to officials in her position.

    2.   Ashley Jones

In arguing that the conduct of Ashley Jones was objectively
unreasonable, Traweek cites even fewer cases to establish what
"*all* reasonable officials" would have supposedly known while in
Jones's shoes: *none* in fact, aside from snippets from this Court's
opinion denying Jones qualified immunity at the motion to dismiss
stage. Cf. Thompson, 245 F.3d at 457; Traweek, 414 F. Supp. 3d
847.

In the time since the Court's decision then, it has now been
discovered that Jones received paperwork indicating Traweek's
entitlement to release three days earlier than previously known.
In light of this development, Traweek bases the bulk of his present

---

[4]    Traweek's cases on bystander liability provide hardly any
more guidance to officials in DiBenedetto's position.

argument on the notion that if the Court held that a one-day delay in processing Traweek's paperwork "was sufficient to deny qualified immunity" at the motion to dismiss stage, "then *a fortiori*, a four-day delay must require denial of qualified immunity." <u>See</u> Opp'n at 18.

The defendants are correct, however, that the Court did not deny Jones qualified immunity because of the length of her delay in processing Traweek's release per se,[5] but instead "because, in the absence of evidence explaining why there was a delay, the Court had to accept [Traweek's] allegations as true and, based on those allegations, it was 'plausible' that the delay was due to incompetence or knowing violation of the law." <u>See</u> Reply at 5; <u>see also</u> <u>Traweek</u>, 414 F. Supp. 3d at 868-69.  Importantly, other new evidence has come to light as well: namely, Jones's uncontroverted explanation for *why* she took four days to process Traweek's release (described in depth at Mot. 8-14).

Here again, Traweek's utter failure to cite *any* caselaw clarifying the precise "contours" of Traweek's abstract entitlement to a timely release from prison compels the Court to

---

[5]     Indeed, this Court explicitly held that the length of Jones's delay was not dispositive on the objective reasonableness of her conduct.  <u>See</u> <u>Traweek</u>, 414 F. Supp. 3d at 868-69.

grant Jones qualified immunity.[6]  Cf. Creighton, 483 U.S. at 640.
And while Traweek cites no law in support of *his* contention, the
defendants *do* cite somewhat persuasive law in support of theirs.
See Baker v. McCollan, 443 U.S. 137, 145 (1979) (holding that
officers had no constitutional obligation to work over the weekend
because Supreme Court was "quite certain that a detention of three
days over a New Year's weekend does not and could not amount" to
a deprivation of the plaintiff's speedy trial right).

At bottom, Jones contends that she received Traweek's papers
on a Friday and began processing them the following Monday; this
is hardly shocking bureaucratic behavior, and Traweek provides no
precedent whatsoever in support of the notion that all officials
in Jones's position would have known that taking Jones's course of
action was objectively unreasonable and unconstitutional.

3.  James LeBlanc

Secretary LeBlanc's entitlement to qualified immunity is a
closer call.  As the Court summarized at the motion to dismiss
stage,

---

[6]     The doctrine of qualified immunity "is shown a special
solicitude by the Supreme Court" for good reason: because it
"balances two important interests – the need to hold public
officials accountable when they exercise power irresponsibly and
the need to shield officials from harassment, distraction, and
liability when they perform their duties reasonably."  Pearson,
555 U.S. at 231; Bray, supra, at 1793.

> LeBlanc's § 1983 individual capacity liability is predicated solely on his supervisory role as Secretary of DOC; there are no allegations that he affirmatively participated in the acts that caused Mr. Traweek's constitutional deprivation.   Thus, LeBlanc is only liable under § 1983 if Mr. Traweek [can show] that [LeBlanc] implemented unconstitutional . . . policies that causally resulted in [Traweek's] overdetention.

Traweek, 414 F. Supp. 3d at 867.

Again, Traweek offers little legal support in his argument on LeBlanc's entitlement to qualified immunity, instead mounting a staggering volume of factual evidence of incompetence and indifference in the Department headed by LeBlanc. See Opp'n at 5–11.   The disturbing nature and sheer weight of this "pattern evidence" is compelling and has led several courts to deny LeBlanc qualified immunity in similar cases.   See Crittindon v. Gusman, 2020 WL 1862467, at *15 (M.D. La. Apr. 13, 2020) ("The state of affairs at the DOC, where DOC's staff were passive and essentially flying blind unless contacted by a concerned family member, evinces a reckless disregard for the likelihood of overdetention in the DOC system."); Grant v. Gusman, 2018 WL 3869494, at *11 (E.D. La. Aug. 14, 2018) (denying LeBlanc qualified immunity where plaintiff's alleged facts made it "plausible that Secretary LeBlanc engaged in a policy of unconstitutionally over-detaining persons and that policy was the driving force behind" the plaintiff's alleged constitutional injury).

