UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JOHNNY TRAWEEK** | * | CIVIL ACTION |
| | * | |
| **VERSUS** | * | NO. 19-1384   SECTION "G" (1) |
| | * | |
| **MARLIN GUSMAN, ET AL.** | * | CHIEF JUDGE |
| | * | NANNETTE JOLIVETTE BROWN |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | JANIS vanMEERVELD |

**************************************

### STATEMENT OF UNDISPUTED FACTS

MAY IT PLEASE THE COURT:

The Defendant, James LeBlanc, herein articulates the undisputed facts supporting his Second Motion for Summary Judgment, in accordance with Fed. R. Civ. P. 56, and Local Rule 56.1.

1. Plaintiff, Johnny Traweek, was arrested on October 2, 2017 in New Orleans, Louisiana.[1]

2. Mr. Traweek was incarcerated at the Orleans Parish Prison following his arrest.[2]

3. On May 2, 2018 he was brought before Judge Benedict J. Willard where he pled guilty to a charge of aggravated battery in exchange for not being billed as a multiple offender by the District Attorney's Office.[3]

4. Mr. Traweek was represented by counsel at the sentencing hearing.[4]

---

[1] Exhibit 5 – Bill of Information at p. 3.
[2] Doc. 83, ¶2.
[3] Exhibit 7 – Sentencing Transcript
[4] *Id*.

1

5. Judge Willard sentenced the plaintiff to serve seven months in the parish jail with credit for time served – an amount equal to the seven months Mr. Traweek had already spent in the parish jail.[5]

6. Judge Willard did not order Traweek's release from custody.[6]

7. The sentencing minutes for Mr. Traweek's hearing incorrectly notated that Mr. Traweek was sentenced to DPSC custody.[7]

8. On May 8, 2018, the Plaintiff's current defense attorney, Stanislav Moroz, emailed Ms. Tracy Dibenedetto.[8]

9. Mr. Traweek had been represented by a different attorney at his sentencing hearing.[9]

10. Ms. Dibenetto was the Administrative Remedy Program Manager for DPSC's Administrative Remedy Procedure ("ARP") department.[10]

11. Mr. Moroz incorrectly informed Ms. Dibenedetto that Mr. Traweek "was sentenced to 7 months DOC."[11]

12. Mr. Moroz inquired as to the status of plaintiff's release, and requested that "his release be expedited."[12]

13. Releases of DPSC offenders are handled by DPSC's Pre-Classification Department.[13]

14. Ms. Dibenedetto was not a part of the pre-classification department, and worked in a different building from the pre-classification department.[14]

---

[5] *Id.* at p. 5-6.
[6] *Id.*
[7] Exhibit 5 – Pre-Classification Packet at p. 5.
[8] Exhibit 4 – May 8, 2018 Email of Stanislav Moroz at p. 5.
[9] Exhibit 7, p. 1 (recording appearance by Matt Vogel, Esq., on behalf of Defendant Traweek).
[10] Exhibit 3 – Declaration of Tracy Dibenedetto at p. 1 ¶ 1.
[11] Exhibit 4 – May 8, 2018 Email of Stanislav Moroz at p. 5.
[12] Exhibit 4 – May 8, 2018 Email of Stanislav Moroz at p. 5.
[13] Exhibit 2 – Declaration of Angela Griffin at p. 2 ¶ 11.
[14] Exhibit 3 – Declaration of Tracy Dibenedetto at p. 2 ¶ 10.

15. On May 9, 2020 Ms. Dibenedetto used her access to the CAJUN system to attempt to try and determine an answer to Mr. Moroz's inquiry regarding the plaintiff.[15]

16. The Criminal and Justice Unified Network [CAJUN] is an electronic system used statewide to track offenders, as well as conducting an offender's time calculation.[16]

17. Ms. Dibenetto was unable to find a record showing where DPSC had received the pre-classification paperwork for Mr. Traweek, and informed Mr. Moroz in an email on May 9, 2020 that his pre-classification paperwork had not been received by DPSC from OPSO.[17]

18. On May 14 and May 15, 2020 Mr. Moroz followed up with Ms. Dibenedetto to inquire as to the status of Mr. Traweek's release.[18]

19. On May 16, 2018 Ms. Dibenedetto once more checked the CAJUN system to determine whether or not DPSC had received any paperwork on the plaintiff, and was unable to find where DPSC had received a pre-classification ("pre-class") packet for Plaintiff from OPSO.[19]

