# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JOHNNY TRAWEEK** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 19-1384   SECTION "G" (1)** |
| | * | |
| **MARLIN GUSMAN, ET AL.** | * | **CHIEF JUDGE** |
| | * | **NANNETTE JOLIVETTE-BROWN** |
| | * | |
| | * | **MAGISTRATE JUDGE** |
| | * | **JANIS** van**MEERVELD** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**MEMORANDUM IN SUPPORT OF *SECOND* MOTION FOR SUMMARY JUDGMENT BY DEFENDANT JAMES LEBLANC**</u>

**MAY IT PLEASE THE COURT:**

James LeBlanc, who is only sued personally, is entitled to entry of summary judgment in his favor because he is entitled to qualified immunity from suit under 42 U.S.C. § 1983 and the Louisiana Constitution. Furthermore, LeBlanc is entitled to summary judgment on the state law negligence claim against him, which will necessarily be disposed of when this Court analyzes LeBlanc's qualified immunity defense. Alternatively, all of Traweek's claims are founded on an allegation that he was unlawfully imprisoned and, because no court declared that any period of his incarceration was unlawful, he is barred from pursuing a claim for money damages under federal or state law.

## I.    Statement of the Case

LeBlanc submits this second Motion for Summary Judgment in accordance with the Judgment entered by the Fifth Circuit in this case and corresponding Order of this Court. Docs. 146, 150.

The Plaintiff, Johnny Traweek, was undisputedly incarcerated in the physical custody of the Orleans Parish Sheriff from the time of his arrest through his release. Doc. 83 at ¶2-18. It is

1

further undisputed that Traweek was sentenced to serve "seven months in the custody of the Orleans Parish Sheriff, with credit for time served." *Id*. at ¶5; Exhibit 7 sentencing transcript. Thus, Johnny Traweek was in the physical and legal custody of the Orleans Parish Sheriff at all times relevant to this lawsuit.

Traweek alleges he was incarcerated "for 20 days beyond his court-ordered release date." Doc. 83, ¶1. Traweek was committed to parish custody to serve a seven month term, with credit for time served. Ex. 7 sentencing transcript. The sentencing judge did not Order Traweek's release from custody at that time. *Id*. Furthermore, Traweek filed a Writ of Habeas Corpus and Motion for Immediate Release on May 22, 2018. Doc. 83, ¶13. That Motion was denied on the merits and Plaintiff's counsel expressed his intent to apply for a writ to the Court of Appeal. Exhibit 8 – Docketmaster.

Following the May 2, 2018, hearing at which Traweek pled guilty to aggravated battery and received the seven month sentence, he was returned to the physical and legal custody of OPSO. But, the minute clerk of the sentencing judge issued an incorrect minute entry, instead of reflecting the judge's sentence of 7 months in parish custody, the minute entry stated that Traweek had been sentenced to DPSC custody. Compare Ex. 7 (sentencing transcript) with Ex. 5, p. 5. OPSO personnel did not send the pre-class packet to DPSC until May 17, 2018, fifteen days after Traweek's sentencing. Once DPSC received the pre-class packet, DPSC personnel immediately began processing it.

Ashley Jones was employed by DPSC as an ARDC Specialist II.[1] Ms. Jones's duties were purely administrative.  Ms. Jones was assigned to process Traweek's pre-classification packet on Friday, May 18, 2018.[2] Due to the processing of other packets given to her on the same day, Ms.

---

[1] *See* Exhibit 1 – Declaration of Ashley Jones, at p. 1 ¶ 1.
[2] *See* Exhibit 1 – Declaration of Ashley Jones at p. 1 ¶ 9.

Jones was unable to begin processing Mr. Traweek's pre-class packet until Monday, May 21, 2018.[3] It is undisputed that she began processing it on Monday May 21, 2018.[4] Ms. Jones works from 8:00 A.M. until 4:30 P.M. Monday through Friday, except holidays.[5] It was not until Monday that she learned that the Plaintiff was eligible for immediate release.[6]

Because the Plaintiff was eligible for immediate release as of the date Ms. Jones calculated his sentence, both the pre-classification and release clearing processes had to be performed in tandem.[7] Normally, the two processes are done at different times. The release clearance process ordinarily begins approximately 45 days before the offender is due for release.[8]

The pre-classification process determines the offender's "release date." In order to determine Mr. Traweek's "release date", Ms. Jones first had to ensure she had sufficient documentation from OPSO and the Orleans Parish Clerk of Court to perform her duties. Then, Ms. Jones had to verify Mr. Traweek's identity.[9] Verification of Mr. Traweek's identity began on May 17, 2018, when Bianca Spradley performed a criminal records check on Mr. Traweek.[10] With the NCIC criminal history report and pre-class packet, Ms. Jones had to cross check Mr. Traweek's social security number, his FBI number, and his SID number to ensure the numbers in the pre-class packet matched those in the criminal history report.[11] She also had to compare the NCIC fingerprinting paperwork and criminal history to ensure that they coincided with the disposition

---

[3] *Id.* at p. 1 ¶ 7.
[4] Rec. Doc. 41, p. 4.
[5] *See* Exhibit 1– Declaration of Ashley Jones at p. 1 ¶ 5.
[6] *See* Exhibit 1– Declaration of Ashley Jones at p. 3 ¶ 24-25.
[7] *See* Exhibit 1– Declaration of Ashley Jones at p. 2 ¶ 16 & 18.
[8] *Id.* at p. 2 ¶ 17.
[9] *Id.* at ¶18. See also Exhibit 2 - Declaration of Angela Griffin at ¶15.
[10] Ex. 2 at ¶42, ¶50.
[11] *See* Exhibit 1– Declaration of Ashley Jones at p. 2 ¶ 19.

