UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JOHNNY TRAWEEK** | * | CIVIL ACTION |
| | * | |
| **VERSUS** | * | NO. 19-1384   SECTION "F" (1) |
| | * | |
| | * | JUDGE MARTIN FELDMAN |
| **MARLIN GUSMAN, ET AL.** | * | |
| | * | MAG. JUDGE JANIS vanMEERVELD |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DECLARATION

### ASHLEY JONES

Who, based upon her personal knowledge, declares under penalty of perjury the following:

1. I am currently employed with the Louisiana Department of Public Safety and Corrections (hereinafter "DPSC") as an ARDC Specialist II, and was so employed in May of 2018.

2. In my capacity as an ARDC Specialist II, it is my responsibility to calculate an offender's sentence by processing pre-classification documents from Sheriff's Departments, Clerks of Court, Parish Jail Administrators, and District Attorneys for persons committed to the custody of DPSC.

3. Additionally, as an ARDC Specialist II, I am tasked with preparing release certificates and other relevant paperwork relevant to releases, parole detainers, and custody transfers for inmates in the custody of the DPSC.

4. The pre-classification process for calculating an inmate's sentence shortly after his conviction is a separate process from the release clearance process.

5. I work from 8:00 A.M. to 4:30 P.M., Monday through Friday excluding any holidays.

6. In general, pre-classification packets are assigned to me throughout the day.

7. Due to the processing other packets given to me on the same day, I was unable to begin processing Mr. Traweek's pre-class packet until Monday, May 21, 2018.

8. Pre-trial packets are hand delivered to my desk by my supervisor for processing.

9. On May 18, 2018 I was assigned by my supervisor to begin processing the pre-trial packet of Mr. Traweek along with between ten to fifteen other pre-trial packets - as was my usual workload.

Exhibit 1

10. The pre-classification process includes: I gather sentencing minutes, jail credit information, and statutory and department regulations in order to compile a chronological criminal history for each offender sentenced to DPSC custody and input that information into DPSC data systems so that an offender's time may be calculated.

11. I reviewed Mr. Traweek's packet to ensure that it contained all of the necessary documentation. Mr. Traweek's packet included:
    a. "Basic Information and Interview for Local Jail Facilities Form,"
    b. "Credit for DPSC Commitment Form",
    c. "Sentencing Minutes,"
    d. "Suspect Rap Sheet with photo from the Automated Fingerprinting Identification System", and
    e. "DPSC Acknowledgements and Signature Statement signed by the inmate."

12. I noted that the criminal history had been completed as was required to verify Mr. Traweek's identity.

13. Because only offenders sentenced to hard labor are sentenced to DPSC custody, I must confirm that the offender received a hard labor sentence.

14. Mr. Traweek's pretrial packet did not include a Bill of Information or a Uniform Commitment Order, which are the documents normally used to determine whether the offender had been sentenced to hard labor.

15. Without a Uniform Commitment Order, I was forced to rely upon the Sentencing Minutes prepared by the Clerk of Court in order to determine whether Mr. Traweek received a hard labor sentence.

16. Mr. Traweek's Sentencing Minutes indicated that he had received a hard labor sentence, and thus under Louisiana law was subject to the care and custody of the Department of Public Safety & Corrections.[1]

17. In situations where I receive a pre-classification packet wherein the individual did not receive a hard labor sentence, I immediately report it and turn over the packet to my supervisor so that it may transmitted back to the facility holding the individual.

18. As part of the pre-classification process I am required to verify the identity of the offender in order to ensure that the person who was convicted is the same person currently in custody.

19. I verified Mr. Traweek's identity by cross checking the criminal history with the photo sheet[2] to ensure the social security number, the FBI number, and SID number all matched. The cross checking also requires me to review his NCIC fingerprinting paperwork and

---

[1] *See* Exhibit 5 – Pre-Classification Packet at p. 5.
[2] *Id.* at p. 7.

criminal history to ensure that they coincide with the disposition for the conviction on his sentencing minutes (this is usually done on a Uniform Commitment Order).

20. After verifying Mr. Traweek's identity, I physically input the following information for Mr. Traweek into CAJUN:
    a. The crime Mr. Traweek was convicted of;
    b. the date the crime was committed;
    c. the sentence date;
    d. the sentence start date;
    e. the sentence length for each charge;
    f. Mr. Traweek's offender class for the charge related to number of felony convictions (calculated by using the information on the CAJUN system and the Criminal History Reports; and Good time rate and parole eligibility for each charge (determined by the commitment date and the type of crime)).