More importantly though, the Fifth Circuit recently followed suit in another overdetention case against LeBlanc, albeit in an unpublished decision that cannot be cited or construed as precedent in this circumstance. There, the court of appeals identified this particular case as one containing a factual scenario in which LeBlanc *could* be held liable for his Department's pattern of overdetention. See Hicks v. LeBlanc, 2020 WL 6164338, at *4 (5th Cir. Oct. 21, 2020) (per curiam) (observing that "LeBlanc could be held liable for incompetent over-detention, such as the failure to process a prisoner's release or immediately compute an inmate's sentence after being sentenced to time served," where, as here, the plaintiff "alleged that LeBlanc knew of the DPSC's long history of over-detaining inmates" and "alleged facts . . . which included processing delays, data errors, inconsistent calculation methodologies, and [other] unspecified deficiencies . . . speak[ing] to the incompetence of DPSC employees and the lack of adequate training and supervision" (emphasis omitted)).

As with DiBenedetto and Jones, Traweek's constitutional claims against LeBlanc raise issues that are primarily legal in nature – indeed, the question is less *what* happened to Traweek and similarly situated inmates as whether LeBlanc's complicity in establishing (and/or failing to correct) policies leading to such extensive violations of inmates' clearly established rights to

14

timely release was objectively unreasonable under the circumstances.  That question is best left for trial.

Accordingly, in light of the foregoing – and particularly in light of the Fifth Circuit's signal in Hicks – the Court cannot grant qualified immunity to LeBlanc on the record before the Court. As a result, Traweek has triable constitutional claims against LeBlanc, and the defendants' motion for summary-judgment dismissal of such claims must be denied.

### B.    Traweek's Tort Claims

That leaves Traweek's ordinary tort claims.  Specifically, Traweek sues all three defendants for negligent overdetention and false imprisonment, and seeks damages from LeBlanc in particular for the torts of Department employees for whom LeBlanc is supposedly vicariously liable under Louisiana law.

The defendants move for summary judgment on all such claims, and the Court considers their motion with regard to each claim in turn.

#### 1.   Negligence (Against All Defendants)

The following "four inquiries must be affirmatively answered" "[f]or a plaintiff to recover on a negligence theory" under Louisiana law:

I. Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred?

II. Did the defendant owe a duty to the plaintiff?

III. Was the duty breached?

IV. Was the risk, and harm caused, within the scope of protection afforded by the duty breached?

Roberts v. Benoit, 605 So. 2d 1032, 1041-42 (La. 1991).

Considering the foregoing standard, the Court proceeds to evaluate Traweek's ability to state a viable negligence claim against each defendant on the developed factual record at hand. Cf. Celotex, 477 U.S. at 322.

**a.   Tracy DiBenedetto**

The summary judgment record reveals that DiBenedetto's actions in relation to Traweek were not negligent under Louisiana law. For starters, DiBenedetto reasonably responded to inquiries from Traweek's counsel and inquired as to the status of Traweek's release. But more importantly, with no indication that DiBenedetto had any ability to singlehandedly assure Traweek's timely release while operating in a tangled bureaucratic web that required action by a bevy of other individuals, there is no evidence that DiBenedetto's actions – or failures to act – were a "substantial factor" in Traweek's overdetention. See id.

**b.   Ashley Jones**

Likewise, undisputed facts in the record show that Jones's actions with regard to Traweek were similarly non-negligent. Like

16

DiBenedetto, Jones is merely a single actor in a large and multifaceted bureaucracy. As a result, she can only do what she has the power to do, and there is no evidence that her actions were beyond the pale or made a substantial difference in Traweek's particular case.

### c.  James LeBlanc

In seeking dismissal of Traweek's negligence claim against Secretary LeBlanc, the defendants argue that "LeBlanc owed no legal duty" to Traweek because Louisiana law committed Traweek to the custody of the Orleans Parish Sheriff. This argument is overly technical and unavailing, as there is certainly a chance that a reasonable factfinder could deem LeBlanc's acts and omissions - as the head of a department that had significant (if not dispositive) say in when Traweek was released from Orleans Parish Prison – to have been "substantial factor[s]" in Traweek's overdetention. See id.; see also Opp'n at 22–23 ("Defendants argue they cannot be responsible for Mr. Traweek's false imprisonment because he was in the 'physical' and 'legal' custody of the sheriff's office. But that argument completely fails to engage with the fact that all parties understood the DOC to be the entity determining when Mr. Traweek should be released. The sheriff's office said they had 'no authority' to release Mr. Traweek without approval from the DOC. And the DOC put Mr. Traweek through their 'normal process'

for processing and release.  Indeed, the DOC concedes that they 'approved [Mr. Traweek's] final release' and that Ms. Jones personally 'transmitted the release certificate.'  Considering that the DOC took upon itself to decide Mr. Traweek's release date, it can hardly escape responsibility for when he was released." (alteration in original) (footnotes omitted)).

As a result, the undisputed facts in the record reveal that Traweek has a viable negligence claim against LeBlanc that cannot be short-circuited at the summary judgment stage.