20. On May 16, 2018 Ms. Dibenedetto responded to Mr. Moroz by email informing him that DPSC had not received the pre-class packet from OPSO.[20]

21. The following day, on May 17, 2018 the DPSC received Plaintiff's pre-class packet from OPSO, which was accordingly timestamped as received.[21]

22. May 17, 2018 was a Thursday.

---

[15] *Id.* at 2 ¶ 11-13.
[16] Exhibit 2 – Declaration of Angela Griffin at p. 5 ¶ 51.
[17] Exhibit 4 – May 9, 2018 Email of Tracy Dibenedetto at p. 4.
[18] Exhibit 4 – May 14 & 15, 2018 Email of Stanislav Moroz at p. 4.
[19] Exhibit 3 – Declaration of Tracy Dibenedetto at p. 2 ¶ 15-16.
[20] Exhibit 4 – May 16, 2018 Email of Tracy Dibenedetto at p. 2. (Although a copy of the email was unable to be found, the email print out does note that Mr. Moroz's May 14 email "has been replied to." Plaintiff's Third Amended Complaint also states that Ms. Dibenedetto replied to Mr. Moroz's email on May 16, 2018. *See* Rec. Doc. 83 at p.3 ¶ 10.)
[21] Exhibit 5 – Pre-Classification Packet of Plaintiff at p. 2 & Exhibit 2 – Declaration of Angela Griffin at p. 4 ¶ 40.

23. The processing and transfer of OPSO inmates to DPSC remains squarely within the authority of the Sheriff.[22]

24. OPSO Policy Number 501.13 "addresses the procedure by which '[i]nmates sentenced to the Department of Corrections (DOC) shall be processed in preparation for transfer.' "[23]

25. Additionally, OPSO Policy No. 501.13 details the Sheriff's Office's duties with regard to preparation of the "DOC Packet", which is "prepared for each inmate sentenced to state prison."[24]

26. DPSC would conduct audits of the OPSO which were done, at least in part, to ensure OPSO deputies were complying with OPSO Policy No. 501.13.[25]

27. The policy was authorized by Sheriff Gusman.[26]

28. Upon arriving at DPSC, Mr. Traweek's pre-class packet was processed by a DPSC supervisor, where it was assigned to ARDC Specialist II Bianca Spradley for the confection of an initial criminal history report via the NCIC system.[27]

29. "Pre-Classification" is the process by which DPSC identifies offenders who have been sentenced to DPSC custody and determines the logistics of their sentences.[28]

30. Pre-Classification includes time computation, awards of good-time credits, qualifications for parole, and other matters affecting the length of an offender's time in DPSC custody.[29]

31. The pre-classification process is performed when an offender receives a hard labor sentence.[30]

---

[22] Doc. 52, p. 6; Ex. 10 - OPSO Policy No. 501.13.
[23] Doc. 52, p. 6; Ex. 10, p. 1.
[24] Ex. 10, p. 3.
[25] Exhibit 11, Deposition of Sheriff Marlin Gusman, 46:4-9.
[26] *Id*.
[27] Exhibit 2 – Declaration of Angela Griffin at p. 4 ¶ 41.
[28] *Id.* at p. 2 ¶ 12.
[29] *Id.* at p. 2 ¶ 13.
[30] *Id.* at p. 2 ¶ 14.

32. That pre-class process includes but is not limited to: verification of the offender's identity, review and collection of conviction and sentencing information, time computation of release dates and parole eligibility dates in compliance with applicable sentencing laws.[31]

33. Criminal history reports are designed to confirm the identity of the person in the packet and whether the offender has any time to serve on other sentences based on the information obtained from their criminal history.[32]

34. Upon completion of the criminal history report, Ms. Spradley returned the packet to her supervisor, who subsequently reassigned the packet to Ms. Jones on May 18, 2018.[33]

35. It was common for Ms. Jones to receive between ten to fifteen pre-class packets per day.[34]

36. Ms. Jones was unable to begin processing the Plaintiff's pre-class packet on May 18, and began processing the following Monday on May 21, 2018.[35]

37. Ms. Jones reviewed Mr. Traweek's packet to ensure that it contained all of the necessary documentation. Mr. Traweek's packet included:[36]

    a. "Basic Information and Interview for Local Jail Facilities Form,"

    b. "Credit for DPSC Commitment Form",

    c. "Sentencing Minutes,"

    d. "Suspect Rap Sheet with photo from the Automated Fingerprinting Identification System", and

    e. "DPSC Acknowledgements and Signature Statement signed by the inmate."

---

[31] *Id.* at p. 2 ¶ 15.
[32] *Id.* at p. 4 ¶ 42 & 5 ¶ 5.
[33] *Id.* at p. 4 ¶ 43-44.
[34] Exhibit 1 – Declaration of Ashley Jones at p. 1 ¶ 9.
[35] *Id.* at p. 1 ¶ 7.
[36] *Id.* at p. 2 ¶ 11.

38. Ms. Jones noted that the criminal history had been completed as was required to verify Mr. Traweek's identity.[37]

39. Ms. Jones's next step in processing Mr. Traweek's packet was to verify that he received a hard labor sentence.[38]

40. Mr. Traweek's pretrial packet did not include a Bill of Information or a Uniform Commitment Order.[39]

41. Mr. Traweek's Sentencing Minutes indicated that he had received a hard labor sentence.[40]

42. Offenders who have been sentenced to parish time (not hard labor) are the responsibility of the parish Sheriff.[41]

43. In situations where an ARDC Specialist receives a pre-classification packet wherein the individual did not receive a hard labor sentence, the ARDC Specialist immediately reports it and turns over the packet to their supervisor so that it may transmitted back to the facility holding the individual.[42]

44. As part of the pre-classification process ARDC Specialists are required to verify the identity of the offender in order to ensure that the person who was convicted is the same person currently in custody.[43]

45. An offender's identity is confirmed by comparing the information with what is contained in the Criminal and Justice Unified Network [CAJUN] using an offender's previously

---

[37] *Id.* at p. 2 ¶ 12.
[38] *Id.* at p. 2 ¶ 13.
[39] *Id.* at p. 2 ¶ 14.
[40] Exhibit 5 – Pre-Classification Packet at p. 5.
[41] Exhibit 2 – Declaration of Angela Griffin at p. 2 ¶ 23.
[42] Exhibit 1 – Declaration of Ashley Jones at p. 2 ¶ 17.
[43] *Id.* at p. 2 ¶ 18.

assigned DPSC number or new DPSC number, with the information obtained or learned from the Pre-Class Packet.[44]

46. Ms. Jones verified Mr. Traweek's by cross checking the criminal history with the photo sheet[45] to ensure the social security number, the FBI number, and SID number all matched. The cross checking also requires me to review his NCIC fingerprinting paperwork and criminal history to ensure that they coincide with the disposition for the conviction on his sentencing minutes (this is usually done on a Uniform Commitment Order).[46]

47. Ms. Jones physically input the following information for Mr. Traweek into CAJUN.

    a. The crime Mr. Traweek was convicted of;

    b. the date the crime was committed;

    c. the sentence date;

    d. the sentence start date;

    e. the sentence length for each charge;

    f. Mr. Traweek's offender class for the charge related to number of felony convictions (calculated by using the information on the CAJUN system and the Criminal History Reports; and Good time rate and parole eligibility for each charge (determined by the commitment date and the type of crime)).[47]

48. After CAJUN computed Mr. Traweek's time, Ms. Jones verified that the computation was accurate.[48]

---

[44] Exhibit 2 – Declaration of Angela Griffin at p. 5 ¶ 49.
[45] Exhibit 5 – Pre-Classification Packet at p. 7.
[46] Exhibit 1 – Declaration of Ashley Jones at p. 2 ¶ 19.
[47] *Id.* at p. 3 ¶ 20.
[48] *Id.* at p. 3 ¶ 23.

49. Ms. Jones completed her initial intake and calculation of Plaintiff's time calculation at approximately 2:13 P.M. on May 21, 2018. This is reflected in the Master Record printout.[49]

50. Based on Mr. Traweek's time calculation results, Ms. Jones determined that Mr. Traweek was eligible for immediate release.[50]

51. Ms. Jones immediately personally hand-delivered delivered Plaintiff's completed time calculation to her supervisor so that it could be double checked for accuracy.[51]

52. Ms. Jones's supervisor completed her review at around 2:55 P.M. on May 21, 2018, and authorized Ms. Jones to begin preparing Plaintiff's release paperwork.[52]

53. Normally, the release clearing process, which can be extremely detailed and time consuming, starts approximately 45 days before an inmate is scheduled to be released.[53]

54. But in this case, because it was determined that Johnny Traweek was overdue for release, the release process was started immediately.[54]

55. The "release clearing process" is a separate process from the pre-class process.[55]

56. Normally, the release clearing process begins 45 days prior to an offender's release.[56]

57. When an offender is discovered to be eligible for "immediate release", the release clearance process begins immediately.[57]

---

[49] Exhibit 5 – Pre-Classification Packet p. 20 & Exhibit 1 – Declaration of Ashley Jones at p. 3 ¶ 24.
[50] Exhibit 1 – Declaration of Ashley Jones at p. 3 ¶ 25.
[51] *Id.* at p. 3 ¶ 28.
[52] Exhibit 5 – Pre-Classification Packet at p. 20.
[53] Exhibit 2 – Declaration of Angela Griffin at p. 2 ¶ 7.
[54] *Id.* at p. 2 ¶ 18.
[55] *Id.* at p. 2 ¶ 16.
[56] *Id.* at p. 2 ¶ 17.
[57] *Id.* at p. 2 ¶ 18.

58. The release clearing process includes, but is not limited to: clearance of each offenders' records prior to their release, and the creation of offenders' release certificates for transmission to their holding facilities.[58]

59. In addition, the release clearing process involves coordination with the Office of Probation and Parole, confirmation of housing of sex offenders, and compliance with other applicable state laws.[59]

60. Ms. Jones worked on Mr. Traweek's Release Clearing Checklist on the morning of May 22, 2018. As is evidenced by the printing timestamp located on the Recommendation for Release Memorandum and the Transfer Record Inquiry timestamp.[60]

61. The Release Clearing Checklist is to assure that all processes have been followed and to confirm that an offender should be released.[61]

62. While preparing the release clearing checklist for Mr. Traweek, Ms. Jones sent Orleans Parish Sheriff's Office a Release Clearance Sheet on May 22, 2018.[62]

63. Release Clearance Sheets are required to be completed by the holding facility, and must be completed and transmitted back to DPSC before an offender can be released.[63]

64. As part of completing the Release Clearing Checklist, Ms. Jones must do the following:[64]

    a. Obtain the Mr. Traweeks' criminal history reports (State Police criminal history, FBI criminal history and any out of state criminal history) to determine whether the Mr. Traweek had any warrants, charges without dispositions, and any Louisiana or out-of-state proceedings in which he may need to serve time.

---

[58] *Id.* at p. 2 ¶ 19.
[59] *Id.* at p. 2 ¶ 20.
[60] Exhibit 5 – Pre-Classification Packet at p. 30-39.
[61] Exhibit 1 – Declaration of Ashley Jones at p. 4 ¶ 33 & Exhibit 2 – Declaration of Angela Griffin at p. 6 ¶ 67.
[62] Exhibit 1 – Declaration of Ashley Jones at p. 4 ¶ 36 & Exhibit 5 – Pre-Classification Packet p. 31.
[63] *Id.* at p. 4 ¶ 37.
[64] *Id.* at p. 4 ¶ 34.

    b. Clear an offender's criminal history by placing phone calls to various State Departments of Corrections, Counties, and other jurisdictional entities.

    c. Check for DNA because Louisiana law requires an offender's DNA be obtained before release.[65]

65. While preparing the Release Clearing Checklist for Mr. Traweek. Ms. Jones sent Orleans Parish Sheriff's Office a Release Clearance Sheet on May 22, 2018.[66]

66. Release Clearance Sheets are required to be completed by the holding facility, and must be completed and transmitted back to DPSC before an offender can be released.[67]

67. Ms. Jones did not find any DNA recordings for Mr. Traweek, as is required by State law before he may be released.[68]

68. Ms. Jones called OPSO by telephone several times, and when she received no response she sent an email to the OPSO contact, Sheila Crader, at 12:46 P.M. on May 22, 2018.[69]

69. At 1:05 P.M., Ms. Crader responded and provided Ms. Jones with Mr. Traweek's DNA kit number.[70]

70. Mr. Traweek also had several convictions in other states which had to be cleared before he could be released.[71]

71. After receiving the Release Clearing Sheet from the Sheriff's Office, obtaining the DNA kit number, and completing the clearance checks of all of the jurisdictions where Mr. Traweek had convictions, Ms. Jones prepared the certificate of release.[72]

---

[65] Louisiana Revised Statutes 15:609.
[66] Exhibit 5 – Pre-Classification Packet at p. 31.
[67] Exhibit 2 – Declaration of Angela Griffin at p. 6 ¶ 66.
[68] Exhibit 1 – Declaration of Ashley Jones at p. 4 ¶ 38.
[69] Exhibit 1 – Declaration of Ashley Jones at p. 4 ¶ 39 & Exhibit 5 – Pre-Classification Packet at p. 33.
[70] Exhibit 5 – Pre-Classification Packet at p. 33.
[71] Exhibit 1 – Declaration of Ashley Jones at p. 4 ¶ 35.
[72] *Id.* at p. 4 ¶ 41.

72. After completing her review of the Release Clearing Checklist, Ms. Jones hand delivered the paperwork and certificate of release to her supervisor.[73]

73. Ms. Jones's supervisor reviewed her work, and took it to the ARDC Manager, Angela Smith for final approval.[74]

74. ARDC Manager Angela Smith approved the final release, and Ms. Jones's supervisor hand delivered the approval to her so that Jones could transmit the full term release paperwork to the holding facility.[75]

75. Ms. Jones transmitted the release certificate via fax to the Orleans Parish Sheriff's Office during the early afternoon of May 22, 2018.[76]

76. Ms. Jones called OPSO in order to confirm that they had received the release certificate.[77]

77. OPSO confirmed their receipt of Mr. Traweek's release paperwork.[78]

78. Upon completing Mr. Traweek's release paperwork and transmitting it to the holding facility, Ms. Jones scanned all of the documentation that she prepared regarding Mr. Traweek into ORACLE.[79]

79. ORACLE is an electronic database utilized by DPSC that houses scanned versions of offender documentation.[80]

80. It is reasonable for a pre-class packet received on a Thursday to not be completed until the following Tuesday because the various parts of the pre-class process can require significant time to complete.[81]

---

[73] *Id.* at p. 4 ¶ 42.
[74] *Id.* at p. 5 ¶ 43.
[75] *Id.* at p. 5 ¶ 44.
[76] *Id.* at p. 5 ¶ 45 & Exhibit 5 – Pre-Classification Packet p. 31.
[77] Exhibit 1 – Declaration of Ashley Jones at p. 5 ¶ 46.
[78] Exhibit 1 – Declaration of Ashley Jones at p. 5 ¶ 47.
[79] *Id.* at p. 5 ¶ 48.
[80] Exhibit 2 – Declaration of Angela Griffin at p. 4 ¶ 38.
[81] *Id.* at p. 4 ¶ 46.

81. On May 22, 2018, Traweek's attorney, Mr. Moroz, filed a Writ of Habeas Corpus and Motion for Immediate Release.[82]

82. Mr. Moroz sent a copy of the Motion to the Sheriff's Office but not to any employee of DPSC.[83]

83. A hearing was held on May 22, 2018 before the sentencing judge. At the conclusion of the hearing, the Writ of Habeas Corpus and Motion for Immediate Release were denied.[84]

84. Mr. Moroz announced his intention on the record to seek appellate review.[85]

85. At approximately 3:00 P.M. on May 22, 2018, Mr. Traweek was released from the Orleans Parish Sheriff's jail.[86]

**WHEREFORE**, the defendant, James LeBlanc requests the foregoing be deemed sufficient and that his Motion for Summary Judgment be granted.

Respectfully submitted,

JEFF LANDRY
ATTORNEY GENERAL

*s/Phyllis E. Glazer*
**PHYLLIS E. GLAZER (La. #29878)**
**ASSISTANT ATTORNEY GENERAL**
Lead Counsel

Louisiana Department of Justice,
Litigation Division
1885 North Third Street, 3rd Floor
Post Office Box 94005 (70804-9005)
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6300
Facsimile: (225) 326-6495
E-mail: GlazerP@ag.louisiana.gov

**ANGELA O'BRIEN (La. #34010)**
**ASSISTANT ATTORNEY GENERAL**

Louisiana Department of Justice,
Litigation Division
1450 Poydras Street, Suite 900
New Orleans, Louisiana 70112
Telephone:   (504) 599-1200
Facsimile:   (504) 599-1212
E-mail:   O'BrienA@ag.louisiana.gov

---

[82] Exhibit 9(A) – Writ of Habeas Corpus and Motion for Immediate Release. Also filed into the record as Doc. 32-1.
[83] Exhibit 9(b) – Email from Moroz to Arcuri.Doc. 32-2.
[84] Exhibit 8 – Docket Master
[85] *Id.*
[86] *See* Rec. Doc. 83 at p. 3 ¶ 15 & Exhibit 5 – Pre-Classification Packet p. 50-51.