for the conviction on his sentencing minutes.[12] This is usually done on a Uniform Commitment Order, but lacking a UCO, Ms. Jones was forced to rely upon the Sentencing Minutes.[13]

After verifying Mr. Traweek's identity, Ms. Jones performed the sentence calculation. That required Ms. Jones to input various data points into CAJUN, which then performed the calculation.[14]  In this case, Mr. Traweek was serving a flat sentence on a single conviction. However, Ms. Jones was nonetheless obligated to ensure Mr. Traweek had no other sentence to serve.[15]  Additionally, a sentence computation does not necessarily result in a single "release date." Offenders who are entitled to earn good time credits will also have a good time release date.  All of those data points had to be investigated by Ms. Jones and input into CAJUN to ensure that CAJUN accurately recorded and calculated the offender's sentence.[16] After CAJUN generated the Plaintiff's sentence computation, Ms. Jones manually checked to ensure CAJUN calculated the correct date.[17] Ms. Jones completed that aspect of the pre-classification process at 2:13 PM on May 21, 2018.[18]

The pre-classification process was not complete until Ms. Jones's supervisor reviewed the sentence computation.[19] As soon as Ms. Jones completed the sentence calculation, she personally walked the paperwork to her supervisor.  Ms. Jones informed her supervisor that Mr. Traweek was due for immediate release.  Less than one hour later, Ms. Jones's supervisor instructed her to begin the release clearing process for Mr. Traweek.

---

[12] *Id.*
[13] *Id*. at ¶15.
[14]  *See* Exhibit 1– Declaration of Ashley Jones at p. 2 ¶ 20.
[15] *Id*. at ¶34-35.
[16] *See* Exhibit 2 – Declaration of Angela Griffin at p. 5 ¶ 52-55.
[17] *See* Exhibit 1– Declaration of Ashley Jones at p. 3 ¶ 23.
[18] *Id.* at p. 3 ¶ 24 and Exhibit 5 – Pre-Classification Packet at p. 43.
[19] *See* Exhibit 2 – Declaration of Angela Griffin at p. 5 ¶ 56.

The release clearing process is done to ensure the offender can legally be released from custody. Undeniably, DPSC has a duty to ensure offenders are not released from custody early.[20] Additionally, Louisiana law imposes various obligations on DPSC which must be fulfilled prior to an offender's release. Pertinent here, Louisiana law requires collection of DNA prior to the release of an offender.[21] The Plaintiff's pre-classification packet did not reflect whether DNA had been collected in accordance with state law. Therefore, Ms. Jones called OPSO and, after receiving no response, emailed Sheila Crader at OPSO to inquire about the DNA. Ms. Crader responded with the DNA kit number, and that satisfied Ms. Jones's inquiry in accordance with those applicable state laws. Ms. Jones completed the comprehensive release clearing checklist on May 22, 2018.

Ms. Jones was not yet authorized to sign the Certificate of Release or transmit it to OPSO. Ms. Jones's supervisor and the Program Director reviewed the release clearing checklist, signed the Certificate of Release and returned it to Ms. Jones who then faxed it to OPSO. Ms. Jones followed up the fax with a phone call to ensure the fax was received. The Plaintiff was then released from OPSO custody.

## II.      Standard of Review

"Summary judgment must be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Solis v. Serrett*, 31 F.4th 975, 980 (5th Cir. 2022) (quoting Fed. R. Civ. P. 56(a) (additional citation omitted)). "A qualified immunity defense alters the usual summary judgment burden of proof. Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by

---

[20] *Thomas v. Gryder*, No. CV 17-1595-EWD, 2019 WL 5790351, at *7 (M.D. La. Nov. 6, 2019).

[21] *See* La. R.S. 15:609(B)(1)(c) ("Under no circumstances shall a person who is convicted or enters into a plea agreement resulting in a conviction for an offense covered by this Chapter be released in any manner after such disposition unless and until a DNA sample has been withdrawn or taken.")

establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* (quoting *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017)) (additional citation omitted).    Additionally, plaintiff bears the burden of citing relevant jurisprudence showing "that the violated right was 'clearly established' at the time of the alleged violation." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020) (citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (additional citations omitted)).

### III.    LeBlanc is entitled to qualified immunity from suit under §1983 and the Louisiana Constitution.

Traweek sues LeBlanc under 42 U.S.C. §1983 claiming a Fourteenth Amendment due process violation. He also sues under Article I, Section 2 of the Louisiana Constitution, which is Louisiana's due process clause. "The Fourteenth Amendment of the United States Constitution provides that no state shall deprive any person of 'life, liberty, and property, except by due process of law.'" *Cripps v. Louisiana Dep't of Agric. & Forestry*, 819 F.3d 221, 232 (5th Cir. 2016) (quoting U.S. Const. amend. XIV, § 1). "The Louisiana Constitution provides the same due process protections as that of the United States Constitution." *Id* (citing *Progressive Sec. Ins. Co. v. Foster*, 711 So.2d 675, 688 (La.1998)) ("[O]ur due process guarantee in La. Const. Art. I, § 2 does not vary from the Due Process Clause of the Fourteenth Amendment to the United States Constitution."). Correspondingly, the qualified immunity defense and its governing legal standards apply equally to both the federal and state due process claims. *Burge v. Par. of St. Tammany*, 187 F.3d 452, 482 (5th Cir. 1999) (quoting *Moresi v. Department of Wildlife and Fisheries,* 567 So.2d 1081, 1093 (La.1990)) (holding "the same factors that compelled the United States Supreme Court to recognize a qualified good faith immunity for state officers under § 1983 require us to recognize a similar immunity for them under any action arising from the state constitution.")

"An officer's qualified immunity is 'an *immunity from suit* rather than a mere defense to liability,' and 'it is effectively lost if a case is erroneously permitted to go to trial.' " *Harris v. Clay Cnty., Mississippi*, 47 F.4th 271, 275 (5th Cir. 2022) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation." *Hinojosa v. Livingston*, 807 F.3d 657, 669 (5th Cir. 2015) (quoting *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011)).

### A. Traweek's detention for 20 days after he was sentenced did not violate the Fourteenth Amendment.

Traweek alleges his Fourteenth Amendment due process rights were violated when he was incarcerated for twenty (20) days after his sentencing. However, "[t]he Fourteenth Amendment does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished 'without due process of law.'" *Baker v. McCollan*, 443 U.S. 137, 145 (1979). The year after *Baker* the Fifth Circuit correspondingly held, "Detention of a prisoner thirty days beyond the expiration of his sentence *in the absence of a facially valid court order or warrant* constitutes a deprivation of due process." *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980) (emphasis added).

Traweek's entire post-sentencing detention was supported by valid court orders and, therefore, he cannot show his due process rights were violated. *Crittindon v. LeBlanc*, 37 F.4th 177, 188 (5th Cir. 2022). He was sentenced to serve a term of imprisonment, which constituted an initial commitment order.  See Ex. 7 (Transcript of Sentencing). Then, on May 22, 2018, Traweek filed a Writ of Habeas Corpus and Motion for Immediate Release, Exhibit 9(A), which was heard by the Sentencing Judge on that date. Exhibit 8. At the conclusion of the hearing, the Writ/Motion

was denied on the merits and Traweek's attorney notified the Court that he intended to seek appellate review of the ruling. Exhibit 8. Traweek was released from custody later in the day on May 22, 2018. Traweek received all necessary due process when the Court conducted a hearing on the legality of his continued detention, at which he was represented by counsel. *See Baker*, 443 U.S. at 145 ("A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers—all of whom may be potential defendants in a § 1983 action—is entirely consistent with 'due process of law.'") See also *Wallace v. Kato*, 549 U.S. 384, 389 (2007) (defining "legal process" in the context of a Fourth Amendment false imprisonment as, essentially, a hearing before a judge or magistrate). And, because the entirety of Traweek's incarceration was supported by valid court orders, his due process rights were not violated.

Furthermore, the 20-day administrative delay between Traweek's sentencing and release was not unreasonable and, therefore, Traweek's "right to timely release" was not violated. The majority panel in *Crittindon* held that the "right to timely release" is a broad legal principle. *Crittindon*, 37 F.4th at 188. The panel explained, "Of course, 'timely release' is not the same as instantaneous release: it is reasonable for jailers to have some administrative delay in processing an inmate's discharge." *Id*. (citations omitted). See also Doc. 83, ¶91 (admitting "a jailer is allowed a reasonable amount of time to process and release" a prisoner's discharge).

It is undisputed that Traweek spent seven months in the parish jail before his sentencing and that he was sentenced to serve seven months in parish jail. Ex. 7. According to Traweek, that meant he was *constitutionally* entitled to release from custody on the day of his sentencing. Doc. 83, ¶93. However, "'timely release' is not the same as instantaneous release." *Crittindon*, 37 F.4th at 188. Therefore, the Plaintiff did not have a Fourteenth Amendment due process right to release at the time of his sentencing.

The Fourteenth Amendment is not implicated until after expiration of the reasonable administrative delay for processing Traweek's sentence and discharge. *Id.* Traweek was sentenced on May 2, 2018. Ex. 7. He was released from custody on the twentieth day after his sentencing, May 22, 2018. Rec. Doc. 83 at p. 3 ¶ 15 & Exhibit 5 – Pre-Classification Packet p. 50-51. An administrative delay of 20 days is not *per se* unreasonable. See *Crittindon*, 37 F.4th at 188 (finding that detaining a prisoner "without legal notice", "for a month beyond the expiration of his sentence constitutes a denial of due process") (citing *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980)).

The question of whether a delay of less-than-30-days is unreasonable such that the Fourteenth Amendment is implicated is a legal question of based on the circumstances of the delay. *Id.* (finding "courts have declined to define the amount of delay that is reasonable"). Thus, this Court must analyze the facts and circumstances as shown in the summary judgment evidence in light of Fourteenth Amendment jurisprudence to determine whether the 20-day-delay at issue in this case was unreasonable. But the first prong of the qualified immunity analysis is not just a question of whether a plaintiff generally proved his constitutional rights were violated. He must prove *the defendant* violated his rights. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Thus, to hold LeBlanc liable, Traweek must prove that the 20-day-delay at issue in this case was unreasonable *and* that LeBlanc caused the delay. And it has already been established that LeBlanc was not personally involved in Traweek's detention. Doc. 129, p. 13 (quoting Doc. 41, p. 33).

### B. LeBlanc did not cause an unreasonable delay and, therefore, did not violate Plaintiff's Fourteenth Amendment rights.

"In a § 1983 suit […]—where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft*, 556 U.S. at 677. To prove LeBlanc is liable for violating Traweek's due process rights, Traweek must prove

9

that LeBlanc acted or failed to act "*with deliberate indifference* to violations of others' constitutional rights committed by [his] subordinates." *Porter v. Epps,* 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Texas Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir.2008) (internal quotation marks and citation omitted, alterations and emphasis in original)). A showing of merely negligent conduct by a supervisory official is insufficient to overcome the defense of qualified immunity. *Whitley v. Hanna,* 726 F.3d 631, 643 (5th Cir. 2013)("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and thus do not divest the official of qualified immunity.").

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 446-47 (quoting *Connick v. Thompson,* 131 S.Ct. 1350, 1360 (2011)). "To establish that a state actor disregarded a known or obvious consequence of his actions, there must be 'actual or constructive notice' 'that a particular omission in their [policy or] training program causes ... employees to violate citizens' constitutional rights' and the actor nevertheless 'choose[s] to retain that program.'" *Id.* (quoting *Connick*, 131 S.Ct. at 1360).

The Plaintiff must show "a pattern of similar constitutional violations" to demonstrate notice. *Connick*, 131 S. Ct. at 1360 (citing *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown,* 520 U.S. 397, 409 (1997)). "Proof of a single instance, rather than a pattern of similar violations, normally will not sustain a plaintiff's claims that such a lack of training or supervision caused a violation of [his] constitutional rights." *Cozzo v. Tangipahoa Parish Council-President Gov't,* 279 F.3d 273, 286 (5th Cir. 2002) (internal citations omitted). A pattern requires "similarity, specificity, and sufficiently numerous prior incidents." *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 396 (5th Cir. 2017), *as revised* (Mar. 31, 2017) (citing *Peterson v. City of Fort Worth,*

*Tex.*, 588 F.3d 838, 851 (5th Cir. 2009)). "'Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question.'" *Peterson*, 588 F.3d at 851 (quoting *Estate of Davis ex rel. McCully v. City of North Richland Hills,* 406 F.3d 375, 383 (5th Cir.2005). Thus, the Plaintiff cannot meet his burden of proving a "pattern of similar constitutional violations" by merely showing other prisoners had been "overdetained." The Plaintiff must prove other incidents "similar to the violation at issue here" in order to put Secretary LeBlanc on notice that a specific policy "was necessary to avoid *this* constitutional violation." *Connick*, 131 S.Ct. at 1360 (emphasis added). Whether the Plaintiff has sufficiently proven a "pattern of similar constitutional violations" is a *legal question*. *Id*. ("The legal question thus presented is whether the 27 complaints on which Peterson relies are sufficient to establish a pattern of excessive force that can be said to represent official policy.")

In *Crittindon*, the panel majority found the plaintiffs raised a genuine issue for trial about whether the defendants, including LeBlanc, knew of a pattern of similar constitutional violations. *Crittindon v. LeBlanc*, 37 F.4th 177, 187 (5th Cir. 2022).[22] In particular, the panel majority found that the plaintiffs presented sufficient evidence for a jury to potentially find that, based on a 2012 Lean Six Sigma study, LeBlanc knew it took on average 31 days to receive paperwork from parish sheriffs, that he also knew some offenders would be eligible for release immediately or shortly after sentencing, and therefore LeBlanc knew that some offenders would be overdetained while DPSC waited on receipt of paperwork from the parishes. *Id*.

The *Crittindon* dissent correctly noted that LeBlanc's knowledge in 2012 was immaterial to his knowledge as of 2019 (the year the *Crittindon* plaintiffs' claims arose) because the undisputed facts showed that DPSC all but completely eliminated its part of the aforementioned

---

[22] A petition for rehearing en banc was timely filed in *Crittindon* and remains pending. The mandate has not yet issued.

delay. *Id.* at 199 (Oldham, J. dissenting). Similarly, LeBlanc's knowledge in 2012 is immaterial to his knowledge in 2018 because the OPSO transmitted the documents to DPSC in about two weeks and DPSC processed Traweek's sentence calculation and release within three business days of receiving the documents from OPSO. Traweek cannot argue that the 2012 Lean Six Sigma study provided notice of a pattern of constitutional violations in place in 2018 without separately proving that said pattern still existed in 2018. Because the internal DPSC processing delays identified in the 2012 Lean Six Sigma study were all but eliminated and the sheriff's delay was cut in half, the Lean Six Sigma cannot satisfy Traweek's burden of proving a pattern of constitutional violations resulting from delays in transmission of paperwork by the sheriffs existed in 2018.

Any fact dispute about whether the sheriffs continued to delay transmission of paperwork would be immaterial, though, because LeBlanc's response to any known delay was not unreasonable. In opposition to LeBlanc's first Motion for Summary Judgment, Traweek argued LeBlanc is personally liable for failing to take steps to ensure the sheriffs transmitted documents to DPSC faster. Doc. 114, p. 10. But it was not unreasonable for LeBlanc to rely on the parish sheriffs to fulfill their mandatory statutory duties to collect and transmit documents regarding the individuals in their custody. *Baker*, 443 U.S. at 145 ("A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers—all of whom may be potential defendants in a § 1983 action—is entirely consistent with 'due process of law.'")

Preliminarily, DPSC does not know of a prisoner's existence or of his conviction and sentence until the sheriff sends the paperwork to DPSC. *Grant v. LeBlanc*, No. 21-30230, 2022 WL 301546, at *1 (5th Cir. Feb. 1, 2022) (citing La. C.Cr.P. 892 and finding, "Until that documentation is transmitted to DPSC, it has no notification of an individual's being in custody.") Furthermore, the parish sheriff "has absolute authority over the inmate without any control

whatsoever exercised by the DPSC." *Harper v. State, Dep't of Pub. Safety & Corr.*, 96-0047 (La. 9/5/96), 679 So. 2d 1321, 1323 (quoting *Cooley v. State*, 88-CA-0400 (La. App. 4th Cir. 10/11/88) 533 So.2d 124, 126)). Sheriff Gusman testified in deposition that the processing and transfer of OPSO offenders to DPSC, including preparation of pre-class packets, remains squarely within the authority of the Sheriff. Doc. 52, p. 6; Ex. 10 - OPSO Policy No. 501.13. To that end, Gusman enacted OPSO Policy No. 501.13, which details the Sheriff's Office's duties with regard to the preparation of the pre-class packet. Ex. 10, p. 3. Therefore, it is not unreasonable for LeBlanc to rely on the sheriff, who has actual custody and absolute authority over the inmate, to compile and transmit paperwork about him to DPSC.

The Louisiana Legislature agrees.

> [S]tate law obliges the sheriff of the parish of conviction to deliver a prisoner to the state correctional institution designated by DPSC *within thirty days* of the sentence. LA. REV. STAT. § 15:566(B). At the time of delivery, the sheriff is required to provide DPSC with certain documentation. [...] *See* LA. CODE CRIM. PRO. art. 892(C). This is the information DPSC uses to calculate release dates.

*Crittindon v. LeBlanc*, 37 F.4th 177, 200 (5th Cir. 2022) (Oldham, J. dissenting). The obligations of the sheriff and clerk of court under La. R.S. 15:566 and La. C.Cr.P. art. 892 are consistent with applicable precedent imposing the duty to ensure "timely release" on the actual jailer. *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968). It is not unreasonable for LeBlanc to rely on the parish sheriffs to fulfill their duties under state law.

DPSC received Traweek's pre-class packet from the Orleans Parish Sheriff's Office on Thursday, May 17, 2018. Exhibit 5 – Pre-Classification Packet of Plaintiff at p. 2 & Exhibit 2 – Declaration of Angela Griffin at p. 4 ¶ 40. Thus, OPSO personnel transmitted the documents to DPSC in half-the-time allotted under state law. Furthermore, Traweek, who bears the burden of

proof, cannot set forth evidence showing that OPSO's delay was unreasonable or, more importantly, how OPSO's delay was caused by LeBlanc.

Then, once the pre-class packet was received from OPSO, Plaintiff was released within three business days. Judge Feldman analyzed the reasonableness of that period of time in connection with the qualified immunity defense of Ashley Jones, the DPSC employee tasked with calculating Traweek's sentence and processing his release paperwork. Doc. 129, pp. 10-12. Ultimately, Ms. Jones was granted qualified immunity because there was no genuine issue of material fact and because Traweek completely failed to cite any cases showing that Jones's actions were unreasonable. *Id*. Because Ms. Jones's actions were already deemed to be reasonable and that ruling was not vacated, Traweek cannot show that LeBlanc's policies with respect to DPSC's internal processing delays were unreasonable.

To summarize, Traweek cannot meet his high burden of proving LeBlanc acted with deliberate indifference because there is no evidence that LeBlanc knew *in 2018* of a pattern of similar constitutional violations caused by deficient or missing policies and there is no evidence that LeBlanc's response to that alleged knowledge was unreasonable. Absent deliberate indifference, Traweek fails to show that LeBlanc violated his constitutional rights.

**C.  The contours of the "right to timely release" were not clearly established.**

In addition to showing that LeBlanc violated Traweek's constitutional rights, he must also show that LeBlanc's actions or inactions were objectively unreasonable in light of clearly established constitutional law.  On this issue, the 5th Circuit's remand order in this case instructed the Court to analyze the qualified immunity defense "in light of the Supreme Court's most recent guidance in *City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021) (per curiam), and *Rivas-Villegas v.*

*Cortesluna*, 142 S. Ct. 4 (2021) (per curiam)).” *Traweek v. LeBlanc*, No. 21-30096, 2022 WL 2315444, at *4 n.5 (5th Cir. June 28, 2022).

In *City of Talequah*, the unanimous Supreme Court restated the longstanding definition of "clearly established law" in the context of the qualified immunity defense.

> We have repeatedly told courts not to define clearly established law at too high a level of generality. See, *e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). It is not enough that a rule be suggested by then-existing precedent; the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

*City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. at 11 (cleaned up). The Court then proceeded to explain how the Tenth Circuit "contravened those settled principles" by relying on cases with "dramatically different facts", where the purported constitutional principle was noted only in dicta, or where the constitutional principle was described "much too general[ly] to bear on whether the officers' particular conduct" violated the Constitution. *Id.* (citations omitted). The Court ultimately found, "Neither the panel majority nor the respondent has identified a single precedent finding a Fourth Amendment violation under similar circumstances. The officers were thus entitled to qualified immunity." *Id.* at 12. And the judgment denying qualified immunity was reversed. *Id.*

Similarly, in *Rivas-Villegas*, another unanimous Supreme Court decision, the Court reversed the denial of qualified immunity because the Ninth Circuit had relied on circuit precedent with materially distinguishable facts to support the finding that the applicable law was "clearly established." *Rivas-Villegas*, 142 S. Ct. at 8.

In *Crittindon*, the panel majority held that LeBlanc had "fair warning" that his "failure to address" the delay in transmission of paperwork by the sheriffs to DPSC "would deny prisoners

like Plaintiffs their immediate or near-immediate release upon conviction." *Crittindon*, 37 F.4th at

188.[23]  That holding was based on the following legal findings.

> This Court has recognized the "clearly established right to timely release from
> prison." *Porter*, 659 F.3d at 445. Of course, "timely release" is not the same as
> instantaneous release: it is reasonable for jailers to have some administrative delay
> in processing an inmate's discharge. See *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir.
> 1968) (concluding that a jailer does not commit "an instant tort at the moment" the
> prisoner is entitled to release; instead, a jailer's "duty to his prisoner is not breached
> until the expiration of a reasonable time for the proper ascertainment of the
> authority upon which his prisoner is detained."). While courts have declined to
> define the amount of delay that is reasonable, see *Berry v. Baca*, 379 F.3d 764,
> 771 (9th Cir. 2004) ("Courts have not settled on any concrete number of
> permissible hours of delay in the context of post-release detentions."), it is without
> question that holding without legal notice a prisoner for a month beyond the
> expiration of his sentence constitutes a denial of due process. *Douthit v. Jones*, 619
> F.2d 527, 532 (5th Cir. 1980) ("Detention of a prisoner thirty days beyond the
> expiration of his sentence in the absence of a facially valid court order or warrant
> constitutes a deprivation of due process.").

*Crittindon*, 37 F.4th at 188 (cleaned up). The foregoing displays that the panel majority recognized

that the panel in *Porter* used the phrase "clearly established" but, merely identified a broad legal

principle – the right to "timely release". The *Crittindon* panel majority further recognized that the

right to "timely release" is not clearly established at all. Rather than being a right whose contours

are so clear that every reasonable official would know that what he is doing would violate the right,

the right to "timely release" has not been defined.

So instead of explaining how the *Crittindon* defendants violated "clearly established"

Fourteenth Amendment due process "right to timely release" jurisprudence, the *Crittindon* panel

found that it is "clearly established" that a supervisor can be held liable for deliberate indifference.

*Crittindon*, 37 F.4th at 187-88. But the general principle that a supervisor can be held liable under

---

[23] *Crittindon*, which was decided several years after Traweek's incarceration, "is of no use in the
clearly established inquiry." *City of Tahlequah*, 142 S.Ct. at 12 (citing *Brosseau v. Haugen*, 543
U.S. 194, 200, n. 4 (2004) (per curiam)).

§ 1983 for deliberate indifference does not, in any way, define what a supervisor in circumstances similar to those faced by LeBlanc was mandated to do under penalty of personal liability. *Cope v. Cogdill*, 3 F.4th 198, 205 n. 4 (5th Cir. 2021), cert. denied, 142 S. Ct. 2573 (2022) (vehemently rejecting argument that "in the context of a deliberate indifference claim, clearly established rights may be defined generally.") Accord *City of Tahlequah* and *Rivas-Villegas*. In his dissent in *Crittindon*, Judge Oldham similarly explained:

> It's not immediately obvious which constitutional provision is implicated by plaintiffs' "deliberate indifference on a failure-to-adopt-policies" theory. It appears to be an amalgamation of the Fourth and Fourteenth Amendments. Neither the majority nor the parties pause to explain how either part of the Constitution, standing alone or combined with some other part, says anything to urge prison officials to adopt particular policies with particular alacrity. The majority and the parties likewise point to no Supreme Court precedent that requires any of the DPSC defendants to do anything at any time. Everyone instead points only to our precedent.

*Crittindon*, 37 F.4th at 198–99 (footnote omitted). Judge Oldham's position that circuit precedent cannot "clearly establish" a constitutional right may be set aside here because the Circuit precedent cited also does not say anything about "adopt[ing] particular policies with particular alacrity" or about "do[ing] anything at any time." *Id*. In fact, the only remotely similar case cited is *Porter*, in which the Fifth Circuit *reversed the denial of qualified immunity* to the Mississippi Department of Corrections' Commissioner. Therefore, to the extent the *Porter* panel found that some particular policies or actions were required of the head of Mississippi's corrections department, those findings were dicta at best. And dicta cannot clearly establish constitutional law. *City of Tahlequah, supra.* See also *Morrow v. Meachum*, 917 F.3d 870, 875–76 (5th Cir. 2019) ("Dictum is not law, and hence cannot be clearly established law. … And while officers are charged with knowing the results of our cases—at least when they are so numerous and pellucid as to put the

relevant question beyond debate, officers are not charged with memorizing every jot and tittle we write to explain them") (citations omitted, cleaned up).

Traweek has not, because he cannot, cite any Supreme Court or circuit precedent establishing the contours of what LeBlanc was required to do under the circumstances or be subjected to personal liability for violating the Fourteenth Amendment's broad "right to timely release" from prison. Therefore, Traweek cannot meet his burden of overcoming the second prong of the qualified immunity analysis and LeBlanc is entitled to qualified immunity from suit.

**IV.   Plaintiff cannot meet his burden of proving that LeBlanc, personally, is liable for negligence under Louisiana tort law.**

Plaintiff sues LeBlanc under Louisiana law under theories of negligence and vicarious liability. Doc. 83, ¶107, *et seq* (Negligence claim); ¶121, *et seq* (respondeat superior claim). LeBlanc's duties under Louisiana law are relevant to, if not dispositive of, his entitlement to qualified immunity. *See e.g. Grant v. LeBlanc*, No. 21-30230, 2022 WL 301546, at *6 (5th Cir. Feb. 1, 2022) (holding "The Secretary, however, has no authority over entities—including local sheriff's and clerk's offices—other than DPSC."). See also *Crittindon v. LeBlanc*, 37 F.4th 177, 199 (5th Cir. 2022) (Oldham, J. dissenting and noting the sheriffs' deadline for transmission of pre-classification paperwork to DPSC); *Hicks v. LeBlanc*, 832 Fed.Appx 836, 840-41 (5th Cir. 2020) (citing La. C.Cr. P. arts. 880, 883.1; *Boddye v. La. Dep't of Corr.*, 2014-1836 (La. App. 1st Cir. 6/26/15) 175 So. 3d 437, 441). Furthermore, the facts that form the basis of the state tort claims are the same as those that form the basis of the §1983 and Louisiana Constitution due process claims. *See* Doc. 83, ¶107, 121. Thus, when evaluating LeBlanc's qualified immunity defense, this Court will necessarily evaluate three of the essential elements of the negligence claim: legal duty, breach, and causation. *Donahue v. Makar Installations, Inc.,* 33 F.4th 245, 249 (5th Cir. 2022).

**A.  LeBlanc, Secretary of DPSC, owed no legal duty to Traweek, a parish inmate.**

"Whether a duty is owed is a question of law; whether defendant has breached a duty owed is a question of fact." *Donahue,* 33 F.4th at 249 (5th Cir. 2022) (quoting *Brewer v. J.B. Hunt Transp., Inc.*, 35 So. 3d 230, 240 (La. 2010) (additional citation omitted)). Traweek was sentenced to serve 7 months in parish custody and he was incarcerated in the Orleans Parish jail through the entire term of imprisonment at issue in this lawsuit. The fact that Plaintiff was not in DPSC physical or legal custody is dispositive of the negligence claim against Secretary LeBlanc. The duties of DPSC and its secretary, extend *only* to offenders committed to the custody of DPSC pursuant to La. R.S. § 15:824.  On the other hand, the duties of parish sheriffs extend to offenders, like the Plaintiff, sentenced to imprisonment without hard labor. "By statute, the sheriff is charged with the safekeeping of prisoners in his jail, including those who are transferred to his jail. LSA–R.S. 15:704, 15:706 C." *Harper v. State, Dep't of Pub. Safety & Corr.*, 96-0047 (La. 9/5/96), 679 So. 2d 1321, 1322.

> Louisiana state law is undisputedly clear that a sheriff has "absolute authority over [such an] inmate without any control whatsoever exercised by the DPSC." Bl. Br. 11; *see Harper v. State, Dep't of Pub. Safety & Corr.*, 679 So.2d 1321, 1323 (La. 1996) (citing *Cooley v. State*, 533 So.2d 124, 126 (La. App. 4th Cir. 1988)). And state law is equally clear that sheriffs are independently elected parish officers who are in no way accountable to DPSC.

*Crittindon*, 37 F.4th at 200 (Oldham J. dissenting). Louisiana Revised Statute § 15:565 articulates the duty of a parish sheriff to execute parish sentences: "The sheriff, as soon as any sentence to imprisonment without hard labor … shall have become final, shall… proceed forthwith to the execution of said sentence." La. R.S. § 15:565.  As Traweek was undisputedly a parish offender, no DPSC personnel, including Secretary LeBlanc, owed Traweek any legal duty.

Judge Feldman previously found that the fact Traweek was a parish prisoner was immaterial because the erroneous minute entry from Criminal District Court led Sheriff's Office personnel and eventually DPSC personnel to mistakenly believe Traweek had been sentenced to

DPSC custody. See Doc. 129, pp. 17-18. Although legal duty is an essential element of a negligence claim under Louisiana law, Judge Feldman did not consider whether LeBlanc owed a legal duty in the circumstances. See *Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir. 2004) (quoting *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157 (5th Cir.1994)).  Instead of analyzing LeBlanc's duty, Judge Feldman focused on the facts of DPSC's involvement in the processing of Traweek's release once DPSC learned of Traweek, received a pre-class packet, and calculated his sentence. *Id*. Notably, Judge Feldman found <u>no negligence</u> by DPSC personnel in the processing of Traweek's paperwork once it was received by DPSC.  *Id*. at pp. 16-17.

Nonetheless, despite having established that LeBlanc owed no duty to parish inmates, this Court may consider what duty might have owed to Traweek had he been sentenced to DPSC custody.  Ordinarily such speculation has no place in a summary judgment argument. But a disagreement over whether DPSC was forced to assume a legal duty to Traweek as a result of the minute clerk's error is immaterial here because no duty owed to Traweek was breached.

**B.  No duty was breached.**

It is undisputed that Plaintiff was sentenced on May 2, 2018. See Ex. 7. DPSC received Traweek's pre-class paperwork on May 17, 2018. Doc. 83, ¶11. And Traweek was released on May 22, 2018. *Id*. at ¶14-15.  Under Louisiana law, those delays did not breach any legal duty.

> [S]tate law obliges the sheriff of the parish of conviction to deliver a prisoner to the state correctional institution designated by DPSC *within thirty days* of the sentence. LA. REV. STAT. § 15:566(B). At the time of delivery, the sheriff is required to provide DPSC with certain documentation. […] *See* LA. CODE CRIM. PRO. art. 892(C). This is the information DPSC uses to calculate release dates.

*Crittindon*, 37 F.4th at 200. Here, DPSC received the paperwork, calculated Traweek's sentence, *and* arranged his release from parish custody within 20 days of his conviction. No duty under Louisiana law was breached.

20

**V.     Traweek's detention was not invalidated through federal habeas or appropriate state proceedings. Therefore, his claims for money damages are *Heck* barred.**

Judge Feldman previously found that this suit is not *Heck* barred. Doc. 41, p. 14, *et seq*.[24] This Court may reconsider an interlocutory order at any time. Fed. R. Civ. P. 54(b); S*toffels ex rel. SBC Tel. Concession Plan v. SBC Commc'ns, Inc.*, 677 F.3d 720, 727–28 (5th Cir. 2012) (quoting *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 171 (5th Cir. 2010)). This Court should reconsider the *Heck* issue in light of the thorough discussion of *Heck* principles in the *Crittindon* rulings and because LeBlanc's assertion that this case was barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), was mentioned by the 5th Circuit panel in this case. Doc. 146-1, p. 3 n.2.  But, because the issue was not raised on appeal, the panel declined to consider it. *Id*. (citing *Crittindon v. LeBlanc*). Herein, Secretary LeBlanc asks this Honorable Court to reconsider the interlocutory holding that *Heck* does not bar this case.

### A.   The §1983 claims are barred.

An unsuccessful habeas petitioner cannot receive § 1983 damages for unlawful confinement. *Heck v. Humphrey*, 512 U.S. 477, 499 n. 4 (1994). Traweek filed a Writ of Habeas Corpus and Motion for Immediate Release, Exhibit 9(A), which was heard by the Sentencing Judge. Exhibit 8.  The Writ/Motion was denied. Exhibit 8. This suit for money damages is a collateral attack on the finding of the sentencing judge that Traweek was not being unlawfully detained and is therefore *Heck* barred.

"[A] prisoner in state custody cannot use a § 1983 action to challenge 'the fact or duration of his confinement.'" *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973); also citing *Wolff v. McDonnell*, 418 U.S. 539, 554 (1974); *Heck v. Humphrey*, 512 U.S. 477, 481 (1994); *Edwards v. Balisok*, 520 U.S. 641, 648 (1997)). "He must

---

[24] The citation for the Order and Reasons is: *Traweek v. Gusman*, 414 F. Supp. 3d 847, 858 (E.D. La. 2019).

seek federal habeas corpus relief (or appropriate state relief) instead." *Id*. Here, the Plaintiff challenges the legality of his confinement from the date of his sentencing through his release. However, he asks this Court in the first instance to adjudge the legality of his confinement *and* to award money damages. The Plaintiff cannot use a § 1983 action for that purpose. *Randell v. Johnson*, 227 F.3d 300, 301 (5th Cir. 2000) ("Because [plaintiff] is seeking damages pursuant to § 1983 for unconstitutional imprisonment and has not satisfied the favorable termination requirement of *Heck*, he is barred from any recovery and fails to state a claim upon which relief may be granted.")

Plaintiff was required to pursue appropriate state relief for his allegedly illegal confinement. And, if unsuccessful in the state courts, he was required to pursue federal habeas relief. Traweek pursued and lost a direct challenge to the constitutionality of his confinement. Exhibits 8-9. Those were Traweek's "exclusive remedies."

> Because "Congress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, [a] specific determination [that] override[s] the general terms of § 1983," ... a state prisoner whose constitutional attacks on his confinement have been rejected by state courts cannot be said to be unlawfully confined unless a federal habeas court declares his "custody [to be] in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a).

*Heck*, 512 U.S. at 499 n.4, (internal citation omitted). The denial of his Writ of Habeas Corpus was never reversed, no state court held Traweek's confinement was unconstitutional or otherwise illegal, and Traweek never instituted federal habeas proceedings. Therefore, his § 1983 claims are barred.

### B. The §1983 claims are barred.

Plaintiff's state constitutional due process, negligence, and vicarious liability claims against LeBlanc are barred by *Heck* for the same reasons the § 1983 claims are barred. *See Thomas*

*v. Louisiana*, 406 F. App'x. 890, 897–98 (5th Cir. 2010) ("[T]he favorable termination rule bars [plaintiff's] state law false imprisonment and false arrest claims.") (citing *Harrison v. State Through Dept. of Pub. Safety & Corrs.*, 721 So.2d 458, 461 (La. 1998)); *see also Williams v. Harding*, 2012-1595, pp. 7-8 (La. App. 1 Cir. 04/26/13), 117 So. 3d 187, 191 (collecting cases) ("[O]ur review of Louisiana case law reveals that the *Heck* rationale is equally applicable to [Plaintiff's] state law claims … that necessarily attack the validity of his underlying convictions.").

## VI.    Conclusion

For the foregoing reasons, there is no genuine issue of material fact for trial on either element of James LeBlanc's qualified immunity defense and he is entitled to entry of summary judgment in his favor as a matter of law. Furthermore, LeBlanc is entitled to entry of summary judgment on the state law negligence claims. And, in the alternative, all of the claims in this case may be dismissed because, before he filed this suit, Traweek did not have his incarceration declared illegal. This suit should, therefore, be dismissed with prejudice.

Respectfully submitted,

**JEFF LANDRY**
**ATTORNEY GENERAL**

*s/Phyllis E. Glazer*
**PHYLLIS E. GLAZER (La. #29878)**
**ASSISTANT ATTORNEY GENERAL**
Lead Counsel

Louisiana Department of Justice, Litigation Division
1885 North Third Street, 3rd Floor
Post Office Box 94005 (70804-9005)
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6300
Facsimile: (225) 326-6495
E-mail: GlazerP@ag.louisiana.gov

**ANGELA O'BRIEN (La. #34010)**
**ASSISTANT ATTORNEY GENERAL**

Louisiana Department of Justice, Litigation Division
1450 Poydras Street, Suite 900
New Orleans, Louisiana  70112
Telephone:      (504) 599-1200
Facsimile:      (504) 599-1212
E-mail:         O'BrienA@ag.louisiana.gov