21. CAJUN is an electronic system used statewide to track offenders, and calculate an offender's time.

22. After I inputted all of the information listed in ¶ 20, CAJUN computed Mr. Traweek's time.

23. I verified that the computation made by CAJUN was accurate.

24. I completed this task at approximately 2:13 P.M. on May 21, 2018. This is reflected in the Master Record printout.[3]

25. Based on Mr. Traweek's time calculation results, I was determined he was eligible for immediate release.

26. The vast majority of time calculations that I perform are not "immediate releases."

27. Although uncommon, if I receive a packet for an offender who is eligible for an immediate release I immediately hand deliver the pre-class packet to my supervisor.

28. I personally hand-delivered the time calculation paperwork to my supervisor as soon as I determined that Mr. Traweek was eligible for immediate release.

29. My supervisor checked my work and returned it to me for further processing after 2:55 P.M. on May 21, 2018. This is reflected in the time stamp on the Offender Master Records print out.[4]

30. At that time I was instructed by my supervisor to begin preparing Mr. Traweek's release paperwork.

---

[3] *Id.* at p.20.
[4] *Id.* at p.43.

31. I began processing Mr. Traweek's release clearance paperwork but was unable to complete it until the following day.

32. Normally, the release clearing process begins 45 days prior to the offender's release.

33. The release clearing checklist is to assure that all processes have been followed and to confirm that an offender should be released.

34. To complete the Release Clearing Checklist, I must do the following:

    a. Obtain Mr. Traweek's criminal history reports (State Police criminal history, FBI criminal history and any out of state criminal history) to determine whether the Mr. Traweek had any warrants, charges without dispositions, and any Louisiana or out-of-state proceedings in which he may need to serve time.
    b. To clear an offender's criminal history, I must place phone calls to various State Departments of Corrections, Counties, and other jurisdictional entities.
    c. Check for DNA because Louisiana law requires an offender's DNA be obtained before release.

35. Mr. Traweek had several convictions in other states which had to be cleared before he could be released.

36. While preparing the release clearing checklist for Mr. Traweek. I sent Orleans Parish Sheriff's Office a Release Clearance Sheet on May 22, 2018.[5]

37. Release Clearance Sheets are required to be completed by the holding facility, and must be completed and transmitted back to DPSC before an offender can be released.

38. I did not find any DNA recordings for Mr. Traweek, as is required by State law before he may be released.

39. I called OPSO by telephone several times, and when I received no response I sent an email to the OPSO contact, Sheila Crader, at 12:46 P.M. on May 22, 2018.

40. At 1:05 P.M., Ms. Crader responded and provided me with Mr. Traweek's DNA kit number.

41. After receiving the Release Clearing Sheet from the Sheriff's Office, obtaining the DNA kit number, and completing the clearance checks of all of the jurisdictions where Mr. Traweek had convictions, I prepared the certificate of release.

42. I hand delivered all of the paperwork, including the certificate of release, to my interim supervisor.

---

[5] *Id.* at p.31.

43. My interim supervisor reviewed my work, and took it to the ARDC Manager, Angela Smith for final approval.

44. Angela Smith approved the final release, then my interim supervisor hand delivered the approval to me so that I could transmit the full term release paperwork to the holding facility.

45. As soon as my supervisor gave me the completed certificate of release I transmitted it fax to the Orleans Parish Sheriff's Office during the early afternoon of May 22, 2018.

46. I called OPSO in order to confirm that they had received the release certificate.

47. OPSO confirmed their receipt of Mr. Traweek's release paperwork.

48. Upon completing Mr. Traweek's release paperwork and transmitting it to the holding facility, I scanned all of the documentation that I prepared into ORACLE.

49. I was not aware that a Writ of Habeas Corpus for Mr. Traweek had been filed on May 22, 2018.

50. I did not hear about Mr. Traweek again until I was named in this lawsuit.

51. The foregoing statement is true and correct to the best of my personal knowledge, and based on my experience and personal review of documents and records in my possession, custody, and control.

I declare, under penalty of perjury, that forgoing is true and correct.

                                         ___*/s/ Ashley Jones*___       Date: 7/20/2020
                                              **Ashley Jones**