### 2.  False Imprisonment (Against All Defendants)

Traweek also sues each defendant for false imprisonment under Louisiana law.  However, as Traweek acknowledges in the operative complaint, in Louisiana, false imprisonment "is restraint without color of legal authority."  See Kyle v. City of New Orleans, 353 So. 2d 969, 971 (La. 1977); Third Am. Compl., ¶ 103.

Because there is no question that Traweek was overdetained under "color of legal authority," Traweek's false imprisonment claims must be dismissed as a matter of law.  See Kyle, 353 So. 2d at 971; see also color of authority, BLACK'S LAW DICTIONARY (10th ed. 2014) ("The appearance or presumption of authority sanctioning a public officer's actions".); color of law, id. ("The appearance or semblance, without the substance, of a legal right. . . . The term

usu. implies a misuse of power made possible because the wrongdoer is clothed with the authority of the state.").[7]

3.   Respondeat Superior (Against James LeBlanc)

In a final claim, Traweek alleges that Secretary LeBlanc is vicariously liable for torts of individuals acting within the scope of his Department's employment and "obligated by Louisiana statute to pay any judgment entered against [such] employees."  See Third Am. Compl., ¶¶ 121–28.

With seemingly little legal guidance on this issue, the parties haggle over the degree to which LeBlanc can be held vicariously liable for the actions of DiBenedetto and Jones.  For their part, the defendants argue that LeBlanc is neither an "employer" nor a "public entity" under Louisiana law; instead, they claim, the State itself is the employer of all three defendants.  See Mot. at 21–22.  Traweek counters that it is conceivable that LeBlanc qualifies as a "Master [or] employer" under Article 2320 of the Louisiana Civil Code, which provides that "Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."

---

[7]   A state prisoner is surely detained under color of legal authority.  Indeed, Traweek's is not the paradigmatic case of false imprisonment, in which a shopkeeper or other private citizen wrongfully restricts a plaintiff's movement against his will.

With no on-point authority provided by either side, the Court is satisfied that, at least at this stage, Traweek has a viable claim that LeBlanc could be held liable for any "damage" proximately caused by the work-related acts of those conceivably under his command.[8]

                    *    *    *

In striking a delicate balance "between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," the doctrine of qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ziglar v. Abbasi, 137 S. Ct. 1843, 1867 (2017) (first quoting Davis v. Scherer, 468 U.S. 183, 195 (1984); then quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). "To determine whether a given officer falls into either of those two categories, a court must ask whether it would have

---

[8]    Traweek is correct that even if the defendants are right "that the State is obligated by State law to indemnify Secretary LeBlanc or the other DOC employees, [] that does not determine whether LeBlanc is the 'master' or 'employer' of those under his command." Article 2320 of the Louisiana Civil Code appears to leave open the possibility that LeBlanc could very well be a "Master" or "employer[]" who is "answerable for the damage occasioned by [his] servants and overseers." See Opp'n at 22. In light of the defendants' failure to directly counter Traweek's legal assertion on this point – and in light of the somewhat analogous and supportive Fifth Circuit decisions cited by Traweek, see Opp'n at 22 n.129 – Traweek's respondeat superior claim against LeBlanc presents a triable legal issue that cannot be dismissed at the summary judgment stage.

been clear to a reasonable officer that the alleged conduct 'was unlawful *in the situation he confronted*.'" Id. (emphasis added) (quoting Saucier, 533 U.S. at 202).

Where Traweek largely (or completely) fails to identify any "pre-existing law" confirming that the unlawfulness of the conduct he complains of would be readily "apparent" to any reasonable officer in the defendants' positions, his claims fail to overcome the qualified immunity enjoyed by the defendants on the developed factual record at hand. Cf. Creighton, 483 U.S. at 640. For this reason, Traweek's constitutional claims against Tracy DiBenedetto and Ashley Jones must be dismissed.[9] Cf. Celotex, 477 U.S. at 322.

However, as it pertains to Secretary LeBlanc – and as the Fifth Circuit recently confirmed,[10] albeit in an unpublished decision – Traweek's claims do raise triable questions regarding the reasonableness of LeBlanc's management of a department which manifests deliberate indifference, systemic error, and rife incompetence – and which contributed to Traweek's injury in this case.

Accordingly, IT IS ORDERED: that the defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. The

---

[9]   And, for the other reasons provided above, Traweek's tort claims against DiBenedetto and Jones are likewise nonviable.

[10]   See Hicks, 2020 WL 6164338, at *4.

21

plaintiff's remaining claims against Tracy DiBenedetto and Ashley Jones, and the plaintiff's false imprisonment claim against James LeBlanc, are DISMISSED WITH PREJUDICE. The plaintiff's constitutional claims, negligence claim, and respondeat superior claim against James LeBlanc shall remain for trial.

New Orleans, Louisiana, January 20, 2021

_____

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE