# COPY

## Transcript of the Testimony of

## ANGELA GRIFFIN

July 1, 2019

JESSIE CRITTINDON, ET AL v. MARLIN GUSMAN, ET AL





## COURT REPORTING & LITIGATION SUPPORT

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

Exhibit 6

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA


JESSIE CRITTINDON, et          CASE NO.
al.,                           3:17-cv-00512-SDD-EWD
    Plaintiffs,
v.
MARLIN GUSMAN, et al.,
    Defendants.


c/w


EDDIE COPELIN, et al.,         CASE NO.
    Plaintiffs,             3:17-cv-00602-SDD-EWD
v.
MARLIN GUSMAN, et al.,
    Defendants.


    DEPOSITION OF ANGELA GRIFFIN, taken at the
LOUISIANA DEPARTMENT OF CORRECTIONS, 504
MAYFLOWER STREET, BATON ROUGE, LOUISIANA 70802,
in the above-entitled cause on the 1st of
July, 2019, commencing at 12:27 p.m.


REPORTED BY:CHERIE' E. WHITE
             CCR (LA), CSR (TX), CSR (MS), RPR
             CERTIFIED COURT REPORTER



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

```
 1   APPEARANCES:
 2   ATTORNEYS REPRESENTING THE PLAINTIFFS, JESSIE
 3   CRITTINDON AND EDDIE COPELIN, ET AL:
 4
 5   RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
 6   4400 South Carrollton Avenue
 7   New Orleans, Louisiana  70119
 8   Phone: (504) 620-2259
 9   (BY: Emily Washington, Esquire)
10   E-mail: emily.washington@macarthurjustice.org
11   (BY: Hannah Lommers-Johnson, Esquire)
12   E-mail:hannah.lommersjohnson@macarthurjustice.org
13   (BY: James Craig, Esquire)
14   E-mail: james.craig@macarthurjustice.org
15
16   ATTORNEYS REPRESENTING THE DEFENDANT, STATE OF
17   LOUISIANA, LOUISIANA DEPARTMENT OF JUSTICE:
18
19        LOUISIANA DEPARTMENT OF JUSTICE
20        1885 N. Third Street, Floor 4
21        Baton Rouge, Louisiana 70802
22        Phone: (225) 326-6085 |Fax: (225) 326-6099
23
24        (BY: James "Gary" Evans, Esquire)
25        E-mail: evansj@ag.louisiana.gov
```



```
 1   APPEARANCES CONTINUED:

 2

 3   ATTORNEYS REPRESENTING THE DEFENDANTS, EAST

 4   CARROLL PARISH SHERIFF'S OFFICE:

 5

 6   USRY & WEEKS, PLC

 7   1615 Poydras Street, Suite 1250

 8   New Orleans, Louisiana  70112

 9   Phone: (504) 592-4600 |Fax: (504) 592-4641

10   (BY: Ronald Shane Bryant, Esquire)

11   E-mail: sbryant@usryweeks.com

12   (By Telephone)

13

14   ATTORNEYS REPRESENTING THE DEFENDANT, ORLEANS

15   PARISH SHERIFF'S OFFICE:

16

17        RODRIGUE & ARCURI LAW GROUP

18        201 St. Charles Avenue, Suite 114-412

19        New Orleans, Louisiana  70170

20        Phone: (504) 249-6990

21

22        (BY: Pete Matthews, Esquire)

23        E-mail: pm@rodriguearcuri.com

24        (By Telephone)

25
```



1    E X A M I N A T I O N   I N D E X

2

3    BY:                                              PAGE

4      Ms. Washington                                   6

5

6                  E X H I B I T S

7

8    NO.    DESCRIPTION                              PAGE

9    30     1/2017 E-mail Chain                       66

10   31     Pre-Class Packet Information              66

11   32     Lean Six Sigma Study                      92

12   33     Pre-Class Policy                         118

13   34     2017 Legislature Audit                   135

14   35     Excerpt from Mr. Crittindon's File       145

15   36     12/16/16 E-mail                          158

16   37     Excerpt from Mr. Burse's File            165

17   38     Excerpt from Mr. Copelin's File          166

18   39     Excerpt from Mr. Dominick's File         167

19   40     Excerpt from Mr. Guidry's File           169

20   41     E-mails Regarding Mr. Burse              170

21   42     E-mails Regarding Mr. Guidry             191

22   43     2nd Step Response Form, Mr. Guidry       203

23   44     2nd Step Response Form,                  203

24          Mr. Crittindon

25   45     1/5/17 E-mail                            208



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

Page 5

1                S T I P U L A T I O N

2

3       IT IS HEREBY STIPULATED AND AGREED by and

4  between counsel for the parties hereto that the

5  deposition of the aforementioned witness is

6  hereby being taken under the Louisiana Code of

7  Civil Procedure, Article 1421, et seq., for all

8  purposes, in accordance with law;

9          That the formalities of reading and signing

10  are specifically NOT waived;

11          That the formalities of sealing,

12  certification and filing are specifically waived;

13          That all objections, save those as to form

14  of the question and the responsiveness of the

15  answer, are hereby reserved until such time as

16  this deposition, or any part thereof, may be used

17  or sought to be used in evidence.

18                  *    *    *    *

19       CHERIE E. WHITE, Certified Court Reporter,

20  in and for the Parish of Orleans, State of

21  Louisiana, officiated in administering the oath.

22

23

24

25



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1              ANGELA GRIFFIN,
 2    LOUISIANA DEPARTMENT OF CORRECTIONS, 504
 3    MAYFLOWER STREET, BATON ROUGE, LOUISIANA 70802,
 4    fter having first been duly sworn by the
 5    above-mentioned Court Reporter did testify as
 6    follows:
 7    EXAMINATION BY MS. WASHINGTON:
 8         Q.    Good afternoon, Ms. Griffin.
 9         A.    Good afternoon.
10         Q.    My name is Emily Washington.  My
11    colleagues, Hannah Loomers-Johnson and James
12    Craig, are going to be joining me for this
13    deposition.  We all represent the plaintiffs in
14    the matter that brings us all here today.
15              Could you please introduce yourself
16    just for the record?
17         A.    Okay.  I'm Angela Griffin.  I'm the
18    administrative program director over pre-class
19    for Department of Corrections.
20         Q.    And, Ms. Griffin, have you had your
21    deposition taken before?
22         A.    Yes.
23         Q.    Without going into too much detail,
24    can you tell me just a little bit about the other
25    cases or context in which you've had your
```



GRIFFIN, ANGELA 7/1/2019

Page 7

1    deposition taken?

2         A.    I mean, where or what they are about

3    or --

4         Q.    Sure.  Let me ask it this way.

5         A.    Okay.

6         Q.    How many other times have you had

7    your deposition taken?

8         A.    Twice.

9         Q.    Okay.  And, in those two other

10   cases, were you being deposed in your

11   professional capacity as an employee of the

12   Department of Corrections?

13        A.    Yes.

14        Q.    Okay.  And were you being deposed as

15   yourself, Ms. Griffin, or as a 30(b)(6)

16   representative for the Department; do you know?

17        A.    I'm not sure.

18        Q.    Okay.

19        A.    Okay.

20        Q.    So when you were deposed before, I'm

21   guessing whoever was taking your deposition went

22   over some basic ground rules.  I am going to go

23   over with them with you as well just to make sure

24   that we are on the same page for the next couple

25   of hours here.

GRIFFIN, ANGELA 7/1/2019

Page 8

1      A.    Okay.

2      Q.    So we have a court reporter sitting

3  at the end of the table.  She's going to be

4  taking down everything that we say, so I just ask

5  that you make your answers audible; yeses and nos

6  rather than nodding or shaking of the head as we

7  do.

8      A.    Okay.

9      Q.    You just took an oath.  It's the

10  same oath you would take as if you were

11  testifying in court, so we are just looking for

12  truthful and complete answers today.  Fair

13  enough?

14      A.    Okay.  Fair.

15      Q.    If at any point during your

16  questioning today I ask you something that is

17  confusing or complicated or unclear, please let

18  me know.

19      A.    Okay.

20      Q.    I will be happy to try to rephrase

21  it or simplify it or see if we can get on the

22  same page.  Fair enough?

23      A.    Okay.

24      Q.    If you don't ask me to rephrase a

25  question or clarify, I'm going to assume that you



1    understand the question that I have asked and
2    that you are answering that question, okay?
3           A.    Okay.
4           Q.    I am happy to take any breaks that
5    you need to take today or if you need to speak
6    with your attorney, that's okay as well.
7           A.    Okay.
8           Q.    I just ask that if I have a question
9    out on the table, that you give me your answer
10   and then we'll take a break after that?
11          A.    Okay.
12          Q.    If at any point during our
13   questioning today if you think about something
14   that maybe came up earlier in our conversation,
15   please just let me know.  I'm happy to supplement
16   the record or make corrections on the record so
17   long as you just let me know.
18          A.    Okay.
19          Q.    And, lastly, is there anything,
20   medication that you're taking, sleep deprivation,
21   other hardships that would keep you from giving
22   complete and truthful testimony today?
23          A.    No.
24          Q.    Okay.  Great.  Let's get started.
25   Very briefly, can you walk me through your



1   educational history?

2          A.     I have a high school diploma.

3          Q.     And where did you receive that from?

4          A.     It was called Sunshine High School

5   at the time.

6          Q.     That sounds nice.  Where is that?

7          A.     It's in Iberville Parish.

8          Q.     Did you take any college courses?

9          A.     No.

10         Q.     What about any other kind of

11  vocational or specialized training, school of any

12  sort?

13         A.     I've taken courses when I worked for

14  a bank, not since.

15         Q.     And what were those courses --

16         A.     I'm trying to think of what they

17  were.

18         Q.     -- focused on?

19         A.     It was on accounting.

20         Q.     Okay.  And you are currently

21  employed by the Department of Public Safety and

22  Corrections, correct?

23         A.     Yes.

24         Q.     And I will warn you right now that

25  during questioning today I'm probably going to

```
 1    use DOC --

 2         A.    That's okay.

 3         Q.    -- and DPS&C interchangeably, maybe

 4    some other variations, but you will understand

 5    what I'm meaning, correct?

 6         A.    Correct.

 7         Q.    Okay.  Good.  And you mentioned that

 8    your job title is administrative program director

 9    over pre-class, correct?

10         A.    Correct.  The job title is basically

11    administrative program director.

12         Q.    Okay.  And then pre-class is the

13    department?

14         A.    Is the department, correct.

15         Q.    And am I correct in understanding

16    that the pre-class department falls inside of the

17    Office of Adult Services?

18         A.    Correct.

19         Q.    Okay.  And all of that is within the

20    Department of Corrections?

21         A.    Correct.

22         Q.    Okay.  And so as the administrative

23    program director, are you head of the pre-class

24    department?

25         A.    Yes.
```

GRIFFIN, ANGELA 7/1/2019

Page 12

1    Q.    And how long have you been in that
2  position?
3    A.    Since 2013.
4    Q.    Were you employed with the
5  Department of Corrections prior to 2013?
6    A.    Yes.
7    Q.    When did you first start with the
8  department?
9    A.    1995.
10    Q.    Between 1995 and 2013, what other
11  positions have you held with the Department?
12    A.    I started as clerical in the mental
13  health department at Hunt Correctional,
14  transferred to the classification clerical,
15  promoted up to a position -- I'm not sure what
16  the title is -- in the pharmacy at Hunt, then I
17  promoted to a classification officer and was
18  still a classification -- considered
19  classification officer but changed to the
20  pre-class department at Hunt Correctional Center
21  and became a supervisor in -- as a classification
22  officer supervisor in pre-class, then came to
23  headquarters in 2000 -- I can't remember if it
24  was 2008 or '09 and as an ESO supervisor and
25  promoted to an executive management position, and



GRIFFIN, ANGELA 7/1/2019

1    then I became the administrative program director

2    in 2013.

3         Q.    Okay.  And just to make sure I

4    understand since that was a lot of information.

5    When you were working as a classification

6    officer, that was at Elayn Hunt?

7         A.    Correct.

8         Q.    And what were your job

9    responsibilities in that position?

10        A.    Working with the-- talking to the

11   offenders and classifying where they needed to be

12   housed depending on their release dates or --

13        Q.    Okay.  So am I correct in

14   understanding that that was largely focused on

15   the housing of prisoners within the Elayn Hunt

16   facility?

17        A.    And verifying the offender is the

18   right offender coming in.

19        Q.    Okay.  So you also had a role in

20   intake?

21        A.    Because there is an intake, correct.

22        Q.    Okay.  And it sounds like -- did you

23   also have a role with release of offenders when

24   you were in that capacity?

25        A.    We would get the offenders'

1   addresses or things like that, but not the actual

2   release.

3        Q.    Okay.  And you stated that following

4   that you moved into a role with pre-class at

5   Elayn Hunt?

6        A.    Correct.

7        Q.    And what were your job

8   responsibilities when you moved over to the

9   pre-class department?

10       A.    Processing new convictions, working

11  their release dates, entering their information

12  in the computer and working their release dates

13  and handling releases.

14       Q.    And so in that job you were

15  responsible for performing time computations?

16       A.    Yes.

17       Q.    How long were you in that position

18  at Elayn Hunt?

19       A.    I'm -- I would have to guess.

20       Q.    Can you give me a rough estimate?

21       A.    I'm going to say roughly five to six

22  years.

23       Q.    Okay.  And that would be five to six

24  years while you were working as a pre-class

25  officer at Elayn Hunt?



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond, LA 70404   Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

Page 15

```
 1        A.    Right.  As a -- in the pre-class
 2   department, yes.
 3        Q.    Okay.  Does that include the years
 4   when you became a supervisor in that department?
 5        A.    Some of that may, because I was a
 6   supervisor only a little while before I moved
 7   here.
 8        Q.    Okay.  Is a "little while" less than
 9   a year?
10        A.    A little -- less than a year.
11        Q.    Okay.  And that supervisory role was
12   over the pre-class officers who were working at
13   Elayn Hunt; is that correct?
14        A.    Yes.
15        Q.    And at the time that you were in the
16   pre-class department at Elayn Hunt, were you-all
17   performing time computations for people sentenced
18   all over the State of Louisiana?
19        A.    For the -- I got to think a while.
20   For the southern parishes --
21        Q.    Okay.
22        A.    -- only.
23        Q.    And roughly what years was that
24   between the five to six years that we've been
25   talking about?
```



```
 1           A.    I'm thinking -- and this -- again,
 2   I'm not --
 3           Q.    It's not a quiz.
 4           A.    -- positive of the dates, yeah.  But
 5   roughly between '96, early '97 through I'm going
 6   to say right before -- '13, probably about '12 as
 7   the -- in the department and then the supervisor
 8   in 2008 or '09.
 9           Q.    Okay.  So that would be sort of a
10   span it looks like of actually like about
11   11 years that you were spending --
12           A.    Okay.
13           Q.    -- doing pre-class?
14           A.    Maybe so.
15           Q.    Okay.  Okay.  And you mentioned that
16   when you came over to headquarters in 2008 or
17   2009 you were working as an EOS supervisor?
18           A.    It's an executive -- I'm trying to
19   think of what the name of it was.  It's a --
20   supervisor levels.
21           Q.    Okay.  And was that within the
22   pre-class department?
23           A.    No.
24           Q.    Okay.  Where was that?
25           A.    That was in the Office of Adult
```



GRIFFIN, ANGELA 7/1/2019

Page 17

1    Services.

2        Q.    And what was your -- what were your

3    job responsibilities when you were working as the

4    supervisor in the Office of Adult Services?

5        A.    I handled some letters and things

6    for the chief of operations at the time and went

7    around the southern institutions training on

8    pre-class and time comp.

9        Q.    And when you say the "southern

10   institutions," which facilities would that

11   include?

12       A.    It's Rayburn Correctional.  I'm

13   trying to think of which other ones were here.

14   Some at Hunt, and I went to -- it was Phelps

15   Correctional at the time.

16       Q.    And all of these facilities that you

17   just mentioned, these are all facilities that are

18   run by the Department of Corrections?

19       A.    Correct.

20       Q.    Did you do any of the training on

21   pre-class and time computation at local

22   facilities or jails?

23       A.    Not -- they don't handle time

24   computation at the jail, so I never did that.  I

25   have been to some of the jails that have


Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    requested some help showing what we needed when

2    they got newer employees and they would request

3    us to help.  Either they came here or we have

4    went there, if they were close by.  I think we

5    went to St. Mary, but very few.

6         Q.    Okay.  Do you happen to remember

7    other than St. Mary other parishes?

8         A.     Iberia and that -- I'm trying --

9    that may be the only ones.  That's the ones I

10   remember.

11        Q.    Okay.  So the ones that you remember

12   requesting pre-classification training would be

13   St. Mary and Iberia?

14        A.     Right.

15        Q.    Okay.  And how long were you in this

16   role as the EO -- EOS supervisor within adult

17   services?

18        A.     I'm going to say about right at two

19   years, maybe a little less.

20        Q.    So that would put us around 2010,

21   2011; is that correct?

22        A.     Correct.

23        Q.    And then you moved over to an

24   executive management position?

25        A.     Management, correct.



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond, LA 70404    Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

1      Q.    And what department or section was
2  that located in?
3      A.    The same department, just the
4  supervision -- my supervision changed,
5  supervisor.
6      Q.    Okay.
7  MR. BRYANT:
8          Hey, guys.  Pete -- sorry to
9          interrupt.  Pete is at the sheriff's
10         office, and I have that number if you guys
11         are ready.
12  MS. WASHINGTON:
13         Let's go off the record for a minute
14         and we will try to get Pete on the phone.
15     (A short recess was taken.)
16  BY MS. WASHINGTON:
17     Q.    Okay.  We can go back on the record.
18  So we were talking about your position, your
19  executive management position which was still
20  within the Office of Adult Services, correct?
21     A.    Correct.
22     Q.    And what were your job
23  responsibilities in that position?
24     A.    Still the same thing, the training.
25  I handled parts of the escapes and fugitive

```
 1    processes.  I'm trying to think back.  And I
 2    still helped with any questions that maybe the
 3    outside field needed answered.  I would get the
 4    questions to help with any time comp concerns or
 5    anything.
 6         Q.     And by "outside field," do you mean
 7    other institutions?
 8         A.     Anywhere, even if it's institutions
 9    or parishes that have concerns and they would
10    call.
11         Q.     Okay.  So if people either in local
12    jail facilities or other DOC facilities had
13    questions about time computation and pre-class,
14    you would be fielding those questions?
15         A.     Correct.
16         Q.     And you were in that position from
17    roughly 2010, 2011 until you took on your
18    position as head of the pre-class department in
19    2013; is that correct?
20         A.     Correct.
21         Q.     When you were working as the EOS
22    supervisor and then in the executive management
23    position within the Office of Adult Services, who
24    were you reporting to?
25         A.     The -- when I was the ESO, the
```

1  executive supervisor position, it was to Jeff

2  Travis, the chief of operations.  And when I

3  switched over to the executive management

4  position, it was Linda Ramsey.

5         Q.    And what was her job title?

6         A.    I'm -- I'm not sure.

7         Q.    Okay.  Was she also part of the

8  Office of Adult Services?

9         A.    Yes.

10        Q.    And am I correct that the -- the

11 position that we've been referring to with an

12 acronym, is it ESO?

13        A.    There's one that's ESO.  It's

14 Executive Supervisor Officer.  I think that's the

15 title it was.

16        Q.    Okay.  I think I wrote it down as

17 EOS before --

18        A.    Okay.

19        Q.    -- but it should be ESO.  I think I

20 understand now.  We are going to talk a little

21 bit more about your current position, but before

22 we move on to that, prior to your employment with

23 the Department of Corrections in '95, can you

24 give me a rough history of any other employment

25 experience that you had?

GRIFFIN, ANGELA 7/1/2019

Page 22

```
1        A.    I worked for the Iberville Trust and
2   Savings Bank for I guess it was about seven
3   years, then I changed to a -- a credit union, a
4   Louisiana credit union for a couple of -- about a
5   year and a half, and then I changed to a company
6   that was -- I'm trying to think of the name.  A
7   construction company as clerical, keep their
8   books, just little -- it was a little business.
9   And then moved from that one to another company,
10  a valve company, which was the same thing I did,
11  accounting, pay bills, the bill paying and things
12  like that.
13       Q.    Okay.  Would it be fair to say that
14  prior to joining the Department of Corrections
15  your work experience was largely banking and
16  accounting and clerical work?
17       A.    Correct.
18       Q.    Okay.  Have you worked for any other
19  law enforcement or correction agency?
20       A.    No.
21       Q.    As the administrative program
22  director, you supervise the pre-class department,
23  correct?
24       A.    Correct.
25       Q.    Can you define pre-class for me?
```



```
 1          A.      And first I wanted to clarify that.
 2          Q.      Sure.
 3          A.      Supervise the pre-class, I
 4   supervisor the pre-class department that is here
 5   at headquarters.
 6          Q.      Okay.
 7          A.      Okay.
 8          Q.      And I think we'll get to that in a
 9   minute --
10          A.      Okay.
11          Q.      -- but while we are on that topic,
12   let me just ask you this.  Are there other
13   pre-class departments within the Department of
14   Corrections?
15          A.      Yes.
16          Q.      And where are those located?
17          A.      It's at David Wade Correctional.
18          Q.      Is that the only other pre-class
19   department?
20          A.      Yes.  Well, I'm saying that.  Now
21   that I remember, there is one more that does it
22   now that started about a year ago, Raymond
23   Laborde Corrections.
24          Q.      And you indicated that Raymond
25   Laborde started having a pre-class department
```

GRIFFIN, ANGELA 7/1/2019

Page 24

1    about a year ago?

2        A.    It's about a year ago I guess, maybe

3    a little bit longer.  I'm not positive of the

4    date.

5        Q.    I will represent to you that the

6    facts that underlie this litigation largely took

7    place in 2016 and 2017.

8        A.    Uh-huh (affirmatively).

9        Q.    Am I correct that during that time

10   period the two pre-class departments that would

11   have been operating would have been here at

12   headquarters and at David Wade?

13       A.    Yes.

14       Q.    Okay.  Now, let's talk about

15   pre-class just so we are on the same page because

16   I think we are going to be using that term a lot.

17   Can you define pre-class for me, what your

18   understanding of it is?

19       A.    It's pre-classification of an

20   offender once he's convicted and sentenced to the

21   Department of Corrections to serve hard labor.

22   And it's the paperwork that lets Department of

23   Corrections know an offender received hard labor

24   and how much time he received and who the

25   offender is that we can process the pre-class --

1    the paperwork to process him in our system and

2    work his release dates.

3         Q.    Am I correct in understanding then

4    that the pre-class department is responsible for

5    performing time computations and thereby

6    establishing release dates for persons who are

7    sentenced to the Department of Corrections?

8         A.    Yes, on hard labor sentence, yes.

9         Q.    And drilling down on that a little

10   bit, the pre-class department is responsible for

11   initial time computations?

12        A.    Initial time comp or any re-time

13   comps of re-sentences or any loss of time they

14   get or any educational credits.  We re-time, we

15   do the time comp.

16        Q.    Okay.  So the pre-class department

17   at headquarters that you supervise is responsible

18   for both initial time computations as well as

19   recalculations?

20        A.    As long as they are offenders housed

21   in the parish -- in a parish jail.

22        Q.    Okay.  If they are housed not in a

23   parish jail, who is responsible for the

24   recalculations?

25        A.    If they are housed in a state

1    institution, each state institution has a records
2    department that handles that.
3         Q.    Am I correct that just for the piece
4    that's the initial time computations, does the
5    pre-class department handle all of those across
6    the state?
7         A.    Handle --
8         Q.    The time, initial time computation?
9         A.    Yes.  Each pre-class department
10   handles whatever the parish that belongs to the
11   pre-class department, yes --
12        Q.    Okay.
13        A.    -- initial.
14        Q.    I guess I just want to make sure
15   that I'm understanding all of this.
16        A.    Yeah.
17        Q.    But initial time computation is not
18   happening in the records department of the
19   individual DOC facilities, correct?
20        A.    With the exception of maybe Hunt
21   Correctional and right now Raymond Laborde
22   handles initial time comp now, which they are
23   part of pre-class.  Now, Hunt Correctional may do
24   initial time comp because they have offenders
25   that go straight there from transfer out of state

Page 27

1    and things like that and they have to do the

2    initial because he's housed at their facility.

3         Q.    Okay.  But by and large when persons

4    across the State of Louisiana are initially

5    sentenced to time at Department of Corrections

6    and need to have their initial computation, that

7    work is being performed by the pre-class

8    department here at headquarters as well as at

9    David Wade and now Raymond Laborde; is that

10   correct?

11        A.    Correct.  Once we get the paperwork,

12   we do the initial.

13        Q.    And the pre-class department at

14   headquarters is located in the building that we

15   are in today?

16        A.    No.  It's in building -- it's right

17   outside.  I think it's Building 5 I think.

18        Q.    Okay.  But it's at this Mayflower --

19        A.    Correct.

20        Q.    -- complex?

21        A.    Correct.

22        Q.    Okay.  How many people work within

23   the pre-class department that's located here at

24   headquarters?

25        A.    Fifty two.



GRIFFIN, ANGELA 7/1/2019

Page 28

1    Q.    And you supervise those 52
2  employees?
3    A.    I'm -- yes.  I'm over the
4  department.  I have managers and -- yes.
5    Q.    Can you tell me a little bit about
6  the rough organizational structure under you
7  within the pre-class department here at
8  headquarters?
9    A.    Sure.  I have two managers who are
10 under me and then under them there's five
11 supervisors, and each supervisor has roughly
12 eight.  There's a few employees under them, and
13 then we have one clerical.  I'm trying to think
14 if that's all.
15   Q.    Has that been the structure within
16 the pre-class department for a while?
17   A.    When pre-class moved here in 2013,
18 we had managers, supervisors, maybe not as many
19 people as we did then.  We have more.
20   Q.    But the basic structure that you
21 just --
22   A.    Structure --
23   Q.    -- described has been the same since
24 2013?
25   A.    Yes.


Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

Page 29

1      Q.     How do you supervise the work of
2   everyone within the pre-class department?
3      A.     Pretty much if -- if I get any --
4   ask any question, I'll get the question, try and
5   figure it and hand it to my managers to make sure
6   the work gets -- they check with their
7   supervisor, see if the work is here or if we need
8   to do something with it or --
9      Q.     And who -- who are the two managers
10  currently that work under you?
11     A.     Elizabeth Tigner (phonetically
12  spelled) and Tessie Cooley.
13     Q.     And how long have they been in those
14  positions?
15     A.     Tessie, she's here at headquarters
16  -- she's been here since 2013.  She moved here
17  when pre-class moved here.  And then I don't know
18  how much time she's had in the same position
19  where -- in -- at Angola.  And Elizabeth Tigner,
20  this go round she's been here since I think
21  October of last year.  She was a manager prior to
22  that here and retired and has come back.
23     Q.     Does the Department of Corrections
24  conduct any sort of regular performance
25  evaluations for stuff?

GRIFFIN, ANGELA 7/1/2019

Page 30

```
 1          A.     Yes.
 2          Q.     How does that process work?
 3          A.     We have a performance that has to be
 4    done every year.  It's yearly, so they -- each
 5    supervisor handles their employee's performance
 6    and has to fill out the performance evaluation.
 7          Q.     Is there a form that's used for
 8    these annual performance evaluations?
 9          A.     Yes.
10          Q.     Are you responsible as the
11    supervisor for completing these evaluations for
12    the pre-class department?
13          A.     I am responsible for completing the
14    ones on my managers.
15          Q.     Okay.
16          A.     It's each supervisor over whoever
17    has to do theirs.
18          Q.     Okay.  Am I correct then that you
19    would complete the performance evaluations for
20    the two managers under you?
21          A.     Yes.
22          Q.     And then those two managers would
23    complete the performs evaluations for the five
24    supervisors under them?
25          A.     Yes.
```

GRIFFIN, ANGELA 7/1/2019

1      Q.    And then those five supervisors

2  would complete the performance evaluation for all

3  of the employees under them?

4      A.    Yes.

5      Q.    Okay.  I think I got it.  Who are

6  those review forms sent to?

7      A.    HR.

8      Q.    Do you know what the reviews are

9  used for, what happens to them after you send the

10  review to HR?

11      A.    I'm not -- not really sure.  I mean,

12  I know that our pay scale, pay goes on it now,

13  but in the past, I'm not sure.

14      Q.    Are the performance evaluations the

15  main way by which pay raises are considered and

16  then provided as necessary?

17      A.    They can keep someone from getting

18  their yearly -- if we -- if we receive a yearly

19  pay increase, it can stop someone from getting

20  that.

21      Q.    Okay.  So a negative performance

22  review could stop someone from getting their

23  yearly pay increase?

24      A.    Correct.

25      Q.    Who does your performance

GRIFFIN, ANGELA 7/1/2019

Page 32

1   evaluation?

2        A.    Derrick Ellis.

3        Q.    Okay.  And what is his position

4   title?

5        A.    Deputy assistant secretary.

6        Q.    Okay.  Is it also sometimes referred

7   to as an assistant deputy secretary?

8        A.    I get the two confused sometimes, so

9   I got to stop and think about it, but it's deputy

10  assistant secretary.

11       Q.    Okay.  I guarantee you that I will

12  get those terms confused within the next few

13  minutes.  We spoke earlier today with Monisa

14  Lentz.  You're familiar with Ms. Lentz?

15       A.    Yes.

16       Q.    And what is your understanding of

17  what her title or -- or job responsibilities are?

18       A.    I do not know.  You know, she's not

19  in pre-class, so I don't know what she does.

20       Q.    What office does she work in?

21       A.    I'm not sure who she's assigned to.

22       Q.    Okay.  Do you know if she works

23  within the Office of Adult Services?

24       A.    I'm not sure.  That section's

25  assigned to adult services.  I'm not sure.

1      Q.    And I want to ask you just about a
2  couple of other individuals because they are
3  names that are going to come up on various
4  documents that we might look at today.  Are you
5  familiar with Raven Groom?
6      A.    Yes.
7      Q.    And what is your understanding of
8  where Ms. Groom works or worked?
9      A.    I know she works with Monisa.
10     Q.    But you are not sure where either of
11 them are employed?
12     A.    No.
13     Q.    Do you know if Ms. Groom is still
14 with the department?
15     A.    I'm not sure.
16     Q.    Do you know Barbara McMullen?
17     A.    Yes.
18     Q.    And what is her role within the
19 department, to your knowledge?
20     A.    I'm not sure.
21     Q.    Do you know which division she works
22 within?
23     A.    No.
24     Q.    With respect to Ms. Lentz, how have
25 you come into contact with her within the



```
 1    department?  Are there particular topics or
 2    issues you've dealt with her on?
 3           A.     We may get an e-mail if she receives
 4    a phone call, but --
 5           Q.     What sorts of phone calls does she
 6    e-mail you about?
 7           A.     Just if a family member's checking
 8    on an offender's case or any phone calls that
 9    they would get from family and an offender is
10    still in a parish jail.
11           Q.     And by the same token, how in your
12    work at the department have you come into contact
13    with Ms. Groom?
14           A.     She would send us some e-mails every
15    once in a while.
16           Q.     The same types of e-mails?
17           A.     Yes.
18           Q.     And what about Ms. McMullen?
19           A.     She would transfer phone calls to
20    us.
21           Q.     What kind of phone calls would she
22    transfer?
23           A.     It could be anywhere from the parish
24    jail calling or a family member of the offender.
25           Q.     What number does Ms. McMullen use to
```

GRIFFIN, ANGELA 7/1/2019

Page 35

1    transfer phone calls to you?

2         A.    I'm not sure of the number.

3         Q.    Okay.  Is it a number that's

4    specific to the pre-class department?

5         A.    I don't understand what --

6         Q.    Well, I'm just trying to understand.

7    You indicated that if Ms. McMullen would get

8    phone calls, she would transfer the phone calls

9    to you?

10        A.    Uh-huh (affirmatively).

11        Q.    I'm wondering what number

12   Ms. McMullen is dialling or connecting to in

13   order to reach you?

14        A.    Oh, to reach me?

15        Q.    Correct.

16        A.    She would -- my number.

17        Q.    Your personal number?

18        A.    My work office number, uh-huh

19   (affirmatively).

20        Q.    Okay.  And I guess my question is is

21   that a personal desk number for you?

22        A.    Yes.  The number's assigned to me.

23        Q.    Okay.  Are there other numbers that

24   are assigned to people within the pre-class

25   department?

GRIFFIN, ANGELA 7/1/2019

Page 36

```
 1          A.     Yes.
 2          Q.     Is there a general number that's
 3   available to the public --
 4          A.     Yes.
 5          Q.     -- for the pre-class department?
 6          A.     Yes.
 7          Q.     Okay.  And that's separate from your
 8   work number?
 9          A.     Yes.
10          Q.     When Ms. McMullen would transfer
11   phone calls, she would transfer it to your direct
12   office line?
13          A.     Some.
14          Q.     Okay.  Are there other numbers that
15   she would transfer phone calls to?
16          A.     Yes.  They're -- like maybe my
17   supervisors or the managers.
18          Q.     Okay.  The people that work under
19   you?
20          A.     Correct.
21          Q.     And they all have individual phone
22   lines as well?
23          A.     Correct.
24          Q.     Who is Angela Smith?
25          A.     She was one of the managers that
```



GRIFFIN, ANGELA 7/1/2019

1    worked in pre-class.

2         Q.    So she would have been one of the

3    two managers working under you?

4         A.    Yes.

5         Q.    And she's no longer with the

6    department?

7         A.    No.

8         Q.    When did she leave?

9         A.    December -- I'm trying to think was

10   it last year.  Yeah.  December of '18.

11        Q.    Do you recall how long she had been

12   a manager in pre-class?

13        A.    I'm -- I'm not sure.

14        Q.    Do you have a rough timeframe?

15        A.    I'm going to say about from maybe

16   2016.  I'm not sure.

17        Q.    Okay.  Did Ms. Smith work inside of

18   the pre-class department prior to becoming a

19   manager?

20        A.    She had in the past worked in

21   pre-class, not directly prior to coming to here.

22        Q.    Okay.  Had she worked in the

23   pre-class department during the time that you

24   were the director of the department?

25        A.    No.

1          Q.     Okay.  So her work in pre-class

2     prior to around 2016 had been prior to your

3     existence --

4          A.     Correct.

5          Q.     -- in that department?

6          A.     Correct.

7          Q.     But when Ms. Smith was manager in

8     pre-class, she reported to you as her supervisor,

9     correct?

10         A.     Yes.

11         Q.     Who is Joseph Bordelon?

12         A.     He is -- he was a pre-class worker,

13    an employee that worked for pre-class.

14         Q.     And he's no longer in that position?

15         A.     Not in pre-class here at

16    headquarters.

17         Q.     Where is he located now?

18         A.     At Raymond Laborde.

19         Q.     So he would have moved over there

20    sometime after that office opened?

21         A.     Correct.

22         Q.     Do you know why Ms. Smith left the

23    department in 2018?

24         A.     She retired.

25         Q.     Okay.  And you indicated before that

GRIFFIN, ANGELA 7/1/2019

Page 39

1   Mr. Ellis as the deputy assistant secretary would
2   be the person who performs your work evaluations,
3   correct?
4           A.    Yes.
5           Q.    And so the deputy assistant
6   secretary is your direct supervisor?
7           A.    Yes.
8           Q.    How long has Mr. Ellis been in that
9   position?
10          A.    I'm not sure.
11          Q.    Did you report to somebody prior to
12  Mr. Ellis being in that position?
13          A.    Yes.
14          Q.    Who was that?
15          A.    Perry Stagg.
16          Q.    I'm just trying to create a sort of
17  general timeline in my head.
18                Do you know if Mr. Stagg was in the
19  position of deputy assistant secretary in 2016?
20          A.    I believe he was.
21          Q.    And what about in 2017?
22          A.    I'm -- I'm not sure.
23          Q.    Mr. Stagg is still employed by the
24  Department of Corrections?
25          A.    Yes.



GRIFFIN, ANGELA 7/1/2019

Page 40

```
 1          Q.    Do you know how he's employed
 2    currently?
 3          A.    No.  I'm not sure of his title.
 4          Q.    Okay.  Does he still work within the
 5    Office of Adult Services?
 6          A.    No.
 7          Q.    So, to the best of your knowledge,
 8    at some point after 2016 Mr. Stagg left his role
 9    as deputy assistant secretary?
10          A.    Yes.
11          Q.    It's my understanding that Mr. Stagg
12    may have been in an acting position when he was
13    deputy assistant secretary; are you aware?
14          A.    I'm not sure how that -- yeah, their
15    positions go.  I'm not sure.
16          Q.    Okay.  Do you know when Mr. Stagg
17    started in his position as the deputy assistant
18    secretary?
19          A.    I'm not sure.
20          Q.    Would it have been before 2016?
21          A.    It could have been then, that year
22    or the year -- I'm not really sure when he
23    started.
24          Q.    Okay.  Was there somebody else who
25    was in the position of deputy assistant secretary
```

GRIFFIN, ANGELA 7/1/2019

Page 41

1    that you reported to prior to Mr. Stagg.

2         A.    Yes.

3         Q.    And who was that?

4         A.    James Bush.

5         Q.    Since you've been in the role of

6    administrative program director, is there anyone

7    else who has occupied the position of deputy

8    assistant secretary that you reported to?

9         A.    I'm not sure if I got that role

10   while James Bush was in the position or prior to

11   him.

12        Q.    Okay.  But those three that we just

13   talked about are the people that you remember

14   reporting to as the deputy assistant secretary?

15        A.    Correct.

16        Q.    Do you -- do you know why Mr. Bush

17   left the position and Mr. Stagg started in that

18   position?

19        A.    I'm really not sure.

20        Q.    And by the same token, are you aware

21   of why Mr. Stagg left the position and Mr. Ellis

22   was put into that position?

23        A.    I'm not sure.

24        Q.    Do you know who makes decisions

25   about who serves as the deputy assistant

GRIFFIN, ANGELA 7/1/2019

1    secretary?

2         A.    I don't know.  Yeah.

3         Q.    Does that position report directly

4    to Secretary LeBlanc?

5         A.    The position, which --

6         Q.    The deputy assistant secretary

7    position.

8         A.    I'm really not sure what -- who they

9    report to.  I'm trying -- I'm not sure.

10        Q.    Okay.  To your knowledge, what are

11   the general responsibilities that fall under the

12   deputy assistant secretary?

13        A.    Other than them being my supervisor,

14   I'm not sure what their responsibilities are --

15        Q.    Okay.

16        A.    -- and job description.

17        Q.    Are there sections other than the

18   pre-class department that fall under the deputy

19   assistant secretary?

20        A.    Again, I'm not sure.  I haven't

21   seen -- I'm not privileged to that information, I

22   guess.

23        Q.    Okay.  Are there other departments

24   that fall within the Office of Adult Services?

25        A.    There's different departments in the

1    Office of Adult Services, yes.

2           Q.    Okay.  What are some of the things

3    that fall under adult services?

4           A.    Transition work program, the

5    fugitive department, which I was part of.  That's

6    all that's coming to mind that I know --

7           Q.    Okay.

8           A.    -- you know, that I've dealt with.

9           Q.    And I'm correct in understanding

10   that the deputy assistant secretary position that

11   we have been talking about is within the Office

12   of Adult Services, correct?

13          A.    Yes, that position.

14          Q.    Okay.  Is that --

15          A.    That I know of.

16          Q.    Is that like the top of the Office

17   of Adult Services hierarchy?

18          A.    I've never seen an organizational

19   chart, so I'm not really sure who's the top --

20          Q.    Okay.

21          A.    -- of it.  I'm not sure how they --

22   who they go to.  I'm not sure where they go.

23          Q.    Okay.  So you know that the deputy

24   assistant secretary supervises you directly, but

25   you're not sure who would be there director?

GRIFFIN, ANGELA 7/1/2019

Page 44

 1        A.     Their direct -- right.

 2        Q.     Okay.  Fair enough.  Is there also a

 3   position within the Department of Corrections

 4   that is the chief of operations?

 5        A.     Yes.

 6        Q.     And, to your knowledge, the chief of

 7   operations reports to the secretary, Secretary

 8   LeBlanc?

 9        A.     To my knowledge, he does, yeah.

10        Q.     Okay.  Do you know whether or not

11   the deputy assistant secretary position that we

12   have been talking about, is it possible that that

13   position reports to the chief of operations?

14        A.     Again, I'm not sure how the chain

15   works.  I've never seen the organizational chart

16   to see how they go.

17        Q.     Okay.  Do you have regular meetings

18   with the deputy assistant secretary?

19        A.     We meet pretty regular, uh-huh

20   (affirmatively).

21        Q.     How often is that?

22        A.     We have a staff meeting we try -- he

23   tries for every month, but sometimes we don't get

24   it in, but it's -- we meet at least once a week

25   on different issues going on.

GRIFFIN, ANGELA 7/1/2019

Page 45

```
 1          Q.    Is there a set agenda for your
 2  weekly meeting?
 3          A.    Not the weekly.
 4          Q.    Who decides what you talk about
 5  during your weekly meetings?
 6          A.    Usually it's a meeting that we may
 7  have called to go meet with him on things we may
 8  have that we just need answers on or --
 9          Q.    Okay.
10          A.    -- opinions.
11          Q.    So a meeting that the pre-class
12  department has called --
13          A.    Correct.
14          Q.    -- to ask him about various things?
15          A.    Correct.
16          Q.    How does the deputy assistant
17  secretary supervise your work?
18          A.    Wait.  I don't -- I mean, what do
19  you mean -- such as?  I don't --
20          Q.    I don't know.  I'm just wondering
21  what structures are in place for the secretary to
22  supervise the work that you do on a daily basis?
23          A.    I mean, he -- pretty much he may
24  assign things to us and make sure it's done and
25  meets with us to see if there's any issues with
```



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond, LA 70404   Fax 985.419.0799

1   what we are working on or backlog or anything
2   that's going on in the pre-class department.
3          Q.    And this is the structure currently
4   under Mr. Ellis?
5          A.    Yes.
6          Q.    Was it the same structure under
7   Mr. Stagg?
8          A.    Yes, pretty much.
9          Q.    Did you have the same weekly
10  meetings with Mr. Stagg?
11         A.    I was going to say.  It wasn't like
12  a weekly meeting.  It's just when we had things
13  we need to -- we would call him and see when we
14  could meet with him and we did the same with
15  Mr. Stagg.
16         Q.    Did you have the monthly -- ideally
17  monthly staff meeting with Mr. Stagg as well?
18         A.    Yes, pretty -- maybe not every
19  month, like I say, but we tried to meet.
20         Q.    Do you know if there's any minutes
21  that are taken during those meetings?
22         A.    I'm not sure.
23         Q.    Is there any record that's
24  maintained of what's discussed in the meetings
25  you had with the deputy assistant secretary?

GRIFFIN, ANGELA 7/1/2019

1      A.      On our meetings that we would call,
2  we wouldn't keep minutes.
3      Q.      You wouldn't keep minutes?
4      A.      No.
5      Q.      Are you aware if any minutes or
6  notes were kept of the staff meetings?
7      A.      I'm not sure.
8      Q.      Did you ever take notes personally
9  when you would meet with the deputy assistant
10 secretary?
11     A.      Yes.
12     Q.      We talked generally about what the
13 pre-class department is responsible for and some
14 of your supervisory responsibilities within that,
15 but can you describe for me what your other
16 day-to-day job responsibilities are?
17     A.      Okay.  Basically working with any
18 issues that may come up, employees -- the
19 managers usually bring me the issues to get an
20 answer, then they go back and get it to the
21 employees.  But working with probation and parole
22 on cases, the fugitive department on cases.
23 Pretty much anything that comes into our office,
24 we -- we try to handle.
25     Q.      Okay.  Any other job

GRIFFIN, ANGELA 7/1/2019

Page 48

1    responsibilities that we haven't talked about?

2         A.    I think that's pretty much it.

3         Q.    Okay.  And earlier you gave me a

4    definition of pre-class that I'm going to try to

5    work within.

6         A.    Okay.

7         Q.    But just to make sure we are on the

8    same page, I want to walk through a few things

9    that I understand to be components of the

10   pre-class and time computation process.

11        A.    Okay.

12        Q.    So you indicated before that DPS&C

13   receives notification that a person has been

14   sentenced to time in the Department of

15   Corrections; is that correct?

16        A.    Well, notification meaning the

17   packet.  It's a packet we receive.

18        Q.    Okay.  And when you say "a packet,"

19   are you referring to something in hard copy?

20        A.    Yes, or e-mail.  We get sometimes

21   e-mailed or faxes.  I know they'll be faxed

22   sometimes.

23        Q.    And who are you receiving these

24   packets from?

25        A.    From the parish of conviction

1    wherever the offender was convicted.

2           Q.    Is that from the sheriff's office?

3           A.    Yes.

4           Q.    Do you receive anything directly

5    from, let's say, the clerk of court in the parish

6    of conviction?

7           A.    We do receive clerk paperwork

8    sometimes too --

9           Q.    Okay.

10          A.    -- from the clerks.

11          Q.    And that would come directly from

12   the clerks?

13          A.    Sometimes they will send us

14   supplemental paperwork or -- or original copies

15   of something we have already received.

16          Q.    But the packets you referred to,

17   those come from the sheriff in the parish of

18   conviction; is that correct?

19          A.    Correct.

20          Q.    Is there any other mechanism by

21   which the Department of Corrections is notified

22   that a person has been sentenced to hard labor?

23          A.    Meaning officially or just notified?

24   I don't --

25          Q.    Officially or unofficially.



1      A.     Okay.  I mean, we -- we get phone

2  calls or things like that of somebody that's

3  waiting for their time comp to be done.

4      Q.     And that would be an unofficial?

5      A.     Right.  And then we will -- right.

6      Q.     Is there any other official

7  mechanism by which the Department of Corrections

8  is notified that someone has been sentenced to

9  DOC?

10      A.     Not officially.

11      Q.     Is there a requirement that the

12  Department of Corrections receive notification

13  that someone has been sentenced to the Department

14  of Corrections?

15      A.     Yes, so we'll know they were

16  sentenced to hard labor to be able to --

17      Q.     Where does that requirement come

18  from?

19      A.     It's an article in the state

20  legislature.  I don't remember the article.

21      Q.     How does the Department of

22  Corrections enforce the requirement that you-all

23  be notified when someone is sentenced to the

24  Department of Corrections?

25      A.     I'm really -- I'm not sure how it's

GRIFFIN, ANGELA 7/1/2019

1    enforced.  I'm not sure.

2         Q.    Do you-all enforce the requirement?

3         A.    Yes.  In fact, I mean, we do if we

4    need -- we need the paperwork to be able to

5    calculate someone in our system to know that he's

6    hard labor.

7         Q.    I guess I'm wondering how the

8    Department of Corrections ensures that it

9    receives the paperwork that you are discussing so

10   that the time computation can occur?

11        A.    We -- it's just that the parishes,

12   once they are convicted and sentenced, they get

13   the packets together and they mail them, send

14   them to us mail or -- yeah.  I'm not sure of --

15   like you are saying to note that we got it or

16   not.  There's no mechanism.

17        Q.    Can a person who has been sentenced

18   to time in the Department of Corrections in one

19   parish be transferred to another parish facility?

20        A.    Yes.

21        Q.    Somehow does the Department of

22   Corrections receive notification of that movement

23   of a person sentenced to DOC?

24        A.    Usually what we have, if they are --

25   if they have not sent us the pre-class packet yet

 1    but they have moved the offender because that's

 2    between the sheriff and the sheriff moving the

 3    offenders, they put that on their jail credit

 4    letter.  It's a letter that tells us when he was

 5    arrested and when they send that to us, if

 6    transferred to another parish they will put that

 7    transfer over to and state the parish he moved

 8    to.

 9            Q.    Am I correct in understanding that

10    that would be paperwork that you still receive

11    from the sheriff at the parish of convictions?

12            A.    Of conviction, correct.

13            Q.    Okay.  So that would be the sheriff

14    who is transferring that individual to another

15    facility?

16            A.    Correct.

17            Q.    Do you receive any notification from

18    the receiving parish in that scenario?

19            A.    Pre-class does not receive anything

20    from them.

21            Q.    Does someone else receive something?

22            A.    There is a form that if an offender

23    transfers to another parish, that they turn that

24    in, the parish sending the offenders to fill out

25    a form and send that in or the parish receiving

1 them, if it's still not in, they'll send it

2 sometimes.  I don't know who required.

3       Q.    Okay.  Who does that go to?

4       A.    To the transfer department.

5       Q.    Okay.  And that's a separate section

6 of the Department of Corrections?

7       A.    It's under the adult services.

8       Q.    Okay.

9       A.    In that department.

10       Q.    And am I correct in understanding

11 that the packet that you've been referring to is

12 supposed to contain the information that the

13 pre-class department needs to perform the initial

14 time computation?

15       A.    Correct.

16       Q.    And what specifically is needed to

17 perform that initial time computation?

18       A.    We receive the basic interview form,

19 which is his personal information; his

20 fingerprints showing that he's verified to that

21 person, that he was the one that was arrested for

22 the -- convicted; jail credit letter when he was

23 arrested; his sentencing minutes, Uniform

24 Commitment Order now; and bill of information.

25 Now, we have worked people's time without the

1   bill of information.  If they just can't get it
2   to us, we will work it because it needs to be
3   worked.
4        Q.     Okay.  And this is the information
5   that is supposed to be provided by the sheriff of
6   the parish of conviction, correct?
7        A.     Correct.
8        Q.     Now, you mentioned that you might
9   get this packet in hard copy or by e-mail or by
10  fax; is that correct?
11       A.     Correct.
12       Q.     Is there any directive to the
13  sheriff's of the various parishes in Louisiana
14  about how this packet of information is to be
15  provided to the Department of Corrections?
16       A.     It -- I don't know if there's a
17  directive out there.  I'm not sure.
18       Q.     Do you know if the Department of
19  Corrections has provided any instruction to the
20  various sheriffs in the state about their
21  obligation to send this packet to the Department
22  of Corrections?
23       A.     We have in the past had training at
24  the sheriff's association meetings, conferences;
25  and then if the jail asks for any information, we

 1    give them the information on how -- what needs to

 2    be done.

 3          Q.    How often have you had these

 4    trainings at the sheriff's offices?

 5          A.    Several years, we have done the

 6    training.

 7          Q.    Have you done them in recent years?

 8          A.    Since pre-class has been here, we

 9    have.

10          Q.    So since 2013?

11          A.    I just don't know which year it is.

12    Correct.

13          Q.    Have you done the training every

14    year since 2013?

15          A.    Not at the -- not with the -- that

16    kind of training at the Louisiana Sheriff's

17    Association.  We may have had it again twice

18    since 2013.

19          Q.    Okay.  So maybe twice since 2013 the

20    Department of Corrections has provided training

21    at that sheriff's conference --

22          A.    Uh-huh (affirmatively).

23          Q.    -- that you mentioned?

24          A.    Right.

25          Q.    And what topics are covered during

1  that training?

2       A.    From the beginning of the pre-class,

3  what paperwork we would need that needs to be

4  sent in and why, and all the way through what we

5  need them to do when we release an offender,

6  clearing an offender for release.

7       Q.    Do you happen to remember the last

8  year that that training was provided?

9       A.    We did a training last year, the

10  last conference, but I don't know how many -- I

11  know right after 2013 we did one.  I just don't

12  know how many in between we have done.

13       Q.    Are you the one who provided the

14  training at the conference?

15       A.    I have, and then I've also included

16  my managers and supervisors to help out and be

17  familiar with them.

18       Q.    Okay.  You mentioned the transfer

19  paperwork that might be sent to the transfer

20  department --

21       A.    Uh-huh (affirmatively).

22       Q.    -- just a minute ago.  If the

23  transfer department were to receive paperwork of

24  a parish jail to parish jail transfer and that

25  person isn't already entered in the Department of

1    Corrections system, what would happen?

2         A.    I'm not sure.  I've never worked in

3    that capacity doing those.

4         Q.    Has the pre-class department, to

5    your knowledge, ever received notification of

6    that occurring?

7         A.    Meaning the transfer of offenders?

8         Q.    Meaning that an offender has been

9    transferred and when the transfer department got

10   that form that you mentioned, they went to put

11   that into the Department of Corrections system

12   and that person wasn't listed or updated.

13        A.    I'm not sure.

14        Q.    If you receive a packet of

15   information from a sheriff's office and that

16   packet is missing some of the information you

17   just said you need to do the time computation,

18   what steps does the pre-class department take?

19        A.    I usually call them first and try

20   and ask them to send it as soon as possible and

21   then we may go on to e-mail them and try and get

22   it.

23        Q.    Is there any way that the pre-class

24   department tracks when you-all receive a packet

25   of information?

GRIFFIN, ANGELA 7/1/2019

Page 58

```
 1          A.      Yes.
 2          Q.      Okay.  How is that tracked?
 3          A.      We stamp the paperwork received.
 4          Q.      Do you stamp each page of the
 5   paperwork?
 6          A.      Not each page.  If it's a packet, we
 7   stamp the -- one page of it received and then the
 8   rest -- if we get any supplemental, it's supposed
 9   to be stamped received when we receive that.
10          Q.      Now, if you receive a packet in hard
11   copy and you stamp it when you receive it, what
12   happens to the packet after that as far as record
13   storage is concerned?
14          A.      It's scanned into a scanning system.
15          Q.      To create an electronic record?
16          A.      To create an electronic, correct.
17          Q.      And does that electronic record then
18   also capture the date that that paperwork was
19   scanned in?
20          A.      Yes.
21          Q.      What do you-all do if you receive
22   the paperwork by e-mail or fax as far as tracking
23   the day that it's received?
24          A.      The same thing.  We stamp it
25   received and then in our system, when we are
```

GRIFFIN, ANGELA 7/1/2019

1   entering the information in our system, it's got
2   a pre-class screen and it's has date received and
3   we put it in there.
4          Q.    So am I correct in understanding
5   that you print out a hard copy of that e-mail or
6   fax --
7          A.    Yes.
8          Q.    -- so that it can be stamped?
9          A.    Yes.
10         Q.    And then that is scanned back in?
11         A.    Then that's scanned in our scanner
12  system, yes.
13         Q.    Do you-all have any mechanism by
14  which you track if there is a parish that you
15  frequently get incomplete packets from that you
16  have to follow up with?
17         A.    We don't have a -- like we don't
18  keep up with as far as a list, but the employees
19  know if they don't get anything to call and try
20  and get it.
21         Q.    And when you say "if they don't get
22  anything, they know to call" --
23         A.    Then they -- well, if they try and
24  get it and they don't, they'll try and e-mail
25  them and then they'll go up to the next chain,

 1    their supervisor, and let them start trying to

 2    get it.

 3         Q.    But there's no way that you guys

 4    track if there's a particular parish where

 5    information is frequently missing?

 6         A.    We don't.  We didn't.  We are

 7    starting to try now.  It's just that we have

 8    groups that are doing it and trying to keep up --

 9    everybody keeping up with it, so we are trying to

10    track it now, but --

11         Q.    When did that start?

12         A.    Probably the last few months.

13         Q.    And so what about the situation

14    where the pre-class department doesn't receive

15    information from a parish about someone who has

16    been sentenced to time in the Department of

17    Corrections?

18         A.    If we don't receive the paperwork,

19    we don't know he got sentenced, so we -- we

20    wouldn't know to call.  We wouldn't know he was

21    sentenced.

22         Q.    So the only mechanism by which the

23    Department of Corrections is keeping track of

24    people who are sentenced to DOC is through

25    receipt of the packets from the parishes of

1    convictions?

2         A.    That I know of, yes.

3         Q.    Okay.  You mentioned that the

4    paperwork is stamped when you-all receive it in

5    the office.  Is there a particular piece of the

6    packet that we discussed that usually receives

7    the stamp?

8         A.    Well, in the -- and I don't know

9    what year when we decided that you have to keep

10   stamping.  It's the basic interview sheet and

11   they are supposed to now -- and this has been

12   about a year now -- at the right top corner of it

13   in the same spot.

14              In the past, we realized that people

15   were stamping different pages, so we have came up

16   with -- so we -- because looking through the

17   paperwork trying to find it, we were having to

18   look at every piece of paper to see where the

19   stamp was.

20        Q.    Okay.  Has it always been the

21   process to at least stamp one of the pages?

22        A.    Yes.  It was supposed to be part of

23   the process to stamp at least one that was in the

24   packet.

25        Q.    And that's during your time as

GRIFFIN, ANGELA 7/1/2019

Page 62

```
1    director over the pre-class?
2         A.    Yes.
3         Q.    You mentioned the fingerprints as
4    part of the packet; is that correct?
5         A.    Yes.
6         Q.    And is that information that's
7    received from the AFIS system?
8         A.    Yes.
9         Q.    Okay.  Can you tell me a little bit
10   about what AFIS is?
11        A.    Okay.  It's an Automatic
12   Fingerprinting System that the offender is
13   fingerprinted and it automatically tells them his
14   SID so they know who he is, who he prints to.
15   And it will kick out a -- it's called a suspect
16   rap sheet and it's got his photo on it.  That
17   will give that SID number and ATN number, which
18   is a tracking number, and it prints to his
19   criminal history.  So that tracking number is our
20   piece to find that tracking number against his
21   criminal history to say that they fingerprinted
22   this offender in their jail and this is him who
23   -- who was convicted.
24        Q.    Okay.  Does the pre-class department
25   have direct access to AFIS?
```

GRIFFIN, ANGELA 7/1/2019

Page 63

```
 1          A.     We do not have AFIS.
 2          Q.     Okay.
 3          A.     We have the criminal -- we can pull
 4    a criminal history --
 5          Q.     Okay.
 6          A.     -- on NCIC.
 7          Q.     Okay.  And, if I understand correct,
 8    you would then be comparing the number from the
 9    AFIS printout --
10          A.     Uh-huh (affirmatively), correct.
11          Q.     -- to the NCIC history that you
12    could pull up?
13          A.     Correct.
14          Q.     So how do you receive the AFIS
15    information?
16          A.     It comes with the packet.  It's a
17    page that's in the packet.
18          Q.     So it's like a hard copy printout?
19          A.     Yes.
20          Q.     And so that's a printout that you
21    receive from the parish of conviction?
22          A.     Yes.
23          Q.     Other than the numbers that you are
24    using to identify the person, is there any other
25    information that's contained on the AFIS printout
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1   that the pre-class department isn't using?

2        A.    We'll use any -- we look at it for

3   any address, marks and tattoos or things like

4   that that's on it.

5        Q.    And as far as some of the other

6   pieces of paper that you mentioned that should be

7   in the packet, what documents does the pre-class

8   department use to actually enter the -- the

9   sentence information to actually do the time

10  computation?

11       A.    The Uniform Commitment Order or

12  sentencing minutes and which is the sentence, how

13  long he's to serve, and then the bill of

14  information, so -- is what we enter.  Like the

15  crime, it tells us when he committed it.

16       Q.    And what about the letter of credit

17  that you mentioned?

18       A.    That's to do the time.  We need that

19  to time comp him to go through, so we know when

20  he was arrested to start his time in custody.

21       Q.    And I assume also thereby the amount

22  of time that he's getting credit for?

23       A.    Correct.  Any ins and outs, if he

24  bonded.  Arrested and bonds, he'll get jail

25  credit, correct.

1      Q.    The AFIS that you mentioned, does
2  the pre-class department rely on those at all for
3  information about sentence or credit for time
4  served?
5      A.    No.  Because usually if we get just
6  the suspect rap sheet, it doesn't give any
7  sentencing information.  It just gives who he
8  printed to, the date he was printed, and none of
9  that sentencing information is on there.
10          Now, it is on the criminal history.
11  If they typed it in, it would be on the criminal
12  history once we pull that criminal history.
13      Q.    That -- you are referring to what's
14  pulled from NCIC?
15      A.    Right.  It's whatever they've
16  entered in the AFIS machines.  Whoever printed
17  the offender, whatever they type comes out on
18  that criminal history.
19      Q.    Okay.  But I'm correct that a
20  printout of the criminal history isn't something
21  that needs to be provided with the pre-class?
22      A.    They do not provide it, no.
23      Q.    Okay.  Is there information that
24  needs to have been entered into the criminal
25  history at the time that the AFIS entry happens

1    for you-all to do your work?

2          A.    We need them to at least print him

3    and they -- they supposed to put the disposition

4    of the crime, but they will put DCID, just that

5    they ID'd him that that is him, and we still use

6    that.

7          Q.    That's enough for --

8          A.    Just as long as he's fingerprinted,

9    yeah, and his arrests are on there and -- and we

10   get minutes that coincide with that.

11         MS. WASHINGTON:

12              Okay.  I want to show you an e-mail

13         which I am marking as Exhibit 30.  And

14         along with it, I am going to mark what was

15         provided to us in discovery as the

16         attachment to the e-mail that you are

17         looking at, which was also provided to us

18         in discovery, and the attachment will be

19         No. 31; and I'm handing you that exhibit

20         as well.

21      (Exhibits 30 and 31 marked and tendered.)

22         THE WITNESS:

23              Okay.

24   BY MS. WASHINGTON:

25         Q.    Do you recognize this e-mail and



1    attachment?

2         A.     Yes.

3         Q.     And the e-mail that I'm referencing

4    is an e-mail that you sent in January of 2017,

5    correct?

6         A.     Yes.

7         Q.     And it indicates that with the

8    e-mail you are forwarding the, quote, pre-class

9    packet information that you provide when you

10   train on pre-class; is that correct?

11        A.     Correct.

12        Q.     And so then Exhibit 31 is the

13   pre-class packet information, correct?

14        A.     Correct.

15        Q.     And am I correct in understanding

16   that these are -- these are documents like the

17   ones that we have just been talking about that

18   you expect to receive in the pre-class packet?

19        A.     Yes.  This is the acknowledgement

20   and signature form when I mentioned the forms.

21        Q.     And so you indicate in your e-mail

22   that -- that you provide this packet when you

23   train on pre-class, correct?

24        A.     Correct.

25        Q.     And so who -- who has received the



GRIFFIN, ANGELA 7/1/2019

Page 68

1   pre-class and thereby received this pre-class
2   packet?
3        A.   I'd say any parishes that has gone
4   -- was at the LSA conference that attended the
5   class.
6        Q.   In the years that it was held?
7        A.   Right.  Correct.
8        Q.   Okay.
9        A.   And anyone that has asked for it.
10  We have -- some parishes will call and ask us
11  because we have it in electronic form to send to
12  them, things like that.
13       Q.   Okay.  And this is an e-mail that
14  you exchanged with the Corey Amacker with OPSO;
15  is that correct?
16       A.   Correct.
17       Q.   Do you know if this was the first
18  time that this packet of information had been
19  provided to OPSO?
20       A.   I'm not sure.
21       Q.   Was Orleans Parish one of the
22  parishes that had asked you for training
23  previously?
24       A.   I'm not sure if they are.
25       Q.   Do you know if they had attended the


Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond, LA  70404    Fax 985.419.0799

```
 1   LSA conference and the particular class on

 2   pre-class?

 3        A.    I'm not sure.

 4        Q.    Okay.  The training that occurred at

 5   the sheriff's association conference, would there

 6   be a roster or sign-in sheet to know who actually

 7   attended that training?

 8        A.    We would probably have one for the

 9   last one, but prior, I'm not sure if we still

10   have them.

11        Q.    And you mentioned that the last one

12   would have been just last year?

13        A.    Right.  Correct.

14        Q.    Why don't you know if there are ones

15   from prior trainings?

16        A.    I'm just not sure if we kept them,

17   have them available or --

18        Q.    Okay.  And I'm correct in

19   understanding then that this pre-class packet is

20   what the pre-class department needs completed in

21   order to do an initial time computation?

22        A.    Majority of this paperwork, we would

23   need.  Now, we -- if it's someone they send us

24   paperwork to time comp and we are needing the

25   paper -- we know he needs to be time comped --
```

1    there's parts that we wouldn't make them send us

2    to time comp them, like signature form,

3    acknowledgment/signature form, because that's if

4    someone escapes or there's, you know, the

5    property.  And knowing he's not coming into a

6    stated facility, we would calculate his release

7    dates without it.

8         Q.    Okay.  Is there any other piece of

9    this packet that isn't needed to do a time

10   computation?

11        A.    In the past, we've had facilities

12   that did not send us the basic interview sheet.

13   They may send us a copy of their -- their

14   computer system with the information on it and we

15   would take it.

16        Q.    Maybe this is an inartful question,

17   but what are the essential pieces of the

18   pre-class packet that you-all need in order to do

19   the time computation?

20        A.    The jail credit letter, the UCO in

21   minutes or minutes, and the fingerprints.  Now,

22   the bill of information is very important because

23   that tells us when he committed the crime.  We

24   have worked them without that depending on the

25   crime.  Because a lot of crimes, it depends on

GRIFFIN, ANGELA 7/1/2019

Page 71

1    how they release by what the crime was and who

2    they committed on and the date it was committed.

3    He would release differently, so we would

4    absolutely need it then.

5            Q.    Because of changes in the statute?

6            A.    Correct.

7            Q.    Okay.  That makes sense.  Now, when

8    the pre-class department gets these packets of

9    information, is there some kind of screening that

10   the department does to prioritize the packets and

11   the time computation?

12           A.    Sort of.  They -- first of all, they

13   have to verify that it's hard labor sentences,

14   then they do try and screen it for -- not

15   necessarily how long the offender received, it's

16   how long he's been in custody against his

17   sentence length, so just trying to see who would

18   -- and what act they would fall under depending

19   on how much time they would have to serve.

20           Q.    And within the pre-class department,

21   who is tasked with performing that screening role

22   that you just described?

23           A.    We have an intake group.  It's a

24   group of employees that we consider the intake

25   group, and they are -- they receive the packets

GRIFFIN, ANGELA 7/1/2019

1    and start going through them.

2          Q.    Has the intake group been

3    structurally in existence since you started as

4    director in 2013?

5          A.    We've changed a little bit since

6    then, but it's always been the employees receive

7    intake; and it used to be some parishes assigned

8    to different groups and they -- their people

9    would -- and now it's one intake group and it all

10   goes to the same intake group.  So we've changed

11   it, but it's pretty much the same as far as how

12   they process it when they receive it.

13         Q.    And when was this sort of

14   specialized intake group created?

15         A.    I'm -- I'm not sure when it was.

16         Q.    Okay.  Like I mentioned before, the

17   facts in this case occurred in 2016 and 2017.  I

18   guess what I'm trying to understand was was this

19   specialized intake group created after that point

20   in time?

21         A.    I'm not sure.  It was somewhere in

22   there, but I'm not sure when -- yeah.  I can't --

23         Q.    Okay.  And am I correct in

24   understanding that prior to that various groups

25   were responsible for various parishes?

1       A.      Correct.

2       Q.      Okay.  The intake group that exists

3  currently, do they have responsibilities outside

4  of just this screening process?

5       A.      Just their responsibilities are to

6  receive the paperwork, verify it, screen it, and

7  enter the pre-class screen that we have received

8  it, this paperwork; and they pull the criminal

9  history too.

10       Q.      Okay.  And then from that point do

11  the various cases or packets get somehow

12  distributed for time computations?

13       A.      They are distributed to different

14  supervisors that handle the time computation to

15  enter the information in our system, the crime,

16  the sentence, and time comping.

17       Q.      Okay.  So you mentioned that the

18  packets are distributed to the supervisors; is

19  that correct?

20       A.      Yes.

21       Q.      Okay.  And is it the supervisors who

22  are responsible for the time computation?

23       A.      No.  They assign it to their

24  employees --

25       Q.      Okay.

1          A.      -- to time comp.

2          Q.      Are the employees who are

3    responsible for actually doing the time

4    computation provided with instruction on how long

5    they have to complete the time computation once

6    they receive a packet?

7          A.      Yes.  I mean, not basically a number

8    of days, no, but they know it's to be worked as

9    soon as they can and once they have the available

10   paperwork; and then as the supervisor keeps up

11   with how long it's -- when it was given to them

12   and if it's done in a certain period of time and

13   find out why it hasn't been done.

14         Q.      How are the supervisors keeping up

15   with that timeline that you just discussed?

16         A.      They assign it to their employees.

17         Q.      Okay.

18         A.      And we also have a scanning program

19   which if it's not time comped, it isn't scanned.

20   I mean, it is indexed, it's scanned, so it's

21   sitting out there in a holding; and once they

22   time comp, they -- it's called indexing and it

23   goes away.  It goes out of that hold.

24         Q.      Do you know if the supervisors

25   maintain any kind of log or spreadsheet by which

GRIFFIN, ANGELA 7/1/2019

Page 75

1  they track when they give out a particular case

2  to an employee?

3      A.    I'm not sure if they keep up a log.

4      Q.    After the time computation has been

5  completed by the employee, is -- is the person,

6  the prisoner provided information about their

7  time computation?

8      A.    He gets a copy of his -- we call it

9  master prison record.

10      Q.    How is that provided?

11      A.    We mail it to the jail that he's

12  housed in.

13      Q.    Does the jail that he is housed in

14  also receive a copy?

15      A.    They receive the packet of whoever's

16  housed there and they can make a copy of that

17  copy to give to the -- keep a copy and give to

18  the offenders.

19      Q.    Is there any requirement that the

20  jail make a copy of these master prison records

21  when they receive them?

22      A.    I'm not sure.

23      Q.    But it sounds from your description

24  like that would be optional?

25      A.    Be optional, correct.



GRIFFIN, ANGELA 7/1/2019

1      Q.    As director over the pre-class
2  department, is it your responsibility to ensure
3  that the department is receiving the required
4  information from the parishes of conviction?
5      A.    Again, we try -- I try my best to --
6  if we know we are not receiving the paperwork, I
7  try my best to work with them and try and see
8  what the hold up or work out some kind of -- with
9  the parish.  Other than that, not knowing we are
10 not getting it, we just don't know if he's
11 sentenced -- if someone's sentenced or not if we
12 do not get it.
13     Q.    Is it part of your responsibility to
14 make sure that you-all are receiving the
15 requisite paperwork soon after person are
16 sentenced?
17     A.    Again, I don't know -- I mean, we --
18 we try our best to tell the parishes to send it
19 as soon -- but I don't know -- if we do not
20 receive anything from the jail, we do not know
21 they are sentenced.
22     Q.    Okay.  The pre-class department is
23 responsible for making sure that time
24 computations are done timely so that persons can
25 be released on the date that they are due to be

GRIFFIN, ANGELA 7/1/2019

Page 77

1    released, correct?

2         A.    Correct.

3         Q.    And it is possible that if time

4    computations are not performed promptly that

5    people may end up being released at some point

6    past the date they were due to be released; is

7    that correct?

8         A.    Correct.  If they don't do it in --

9    right.  If we have the paperwork and just don't

10   do the time comp, yeah, that could happen.

11        Q.    Are there any timelines in place for

12   that screening process that you told me about?

13        A.    We -- we train the employees to have

14   it done within a day of receiving the paperwork.

15   Again, that depends on how much paperwork came in

16   the mail that day, but we try and get it done and

17   it goes to the next group within a day.  And each

18   thing we do, it's as soon as possible when you

19   can get it done and just work it --

20        Q.    Okay.

21        A.    -- as you have it.

22        Q.    And by the same token, once the

23   intake screening process has happened and those

24   have been distributed to the supervisors, is

25   there a timeline by which the supervisor is

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

Page 78

1    supposed to assign a given case to one of the
2    employees to work?
3          A.    They should be assigning it right
4    away --
5          Q.    Okay.
6          A.    -- as soon as they receive it.
7          Q.    Okay.  And earlier you mentioned the
8    -- the UCO, the Uniform Commitment Order.  Is
9    that coming as part of the packet from the
10   sheriff's office to the department?
11         A.    The Uniform Commitment Order is a
12   new form that legislation passed and the Supreme
13   Court passed that they are to use to send to us
14   on convictions, sentences.  We still have a few
15   parishes that do not use it, so we still use
16   sentencing minutes --
17         Q.    Okay.
18         A.    -- to calculate.
19         Q.    When did that order or the form come
20   into existence?
21         A.    I think it was 2000 -- I'm not
22   positive.  I know 2016, '17 that they made it
23   mandatory.
24         Q.    Is it one of the forms that was in
25   Exhibit 31 that we looked at?

GRIFFIN, ANGELA 7/1/2019

Page 79

```
 1        A.    No.
 2        Q.    Okay.
 3        A.    Because it's a Supreme Court form.
 4        Q.    Okay.
 5        A.    Yeah.
 6        Q.    But just so I understand, is that a
 7   form that you are receiving directly from the
 8   clerk of court?
 9        A.    The parish jails of conviction sends
10   it to us.
11        Q.    Okay.  So the sheriff is still
12   sending that?
13        A.    They -- right.
14        Q.    But it would be part of the court
15   record for a case; is that correct?
16        A.    It's his court minutes.  It's really
17   the court minutes --
18        Q.    Okay.
19        A.    -- but they use UCO.
20        Q.    Okay.  But it is a document that is
21   initially generated by the court itself where the
22   sentence occurred?
23        A.    I'm not sure who generates it.  We
24   have different places they say do it.  I mean,
25   I'm not sure who does it, if it's the court,
```

1    clerk of court.  I'm not sure.
2         Q.    On your end, you receive it as part
3    of the packet you receive from the sheriffs'
4    offices?
5         A.    Correct.
6         Q.    Okay.  When you started your work in
7    pre-class at Elayn Hunt --
8         A.    Uh-huh (affirmatively).
9         Q.    -- what training did you receive for
10   performance of your job duties?
11        A.    It was a booklet more on the laws
12   and things, the different acts that someone can
13   fall under and a lot of on-the-job training.
14        Q.    And when you moved into your current
15   position as director over the pre-class
16   department here at headquarters, what training
17   did you receive specific to that role?
18        A.    Training wise, again, it was
19   basically on-the-job training and the training --
20   going out and train.  It was basically what I was
21   doing prior, so it's about the same, on-the-job
22   training.
23        Q.    Okay.  For the employees who work
24   under you within the pre-class department here at
25   headquarters, what training do they receive when

1   they start working the department?

2        A.    We have a training, we call them

3   modules.  Each step of the pre-class process, we

4   broke it down to train what each thing is and

5   what we need and how it's handled, how to enter

6   in our system, explain time comp.  And then we

7   also give out -- again, it's kind of like a cheat

8   sheet per se.  It's the different acts and the

9   dates the offender committed, what he would fall

10  under, and all the list of crime of violences,

11  the list of offenders that -- the crimes that are

12  not eligible for parole, so it's a lot of forms

13  that -- basically it's a lookup process to be

14  able to process the time comp.

15       Q.    Okay.  And the training modules that

16  you mentioned, are those PowerPoint

17  presentations?

18       A.    They are, yeah.  I was trying to

19  think.  Yeah, PowerPoint.

20       Q.    Okay.  Are they provided as an

21  in-person training with the PowerPoint

22  presentations?

23       A.    Yes.

24       Q.    Okay.  I think that we were provided

25  with several of those modules in discovery in

1    this litigation.

2         A.    Uh-huh (affirmatively).

3         Q.    They were on topics like verifying

4    paperwork, updating CAJUN.  Does that sound

5    right?

6         A.    Yes.

7         Q.    How long have those training modules

8    been in existence?

9         A.    The so-called modules we made within

10   about a year or so, but it was -- the same

11   process, the same training material has been

12   around since I began in pre-class.  We just keep

13   updating it with the change in legislation and we

14   just update it.  And then about two years ago, we

15   made it into -- we called them modules.  It just

16   -- but it's the same material, just updated with

17   the new legislation.

18        Q.    Okay.  And when you say that the

19   modules were created about a year or two ago, by

20   modules, do you mean specifically this PowerPoint

21   presentation form?

22        A.    Yeah.  It's as a PowerPoint.

23        Q.    And prior to the creation of the

24   PowerPoint, where was this information contained?

25        A.    I think it was in something like

GRIFFIN, ANGELA 7/1/2019

Page 83

1  Microsoft Word and they printed it for us.  We
2  had it in books.
3        Q.    Okay.  So that would be the booklet
4  that you referred to from your time at Elayn
5  Hunt?
6        A.    That's part of it, correct.
7        Q.    Okay.  And when it was in booklet
8  form, was that something that was printed out and
9  provided to employees in the department?
10       A.    We've had training, and I don't know
11  when.  Being at Hunt where we sat down and went
12  over the pre-class and -- but they would also --
13  once we had it in our book, we sat down with an
14  employee and -- as they were working it, we went
15  through our book and to see where they were at
16  that point.  But we were provided with the copies
17  of the -- like I said, Microsoft Word.  It wasn't
18  in PowerPoint.
19       Q.    Okay.  Am I correct, though, that
20  this sort of more formal training modules and
21  in-person PowerPoint presentation started about a
22  year or two ago?
23       A.    Pretty much about, right.
24       Q.    Okay.  And in looking at the modules
25  that we received, am I correct in understanding



GRIFFIN, ANGELA 7/1/2019

Page 84

1    that the modules sort of start at the time from

2    which the packet has arrived in the

3    pre-classification department?

4         A.    Correct.

5         Q.    Okay.  And so the modules don't

6    appear to deal with what has happened with the

7    packet prior to it arriving in the pre-class

8    department?

9         A.    Correct.  Because that's -- it

10   starts with our job, you know, what -- what would

11   happen -- once we get the paperwork, what's the

12   responsibility of the employees here.

13        Q.    Okay.  Does it have -- does the

14   module cover anything about what steps a DPS&C

15   pre-class employee needs to take to make sure

16   that you are receiving the sentencing information

17   from the parishes of conviction?

18        A.    Again, no, it doesn't; because we

19   wouldn't know if they were sentenced or not to

20   know to take steps for that.

21        Q.    Okay.  So that's not covered in the

22   training modules?

23        A.    Right.

24        Q.    Is the pre-classification department

25   staff provided with any legal training, any

1    training on the legal aspects of pre-class and

2    time computation?

3          A.    No.

4          Q.    Okay.

5          A.    No training.

6          Q.    Okay.  Is the pre-class department

7    staff provided with any information about the

8    duty of a jailer to only be holding persons that

9    they have the legal authority to hold?

10         MR. EVANS:

11              Object to form.  You can answer.

12         THE WITNESS:

13              No.  The jailer holding the offender

14         that -- they can't.  I mean, we wouldn't

15         as far as pre-class other than once he

16         time comped and due for release.

17         MS. WASHINGTON:

18              Okay.

19         THE WITNESS:

20              Yeah.

21    BY MS. WASHINGTON:

22         Q.    And how about then are employees of

23    the pre-class department provided with any

24    training or instruction regarding the duty of a

25    jailer to release someone once there is no longer



```
 1    a legal authority to hold that person?
 2          MR. EVANS:
 3                Object to form.
 4          THE WITNESS:
 5                In our training -- oh, I'm sorry.
 6          MR. EVANS:
 7                Object to form.  You can answer.
 8          THE WITNESS:
 9                In our training, we do go over that,
10          that once we have a release date for an
11          offender and he's due for release that we
12          are to handle the release as long as we
13          have everything that we need to do the
14          release.  So they do know that an offender
15          is not to be held over once we get
16          everything necessary.  They need to be
17          released.
18    BY MS. WASHINGTON:
19          Q.    Okay.  Are employees of the
20    pre-class department provided with any training
21    or instruction that delays in conducting time
22    calculation could result in persons being held
23    past their release date?
24          A.    Yes.
25          Q.    Okay.  What does that consist of?
```

GRIFFIN, ANGELA 7/1/2019

Page 87

```
 1        A.    It's in the training.  Whenever we
 2  do our pre-class training, that is mentioned in
 3  every step of it, the pre-class receiving it, not
 4  to hold onto it, and it's to keep going through
 5  the steps.  Once they -- and to time comp and --
 6  because if they are due for release, we need to
 7  handle those releases.
 8        Q.    Okay.  But like we just discussed,
 9  the steps that are being covered in the training,
10  that only has to do with once a pre-class packet
11  has arrived in the pre-class department; is that
12  correct?
13        A.    Correct.
14        Q.    What training are persons within the
15  pre-class department provided regarding concerns,
16  communications that might come into the
17  department about someone's time not being
18  computed or someone being overdue for release?
19        A.    Basically if someone -- if a call or
20  e-mail, anything, if we get one, our supervisors
21  and managers are -- you know, we meet and talk
22  about this, that they are to get -- every
23  possible way try and get the paperwork.
24              Employees, not so much, because the
25  majority of the employees, they don't receive the
```

1  e-mails or phone calls.  If they do, they know to

2  bring it to their supervisor.

3         Q.    Okay.  Are there any specific steps

4  that the supervisors and managers have been

5  instructed to take when they receive a concern

6  about time computation?

7         A.    We always tell them the fastest

8  possibly way, and which is phone calls for us, so

9  they usually start off with phone calls.  Once we

10 get nowhere with a phone call, we start sending

11 e-mails; or we may e-mail saying tried to call

12 and trying to get paperwork.

13        Q.    Is there a mechanism by which the

14 department tracks or logs or records the outreach

15 that a supervisor or manager or you personally

16 take when you've received a complaint about time

17 computation delays?

18        A.    We have just started where we fill

19 out a narrative now on anything that we are

20 trying to get.  If we call, we put who we call;

21 and we pretty much started that within the last

22 year or less, a little bit less.

23        Q.    And why was this new narrative

24 system put into place?

25        A.    So we can track.  I wanted them to



GRIFFIN, ANGELA 7/1/2019

1   keep from having to come tell me about every one,

2   to track if -- if it's a specific parish that we

3   are having problems with.

4          Q.     And prior to this narrative system

5   being put into place, there wasn't any way by

6   which you-all were tracking particularly

7   problematic parishes?

8          A.     We didn't track the parishes per se.

9          Q.     Did you track the outreach or the

10  e-mails or calls in any kind of way?

11         A.     We did until, once the case was

12  processed, it went with the case.  Like we didn't

13  keep a going record of them.

14         Q.     What do you mean "it went with the

15  case"?

16         A.     By if we processed a case and we had

17  to call, they would write little notes on it and

18  it stayed with that paperwork until they finished

19  -- completed it; and I don't think they kept the

20  paperwork with it.  Just once they finished it,

21  it was done.

22         Q.     Okay.

23         A.     And that was the -- after the

24  scanning, it was held a couple of months and then

25  shredded.

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond, LA  70404     Fax 985.419.0799

1       Q.     And if you-all were receiving calls,

2   let's say, from family members of people who

3   maybe hadn't had their time calculated or family

4   members were concerned that someone was due for

5   release, is there a way that those calls were

6   being logged within the pre-class department?

7       A.     Not logged.

8       Q.     Okay.  Other than the training that

9   we discussed, the booklet and the on-the-job

10  training that you received when you were at

11  pre-class at Hunt and the other on-the-job

12  training that you got when you started in your

13  director position, is there any other training

14  that you've received specifically with reference

15  to your current job responsibilities?

16      A.     As far as training, we will go -- I

17  don't want to call -- I guess it would be

18  training.  We'd go through the legislature --

19  once the laws change and we sit down with legal

20  and go through to make sure the understanding and

21  the process of it.

22      Q.     And that would be as to legislative

23  statutory changes?

24      A.     Correct.

25      Q.     Is that done annually?



GRIFFIN, ANGELA 7/1/2019

1    A.    Yes, if we have any changes dealing
2  with pre-class or time comp.
3    Q.    Okay.  Anything else, any other
4  training that we haven't gone over?
5    A.    I mean, then I guess we have
6  mandatory training, but that's not specifically
7  job, you know, related.
8    Q.    What is the mandatory training on?
9    A.    It's just ethics and just we have a
10  lot of mandatories that we have to take in a year
11  --
12    Q.    Okay.
13    A.    -- during the year.
14    Q.    And are those in-person trainings?
15    A.    Some are in-person and some are to
16  be done on the computer that are eligible to be
17  done on the computer.
18    Q.    Okay.  But those are specific to the
19  pre-class department?
20    A.    To the -- no.  No.
21    Q.    You mentioned the development of the
22  modules in the last year or two.  Have there been
23  any other changes to the training that's being
24  provided to the pre-class staff in recent years?
25    A.    Not -- I'm trying to think if any

1  different -- I mean, we train and we try -- we do

2  -- we have changed it where -- and this has been

3  a few years where the employee -- the supervisors

4  meet with their employees -- and we tried once a

5  week -- just to talk over the cases that they

6  had.

7        Q.    When did that start?

8        A.    That's been going on for a couple of

9  years.

10        Q.    And that's to go over the cases that

11  the employee has been assigned for the time

12  computation?

13        A.    Right.  If they have any problems or

14  issues with them.

15        MS. WASHINGTON:

16              Okay.  I'm going to show you what we

17        can mark as Exhibit 32.

18        (Exhibit 32 marked and tendered.)

19  BY MS. WASHINGTON:

20        Q.    Are you aware of the Lean Six Sigma

21  study that the Department of Corrections engaged

22  in in 2012?

23        A.    Yes.

24        Q.    What was your involvement in the

25  study?



1        A.    I was at the meetings to give

2   information how the paper -- how it's handled,

3   the work is handled and number of cases, things

4   like that.

5        Q.    And the exhibit that I have marked

6   as 32 and handed to you, am I correct that this

7   is a PowerPoint presentation that sums up the

8   findings of the study?

9        A.    Correct.

10       Q.    Were you present when this

11  presentation was given?

12       A.    Yes.

13       Q.    Who all was present for the

14  presentation?

15       A.    I really can't -- I can't name --

16  now that I've seen some of these names, I can say

17  -- but I -- I know they worked on it, but I can't

18  say for sure they were present in the

19  presentation.

20       Q.    Okay.  Sure.  Let's look at the

21  third slide in this exhibit.  It mentions what

22  the LSS, which I assume stands for Lean Six

23  Sigma, correct?

24       A.    Correct.

25       Q.    And this slide discusses the project



GRIFFIN, ANGELA 7/1/2019

Page 94

1  team and that it consisted of seven DOC staff,

2  other DPS LSS trained staff, and then three

3  project champions; is that correct?

4        A.    Yes.

5        Q.    Were you one of the DOC staff that

6  was part of the LSS team?

7        A.    Yes.

8        Q.    Okay.  And I'm correct that

9  Secretary LeBlanc is listed there as one of the

10  project champions?

11        A.    Yes.

12        Q.    And this exhibit is the PowerPoint

13  presentation that includes the notes section of

14  the slide, and under this slide it explains that

15  "Champions guide the work and approve the work

16  during toll gates at the end of each phase of

17  work."  Did I read that correctly?

18        A.    Yes.

19        Q.    And so Secretary LeBlanc was one of

20  the champions who guided the work and approved of

21  the work at various phases of the study; is that

22  correct?

23        A.    I'm not sure if he did or not, no.

24        Q.    Okay.  But you would agree that he

25  is listed as one of the champions, correct?



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

```
 1          A.    Yes.
 2          Q.    And also that this slide provides a
 3   definition for champions?
 4          A.    Yes.
 5          Q.    We can turn to the next page in the
 6   slide, the fourth slide, which is titled Business
 7   Case.  Do you see where I am?
 8          A.    Yes.
 9          Q.    And am I correct in understanding
10   that this slide gives the state of affairs in
11   January of 2012 relative to pre-class?
12          A.    Yes.
13          Q.    Okay.  And on this slide it
14   indicates that at that time there was 1,446 cases
15   that were backlogged to have time computed; is
16   that correct?
17          A.    Yes.
18          Q.    And also provides an average
19   processing delay of 110 days?
20          A.    Yes.
21          Q.    And then looking down at the bottom
22   of the slide, it indicates that there was an
23   83.44 percent occurrence of an immediate release
24   upon processing; is that correct?
25          A.    Yes.
```



1       Q.     What is referred to as an "immediate
2    release"?
3       A.     Immediate release to pre-class, and
4    I'm not sure what it was referring to here.   It
5    is anyone releasing from the date he's time
6    comped within ten days in the future.
7       Q.     Okay.  So am I correct in
8    understanding that once time was calculated
9    83 percent of the cases were due for immediate
10   release either because the release date had
11   passed or it was within ten days; is that
12   correct?
13      A.     Yes.
14      Q.     Okay.  And so to summarize this
15   business case slide, would it be fair to say that
16   the Six Sigma study found that there were a lot
17   of people waiting or a lot of cases that were
18   waiting months to be calculated?
19      A.     I'm not sure if it's saying that or
20   that we -- how long it was waiting.  It shows the
21   backlog, there was a backlog.
22      Q.     Okay.
23      A.     But I'm not sure how long they were
24   waiting to be worked.
25      Q.     Okay.  But this slide is talking

1    about the number of cases that were in backlog to

2    have their time computed, correct?

3          A.    Correct.

4          Q.    And also contains the finding that

5    there was an average processing delay of 110 days

6    for cases; is that correct?

7          A.    Correct.

8          Q.    Okay.  If you look at the seventh

9    slide, there's a little number seven in the

10   bottom right-hand corner.  And am I correct that

11   this slide is looking at kind of the different

12   stages of the process between when a person is

13   sentenced and the time is ultimately computed?

14         A.    I'm not sure if it's between the

15   time sentenced and computed or just that DOC

16   received it.

17         Q.    Okay.

18         A.    I'm not sure.

19         Q.    That makes sense.  And this slide is

20   looking at different agencies or actors who play

21   a role in getting the information from when a

22   person is sentenced to the Department of

23   Corrections; is that correct?

24         A.    Correct.

25         Q.    Okay.  And it is discussing the



GRIFFIN, ANGELA 7/1/2019

1    various clerks of court and then the jails that
2    would be run by a local sheriff; is that correct?
3        A.    Correct.
4        Q.    Okay.  I'm looking at the next page,
5    which is the eighth slide.  And I'm looking at
6    the note section to that slide where it says
7    "While there does seem to be delays between the
8    clerks and the jails to us, our approach was to
9    focus on minimizing our CT before addressing it
10   with out agencies."  Did I read that correctly?
11       A.    Yes.
12       Q.    Okay.  Is it your understanding that
13   the study chose to focus on minimizing time to
14   time calculations for actions taken within the
15   Department of Corrections?
16       A.    I think it was looking at the
17   process, the time it took from the time of
18   sentencing all the way through time comp and
19   looking at the length it took at each step --
20       Q.    Okay.
21       A.    -- and trying to minimize it.
22       Q.    Okay.  I guess my question is about
23   that note section.  Have you seen this note to
24   this slide before?
25       A.    Maybe in the past, but I don't



1   remember it.

2          Q.     Okay.  Well, I guess my question is

3   this.  The study showed that there were delays

4   between conviction or sentencing and the

5   documentation actually being received by the

6   Department; is that correct?

7          A.     Correct.

8          Q.     Okay.  Do you know whether or not

9   the study made any recommendations as to this

10  part of the delay in time computation?

11         A.     I'm not sure.

12         Q.     Okay.  Do you know if the Department

13  of Corrections has gone back since this study to

14  address the delays that might be happening at the

15  level of the clerk of court or the sheriffs'

16  offices since this study?

17         A.     I know that because I was involved,

18  went to a meeting with them with the clerk of

19  courts trying to see if there was a delay in the

20  time of sentencing until they got the paperwork

21  ready.

22         Q.     Okay.  When did that occur?

23         A.     It's been probably maybe 2016,

24  somewhere in there.

25         Q.     Okay.  And was that with all of the

1    clerks of courts across the state?

2        A.    It was with Ms. Hudnell.  I can't

3    think of her name.  She's over the clerk of

4    courts.

5        Q.    For the State of Louisiana?

6        A.    State of Louisiana, yes.

7        Q.    Okay.  What were the outcomes of

8    that meeting?

9        A.    Not really, that I remember, much

10   other than she was going to get with the clerks

11   of courts and see if they could -- you know, if

12   there was a delay or if -- you know, we just met

13   with her to see if she could work with us on

14   that.

15       Q.    Okay.  Do you know of any follow-up

16   communication with Ms. Hudnell?

17       A.    I'm not really sure directly with

18   her.

19       Q.    Uh-huh (affirmatively).

20       A.    But I haven't had any communications

21   with them --

22       Q.    Okay.

23       A.    -- about it.

24       Q.    Do you know if any changes were made

25   to the actions that the clerks of court were



1    taking following this meeting that you-all had?

2         A.    I know that was part of the UCO,

3    becoming part of law and going -- the Supreme

4    Court ordering that.

5         Q.    And that's the uniform commitment

6    order?

7         A.    Correct.

8         Q.    And you're not sure when that

9    started?

10        A.    No.  I'm not sure.

11        Q.    I want to look at slide 17 of this

12   exhibit.

13        A.    (Witness complied.)

14        Q.    And looking at that first column

15   which talks about a baseline and says May.  Do

16   you see that?

17        A.    Yes.

18        Q.    And I assume that would refer to May

19   of 2012 when this study was occurring; do you

20   know?

21        A.    I wouldn't -- I don't know.

22        Q.    Okay.  In that baseline column under

23   the -- the first row, it indicates that there was

24   2,252 immediate releases per year as the

25   baseline; is that correct?

1         A.      Correct.

2         Q.      And this would be immediate releases

3   as we discussed just a minute ago?

4         A.      Yes.

5         Q.      Which would be cases where either

6   the release date had already come due and passed

7   or release dates that were within ten days; is

8   that correct?

9         A.      Yes.

10         Q.      And this slide also then shows

11   immediately below that that there was a baseline

12   of 71.7 days overdue per case; is that correct?

13         A.      Correct.

14         Q.      And this slide then also shows a

15   column for goals; am I correct?

16         A.      Yes.

17         Q.      And am I correct in understanding

18   that that was the -- the goal that the Department

19   of Corrections was -- was hoping to achieve

20   through some of the programs that were being

21   piloted as part of this study?

22         A.      I'm not sure.  I don't remember what

23   -- how the goal came up, but --

24         Q.      Okay.  Do you understand this to be

25   a goal of the Department of Corrections?

GRIFFIN, ANGELA 7/1/2019

Page 103

```
 1          A.     Yes.
 2          Q.     Okay.  And my question is that under
 3   immediate releases, the goal is listed as 1,802
 4   immediate releases per year, correct?
 5          A.     Yes.
 6          Q.     Do you know -- do you know why that
 7   was the goal?
 8          A.     I'm not sure, because immediate
 9   releases could happen whether from sentencing and
10   already being immediate to earning credits in
11   custody, so I don't know if that was taking
12   effect that we would bring it down to that
13   because of the amount of credit.  I'm not sure
14   what the offender's receiving.
15          Q.     And then below that, the stated goal
16   for number of overdue days per case is listed as
17   31; is that correct?
18          A.     Correct.
19          Q.     That would be about a month?
20          A.     Correct.
21          Q.     Do you know why this was the goal?
22          A.     I'm not sure.
23          Q.     Okay.  Do you know why the goal
24   wouldn't have been 0?
25          A.     I'm not sure.
```


AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond  LA  70404   Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

1        Q.     There's a column on that same slide
2    for control.   Do you see where I'm looking at?
3        A.     Yes.
4        Q.     Do you know what that column
5    represents?
6        A.     I don't remember.
7        Q.     Am I correct in understanding that
8    during this study there were various pilot
9    programs or different test processes that were
10   still well over a thousand releases per year?
11       A.     Yes.
12       Q.     Okay.  And that assessments were
13   made about whether or not any of those pilot
14   programs had any success in achieving the stated
15   goals of the department; is that correct?
16       A.     Yes.
17       Q.     And am I correct in understanding
18   that even with some of these pilot programs and
19   changed processes in place that there were still
20   well over a thousand immediate releases per year?
21       A.     Yes.
22       Q.     And that the overdue days per case
23   remained at about 60; is that correct?
24       A.     Yes.
25       Q.     Okay.  I want to look at slides 26

```
 1    and 27 which are titled Recommendations and
 2    Additional Recommendations.  And my question is
 3    just for the record, to your knowledge, were
 4    these recommendations on these two slides carried
 5    out by the department as followed on this study?
 6         A.    I believe some of them were -- were
 7    carried out, some were carried out and changed
 8    since it -- you know, after the --
 9         Q.    And some of them were not, though?
10         A.    Well, I think --
11         Q.    Which ones do you know were carried
12    out?
13         A.    They locate a specialized pre-class
14    central office where we -- where we still have
15    two places.
16         Q.    But am I correct in understanding
17    that was the movement of the pre-class department
18    to headquarters in David Wade?
19         A.    David Wade already had a pre-class
20    department and they just left it there --
21         Q.    Okay.
22         A.    -- so I don't --
23         Q.    So what steps were taken to carry
24    out this recommendation?
25         A.    We moved -- we moved pre-class from
```

1    the institutions.  Each institution had pre-class

2    and we moved those pre-class sections to

3    headquarters.

4            Q.     Okay.  Are there other of the

5    recommendations on these two slides that were

6    carried out?

7            A.     The management routines we carry out

8    as far as having meetings with the groups.  We

9    have supervision in levels now.  I'm not sure

10   about the number of positions.  I wasn't involved

11   in that one.  We did move the files here.  All

12   the pre-class that came here, we moved them here

13   and now we have since started scanning them.

14           Some of the legislative statutes

15   were revised and made it a little bit simpler to

16   know time comp, but since this, you know,

17   legislation, it changes every year and they'll

18   add some different laws, so the Uniform

19   Commitment Order was created and that was to be

20   filled out in the court by the judge and signed

21   by the judge in court so it was available

22   immediately.

23           Q.     Available to who, who immediately?

24           A.     So it was available to give to the

25   jails to start the process to send to us.

GRIFFIN, ANGELA 7/1/2019

1      Q.    But it sounds like that wasn't put
2  in place until more recently; is that correct?
3      A.    Well, it was in place.  It's just
4  it's been changed and they have made it a law.
5  The supreme court pushed it, and I don't remember
6  exactly what year, but they did start it fairly
7  -- not -- it was after '12 because they had to
8  make the foreman things, but --
9      Q.    Was it -- was it mandatory to be
10  used at that point in time?
11      A.    Not at this point, no.
12      Q.    Okay.
13      A.    I'm not sure about the communication
14  of the requirements with all stakeholders.  I'm
15  not sure what that means.
16      Q.    You're looking at the recommendation
17  to provide communication of the requirements with
18  all stakeholders?
19      A.    I'm not sure.
20      Q.    You're not sure of that
21  recommendation?
22      A.    I'm not sure what it means.
23      Q.    Okay.
24      A.    Standardized pre-class and time
25  computation procedures, it was pretty much we --

GRIFFIN, ANGELA 7/1/2019

Page 108

1    there was one way to do it and we were doing it.

2              The resource for the new employees

3    to reference, we do have -- again, we don't call

4    it a resource and we -- it's just the different

5    laws out there that -- the acts that they could

6    fall under and the commitment dates, so we have

7    done that.

8              The electronic filing, and we did

9    reduce the transfer of paper files because we

10   have started scanning all newer files.  Anybody

11   sentenced after 2013 are a scanned file.

12        Q.    Okay.  So you started scanning in

13   2013?

14        A.    I think it was June of '13.

15        Q.    But I'm correct in understanding

16   that the pre-class department still receives hard

17   copy paper packets?

18        A.    Correct.

19        Q.    Okay.  Am I correct that none of

20   these recommendations have to do with any of the

21   delays that might be occurring at the level of

22   the clerk of court or the local sheriffs prior to

23   information being received by the Department of

24   Corrections?

25        A.    Not prior to us receiving it, no.

1      Q.    Looking at the 37th slide of this

2   exhibit, in the note section it says "Angela G."

3   Is that referring to you?

4      A.    Yes.

5      Q.    Did you design this slide?

6      A.    No.

7      Q.    Okay.  Why does it have you in the

8   notes section?

9      A.    I think what they did is have --

10   they picked different slides and we read them to

11   the -- in the meeting.

12      Q.    Okay.  So you gave this slide during

13   the presentation?

14      A.    Correct.

15      Q.    Okay.  And am I correct that this

16   slide deals with benefits that might befall

17   various people, including wardens, staff, and the

18   prisoners themselves, if there are reductions in

19   the amount of time that it takes for pre-class

20   time computations?

21      A.    Correct.

22      Q.    Okay.  And so this slide in

23   describing the benefits to prisoners includes

24   less wait time for time computation, correct?

25      A.    Yes.

GRIFFIN, ANGELA 7/1/2019

Page 110

1      Q.    And the second one listed there is
2  less releases beyond due date; is that correct?
3      A.    Correct.
4      Q.    And also it appears fewer complaints
5  or questions about time computation?
6      A.    Correct.
7      Q.    Okay.  So at the time of this study
8  in 2012 and when you were giving the presentation
9  on this slide, it was known to be a consequence
10 to DOC sentenced persons if there is delays in
11 time computation that they might be released
12 beyond their due date; is that correct?
13     A.    I don't understand the question.
14     Q.    I'm looking at the second bullet
15 point under the title Offender here.
16     A.    Uh-huh (affirmatively).
17     Q.    And it says, "less releases beyond
18 due date," correct?
19     A.    Correct.
20     Q.    And so am I correct in understanding
21 that the Department of Corrections knew at the
22 time of this study that one of the consequences
23 of the delays in time computation was that
24 prisoners were at risk for release beyond their
25 due dates?

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond, LA 70404   Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

1          A.      Correct.

2          Q.      And am I correct based on the slides

3     that we reviewed in this presentation that even

4     with the various pilot programs and changes in

5     processes that were part of this study, immediate

6     releases continued?

7          A.      Yes.  We still have immediate

8     releases.

9          Q.      Okay.  And that even at the time of

10    this study after the various pilot programs had

11    been tried, there was still an average overdue

12    days per case of about two months; is that

13    correct?

14         A.      As far as the program -- this --

15         Q.      As far as the study?

16         A.      The Lean Six Sigma study, yes.

17         Q.      Uh-huh (affirmatively).  Okay.

18    MR. EVANS:

19              Take a little bit of a break.

20    MS. WASHINGTON:

21              Sure.  Let's go off the record.

22         (A short recess was taken.)

23    BY MS. WASHINGTON:

24         Q.      We can go back on the record.  We

25    were just wrapping up talking about the Six Sigma

1   study, correct?

2        A.    Correct.

3        Q.    Is there a mechanism by which the

4   Department of Corrections tracks the number of

5   immediate releases per year that was included in

6   that study?

7        A.    I'm really not sure how they got the

8   numbers off -- I'm really not sure how they get

9   it.

10       Q.    Okay.  Do you know who would have

11  provided the study with those numbers?

12       A.    I'm not sure.

13       Q.    Is it information that's maintained

14  by your pre-class department?

15       A.    We keep manual -- some different

16  numbers, but it's just them writing little ones,

17  but I don't think they took that.  I'm not sure

18  how they -- where they got it from.

19       Q.    Okay.  So the pre-class department

20  doesn't maintain its own record of the number of

21  immediate releases per year?

22       A.    No.

23       Q.    Okay.  And what about the data that

24  was contained about the average number of overdue

25  days per case, do you know where that information

GRIFFIN, ANGELA 7/1/2019

1     came from?

2          A.    I'm not sure.

3          Q.    Okay.  Does the pre-class department

4     maintain any way to track the average number of

5     overdue days per year?

6          A.    No.

7          Q.    Okay.  Does the Department of

8     Corrections at large have a policy and procedure

9     manual?

10         A.    Yes.

11         Q.    Okay.  Is there a mechanism by which

12    employees of the department receive that manual?

13         A.    It's on the Lotus notes.  We can

14    pull them up.

15         Q.    Okay.  Is there a particular section

16    of the manual that deals with the pre-class

17    department?

18         A.    Yes.  There's a pre-class manual.

19         Q.    Okay.  Is it just one policy or are

20    there multiple policies?

21         A.    There's one -- it -- it's different

22    steps.  The pre-class part, the time comp,

23    there's a time comp part.

24         Q.    Okay.  When people start their

25    employment with the Department of Corrections, do

1    they receive a hard copy of the policy manual?

2         A.    No.   They go through training, but I

3    don't -- a mandatory training, but no copies of

4    the policy would be -- of all the policies -- are

5    you talking about pre-class?

6         Q.    No.   I was just --

7         A.    General.

8         Q.    -- talking in general at this point.

9         A.    No.   Oh, yeah.   No.

10         Q.    Okay.   Are new employees provided

11   with instructions about where to access policies

12   that would be relevant to their job

13   responsibilities?

14         A.    I'm not sure in the training they

15   receive, which is our training department does

16   that.   But we try -- in pre-class we do, but I'm

17   not sure about in their initial training.

18         Q.    Okay.

19         A.    I'm not sure.

20         Q.    Do you know what is covered in the

21   initial training by the training department?

22         A.    I don't remember.

23         Q.    Did you go --

24         A.    It's been years ago.

25         Q.    -- through it yourself --



1          A.      Yeah.

2          Q.      -- when you first started?

3          A.      Yeah, right, uh-huh (affirmatively).

4          Q.      Okay.  Do you remember if it covers

5     topics that have to do with the pre-class

6     department?

7          A.      I'm really not sure, but I don't --

8     it -- it's basic.  Everybody goes to it, so I

9     really don't think a specific job, you know,

10    department is covered.

11         Q.      And -- and so you mentioned that

12    there are a couple of policies that are related

13    to the work that the pre-class department does,

14    correct?

15         A.      Correct.

16         Q.      And how are new employees that you

17    have in the pre-class department provided with

18    access to those policies?

19         A.      And -- and it really -- we -- I keep

20    saying policies.  It's regulations.  We call them

21    reg --

22         Q.      Uh-huh (affirmatively).

23         A.      And we do give them copies of the

24    pre-class, in the training material of the

25    pre-class, the time comp, the release

GRIFFIN, ANGELA 7/1/2019

Page 116

```
 1    regulations.
 2           Q.    Okay.  And you provide that in hard
 3    copy to all new employees within the pre-class
 4    department?
 5           A.    Correct.
 6           Q.    Okay.  And is there any training
 7    course or curriculum that's actually performed
 8    based on those policies?
 9           A.    The module trainings are kind of
10    based on those because it is our job; and -- and
11    even though we give it to them, they still have
12    to do on-the-job training to understand what it
13    is, but the modules are based on -- pretty much
14    on those regulations.
15           Q.    Okay.  Do you all do any kind of pre
16    or post testing of new employees in the pre-class
17    department to see if they understand the
18    information that they received?
19           A.    We audit cases.
20           Q.    Okay.
21           A.    We do internal audits.
22           Q.    Okay.  And how -- how do you perform
23    those audits?
24           A.    It's cases that they have worked and
25    we check them.
```

GRIFFIN, ANGELA 7/1/2019

Page 117

```
 1          Q.    Is there a certain percentage of
 2   cases that you check?
 3          A.    Yes.  They do a percentage; and I
 4   can't remember the percent, but it's roughly --
 5   each supervisor has roughly 35 cases a month that
 6   they audit.
 7          Q.    And when you say "each supervisor,"
 8   you are talking about the five supervisors who
 9   work under the two managers under you?
10          A.    Correct.  Correct.
11          Q.    Okay.  Do you review the audits that
12   the supervisors do?
13          A.    The managers -- the managers do and
14   then they will come and talk to me about the --
15   what they found and if it's a specific employee
16   or -- or a specific kind of case that's the
17   issue.
18          Q.    Okay.  Other than the regulations
19   that the department puts out and the training
20   modules and the booklet that you referenced
21   before and the sort of cheat sheet, are there any
22   other sort of written directives that are used by
23   pre-class department employees in doing their
24   jobs?
25          A.    Yeah.  We -- we may send out e-mails
```

GRIFFIN, ANGELA 7/1/2019

Page 118

```
1    with changes or just a reminder of things, how to
2    do something or reminder of anything that changes
3    in legislation once it changes, things like that.
4            MS. WASHINGTON:
5                Okay.  I'm going to show you what we
6            can mark as Exhibit 33, which I'm hoping
7            is one of the policies that you just
8            mentioned.
9        (Exhibit 33 marked and tendered.)
10   BY MS. WASHINGTON:
11           Q.    Take a look at that and let me know
12   if you recognize it.
13           A.    Yes.  It's the pre-class reg.
14           Q.    Okay.
15           A.    Uh-huh (affirmatively).
16           Q.    And this is the copy of the policy
17   that we received in discovery in this case.  And
18   am I correct that at the top of it it has a
19   printed, like type printed date of the 15th of
20   February, 2011?
21           A.    Yes.
22           Q.    And then there seems to be a
23   handwritten note that says revised 4/5/13; is
24   that correct?
25           A.    Yes.
```



GRIFFIN, ANGELA 7/1/2019

Page 119

1        Q.     And then at the bottom of the copy
2   we received, it indicates that this is a true
3   copy as of April of 2018.
4        A.     Yes.
5        Q.     Do you know if this is the correct
6   version of this policy?
7        A.     I'm really not sure --
8        Q.     Okay.
9        A.     -- without pulling it.
10       Q.     Do you know if there would have been
11  any revisions since the one that's noted in 2013?
12       A.     I'm not sure.  Usually pre-class is
13  the same process --
14       Q.     Uh-huh (affirmatively).
15       A.     -- as far as the pre-class, the
16  beginning part.
17       Q.     As director of the pre-class
18  department, do you know of any changes that have
19  been made to this policy since 2013?
20       A.     I'm not sure, yeah.
21       Q.     As director of the pre-class
22  department, would you be involved in any
23  revisions to the pre-class policy?
24       A.     Yes, uh-huh (affirmatively).
25       Q.     Okay.  And do you recall any changes

GRIFFIN, ANGELA 7/1/2019

Page 120

1    or input that you had into the policy since 2013?

2         A.    I'm trying to think.  I just can't

3    remember the -- if we changed it and when.

4         Q.    Okay.  So you don't have a specific

5    memory of any revisions since this one that's

6    noted in 2013?

7         A.    Not -- right.  I'd have to look it

8    up in my -- yeah.

9         Q.    Okay.  I want to look just at the

10   first page of this Exhibit 33 where it says

11   purpose.  Do you see where I'm reading?

12        A.    Yes.

13        Q.    And it says "To establish standard

14   operating procedures for regional facilities to

15   prepare newly convicted offenders housed at local

16   jail facilities for initial reception and

17   diagnostic processing."  Did I read that

18   correctly?

19        A.    Yes.

20        Q.    And this is the purpose of this

21   pre-classification policy; is that correct?

22        A.    Yes.

23        Q.    What regional facilities are being

24   referred to in this section?

25        A.    This -- prior to pre-class becoming



1    -- coming to headquarters, they were at each of

2    the institutions and there were regional

3    facilities.  Certain facilities was considered

4    together a region.

5         Q.    Okay.  And so that reference

6    predates the movement of the pre-class department

7    to headquarters?

8         A.    Correct.

9         Q.    And am I correct that that occurred

10   following the Six Sigma study?

11        A.    Yes.

12        Q.    I want to look at the second page at

13   the top where it says policy, colon.  Do you see

14   where I'm referring to?

15        A.    Yes, uh-huh (affirmatively).

16        Q.    And in that paragraph, it says that

17   it is the secretary's policy to ensure that

18   information necessary for reception and

19   diagnostic processing is captured and documented

20   soon after sentencing.  Do you see where I'm

21   reading?

22        A.    Yes.

23        Q.    And is that sentence the policy of

24   the Department of Corrections?

25        A.    It is to -- that is our procedure.



1    We get it as soon as it's -- they sentence and

2    they get the paperwork to send it to us to

3    process.

4          Q.    Okay.  What is your understanding of

5    the phrase, "soon after sentencing?"

6          A.    As soon as whenever -- because the

7    jail gets their paperwork sentencing minutes,

8    UCO, what they get from somewhere.  I'm not sure

9    if they get it from the court, the clerk of

10   court, I'm not sure; but once they receive it,

11   that's notification to them that the offender has

12   a hard labor sentence.  So as soon as they get it

13   to process him is as soon as they can to get it

14   to us.

15         Q.    Okay.  And so it's the policy of the

16   secretary to ensure that the information that is

17   needed for a time computation is, quote.

18   Captured and documented soon after sentencing; is

19   that correct?

20         A.    Yes.

21         Q.    I want to look down at the very

22   bottom of that page where it says Procedures.  Do

23   you see that?

24         A.    Yes.

25         Q.    And it says there "Upon notification

1   that an offender has been sentenced to the

2   custody of the DPS&C, ARDC specialists at the

3   appropriate regional facility shall compile all

4   required information, including but not limited

5   to the following," and then it continues --

6        A.    Uh-huh (affirmatively).

7        Q.    -- is that correct?

8        A.    Yes.

9        Q.    And in this section of the policy

10  where it is talking about notification that's

11  received by DPS&C, is this the same notification

12  that we discussed earlier?

13       A.    Yes.  That the jails notify us with

14  the paperwork.

15       Q.    And I'm correct in remembering your

16  testimony that there's no other mechanism other

17  than the arrival of the packets by which DPS&C is

18  notified?

19       A.    No, correct.

20       Q.    Okay.  And the following page which

21  has the Bates number in the bottom right-hand

22  corner of 2118, about a third of the way down, it

23  talks about how "If any of the required

24  information is missing, an ARDC specialist shall

25  contact the appropriate agency, slash, office and

1  request the information."  Do you see where I'm

2  reading?

3       A.     Yes.

4       Q.     And I think you indicated before

5  that this would be the responsibility of persons

6  within the pre-class department?

7       A.     Yes.  As long as they are still in

8  the parish jail, the offender.

9       Q.     Tell me a little bit more about

10 that.

11      A.     Meaning, if -- if he has a sentence,

12 and we have received the paperwork on one

13 sentence and we process him, do his time comp,

14 and he moves into a state facility and he has

15 another sentence out there, the institution would

16 be responsible --

17      Q.     Okay.

18      A.     -- for getting the --

19      Q.     But if the initial packet of

20 information that was received in pre-class was

21 missing some of the required information, it

22 would be the responsibility of pre-class

23 employees under your department --

24      A.     Yes.

25      Q.     -- to follow up; is that correct?



1        A.      Yes.  Yes.

2        Q.      And in the section immediately below

3   that where it talks about pre-class screening; do

4   you see that?

5        A.      Yes.

6        Q.      And we talked a little bit about

7   screening before, and I just wanted to ask.  The

8   policy indicates that each offender shall be

9   screened for intake priority and then lists some

10  various factors or program eligibility, correct?

11       A.      Correct.

12       Q.      And the first one says "immediate

13  release eligibility;" is that correct?

14       A.      Yes.

15       Q.      And I guess my question is, when

16  information comes into the pre-class department

17  and the employees under your supervision are

18  screening for the intake priority, is immediate

19  release eligibility one of the factors that they

20  are supposed to be considering?

21       A.      Yes.

22       Q.      Okay.  And how are they instructed

23  in how to determine whether or not that

24  particular case is immediate release eligible?

25       A.      They have to look at the crime and

GRIFFIN, ANGELA 7/1/2019

Page 126

1    then his sentence length and his jail credit, and

2    depending on what act he would fall under depends

3    on how much time he would have to serve, what

4    percentage of the time he has to serve; and just

5    kind of calculate it out by hand first and if

6    he's an immediate -- looks like he's going to be

7    close to being released within a month even, we

8    process -- those are done first.

9         Q.    Okay.  And when we talked earlier,

10   you mentioned that after the time computation is

11   completed a copy of the master prison record is

12   sent to the facility for the prisoner himself; is

13   that correct?

14        A.    Yes.

15        Q.    Is there any mechanism by which the

16   pre-class department logs or records when those

17   master prison records are sent out?

18        A.    No.

19        Q.    Okay.  How does the pre-class

20   department track which packets or cases have been

21   received and are still awaiting time computation?

22        A.    We have -- say it's hard copies, so

23   even though we scan it, that hard copy still gets

24   passed on to another group to do the time comp

25   once they process it.  So the employee that's



1    assigned the case to time comp, they -- if they

2    have a hard copy of it, it needs to be time

3    comped.  Once they time comp it, it's all

4    scanned, the rest of it is scanned in and indexed

5    and then in the meantime the supervisor has

6    access to what's out there in the scan program

7    and what hadn't been indexed.  They will check

8    and see if it's time comped and needed to be time

9    comped or it's time comped and they just need to

10   index the paperwork.

11        Q.    Okay.  And just so I understand,

12   when the packets come in and are with the intake

13   group --

14        A.    Uh-huh (affirmatively).

15        Q.    -- are they responsible for scanning

16   all of those documents?

17        A.    The documents, correct.

18        Q.    Okay.  And that's the stage at which

19   they are stamped as received?

20        A.    Correct.

21        Q.    Okay.  And so after they have been

22   scanned by the intake group, there's some kind of

23   electronic folder?

24        A.    There's a -- once they scan it, they

25   enter a pre-class screen that's in our system and

1    it's -- it's marked as incomplete.  It's an I.

2    And so once that happens, it goes to the time

3    comp people; and once they time comp it, it flips

4    to an R, meaning he's ready for intake or we can

5    handle a release, if that's necessary.  So any of

6    the Is, we keep up with that also.  Any

7    incompletes, what -- what -- are we missing

8    paperwork or do we just need to calculate it.

9         Q.    Okay.  And this is inside of CAJUN

10   --

11        A.    CAJUN.

12        Q.    -- is that correct?

13        A.    Correct.

14        Q.    Okay.  And so do you have the

15   ability as a director to go into CAJUN and see

16   how many cases are marked as I for incomplete?

17        A.    Yes, I can.

18        Q.    Okay.  And do you also then have the

19   ability to conduct a search for R marked

20   pre-class screens?

21        A.    It -- we can pull up Rs and it's by

22   parish.  We have to put in each individual

23   parishes.

24        Q.    Okay.  In the screening and intake

25   priority process, is there any system by which

GRIFFIN, ANGELA 7/1/2019

Page 129

1   the supervisors conduct a review of whether or
2   not those cases that have been marked as priority
3   actually are being treated by the employees with
4   priority?
5         A.    Other than just making sure all of
6   them are calculated, they just hand them -- I
7   mean, the supervisors may keep up with a sheet or
8   something.  I'm not sure if they keep a list and
9   to see when they completed it, the employee
10  completed it.  I'm not sure.
11        Q.    Okay.  And as far as the completion
12  of this pre-class screen that has the I and the R
13  notations in it, did that general format for the
14  pre-class screen exist in 2016?
15        A.    Yes.
16        Q.    Okay.
17        A.    That whole process that we just
18  described would have existed in 2016.
19        Q.    We just looked at the
20  pre-classification policy.  To your knowledge, is
21  there any policy that informs how the department
22  is supposed to respond when you-all receive
23  concerns about delays in time computation?
24        A.    I'm not that -- I'm not sure.  Not
25  that I know of.

GRIFFIN, ANGELA 7/1/2019

1    Q.    Okay.  And -- and I guess sort of by
2    the same token, is there any policy that informs
3    how the department is supposed to respond if
4    you-all receive complaints or concerns that a
5    person is overdue for a release?
6    A.    There's a -- I think there's a
7    regulation on Administrative Remedy Procedures.
8    Q.    Uh-huh (affirmatively).
9    A.    And that department -- there's a
10   department that handles that.
11   Q.    Okay.  Anything other than the ARP
12   policy?
13   A.    No.  There's nothing written other
14   than us, you know, in the training telling the
15   employees, if you get something, check on it.
16   Q.    And that's just sort of an oral
17   guideline that you get during training?
18   A.    Yes.
19   Q.    Other than the oral instruction that
20   if calls or concerns are received that they
21   should pass that along, is there any kind of
22   written directive that staff in the pre-class
23   department have received about responding to
24   concerns about people past due or time
25   computation delays?

GRIFFIN, ANGELA 7/1/2019

Page 131

```
 1          A.     I'm not sure.  Like I say, we do
 2   send out e-mails when we have situations come up,
 3   and so I'm really not sure if we send out
 4   something.
 5          Q.     Do you remember sending anything out
 6   on that topic?
 7          A.     No.
 8          Q.     Have the staff of the pre-class
 9   department been provided with any directives
10   about how to record or keep track of calls or
11   other communications that are received with
12   concerns about delays in time computation or
13   persons being overdue for a release?
14          A.     Not keep track of them, no.
15          Q.     Okay.  Is there any way that the
16   employees in the pre-class department have been
17   instructed to record how such calls or
18   communications are followed up on?
19          A.     Like I say, other than a narrative,
20   once they start a process that's a problem or
21   calls they are checking on and they keep up with
22   who they talk to, but it's not a list or
23   something they just keep up forever.  You know,
24   it's not there to just go pull it.
25          Q.     And that narrative process I think
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond, LA 70404   Fax 985.419.0799

1    you indicated started fairly recently?

2        A.    Right.

3        Q.    Like within the past year?

4        A.    Correct.  Correct.

5        Q.    Okay.  What is your role as director

6    of the pre-class department related to responding

7    to any kind of calls or communications that are

8    received with concerns about delays in time

9    computation or persons overdue for release?

10        A.    That we -- you know, and I --

11    basically, I deal with my managers.  They are to

12    be told if there are any overdue, if they -- if

13    they notified of any too, we have to start trying

14    to get the paperwork from wherever, if we know

15    where he was sentenced.  We need to just call

16    that parish jail, try and find out where -- you

17    know, where he was sentenced or --

18        Q.    Okay.  Is it your responsibility as

19    the director to investigate when you receive

20    these reports or concerns?

21        A.    As a director -- I mean, I don't

22    know about investigate, but I am -- you know,

23    once we get them, to have it investigated.

24        Q.    Okay.  And is it your responsibility

25    to make sure that the concerns or reports are



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond, LA 70404     Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

Page 133

1  resolved or closed out in some kind of way?

2       A.    To the best that they can, yeah.

3  They -- we -- I instruct them to get it taken

4  care of if we can and know the information to get

5  the -- you know, or getting paperwork.  We have

6  to know where to get it from, that we need to get

7  it and try and get it because it's up to the

8  parish to send it to us.

9       Q.    We talked about this a little bit

10  earlier, but I just want to make sure I remember

11  your testimony.  After a person has been

12  sentenced to time in the Department of

13  Corrections and they are still housed at that

14  local jail facility, I think you indicated that

15  it's permissible for that local sheriff to

16  transfer that DOC sentenced person to another

17  local facility, correct?

18       A.    Correct.

19       Q.    Is the facility that wants to

20  transfer the person, the parish of conviction

21  facility, are they required to notify the

22  Department of Corrections about transferring that

23  DOC sentenced prisoner to another local facility?

24       A.    They are required to let us know

25  that they transferred, yes.  Like I say, if -- if

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond, LA 70404   Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

Page 134

1   they -- we have not received the pre-class
2   packet, most jails put it on the jail credit
3   letter transferred over to and they'll put what
4   parish and the date they transferred them and we
5   enter it.  Now, if they do not put that and the
6   other parish doesn't have -- you know, they --
7   it's not showing he's in their parish and they
8   see that, there's a form that they fill out and
9   they send in to the transfer department.
10       Q.    Who fills out that form, the
11   receiving parish?
12       A.    There's one that they are -- the
13   receiving parish can fill one out and send it in
14   and also the transferring parish; because once
15   their pre-class is done, they still can transfer
16   them and there's a form they fill out to send in
17   they are transferring this offender to this
18   parish.
19       Q.    Where would I get a copy of that
20   form?
21       A.    From probably my supervisor, Derrick
22   Ellis --
23       Q.    Okay.
24       A.    -- should have a copy.
25       Q.    Does he supervise the transfer

GRIFFIN, ANGELA 7/1/2019

Page 135

1   department as well?

2       A.    I think so, but I'm not positive

3   direct or not.

4       Q.    Okay.  But I think you indicated

5   before that those transfer forms would not come

6   to pre-class?

7       A.    No.

8       Q.    They go to a separate department?

9       A.    Correct.

10  MS. WASHINGTON:

11          Okay.  I'm going to show you another

12      exhibit that we can mark as 34.

13      (Exhibit 34 marked and tendered.)

14  BY MS. WASHINGTON:

15      Q.    Are you familiar with this document?

16      A.    Yes.

17      Q.    And what is this document?

18      A.    The legislature auditor -- audit

19  from 2017.

20      Q.    Generally speaking, what is your

21  understanding of what this report is?

22      A.    That they audited some cases or

23  different aspects of Department of Corrections,

24  but involving my department, they audited some

25  time comps in some cases.

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

1      Q.     Okay.  And I want to look
2    specifically at page 5 of this report.  And by
3    page 5, I mean the page that actually has the
4    number five at the bottom of it.
5      A.     Five.  Okay.
6      Q.     In the top of this page indicates
7    that DOC's policy for transferring offenders in
8    state facilities requires DOC to approve
9    transfers before they occur; and it says,
10   "However, the department's transfer policy for
11   local facilities does not include a timeframe for
12   when facilities must notify DOC of a transfer to
13   another local facility."  Do you see where I was
14   reading from?
15     A.     Yes.
16     Q.     Can you tell me about the DOC policy
17   that requires the department to approve transfers
18   before they occur?
19     A.     I'm not sure about transfers.
20     Q.     Okay.  Are you aware of the
21   department's policy regarding transfer approvals?
22     A.     I never -- yeah.  I'm not sure.  I
23   never worked in transfer, so I'm not sure.
24     Q.     Okay.  So approval for transfer is
25   not something that would fall within the



1    pre-class department?

2         A.    No.

3         Q.    Okay.  If you look at the paragraph

4    that's just below that, it indicates at the very

5    bottom of that second paragraph a recommendation.

6    It looks like that DOC should revise its transfer

7    policy to include a timeframe requirement and

8    method for keeping track of offenders housed in

9    local facilities.  Do you see that?

10        A.    Yes.

11        Q.    Do you have any knowledge about

12   whether or not this recommendation was put into

13   effect following the 2017 audit?

14        A.    No.  I don't know anything about --

15   yeah.

16        Q.    Okay.  Do you know if following this

17   report there was any new development of a method

18   to track DOC sentenced persons that were being

19   housed in local facilities?

20        A.    I'm not sure.  As far as the-- I

21   think that would deal with transfers, so I'm not

22   sure how they handled that.

23        Q.    Okay.  Are you aware that the

24   litigation that brings us all here today has to

25   do with five men who alleged that they were held

GRIFFIN, ANGELA 7/1/2019

Page 138

1    in custody for months beyond their release dates?

2         A.    Yes.

3         Q.    Okay.  And are you aware that

4    specifically this litigation involves five men

5    who were convicted and sentenced in Orleans

6    Parish, but who were transferred and housed at

7    the Riverbend Detention Center?

8         A.    Yes.

9         Q.    Okay.  We have probably covered in

10   general terms some of what I am about to ask you

11   about, but I want to know what -- in your

12   understanding, what specific steps are to occur

13   once a person is sentenced to the Department of

14   Corrections in Orleans Parish as far as getting

15   them -- getting their time computation and their

16   release date determined?

17        A.     We receive and -- and always have

18   from Orleans a -- a pre-class packet.  And they

19   are one of the ones that the basic interview

20   sheet may not be the basic interview sheet.  They

21   printout a copy.  We get a jail credit letter.

22   Sometimes we do not get the bill of information

23   from them, but we get sentencing minutes and

24   fingerprints; usually the acknowledgment form,

25   signature form.  And they hand deliver them here

1 usually on certain days -- a certain day of the

2 week, and I'm not really sure what day; and we

3 process them and we calculate their dates.

4   Q. Am I correct in understanding that

5 they hand deliver these packets to you-all here

6 at headquarters once a week?

7   A. Yes.

8   Q. Okay.

9   A. And they no longer do now.

10   Q. Say that again?

11   A. We don't -- they no longer hand

12 deliver them here now.

13   Q. How do they provide them now?

14   A. Now, they go to Raymond -- Raymond

15 Laborde Correctional Center is their pre-class

16 place.  And the offenders -- they will send it by

17 e-mail and they work them and those offenders

18 convicted go directly to Raymond Laborde.

19   Q. When did that change?

20   A. I'm not sure.  Maybe sometime last

21 year, but I'm not positive.

22   Q. After 2017?

23   A. Yes, I think it was.

24   Q. Am I correct in understanding that

25 in 2016 and 2017 Orleans would have been hand



1    delivering pre-class packets to headquarters here
2    in Baton Rouge --
3         A.    Yes.
4         Q.    -- once a week?
5         A.    Yes.
6         Q.    Okay.  And are you aware that
7    sometime in or around 2016 Orleans Parish began
8    transferring or, quote, releasing DOC sentenced
9    prisoners to East Carroll Parish?
10        A.    Aware after the fact, yeah.
11        Q.    Were you aware --
12        A.    Yeah.
13        Q.    -- at the time that that process
14   started?
15        A.    No.
16        Q.    When did you first become aware?
17        A.    It was one of the cases where they
18   weren't time comped.  We had nothing on them and
19   trying to get -- that's when we were made aware
20   of it.
21        Q.    Okay.  But prior to that, you
22   weren't aware that Orleans had begun this
23   practice of transferring DOC sentenced prisoners
24   directly to Riverbend?
25        A.    Not a process -- right.  We didn't

GRIFFIN, ANGELA 7/1/2019

1  know there was a process out there for them to do

2  that.

3        Q.    Okay.  Am I correct in understanding

4  that previously the Orleans practice was to be

5  sending the pre-class paperwork here to

6  headquarters?

7        A.    Correct.

8        Q.    And then the actual DOC sentenced

9  prisoners, were those people being transported to

10  the Elayn Hunt facility?

11        A.    Some of them were sent to Elayn

12  Hunt, some I think transferred other places.

13        Q.    Okay.  When Orleans began

14  transferring DOC sentenced prisoners directly to

15  East Carroll Parish, what is your understanding

16  of who was responsible for providing the

17  department with the pre-classification paperwork?

18        A.    We always -- the pre-class packet

19  always comes from the parish of conviction, and

20  that's where we would order it from or get it.

21  That's where it comes from.

22        Q.    So you would have expected to

23  receive a pre-class packet directly from the

24  Orleans sheriff?

25        A.    Yes.

GRIFFIN, ANGELA 7/1/2019

Page 142

1      Q.    Am I correct that inside of CAJUN
2  there is some sort of initial entry that's made
3  for a person when that pre-class screen that you
4  described is created?
5      A.    Yes.
6      Q.    Okay.  What information is contained
7  just in that initial pre-class screen?
8      A.    In that, the very first thing we do,
9  we would put is the parish of conviction, the --
10  you know, the thing showing where he was
11  convicted at.  And then on the pre-class screen,
12  it's going to show that the date we received the
13  paperwork, and it shows a date of file -- of file
14  it was received.
15          That date -- if it's a new
16  pre-class, we are making the file, so we would
17  put that date.  It shows the sentence date, the
18  crime, the sentence length, I think the judicial
19  district, and the parish of conviction.
20      Q.    After the actual time computation
21  has occurred, can you still pull up that
22  pre-class screen for a given case?
23      A.    Yes.
24      Q.    Okay.  So the pre-class screen lives
25  forever?

1        A.      Until he gets convicted again on --
2   if he gets out and comes back in, a new one is
3   created.
4        Q.      Okay.  Is there any storage
5   mechanism for the old pre-class screen?
6        A.      No.  I don't think there's a storage
7   for it.
8        Q.      Okay.  Can you tell in CAJUN when an
9   entry is created on a given individual?
10        A.      On the -- any screen or just are we
11   talking the pre-class screen or --
12        Q.      I guess I'm wondering about the
13   first entry that is made for somebody in CAJUN.
14   Like can you tell when that first existence of a
15   person in CAJUN occurred?
16        A.      Yeah.  You can inquire on -- like
17   the pre-class screen, it will give you a user
18   name and a date.  At that time, it will give
19   you --
20        Q.      Okay.
21        A.      As time goes on, as things change,
22   that changes.
23        Q.      Okay.  So further down the road,
24   let's say after a time computation has been
25   completed, can you still look for a given

```
 1    individual or a given case when they were first
 2    entered into the system?
 3            A.     You can see when the -- it still
 4    shows the pre-class received --
 5            Q.     Okay.
 6            A.     -- date stays there.
 7            Q.     Okay.  When we were talking a minute
 8    ago about receiving the pre-class packet from the
 9    parish of conviction, did I hear you say that the
10    Department of Corrections orders the pre-class
11    packet?
12            A.     No.
13            Q.     Okay.
14            A.     We will order if -- we will try to
15    order if we start getting calls on offenders that
16    they tell us where they were sentenced at or we
17    will try and order it from the parish.
18            Q.     Okay.
19            A.     If we don't have it, we will call
20    them and try to get it, but that -- you know,
21    it's up to them to send it to us, but that's the
22    only time we would order it, but they -- when
23    he's convicted, they send it.
24            Q.     Okay.  And -- and how would you know
25    to, quote, order?
```

GRIFFIN, ANGELA 7/1/2019

Page 145

```
 1          A.     Like I say, if we get calls from a
 2   family member or the ARP process, if they get a
 3   letter from an offender and it goes through that
 4   process, they would let us know.
 5          Q.     Okay.  So you would only order
 6   information if you had received word through an
 7   ARP itself or someone calling on behalf of the
 8   prisoner?
 9          A.     Right.
10          MS. WASHINGTON:
11               I am going to mark a new exhibit for
12          you, which is Exhibit 35.
13        (Exhibit 35 marked and tendered.)
14   BY MS. WASHINGTON:
15          Q.     And I will represent to you that as
16   part of this litigation we received files on each
17   of the five named plaintiffs from the Department
18   of Corrections.
19          A.     Okay.
20          Q.     And I have saved us the trouble of
21   having the complete files and have excerpted them
22   so I have the specific pages I want to talk
23   about.
24          A.     Okay.
25          Q.     And so Exhibit 35 that I have just
```



```
 1    handed you I will represent was provided to us by
 2    the Department of Corrections as part of the file
 3    that was maintained on Jessie Crittindon.
 4         A.    Uh-huh (affirmatively).
 5         Q.    And I actually want to start not
 6    with the e-mail communication that is at the
 7    beginning of this exhibit, but towards the end.
 8    If you look at the second to last page --
 9         A.    Okay.
10         Q.    -- it has the Bates number 2360 in
11    the right-hand corner.  Do you see that?
12         A.    Yes.
13         Q.    And the top of this says "Time
14    computation and jail credits;" is that correct?
15         A.    Yes.
16         Q.    And am I correct in understanding
17    that this is an initial time computation form?
18         A.    Correct.
19         Q.    Okay.  And at the bottom it -- it
20    says "computed by," and then has a date of
21    January 13th, 2017; is that correct?
22         A.    Yes.
23         Q.    And so this date would indicate the
24    date that the initial time computation was
25    performed?
```



GRIFFIN, ANGELA 7/1/2019

Page 147

1        A.      Correct.

2        Q.      And about halfway down the page next

3    to what I imagine stands for sentenced date and

4    sentence start, it indicates August 2nd of 2016;

5    is that correct?

6        A.      Correct.

7        Q.      And so that would be the information

8    that was put into CAJUN as to Mr. Crittindon's

9    sentencing date?

10        A.      Correct.

11        Q.      Okay.  And so I'm correct that there

12    was over five months that passed between the date

13    of sentence and the initial time computation that

14    was performed, correct?

15        A.      Correct.

16        Q.      Am I also correct that

17    Mr. Crittindon was an immediate release at the

18    time that this computation was performed?

19        A.      Yes.

20        Q.      Okay.  And that he was, in fact,

21    eligible for release in August of 2016 when he

22    had been sentenced?

23        A.      Yes.

24        Q.      Looking at the very last page of

25    this exhibit, it has Bates stamp number 2367 at



GRIFFIN, ANGELA 7/1/2019

1    the bottom right-hand side.   Do you see that?

2         A.    Yes.

3         Q.    The top of this form says "Transfer

4    record inquiry."

5         A.    Yes.

6         Q.    What is this form?   I assume it

7    comes from CAJUN.

8         A.    Yes.

9         Q.    But what is it?

10        A.    It's his -- it's the location of the

11   offender.   The very first one, the A-101 means a

12   new conviction.

13        Q.    That's my next question.

14        A.    And he was convicted in Orleans

15   Parish.

16        Q.    Okay.

17        A.    The next one shows he was -- the

18   A-402 is a transfer, and he was transferred to

19   Riverbend on the same day.   And we -- he may have

20   been transferred before -- before that date or

21   whatever, but we only keep up with after they are

22   sentenced.

23        Q.    How would you-all receive the

24   information about the date that he had been

25   transferred to Riverbend Detention?



1      A.      I'm not sure about him, but usually,

2  like I say, they put it on the jail credit letter

3  "transferred over to" and they will say where or

4  the forms that are sent in saying that they

5  received him or they transferred him.

6      Q.      Okay.

7      A.      So it's entered in different ways.

8  Or we could call -- that's another way.  We --

9  since he was an immediate release, we could call

10  the jail trying to clear his release and they

11  tell us he's not here.

12      Q.      Orleans would tell you he's not

13  here?

14      A.      Right.  And we would ask where did

15  you send him and when and we would update it.

16      Q.      Okay.  So it seems like there's a

17  lot of ways you could get information for that?

18      A.      Correct.  Correct.

19      Q.      But A-101 means new conviction and

20  A-402 means transfer?

21      A.      Correct.

22      Q.      Okay.  Looking back at the e-mails

23  that were at the beginning of this exhibit, I

24  want to start with the page that's Bates numbered

25  2333, so it's a couple of pages in.

GRIFFIN, ANGELA 7/1/2019

Page 150

1      A.    Okay.

2      Q.    And actually starting on the

3  following page, which is 2334.  It's part of an

4  e-mail that spans both pages, correct?

5      A.    Correct.

6      Q.    The first e-mail in this chain

7  appears to be from Raven Groom, who we talked

8  about briefly earlier, correct?

9      A.    Correct.

10     Q.    And in this e-mail it appears that

11  she received a call on November 21st of 2016 from

12  Tammy Crittindon and that Ms. Crittindon

13  indicated that her son was sentenced in August of

14  2016, is located at Riverbend, and was concerned

15  that his time had not been calculated; is that

16  correct?

17     A.    Correct.

18     Q.    And looking at the page that's Bates

19  numbered 2333, it appears that Ms. Groom sent

20  this information to Monisa Lentz and some other

21  personnel within the department; is that correct?

22     A.    Correct.

23     Q.    Do you know why Ms. Groom sent the

24  information to these individuals?

25     A.    No, I'm not sure.



GRIFFIN, ANGELA 7/1/2019

Page 151

1      Q.    Okay.  Do any of the individuals
2   listed there work with you in the pre-class
3   department?
4      A.    No.
5      Q.    Okay.  Do you know if any of them
6   work in the office of adult services?
7      A.    No.
8      Q.    They don't work there?
9      A.    Well, I'm not sure if they were --
10   if they were assigned to adult services or if
11   they are a different department.
12      Q.    Okay.  It looks like then Ms. Lentz
13   forwards this e-mail to Perry Stagg; is that
14   correct?
15      A.    Correct.
16      Q.    With a note saying "Please see below
17   and handle as appropriate," correct?
18      A.    Correct.
19      Q.    And then Mr. Stagg in turn it
20   appears forwards that to you and Angela Smith; is
21   that correct?
22      A.    Correct.
23      Q.    So am I correct that Mr. Stagg
24   thought that you and Ms. Smith were the
25   appropriate persons to look into the concerns

```
 1    contained in this e-mail thread?
 2         A.    Correct.
 3         Q.    And I'm looking now at Bates number
 4    2332, and -- and you respond to Mr. Stagg; is
 5    that correct?
 6         A.    Correct.
 7         Q.    And this is all happening on the
 8    same day, November 21st of 2016, correct?
 9         A.    Correct.
10         Q.    And you indicate that Mr. Crittindon
11    is not in CAJUN and also that the only way you
12    know when an offender is DOC is when you receive
13    the complete pre-class packet; is that correct?
14         A.    Correct.
15         Q.    What happened after your e-mail to
16    Mr. Stagg?
17         A.    I'm not sure, but we -- I -- Angela
18    Smith would have been handling it because she was
19    over the pre-class department that would get the
20    paper -- you know, that would handle it once the
21    paperwork gets in.
22         Q.    Ms. Smith works under you, correct?
23         A.    She did, yes.
24         Q.    Okay.  Do you know if you called
25    Ms. Crittindon?  Her -- her number is listed in
```



GRIFFIN, ANGELA 7/1/2019

Page 153

```
 1    the initial e-mail.
 2          A.    I did not.
 3          Q.    Okay.  Do you know if Ms. Smith
 4    contacted --
 5          A.    I don't know if she did.
 6          Q.    Okay.  Did you contact Riverbend
 7    regarding --
 8          A.    I did not.
 9          Q.    Do you know if Ms. Smith did?
10          A.    I'm not sure.
11          Q.    Were you concerned that there wasn't
12    a CAJUN entry for somebody who had been sentenced
13    three months earlier?
14          A.    Yes.  We usually try to find out
15    where they were convicted at.  Like I say, I'm
16    not sure what Angela Smith did.
17          Q.    Is there a way to know from these
18    e-mails that Ms. Smith had been told to do
19    anything?
20          A.    No.  There's no e-mail telling her
21    to.
22          Q.    Okay.  We can look at the first page
23    of this exhibit which kind of overlaps some of
24    the e-mails --
25          A.    Uh-huh (affirmatively).
```



GRIFFIN, ANGELA 7/1/2019

Page 154

1      Q.      -- the same ones, and there does
2  appear to be an e-mail from you to Ms. Smith
3  saying "See me on this" with an ellipsis.  Do you
4  see that?
5      A.      Uh-huh (affirmatively), yes.
6      Q.      Do you remember sending that
7  communication to Ms. Smith?
8      A.      I don't remember, but it's --
9      Q.      Okay.  Do you know if Ms. Smith came
10 to see you about this concern related to
11 Mr. Crittindon?
12     A.      I'm not -- I'm not sure.
13     Q.      Okay.  Do you know what actions, if
14 any, Ms. Smith took following this e-mail on
15 November 21st of 2016?
16     A.      I can't say what she did.  I'm not
17 sure.
18     Q.      Did you follow up with Ms. Smith
19 about Ms. Crittindon?
20     A.      I -- I can't remember following up
21 with her; but usually if I send something out, I
22 do follow up that they are trying to get
23 paperwork.
24     Q.      How would any actions that Ms. Smith
25 took in response to this e-mail thread and the

GRIFFIN, ANGELA 7/1/2019

Page 155

1   call from Mr. Crittindon's mother, how -- how

2   would those steps have been documented?

3        A.    Like I say, in '16, I'm not sure how

4   she would -- just wrote notes and usually they

5   would write notes, but I'm not sure back then how

6   they kept up with them.

7        Q.    Okay.  If we look a little bit

8   further back in this exhibit, we can turn to

9   Bates numbers 2335 and 2336?

10       A.    Okay.

11       Q.    It appears that Ms. Smith e-mailed

12  someone at the e-mail address of Laura,

13  underscore, Johnson 62 at hotmail dot com on

14  December 8th, of 2016 and asked for a, quote,

15  updated list of offenders that are housed with

16  you from Orleans Parish that are DOC without

17  paperwork.  Do you see that?

18       A.    Yes.

19       Q.    Are you aware of this e-mail that

20  Ms. Smith sent?

21       A.    I may have been then, but --

22       Q.    Okay.

23       A.    Yeah.

24       Q.    And based on the -- the e-mails that

25  then follow in this chain it appears that that

1   person who this was directed to was Laura Sevier;

2   is that correct?

3         A.      Correct.

4         Q.      And is she an employee of the East

5   Carroll Parish Sheriff's office?

6         A.      She works or worked at Riverbend

7   Detention Center.

8         Q.      Okay.  Okay.  And so at the time

9   that Ms. Smith was sending this e-mail, the

10  pre-class department was aware that Riverbend was

11  housing DOC sentenced prisoners from Orleans that

12  the department didn't have paperwork on, correct?

13        A.      It looks like at this point she

14  found out, yes.

15        Q.      Okay.  And looking further in the

16  e-mail chain on Bates number 2335, it appears

17  that Ms. Smith forwarded the response that she

18  received from Ms. Sevier to you; is that correct?

19        A.      Correct.

20        Q.      And in looking at the response from

21  Ms. Sevier, am I correct that it describes DOC

22  sentenced prisoners who, quote, went to DOC in

23  prior months, but who at that time were not

24  updated in CAJUN?

25        A.      Yes.



1      Q.     And there's a list that's attached
2  that if you look to the next couple of pages in
3  the exhibit at Bates number 2337 through 2339.
4  Do you see that list?
5      A.     Yes.
6      Q.     Okay.  And am I correct in
7  understanding that this is the list that
8  Ms. Smith had requested of persons from Orleans
9  Parish that are DOC without paperwork?
10      A.     Yes.  That's what it appears.
11      Q.     Okay.  And do you see that in this
12  list Mr. Crittindon, Mr. Jessie Crittindon, who
13  we have been discussing, is included in the list?
14      A.     Yes.
15      Q.     Okay.  And so this would be two
16  weeks approximately after Ms. Groom's e-mail
17  regarding the call from Tammy Crittindon,
18  correct.
19      A.     Correct.
20      Q.     Do you know if any action has been
21  taken in those two weeks?
22      A.     Like I say, I can't say positively,
23  but our first response is to try and call because
24  that's the fastest way we can get in touch with
25  them.

1      Q.    Okay.  But two weeks later
2  Mr. Crittindon is still included in this list as
3  someone that department is without paperwork on,
4  correct?
5      A.    Correct.
6  MS. WASHINGTON:
7          Okay.  I want you to hold onto that
8          exhibit because we are going to talk about
9          a couple more things, but I'm going to
10         mark this next exhibit as Exhibit 36.
11     (Exhibit 36 marked and tendered.)
12  BY MS. WASHINGTON:
13     Q.    And if you look to the last page, or
14  I guess really the second page of this exhibit,
15  this appears to be e-mail correspondence between
16  Corey Amacker and Joseph Bordelon; is that
17  correct?
18     A.    Correct.
19     Q.    Okay.  And Corey Amacker is a person
20  with the Orleans Parish Sheriff's office?
21     A.    Correct.
22     Q.    And then we talked about
23  Mr. Bordelon briefly before, but he was a
24  pre-class employee in your department?
25     A.    Correct.

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1        Q.    Okay.  And so in looking at the

2    e-mail that's dated December 16th of 2016, and in

3    it, am I correct that Mr. Amacker states that

4    "Riverbend has been failing to send the sentence,

5    slash, LOC to you guys"?  I'm looking at the

6    first paragraph.

7        A.    Oh.  Yes.

8        Q.    And by "you guys," I assume he means

9    the Department of Corrections?

10        A.    Corrections, correct.

11        Q.    Okay.  And also that Mr. Amacker

12    reports that he is, quote, running into way too

13    many inmates whom are over their full term date

14    that we released to Riverbend?

15        A.    Yes.

16        Q.    Okay.  And it appears from this

17    exhibit that Mr. Bordelon provided this e-mail to

18    Ms. Smith who then provided it to you; is that

19    correct?

20        A.    Correct.

21        Q.    Okay.  And you responded a couple

22    days later on the 19th of December to

23    Mr. Bordelon saying well, this e-mail tells us he

24    was sending the packet to Riverbend and not DOC;

25    is that correct?

1        A.      Correct.

2        Q.      Do you remember this exchange?

3        A.      I don't remember it, but --

4        Q.      Okay.   Am I correct in understanding

5   that at least as of this point in mid December of

6   2016, you were aware that there were issues with

7   the time calculation for DOC sentenced persons

8   who had been transferred from Orleans to

9   Riverbend?

10       A.      Yes.

11       Q.      Okay.   Do you know what you did

12  after you received this e-mail from Mr. Bordelon

13  and Ms. Smith?

14       A.      I'm not -- I mean, I really don't

15  remember back then, but I know I've spoken to him

16  lots of times during this process.

17       Q.      Who is "him"?

18       A.      To Corey Amacker.

19       Q.      Okay.

20       A.      But I can't say what -- I don't

21  remember what was going on.

22       Q.      So in this e-mail, Mr. Amacker's

23  title is listed as the Department of Corrections

24  classification manager.   Do you see that?

25       A.      Yes.

GRIFFIN, ANGELA 7/1/2019

Page 161

1       Q.    It's on the last page?

2       A.    Yes.

3       Q.    Okay.  Is there any kind of

4   certification process for a person at a local

5   facility to become a DOC classification manager?

6       A.    No.

7       Q.    Okay.

8       A.    He's not a Department of

9   Corrections --

10      Q.    Employee?

11      A.    -- employee.

12      Q.    Okay.  Am I correct in understanding

13  that this title doesn't designate him as having

14  received some special kind of certification or

15  training from the Department of Corrections?

16      A.    Not that I know of.

17      Q.    Okay.  And I want to look back at

18  the exhibit that we were just looking at

19  previously, and if you could go to Bates number

20  2340 in that exhibit.

21      A.    Okay.

22      Q.    And here it appears that there is an

23  e-mail from Mr. Amacker now dated December 27th

24  of 2016.  Do you see that?

25      A.    Correct.

GRIFFIN, ANGELA 7/1/2019

Page 162

1        Q.    And this e-mail is sent to various
2   DPS&C employees, including Ms. Smith, correct?
3        A.    Yes.  Yes.
4        Q.    Okay.  And in this e-mail
5   Mr. Amacker indicates that there are about a
6   hundred inmates so far whom were supposedly
7   pre-classed by Riverbend; is that correct?
8        A.    Yes.
9        Q.    But that had not been worked or
10  calculated in CAJUN, correct?
11       A.    Correct.
12       Q.    And I believe he describes this as,
13  quote, a Riverbend fiasco; is that correct?
14       A.    Yes.
15       Q.    Okay.  And in the second paragraph
16  of his e-mail, he indicates that some of these
17  individuals that he's identified are, quote, most
18  likely full-term once calculated; is that
19  correct?
20       A.    Correct.
21       Q.    Would you agree that this e-mail
22  from Mr. Amacker describes a pretty significant
23  problem?
24       A.    Yes.
25       Q.    Okay.  And this e-mail also attaches

GRIFFIN, ANGELA 7/1/2019

Page 163

```
 1    a separate list, correct?

 2         A.    Correct.

 3         Q.    And that is at Bates numbers 2342 to

 4    2344.  Do you see that?

 5         A.    Yes.

 6         Q.    And would you agree that

 7    Mr. Crittindon's -- Mr. Jessie Crittindon's name

 8    is also included in this audit list?

 9         A.    Yes.

10         Q.    And so this is as of December 27th

11    of 2016, correct?

12         A.    Correct.

13         Q.    So it's now been over a month since

14    Ms. Groom's e-mail regarding the call from Tammy

15    Crittindon?

16         A.    Yes.

17         Q.    Okay.  Do you know why further

18    action as to Mr. Crittindon hadn't been taken

19    over that month?

20         A.    Well, we have yet to get the

21    paperwork on him, his sentencing paperwork, his

22    jail credit letter for us to calculate him.

23         Q.    Okay.  Are -- do you have memory of

24    not having received the paperwork or are you

25    inferring that from the e-mails?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

Page 164

1          A.    I mean, I remember some of the

2     cases, not necessarily him, but looking through

3     the paperwork and these e-mails.

4          Q.    Okay.  Turning to the second to last

5     e-mail page of this exhibit, it's Bates number

6     2345.

7          A.    Okay.

8          Q.    This is an e-mail from Angela Smith

9     that includes you as one of the recipients on

10    January 13, 2017; is that correct?

11         A.    Correct.

12         Q.    And this indicates that, as of

13    January 13th, Mr. Crittindon is an immediate

14    release; is that correct?

15         A.    Correct.

16         Q.    And the bottom of the e-mail

17    indicates, quote, per Chief Smith, it is

18    imperative that these offenders are released

19    today, if possible.  Do you see that?

20         A.    Yes.

21         Q.    Why, to your knowledge, was it

22    imperative that these offenders be released?

23         A.    From what I can recall is if -- or

24    reading it, it's because we knew that we were

25    trying to get this paper, that there was a

1    possibility that they were overdue.

2           MS. WASHINGTON:

3               Okay.  I'm going to mark this next

4           exhibit as Exhibit 37, and I'll represent

5           to you that this is an excerpt from one of

6           the other individual files on one of the

7           plaintiffs that we received from the

8           Department of Corrections in discovery.

9           This one is as to Mr. Leon Burse.

10       (Exhibit 37 marked and tendered.)

11   BY MS. WASHINGTON:

12         Q.    And like the form that we reviewed

13   with Mr. Crittindon, is this also the initial

14   time computation for Mr. Burse?

15         A.    Yes.

16         Q.    And am I correct in looking at the

17   bottom that the date of the computation was

18   January 10th of 2017?

19         A.    Yes.

20         Q.    And Mr. Burse had been sentenced on

21   August 8th of 2016; is that correct?

22         A.    Correct.

23         Q.    And so similar to Mr. Crittindon,

24   this appears to be roughly five months that

25   lapsed between his sentencing and his initial



GRIFFIN, ANGELA 7/1/2019

Page 166

```
 1    time computation, correct?
 2         A.    Correct.
 3         Q.    And Mr. Burse was also an immediate
 4    release?
 5         A.    Yes.
 6         Q.    And he was also due for release in
 7    August of 2016 when he had been sentenced; is
 8    that correct?
 9         A.    Correct.
10         MS. WASHINGTON:
11              I'm handing you Exhibit 38, which,
12         again, is an excerpt from the individual
13         files that we received on the named
14         plaintiffs in this litigation from the
15         Department of Corrections.  And this one
16         is as to Mr. Eddie Copelin.
17       (Exhibit 38 marked and tendered.)
18    BY MS. WASHINGTON:
19         Q.    And, similar to the questions that I
20    asked about Mr. Burse and Mr. Crittindon, this is
21    the documentation of Mr. Copelin's initial time
22    computation, correct?
23         A.    Yes.
24         Q.    And this one was performed or
25    computed on January 13th of 2017?
```

GRIFFIN, ANGELA 7/1/2019

Page 167

```
 1          A.    Correct.
 2          Q.    And Mr. Copelin had been sentenced
 3   October 14th, of 2016; is that correct?
 4          A.    Yes.
 5          Q.    Am I correct that Mr. Copelin was
 6   also an immediate release?
 7          A.    Yes.
 8          Q.    And that Mr. Copelin was due for
 9   release in October of 2016 when he had been
10   sentenced; is that correct?
11          A.    Yes.
12   MS. WASHINGTON:
13               I'm handing you Exhibit 39, which is
14          the excerpt from the file that we received
15          from the Department of Corrections on
16          plaintiff Philip Dominick.
17      (Exhibit 39 marked and tendered.)
18   BY MS. WASHINGTON:
19          Q.    And I've included a couple more
20   pages in this excerpt as it appears that some
21   time computation steps were being taken over the
22   course of a couple of days; is that correct?
23          A.    Correct.
24          Q.    Okay.  Am I correct that the -- it
25   looks like the initial time computation was
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
1    started at the very end of November of 2016?
2         A.    Correct.
3         Q.    November 30th it looks like?
4         A.    Yes.
5         Q.    Okay.  And that ultimately that
6    computation was completed on December 6th of
7    2016; is that correct?
8         A.    Yes.
9         Q.    Mr. Dominick had been sentenced on
10   the charges or cases for which his time
11   computation was happening on September 1st of
12   2016; is that correct?
13        A.    Correct.
14        Q.    And so it was approximately three
15   months between the date of his sentencing and
16   when his time computation and release date was
17   computed; is that correct?
18        A.    Yes.
19        Q.    And Mr. Dominick was also an
20   immediate release?
21        A.    Yes.
22        Q.    And he was due for release on
23   September 1st of 2016 when he was sentenced; is
24   that correct?
25        A.    Yes.
```

1          MS. WASHINGTON:

2               I'm going to hand you Exhibit 40,

3          which I will represent to you is the final

4          excerpt from an individual file as to the

5          plaintiffs that we were provided by the

6          Department of Corrections.  This one is as

7          to Mr. Donald Guidry.

8          (Exhibit 40 marked and tendered.)

9     BY MS. WASHINGTON:

10         Q.    Am I correct that this form is his

11    initial time computation?

12         A.    Yes.

13         Q.    And it appears that this time

14    computation was conducted on January 24th of

15    2017; is that correct?

16         A.    Yes.

17         Q.    And that Mr. Guidry had been

18    sentenced July 12th of 2016, correct?

19         A.    Correct.

20         Q.    So this was over six months from the

21    time of his sentence until his initial time

22    computation was completed, correct?

23         A.    Correct.

24         Q.    Was Mr. Guidry also an immediate

25    release?



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

Page 170

```
1        A.     Yes.
2        Q.     And am I correct that it appears
3   that he was due for release at the beginning of
4   September of 2016?
5        A.     Correct.
6        Q.     We talked about some of the
7   communications that the department had received
8   from Ms. Crittindon on behalf of her son, and I
9   wanted to look at a couple of other contacts that
10  the department received with concerns about time
11  calculation and overdetention specifically
12  related to the plaintiffs in this litigation.
13  And like the former e-mails, I will represent to
14  you that these are exhibits that we received from
15  -- I'm making them exhibits, but they are e-mails
16  that we received from the department in discovery
17  in this litigation.
18        MS. WASHINGTON:
19               I'm marking this set of e-mails
20        Exhibit 41.
21     (Exhibit 41 marked and tendered.)
22  BY MS. WASHINGTON:
23        Q.     I want to start at the last page of
24  this exhibit, which actually is on the very back
25  of the exhibit.  Am I correct that there appears
```

1    to be an e-mail dated November 22nd of 2016 from

2    Barbara McMullen to Monisa Lentz?

3          A.    Yes.

4          Q.    And that the title of that e-mail is

5    Leon Burse, no DOC number, and then a date of

6    birth; is that correct?

7          A.    Correct.

8          Q.    And in the e-mail that Ms. McMullen

9    sends, she indicates that Linda Hargrove Jones

10   called again about her son.  She goes on to say

11   that she states that he was sentenced August 8th,

12   2016 and has no DOC number or time calculated as

13   of yet; is that correct?

14         A.    Correct.

15         Q.    And it appears that there is contact

16   information.  In fact, there are two numbers that

17   Ms. Hargrove Jones can be reached at?

18         A.    Correct.

19         Q.    Am I correct in understanding from

20   the text of this e-mail that this doesn't appear

21   to be the first time that Ms. Hargrove Jones had

22   called the Department of Corrections about her

23   son?

24         A.    I mean, it says -- again, so it

25   looks like she may have.

1          Q.     Do you know where previous calls by

2   Ms. Hargrove Jones would be cataloged or noted?

3          A.     I don't know.

4          Q.     Okay.  And it appears that Ms. Lentz

5   then passed this e-mail along to Mr. Stagg; is

6   that correct?

7          A.     Correct.

8          Q.     And also that by this point there

9   was some information that she provided regarding

10  Mr. Burse's sentence and the date of his sentence

11  and the location of it; is that correct?

12         A.     Correct.

13         Q.     Do you know what Mr. Stagg did with

14  this information?

15         A.     I -- I don't know.

16         Q.     Okay.  Do you know if Mr. Stagg

17  brought this call to your attention?

18         A.     I don't know.

19         Q.     Okay.  So if you flip ahead in the

20  exhibit, it appears that Ms. Hargrove Jones

21  called again on November 28th of 2016.  Do you

22  see that?  I'm looking at an e-mail from Barbara

23  McMullen to Malcolm Myer.

24         A.     Okay.  Yes.

25         Q.     In the body of that e-mail, as far



1    as the message appears to indicate, that

2    Ms. Hargrove Jones, quote, has spoken to Monisa

3    about getting her son's time calculated several

4    times.  He still doesn't have a DOC number.  Do

5    you see that?

6          A.    Yes.

7          Q.    Okay.  And so it appears that on

8    November 7th -- I'm sorry -- December 7th of

9    2016, Ms. Lentz e-mailed Mr. Stagg again.  I'm

10   kind of working my way up the chain.  Do you see

11   that?

12         A.    Yes.

13         Q.    Okay.  And Ms. Lentz tells Mr. Stagg

14   "FYI, offender's family is calling again about

15   him not having a DOC number.  Per the caller, the

16   offender has filed an ARP.  Please handle as

17   appropriate."  Did I read that appropriately?

18         A.    Yes.

19         Q.    And, at that point, it looks like we

20   are now at December 7th of 2016.  Mr. Stagg

21   reaches out to you; is that correct?

22         A.    Yes.

23         Q.    Do you know why Mr. Stagg didn't

24   reach out to you between November 22nd and

25   December 7th of this issue?

1      A.      I don't know.

2      Q.      Do you know if he did during that

3  period of time?

4      A.      I don't know.

5      Q.      Okay.  And so similar to the e-mails

6  that we looked at related to Mr. Crittindon, it

7  appears that at some point Mr. Stagg thought it

8  was appropriate to reach out to you for you to

9  look into the concerns that were raised by

10  Ms. Hargrove Jones; is that correct?

11      A.      Yes.

12      Q.      And, based on those e-mails, it

13  appears that at this point Ms. Hargrove Jones had

14  already made several calls about her son; is that

15  correct?

16      A.      Yes.

17      Q.      Okay.  In response to Mr. Stagg, you

18  indicate that the department had not received

19  pre-class paperwork on Mr. Burse; is that

20  correct?

21      A.      Yes.

22      Q.      Okay.  And how did you determine

23  that the department hadn't received paperwork on

24  Mr. Burse?

25      A.      I can't say for sure what I did, but



GRIFFIN, ANGELA 7/1/2019

Page 175

```
1    how we can tell is look in CAJUN and go and look
2    through paperwork that we may have --
3          Q.    Okay.
4          A.    -- that is entered.
5          Q.    And that's the search that you could
6    have performed; is that correct?
7          A.    That's what we usually perform when
8    we looking, yeah, for things.
9          Q.    Okay.  You also tell Mr. Stagg that
10   you are trying to get information on Mr. Burse,
11   "but cannot do anything until we receive it"?
12         A.    Correct.
13         Q.    And just based on these e-mails
14   alone, it appears that it's now a couple of weeks
15   after Mr. McMullen's e-mail about the
16   November 22nd call from Ms. Hargrove Jones; is
17   that correct?
18         A.    Correct.
19         Q.    Is there a reason why multiple calls
20   from this woman were not addressed more promptly?
21         MR. EVANS:
22               Object to form.  You can answer.
23         THE WITNESS:
24               Our addressing is going to be with
25         the actual parish of conviction trying to
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1        get the paperwork.

2  BY MS. WASHINGTON:

3       Q.    Do you have any record of the steps

4  that would have been taken over these two weeks

5  to try to address the concerns?

6       A.    No.  I don't -- I don't recall any.

7  I mean, I don't -- I'm not sure.

8       Q.    Were you concerned that you didn't

9  have paperwork on someone who had been sentenced

10  in August which would have been four months

11  earlier at this point?

12      A.    Yes.  When we -- we -- and it's not

13  in these e-mails, it's -- we start calling

14  because we do not get e-mails back, start calling

15  to get paperwork.

16      Q.    Okay.  Were you concerned that

17  Mr. Burse might be past due for release at this

18  point?

19      A.    Yes.

20      Q.    Why is that?

21      A.    Anytime they have parents calling

22  saying they are overdue, we look at it as if they

23  are really overdue and try and start getting

24  paperwork to see if they really were sentenced to

25  the amount of time they are saying they were.



1    Q.    And you-all had been provided with
2  some information --
3    A.    Correct.
4    Q.    About Mr. Burse, correct?  Okay.  So
5  it looks like you e-mail Ms. Smith in relation to
6  Mr. Burse and say "See me on this, please,"
7  correct?
8    A.    Correct.
9    Q.    Do you know if you met with
10  Ms. Smith about Mr. Burse?
11    A.    Again, I don't remember this
12  specific case, but usually when I tell them to
13  see me, they come and meet with me.
14    Q.    Do you know what steps you took
15  after this December 7th e-mail related to
16  Mr. Burse?
17    A.    Again, I don't remember.  It would
18  be preferably telling her she needs to contact
19  whatever parish it is to try and get paperwork so
20  we can work him.
21    Q.    So it appears that this situation
22  with Mr. Burse relates to both Orleans Parish and
23  East Carroll Parish that was included in some of
24  the original e-mails; is that correct?
25    A.    Correct.

GRIFFIN, ANGELA 7/1/2019

```
 1            Q.    Do you know if you or Ms. Smith
 2    contacted electronically by e-mail anyone at
 3    either of those sheriffs' offices?
 4            A.    I'm not sure.  We would have
 5    contacted Orleans.  That's where he was convicted
 6    at.
 7            Q.    Okay.  And other than phone calls,
 8    that could have been by e-mail; is that correct?
 9            A.    Correct.
10            Q.    And would that have been to
11    Mr. Amacker --
12            A.    Yes.
13            Q.    -- that we discussed earlier?
14            A.    Yes.
15            Q.    Okay.  I want to look at the first
16    page of this exhibit.  There are some pages in
17    there that duplicate part of the thread.  But it
18    appears that as of December 27th of 2016, Raven
19    Groom is sending an e-mail to Mr. Stagg and to
20    others within the department.  Do you see that
21    e-mail?
22            A.    Yes.
23            Q.    Okay.  I'm sorry.  Apparently, for
24    the record, I said the wrong year.  We are
25    dealing with a lot of dates.  This is an e-mail
```

GRIFFIN, ANGELA 7/1/2019

Page 179

1   dating December 27th of 2016; is that correct?

2       A.   Yes.

3       Q.   Okay.  And this e-mail from

4   Ms. Groom indicates the family has called back

5   again.  "I looked in CAJUN and cannot find the

6   offender.  Please handle as appropriate."  Did I

7   read that appropriately?

8       A.   Yes.

9       Q.   And this appears, based on the

10  subject of the e-mail, to be part of the same

11  thread regarding Mr. Burse; is that correct?

12      A.   Yes.

13      Q.   Okay.  And Mr. Stagg then provides

14  you and Seth Smith with this e-mail; is that

15  correct?

16      A.   Yes.

17      Q.   Okay.  Why is Mr. Seth Smith on this

18  e-mail?

19      A.   I can't say positively, but at some

20  point in time he was involved.  When we found out

21  all these offenders were transferred and we had

22  no paperwork --

23      Q.   And what was --

24      A.   -- we notified him.

25      Q.   What was Mr. Smith's position?



GRIFFIN, ANGELA 7/1/2019

Page 180

```
 1          A.    At this point, I'm thinking he was
 2   the chief of operations.
 3          Q.    Within the Department of
 4   Corrections?
 5          A.    Yes.
 6          Q.    Okay.  Do you know what you did
 7   after receiving this e-mail from Mr. Stagg?
 8          A.    I don't recall.
 9          Q.    I want to look back to about the
10   middle of this exhibit.  I apologize that there
11   --
12          A.    Okay.
13          Q.    -- are no page numbers on this, but
14   I'm trying to move chronologically.  I'm looking
15   at an e-mail that's from you, and it's dated
16   January 9th, of 2017 to Corey Amacker.
17          A.    Okay.
18          Q.    Do you see that?
19          A.    Yes.
20          Q.    Okay.  In the subject line of this
21   is -- is Leon Burse, correct?
22          A.    Correct.
23          Q.    And this is the same individual that
24   these other e-mails have been related to; is that
25   correct?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond, LA 70404   Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

Page 181

1          A.     Correct.

2          Q.     Okay.  And you e-mail Mr. Amacker

3    and you indicate that family members continue to

4    call DOC on this offender; is that correct?

5          A.     Correct.

6          Q.     And you request that Mr. Amacker

7    send the pre-class packet ASAP; is that correct?

8          A.     Correct.

9          Q.     Do you know if anyone with the

10   department had reached out to Mr. Amacker about

11   Mr. Burse in any of the weeks prior to

12   January 9th of 2017?

13         A.     Again, I can only say usually when

14   we get e-mails like that we start calling

15   immediately to try to get paperwork.

16         Q.     Would you'll have been calling for

17   almost a month and a half?

18         A.     We could.

19         Q.     If you look above that, it appears

20   to be Mr. Amacker's response to your e-mail in

21   which Mr. Amacker indicates that Mr. Burse was,

22   quote, pre-classed by my staff; is that correct?

23         A.     Correct.

24         Q.     And Mr. Amacker goes on to say that

25   his packet was delivered to HQ on 8/18/2016.  Do

1     you see that?

2          A.     Yes.

3          Q.     And am I correct in understanding

4     that Mr. Amacker was indicating that Orleans had

5     provided the pre-class packet on Mr. Burse on

6     August 18th of 2016?

7          A.     Correct.

8          Q.     And you responded to Mr. Amacker and

9     stated, quote, not sure what happened with the

10    PW, sent 8/18/2016; is that correct?

11         A.     Correct.

12         Q.     Did you take any steps to see why

13    whether or not the pre-class packet that

14    Mr. Amacker referenced sending to headquarters in

15    August of 2016 --

16         A.     We did.

17         Q.     -- had arrived?

18         A.     We looked for a packet and also

19    verified the paperwork and I -- I maybe off of

20    Leon Burse, but all of them -- when the copies we

21    -- he finally did send to us weren't dated August

22    of 2016.

23         Q.     Okay.  I guess my question is, did

24    you specifically look for whether or not

25    headquarters received this packet on Mr. Leon

1    Burse in August of 2016?

2        A.    We did.

3        Q.    And what was the outcome of that

4    search?

5        A.    From what I remember, we were not

6    here during August of 2016.  That was during the

7    flood, so we tried to get him to give us who he

8    gave it to -- who they gave it to, who they

9    dropped it off with, and then he never could give

10   us that information.

11       Q.    Where were you-all in August of

12   2016?

13       A.    Our office was closed.

14       Q.    What dates was it closed between?

15       A.    I'm not positive the complete dates,

16   but it was a little while because it was during

17   the flood, when it was flooding here.

18       Q.    Right.  I remember the flood.  Do

19   you know approximately how long that lasted for?

20       A.    I can't say for sure because I

21   wasn't here at the time.

22       Q.    Where were you?

23       A.    I was off on FMLA.

24       Q.    Okay.

25       A.    I had surgery.

1        Q.      Okay.   Who was filling in in your
2    position during the time?
3        A.      The two managers.
4        Q.      Which would have been Ms. Smith and
5    somebody else?
6        A.      And, at that time, I think it was --
7    I'm not positive, but Mary Strickland maybe in
8    '16.
9        Q.      Had headquarters informed the
10   sheriff's offices that the office was closed?
11       A.      I'm not sure.
12       Q.      Would the sheriff's office have
13   known that the office was closed?
14       A.      Again, I'm not -- I don't know.
15       Q.      As director of the pre-class
16   department, what did you think would happen to
17   pre-class packets that were arriving at
18   headquarters during this time period?
19       A.      I mean, I -- I think because they
20   hand delivered their packets, they would have --
21   you know, if they came, they would have seen that
22   we weren't open to give it to someone, so I'm not
23   sure.   Like I say, I wasn't here at the time when
24   all that was going on.
25       Q.      But you were still director of the

GRIFFIN, ANGELA 7/1/2019

1    department, correct?

2        A.    Yes.  Yes.

3        Q.    When did you return from your

4    medical leave?

5        A.    I think maybe -- maybe the end of

6    August or beginning of September.  I'm not really

7    positive the exact date.

8        Q.    Okay.  But sometime in the beginning

9    of September timeframe?

10       A.    Sometime, right.

11       Q.    Was the office back open at that

12   point?

13       A.    Yes.

14       Q.    When the office was reopened, did

15   the pre-class department reach out to local

16   sheriffs about pre-class packets that might have

17   arrived during the time the office was closed?

18       A.    Well, Orleans is one of the only

19   ones that hand delivers.  The others are mailed.

20   So I -- I mean, when it reopened, I'm not sure if

21   anyone reached out, but the mail -- if they

22   mailed it, the mail came -- you know, they

23   checked the mail after -- I'm sure the mailroom

24   whenever they got here.

25       Q.    Was all of headquarters closed

GRIFFIN, ANGELA 7/1/2019

Page 186

1   during this time period of the flood?

2        A.    At some -- I'm not sure how many

3   days they were closed, but during that -- the

4   August -- a few days in August, around that time,

5   they were closed.

6        Q.    Was mail still being delivered

7   during that time?

8        A.    I'm not sure how that works.

9        Q.    Did you'll reach out to Orleans

10  specifically knowing that they would have been

11  trying to hand deliver pre-class packets during

12  the time that the office was closed?

13       A.    Again, I wasn't here.  I'm not sure

14  if they reached out to them then, but they did --

15  they continued to deliver after.

16       Q.    I'm asking about when you returned

17  from leave --

18       A.    Okay.

19       Q.    -- whether or not you reached out to

20  Orleans or directed anyone to?

21       A.    No, because they were still

22  delivering each week.

23       Q.    And when Orleans hand delivers the

24  packets, where -- where do they show up with the

25  packets?

GRIFFIN, ANGELA 7/1/2019

Page 187

1      A.     At the front gate; and I'm not sure
2  back then how they did it, but they usually sent
3  them to the pre-class department to give it to a
4  pre-class person.
5      Q.     And you are referring to the front
6  gate that's on Mayflower?
7      A.     Front gate, right.   Correct.
8      Q.     And then someone from the front gate
9  from the security office would deliver the
10  packets?
11      A.     Correct.   No.   They would -- well,
12  again, I'm not sure how they were doing it back
13  then, but they would let them in and let them go
14  to the pre-class department to hand deliver to
15  our pre-class department.
16      Q.     Okay.   So other than the time when
17  there was a closure due to the flooding, in
18  general when Orleans was hand delivering the
19  packets, they would physically walk into the
20  pre-class department?
21      A.     From the times I knew they came this
22  year, there was a deputy and he would deliver it.
23      Q.     Okay.   And -- and who within the
24  pre-class department does the deputy deliver the
25  packets to?

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Page 188

1      A.      It was usually a supervisor.

2      Q.      Do you know if the front gate was

3 being staffed during the period that the flood

4 closed operations?

5      A.      It's 24 hours, yes.

6      Q.      Okay.  And even during the flood, it

7 was operational?

8      A.      Yes.

9      Q.      Is it a common occurrence for

10 parishes to report that they have delivered

11 paperwork that you-all in the pre-class

12 department then say wasn't delivered?

13      A.      Common, no.  Like I say, they are

14 one of the only ones that delivers, and I'm not

15 going to say in the past we haven't had someone

16 say they mailed it before, but no, it's not

17 common.

18      Q.      Okay.  Is there any log that the

19 front gate keeps of when Orleans comes to hand

20 deliver packets?

21      A.      I don't know.  I'm not sure.

22      Q.      Is there any log within the

23 pre-class department when pre-class packets come

24 in hand delivered from Orleans?

25      A.      No.



GRIFFIN, ANGELA 7/1/2019

Page 189

```
 1         Q.    Do you know if the mail room has any
 2  log of receipt of pre-class packets that come by
 3  mail?
 4         A.    I'm not sure how they -- if they log
 5  or not.
 6         Q.    Do you-all sign any kind of receipt
 7  when the mailroom delivers mail to the pre-class
 8  department?
 9         A.    No, we don't.
10         Q.    With regard to Mr. Burse, you're
11  aware that he finally had his time computed in
12  January of 2017?
13         A.    Uh-huh (affirmatively), yes.
14         Q.    And I think we reviewed earlier that
15  he was an immediate release at the time; do you
16  remember that?
17         A.    Correct.
18         Q.    And he had been due to be released
19  on August 8th of 2016, which was the date that he
20  had been sentenced, correct?
21         A.    Yes.
22         Q.    Okay.  In your opinion, do you think
23  that the Department of Corrections handled the
24  numerous calls and concerns that it received from
25  Mr. Burse's family appropriately?
```

```
 1        MR. EVANS:
 2              Object to form.  You can answer.
 3        THE WITNESS:
 4              I mean, I -- as far as what I think
 5        that happened, yes, because again, we make
 6        phone calls rather than e-mails; and if we
 7        receive a call from someone, we start
 8        calling the parish of conviction to try
 9        and start the process.
10  BY MS. WASHINGTON:
11        Q.    You would agree that the department
12  failed to ensure that Mr. Burse was timely
13  released from custody, though, correct?
14        MR. EVANS:
15              Object to the form.  You can answer.
16        THE WITNESS:
17              Yes.  He released when we calculated
18        him.
19  BY MS. WASHINGTON:
20        Q.    Which was over five months after the
21  date he was due for release, correct?
22        A.    Yes.
23        Q.    Do you know if any changes have been
24  made in how the department handles calls from
25  family members like the ones you received from
```



GRIFFIN, ANGELA 7/1/2019

1   Ms. Hargrove Jones?

2        A.    I don't know about changes.    I

3   don't.

4        Q.    So you're not aware of any changes?

5        A.    I'm not aware.

6   MS. WASHINGTON:

7             Okay.  I'm going to mark another set

8        of e-mails that we received in discovery

9        from the Department of Corrections as

10       Exhibit 42.  And I will represent to you

11       that these are e-mails that we received

12       from the Department of Corrections related

13       to Donald Guidry, who is another one of

14       the named plaintiffs in this litigation.

15   (Exhibit 42 marked and tendered.)

16   BY MS. WASHINGTON:

17       Q.    I'm looking at the second page of

18   this exhibit which appears to contain an e-mail

19   from Raven Groom on January 9th of 2017, correct?

20       A.    Yes.

21       Q.    And the subject line has to do with

22   Donald Guidry; is that also correct?

23       A.    Yes.

24       Q.    And the subject line appears to

25   include a number.  Am I correct that that could

1    be his DOC number?

2         A.    Yes.

3         Q.    Okay.  And Ms. Groom's e-mail

4    indicates that "Ms. Jamica White" -- and provides

5    a phone number -- that "Ms. White called in

6    regards to Offender Guidry's time calculation.

7    She mentioned Offender Guidry was sentenced

8    July 15th of 2016.  She is concerned that the

9    offender might be due for release if his time is

10   calculated."  Did I read that correctly?

11        A.    Yes.

12        Q.    And there appears to be an

13   attachment or maybe it was included in the body

14   of the e-mail since Ms. Groom's signature is

15   under it, but that's on the next page of this

16   exhibit.  Do you see that?

17        A.    Yes.

18        Q.    And is -- this is a screen from

19   CAJUN, correct?

20        A.    Correct.

21        Q.    Okay.  And so it appears that as of

22   this date, there is, in fact, a CAJUN entry for

23   Mr. Guidry, correct?

24        A.    Correct.

25        Q.    Okay.  And it -- it provides the



GRIFFIN, ANGELA 7/1/2019

Page 193

1  number that was in the subject line is his DOC

2  number?

3       A.    Correct.

4       Q.    And it provides information about

5  his physical location as Riverbend Detention and

6  includes a transfer date of 7/15/2016; is that

7  correct?

8       A.    Correct.

9       Q.    But am I correct that a lot of the

10 other information on this screen is blank?

11      A.    Correct.

12      Q.    And so this doesn't include any

13 information about a time computation or a release

14 date?

15      A.    Correct.  No.

16      Q.    Okay.  How would Mr. Guidry have a

17 DOC number but not the time calculation?

18      A.    I'm really not sure by looking at

19 this.

20      Q.    We talked before about pre-class

21 screens versus some other screens in CAJUN,

22 correct?

23      A.    Correct.

24      Q.    This is not a pre-class screen,

25 correct?



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

Page 194

```
 1          A.      No.
 2          Q.      Okay.  This says Master Record
 3   Inquiry at the top, correct?
 4          A.      Correct.
 5          Q.      Am I correct in understanding that
 6   the master record is something that is usually
 7   generated after a time computation has been
 8   completed?
 9          A.      Well, his release dates will be
10   filled out after time comp.  He will have a
11   master -- we have to give him a DOC number and
12   enter his information.  So once we do a pre-class
13   screen, the pre-class status which showed an I,
14   incomplete, waiting to be time comped -- it's all
15   the way at the bottom on the left.
16          Q.      Oh, I see that.  Okay.
17          A.      And then -- and then once he's time
18   comped, he would have release dates and the full
19   term and that pre-class status would change to an
20   R.
21          Q.      Is there anything in this pre-class
22   --
23          A.      There's no --
24          Q.      -- pre-class status?
25          A.      No.  He doesn't have a pre-class
```



1    status at this point.

2         Q.    So it's just blank?

3         A.    Correct.

4         Q.    So how would -- how would this entry

5    have been completed for Mr. Guidry?

6         A.    I'm not sure.

7         Q.    Okay.  There is a transfer date on

8    this screen.  Do you see that?

9         A.    Yes.

10        Q.    What does -- what information is

11   being provided by the transfer date?

12        A.    The date he moved to Riverbend.

13        Q.    Okay.  Do you know where he moved

14   from?

15        A.    No.

16        Q.    How would that information have

17   gotten into CAJUN?

18        A.    Someone entered it, but I'm not

19   sure.

20        Q.    Okay.  Do you know why Mr. Guidry

21   has some CAJUN entries having to do with a

22   transfer in July of 2016 without having his time

23   calculated by the time this screen was pulled up

24   in January of 2017?

25        A.    I'm not sure.



```
 1          Q.     Looking back at the e-mails, it
 2   appears that Ms. Lentz forwarded that e-mail to
 3   Mr. Stagg; is that correct?
 4          A.     Correct.
 5          Q.     And then Mr. Stagg forwards this
 6   e-mail to you and Ms. Smith; is that correct?
 7          A.     Correct.
 8          Q.     You then e-mail Ms. Smith stating,
 9   please have someone send Corey an e-mail in
10   reference to this offender; is that correct?
11          A.     Yes.
12          Q.     Do you know what happened after you
13   directed this e-mail to Ms. Smith?
14          A.     I'm not sure.
15          Q.     Did you follow up with Ms. Smith to
16   see if she or someone else sent an e-mail to
17   Corey like you referenced?
18          A.     I can't say if I did or not.  I
19   don't remember.
20          Q.     When an e-mail was being sent to
21   Corey Amacker, would you be cced on that e-mail?
22          A.     Sometimes; sometimes no.
23          Q.     Was there any protocol in place for
24   whether or not you were cced?
25          A.     No, there was no protocol.
```



GRIFFIN, ANGELA 7/1/2019

```
 1         Q.    Looking back at that CAJUN screen,
 2   is there a way to tell who entered the data?
 3         A.    Not using this screen.
 4         Q.    Is there another screen?
 5         A.    It's -- It's screen 1 of 3.  It
 6   would have a -- a user name, but that name
 7   changes when different things happen on it.
 8         Q.    Okay.  I want to look at the last
 9   page of this exhibit.
10         A.    (Witness complied.)
11         Q.    So this is approximately two weeks
12   after the e-mail from Ms. Groom regarding the
13   call from Ms. White, correct?
14         A.    Correct.
15         Q.    And, on this date, you e-mail
16   Mr. Amacker and state that "Below are a few
17   offenders that we are getting questions on and we
18   have no paperwork on them;" is that correct?
19         A.    Correct.
20         Q.    And it appears that Mr. Donald
21   Guidry is listed below --
22         A.    Correct.
23         Q.    -- is that correct, along with
24   apparently some other individuals whose names we
25   were not provided by the Department of
```



GRIFFIN, ANGELA 7/1/2019

1    Corrections?

2        A.    Right.

3        Q.    Do you know if anything had happened

4    in the two weeks between your e-mail to Ms. Smith

5    asking that somebody e-mail Corey and you

6    e-mailing Corey on January 23rd?

7        A.    Like I say, if it gets to a point

8    where we still can't get the paperwork, it

9    usually comes back to me and I start trying to

10   get in touch with them, calling them or trying to

11   get in touch with them.  And e-mail for me is my

12   last resort because I try and get in touch with

13   them and talk to him.

14       Q.    Do you know if any steps, in fact,

15   had been taken in those two weeks?

16       A.    I'm not sure.  I can't -- I don't

17   remember.

18       Q.    I want to look back briefly at one

19   of the other exhibits that we looked at, which

20   was the excerpts from the file that we received

21   as to Mr. Crittindon.  That has some of those

22   e-mails at the beginning of it.  It's No. 35.

23       A.    Okay.

24       Q.    And, specifically, I want to look

25   back at Bates No. 3 -- sorry, 2342, which is that

 1    -- that -- that audit list that Ms. --
 2    Mr. Amacker provided on December 27th of 2016.
 3            A.    Uh-huh (affirmatively).
 4            Q.    Do you see that?
 5            A.    Yes.
 6            Q.    And Mr. -- Mr. Guidry's name is on
 7    that list, correct?
 8            A.    Correct.
 9            Q.    Do you know if any steps had been
10    taken to look into Mr. Guidry and his time
11    computation in December of 2016 when this audit
12    was received?
13            A.    Well, we still didn't have paperwork
14    on these offenders, so we still couldn't
15    calculate their times.
16            Q.    But you knew of their existence,
17    correct?
18            A.    At this point, yes.
19            Q.    And you knew that you didn't have
20    paperwork --
21            A.    Correct.
22            Q.    -- at that time, correct?  Do you
23    know what steps were taken specifically as to
24    Mr. Guidry at the end of December to locate his
25    paperwork?

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

Page 200

```
 1         A.    Again, you know, other than calling
 2   Corey -- and some of this is a result of us
 3   talking to Corey trying to get paperwork from him
 4   and which inmates out there that we need
 5   paperwork on.
 6         Q.    And I think we reviewed earlier,
 7   you're aware that Mr. Guidry ultimately had his
 8   time calculated near the end of January '17,
 9   January 24th of 2017?
10         A.    Yes.
11         Q.    And, like the other individuals that
12   we reviewed relative to this litigation, he was
13   an immediate release, correct?
14         A.    Correct.
15         Q.    And by the time Mr. Guidry was
16   released at the end of January 2017, he had been
17   held, I believe, about four months past his due
18   date; is that correct, over four months, correct?
19         A.    Correct.
20         Q.    In your role as director of the
21   pre-class department, were you made aware of
22   other situations like the ones we have been
23   reviewing where a DOC sentenced prisoner had no
24   DOC number or time calculation or release date
25   several months after they were sentenced?
```

```
1         A.    The list that Corey Amacker sent was
2    a list of offenders and when they were sentenced,
3    not necessarily how much time they received, so
4    we wouldn't know if they were past their time
5    just getting this report, but these are some that
6    we knew that we didn't have the paperwork to
7    calculate.
8         Q.    Did you ask Mr. Amacker for
9    additional information when you received that
10   audit so that you might be able to prioritize the
11   time computations?
12        A.    Yes.  We tried to get the paperwork
13   from him, and that's what made him start the --
14   the audit.  To get the offenders, he was having
15   to get the paperwork done to send to us, put it
16   together to send to us.
17        Q.    Did you ever send anyone, staff to
18   Orleans physically to meet with Mr. Amacker and
19   get the paperwork that you-all needed?
20        A.    I didn't.  Yeah.  That's something I
21   couldn't do --
22        Q.    Not as director --
23        A.    -- in my director --
24        Q.    -- of pre-class department?
25        A.    No.
```



GRIFFIN, ANGELA 7/1/2019

1   Q.    Why not?

2   A.    I would -- it would have to come

3   from higher up to send people out, state

4   employees.

5   Q.    Did you -- Did you ask your

6   supervisor for permission to send personnel to

7   Orleans to get the paperwork that you needed?

8   A.    Not that I know of because they have

9   always sent us the paperwork.  They knew what

10  paperwork we needed, because before this, we --

11  we had received paper -- all the paperwork from

12  them.

13  Q.    But you knew that there was a pretty

14  significant problem going on, correct?

15  A.    After he sent this list saying they

16  were in another parish at that point.

17  Q.    Well, I think actually even before

18  that; is that correct, we looked at some stuff

19  from at least the middle of December?

20  A.    Well, that's what I'm saying.  When

21  we knew, they started transferring them.  When we

22  found that out, yes, and didn't have paperwork.

23  Q.    Okay.  And at any point after that

24  did you ask for permission to send personnel to

25  Orleans to obtain the paperwork that you needed?

GRIFFIN, ANGELA 7/1/2019

1      A.     Not that I recall.  We offered our
2  help to them, but not that I recall checking with
3  our people to send somebody.
4      Q.     What do you mean you offered to
5  help?
6      A.     Just let him know that on several
7  occasions on the phone for sure that, if he
8  needed anything, to let us know; any help with
9  DOC or something, we could help him with.
10      Q.     Did Mr. Amacker take you up on those
11  offers?
12      A.     No.  He actually had formed up some
13  type of task force or something that they were
14  going to go handle up in Riverbend.
15      MS. WASHINGTON:
16          I am going to hand you two exhibits
17          that I am marking as 43 and 44.  I want to
18          represent to you that these are documents
19          that, again, we received from the
20          Department of Corrections in discovery in
21          this litigation.
22      (Exhibits 43 and 44 marked and tendered.)
23  BY MS. WASHINGTON:
24      Q.     What I have marked as Exhibit 43
25  appears to be related to Donald Guidry; is that

1    correct?

2         A.    Yes.

3         Q.    And Exhibit 44 is related to Jessie

4    Crittindon, correct?

5         A.    Correct.

6         Q.    And both of these documents appear

7    to be titled as Second Step Response Forms; is

8    that correct?

9         A.    Correct.

10        Q.    And -- and these forms are part of

11   the ARP process that you've referenced?

12        A.    Yes.

13        Q.    These forms are second step

14   responses, correct?

15        A.    That's what it -- yeah.  It states

16   on there "second step."

17        Q.    And do you know where the original

18   ARP that Mr. Guidry and Mr. Crittindon wrote

19   would be?

20        A.    I'm not sure or with the

21   administrative procedure department.  There's a

22   department.

23        Q.    And you indicated before that that's

24   something else that would have fallen under the

25   deputy assistant secretary?



GRIFFIN, ANGELA 7/1/2019

```
1        A.      Yes.
2        Q.      Okay.  So the -- the role that
3   Mr. Stagg had previously?
4        A.      Correct.
5        Q.      Okay.  And what about the First Step
6   Response Form, am I correct that there would be a
7   first step response before the second step
8   response?
9        A.      I'm not sure how the steps -- I'm
10  not sure.  I mean, I'm --
11       Q.      Are you familiar with the ARP?
12       A.      I'm not familiar with the ARP
13  process, no.
14       Q.      Okay.  But you indicated that ARPs
15  are one of the ways that persons in custody might
16  be able to relate concerns about time
17  computation, correct?
18       A.      Right.  I know they can -- yes, yes.
19       Q.      Okay.  But you're not aware of what
20  the process is?
21       A.      No.
22       Q.      Okay.  So am I correct in
23  understanding that you don't know where the first
24  step response forms that go with either of these
25  case numbers are; is that correct?
```

GRIFFIN, ANGELA 7/1/2019

Page 206

```
 1          A.    No, I do not know, correct.
 2          Q.    Both of these forms that I'm looking
 3   at appear to have dates in January of 2017 next
 4   to "received in this office."  Do you see that?
 5          A.    Yes.
 6          Q.    And the signature date on these two
 7   forms appears to be in September of 2017; is that
 8   correct?
 9          A.    Yes.
10          Q.    Do you know why these Second Step
11   Response Forms would be dated eight months after
12   they were reportedly received?
13          A.    I don't know how they handle that.
14          Q.    Okay.  Have you seen these response
15   forms as to Mr. Guidry and Mr. Crittindon before?
16          A.    I can't say that I did or -- yeah,
17   I'm not sure.
18          Q.    Okay.  There appears to be, just
19   from reading these two forms, information
20   contained in here about their sentences, the acts
21   that would relate to them, time they were given
22   for credit, that sort of information; is that
23   correct?
24          A.    Correct.
25          Q.    And were you contacted to provide
```

```
 1    this information related to Mr. Guidry and
 2    Mr. Crittindon for these response forms?
 3          A.    I don't -- I didn't understand the
 4    question.
 5          Q.    Sure.
 6          A.    I'm sorry.
 7          Q.    The information that's contained in
 8    these two paragraphs in the response forms
 9    appears to be largely related to -- to time
10    calculation, correct?
11          A.    Correct.
12          Q.    And I'm wondering whether or not you
13    were contacted to provide the information that
14    wound up being provided in this Second Step
15    Response Form?
16          A.    The ARP department, I know they have
17    people that have work in time comp and that have
18    access to the files.
19          Q.    So you don't remember being
20    contacted specifically related to the ARPs by
21    Mr. Guidry or Mr. Crittindon?
22          A.    No.
23          Q.    Do you see at the bottom of both of
24    them that they state that "No further
25    investigation is warranted"?
```

GRIFFIN, ANGELA 7/1/2019

Page 208

```
 1          A.      Yes.
 2          Q.      Okay.  Do you know why that is?
 3          A.      No.  I'm not familiar with the
 4    process.
 5          MS. WASHINGTON:
 6                  I'm going to show you what I will
 7          mark as Exhibit 45, more e-mails.
 8          (Exhibit 45 marked and tendered.)
 9          THE WITNESS:
10                  Okay.
11          MS. WASHINGTON:
12                  And I will represent to you that
13          this is another e-mail with an attachment
14          that we received from the Department of
15          Corrections in discovery in this
16          litigation.
17    BY MS. WASHINGTON:
18          Q.      And am I correct that this exhibit
19    contains an e-mail that you sent to Mr. Seth
20    Smith and Mr. Perry Stagg on January 5th of 2017?
21          A.      Correct.
22          Q.      And -- and that that e-mail was
23    related to information on the Orleans Parish
24    offenders waiting to be processed and time
25    comped?
```

```
 1          A.     Correct.
 2          Q.     And that there was an attachment to
 3   it which you ultimately converted to a Word
 4   document and that's the second page of this
 5   exhibit, correct?
 6          A.     Correct.  Correct.
 7          Q.     Did you author the memo attachment
 8   that's contained in this exhibit?
 9          A.     Did I send it, yes.  What do you
10   mean?
11          Q.     Did you author it?  Did you write
12   this?
13          A.     Oh, yes.
14          Q.     You did.
15          A.     Yes.
16          Q.     Okay.  And you are looking at the
17   second page of Exhibit 45?
18          A.     Yes.
19          Q.     And that's dated January 5th of
20   2017?
21          A.     Yes.
22          Q.     Tell me about how this memo came to
23   exist.
24          A.     From what I recall, trying to relate
25   to Perry and the chief what would have been --
```

GRIFFIN, ANGELA 7/1/2019

Page 210

1   what's been going on with Orleans and the

2   problems; because before this, we were just

3   telling them and -- you know, so I just tried to

4   put something into play what was going on and so

5   they will know, be able to have something in

6   writing to go by to look at on what was going on

7   with the Orleans cases.

8           Q.     Were you asked to generate this

9   memo?

10          A.     Not that I recall.

11          Q.     What did you use to put together

12  this memo?

13          A.     Just information that we had, the

14  e-mails, the calls, the different -- my manager

15  telling me and the employees that were involved

16  with it what was going on.

17          Q.     Okay.  After you sent this memo to

18  Mr. Smith and Mr. Stagg, what -- what happened as

19  a result of sending this memo?

20          A.     I'm not sure.  I really don't know.

21          Q.     Did you follow up with Mr. Stagg or

22  Mr. Smith after they would have received this

23  memo?

24          A.     I can't say for sure if we had

25  meetings after it or talked, you know, if we



GRIFFIN, ANGELA 7/1/2019

1    talked about it.  I don't remember.

2          Q.    Do you know if the department made

3    any changes after what Mr. Amacker referred to as

4    "the Riverbend fiasco"?

5          A.    The department made changes?

6          Q.    Yeah.  Did DPS&C and the pre-class

7    department or anyone else in the Department of

8    Corrections make any changes as a result of what

9    had happened with these DOC sentenced prisoners

10   from Orleans?

11         A.    I mean, no changes.  I mean, that we

12   still have to get the paperwork to work them, so

13   I mean, I don't think any changes happened.

14         Q.    Do you know if there were any other

15   reports or documents or analysis that was

16   produced as a result of looking into this -- this

17   situation that occurred with these Orleans

18   sentenced prisoners?

19         A.    Not -- Not that I'm aware of.  I

20   don't think so.

21         Q.    Were there any kind of, you know,

22   lessons learned, presentations or e-mails

23   communicated in the department that you remember?

24         A.    Not that I remember.

25         Q.    Do you know if Orleans Parish is

```
 1   still transferring DOC sentenced prisoners to
 2   East Carroll Parish?
 3          A.    I -- I don't know that.  I do know
 4   they are part of one of the parishes that
 5   transfer their offenders as they are sentenced to
 6   Raymond Laborde Correctional.
 7          Q.    And that's within the past year that
 8   that has been occurring --
 9          A.    Right.
10          Q.    -- since Raymond Laborde became a
11   pre-class?
12          A.    An intake facility.
13          Q.    An intake facility?
14          A.    Right.
15          Q.    Okay.  I want to play for you an
16   audio recording.  I'll play the recording for
17   you, and then just let me know if you are
18   familiar or if you recognize the recording.
19          A.    Okay.
20       (Recording playing on the record).
21   BY MS. WASHINGTON:
22          Q.    Are you familiar with that
23   recording?
24          A.    I'm not familiar with the exact
25   recording.  It could have been our recording at
```

1   the beginning, but I'm not familiar with the
2   exact recording.
3          MS. WASHINGTON:
4                 Okay.  And, for the record, this is
5                 the recording that was previously marked
6                 as Exhibit 26A.
7   BY MS. WASHINGTON:
8          Q.    Do you -- so you don't know what --
9   what number you would call to reach that
10  recording?
11         A.    No.
12         Q.    Okay.  I'm going to play for you a
13  second recording, which was previously marked as
14  Exhibit 26B.  Again, take a listen.  This one is
15  a little bit quieter, but hopefully you can hear
16  it.
17         (Recording playing on the record.)
18  BY MS. WASHINGTON:
19         Q.    Are you familiar with that
20  recording?
21         A.    Yes.
22         Q.    And what is that recording?
23         A.    That's the recording in the
24  pre-class department.
25         Q.    What number do you call to reach



GRIFFIN, ANGELA 7/1/2019

Page 214

1    that recording?

2         A.    I believe it's 342-0799.

3         Q.    Okay.  And is that one of the

4    numbers that was in that first recording you

5    listened to or do you remember?

6         A.    I don't remember.

7         Q.    And is that the -- like a main line

8    for the pre-class department?

9         A.    It's a contact line.  We have main

10   line -- we have a line -- other lines, but it's a

11   contact line to call on.

12        Q.    Do you know when that recording, the

13   second one that we just listened to, when that

14   was created?

15        A.    It was after pre-class came here --

16        Q.    Uh-huh (affirmatively).

17        A.    -- and after 2013.

18        Q.    Okay.  And -- and the number that

19   you just indicated you would call to get to that

20   recording, do you know if that number is

21   available to the public, that pre-class contact

22   line?

23        A.    I'm not sure.  I mean, I think it's

24   on our website, but I'm not positive.

25        Q.    Okay.  Do you know if there's a --

GRIFFIN, ANGELA 7/1/2019

1    an entry for the pre-class department on the

2    DPS&C website?

3         A.    Which entry?

4         Q.    If I'm a member of the public and I

5    go to the Department of Corrections website, is

6    there a page that I can get to that provides

7    contact information for the pre-class department?

8         A.    I'm not sure.

9         Q.    Okay.  So the recording that we just

10   listened to gave you some options; is that

11   correct?

12        A.    Correct.

13        Q.    And, to your knowledge, if you were

14   to call the number and get that recording and

15   select an option, where are you sent to; are you

16   sent to a voicemail?

17        A.    It depends on what option you

18   selected.

19        Q.    Uh-huh (affirmatively).

20        A.    That some go to voicemail and some

21   it goes to -- you have to put in a parish.  Like

22   if it's the sheriff's office, then it sends you

23   to the supervisor over that parish.

24        Q.    Okay.  Let's listen to it one more

25   time just so I can understand where the various



GRIFFIN, ANGELA 7/1/2019

Page 216

1      options take you.

2            (Recording playing on the record.)

3      BY MS. WASHINGTON:

4            Q.     Okay.  So option one of the

5      recording says "for family and friends of an

6      offender," correct?

7            A.     Right.

8            Q.     If you call this number and receive

9      this recording and press 1, what happens to your

10     call?

11           A.     It goes to another message that

12     tells them about the sentencing, the calculating

13     of time, and what -- I can't remember exactly

14     what it says.  And then it eventually leads them

15     to a message, I think to leave a message.

16           Q.     So it may eventually, after you

17     receive another recording, provide you with an

18     option to leave a message?

19           A.     Right.

20           Q.     And who picks up the messages that

21     are left?

22           A.     It goes to our clerical, to an

23     e-mail, then sends it out to the supervisors to

24     check on.

25           Q.     The messages are attached to an

GRIFFIN, ANGELA 7/1/2019

Page 217

```
 1     e-mail as a recording?
 2          A.    Yes.
 3          Q.    And the e-mail address that they are
 4     sent to is a clerical person within the pre-class
 5     department?
 6          A.    I'm not sure if it's a telephone,
 7     e-mail address, or her e-mail.  I think it's a
 8     different address in the pre-class department,
 9     yes.
10          Q.    And -- and who -- who manages that
11     e-mail or who's e-mail does it get sent to?
12          A.    Our clerical, Melissa Allen.
13          Q.    How long has Melissa Allen been in
14     that role?
15          A.    Since the beginning of -- since the
16     automated line was developed.
17          Q.    And when was it developed?
18          A.    Oh, you mean in her -- well, she
19     came with pre-class when pre-class came here.
20          Q.    Okay.  So she came over --
21          A.    And this was developed right after.
22          Q.    Okay.  So she has been within the
23     pre-class department here at headquarters since
24     2013?
25          A.    Thirteen, correct.
```



866.870.7233   P.O. Box 1554  Hammond LA  70404   Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

1      Q.     Okay.  Would she have been receiving
2  all of the messages from this phone number to her
3  e-mail since 2013?
4      A.     I'm not sure how it -- in 2013, if
5  it went to an e-mail, but I do now know it goes
6  to an e-mail.  I don't remember what happened in
7  -- when they first set it up how it worked.
8      Q.     Do you know if in 2016, 2017
9  messages left on this line would be provided by
10 e-mail?
11     A.     I'm not sure exactly when it
12 changed.
13     Q.     After Ms. Allen receives the
14 recordings by e-mail, what does she do with the
15 recordings?
16     A.     She forwards them to -- she listens
17 to them to see what parish -- if she can tell
18 what parish or she'll look them up; if they leave
19 a DOC inquiry by name, look and see if we have
20 them in pre-class.  If there's something on them
21 and if it needed further investigating, she will
22 send it to the supervisors to check, so --
23     Q.     And these other five supervisors
24 within the pre-class department?
25     A.     Correct.



GRIFFIN, ANGELA 7/1/2019

Page 219

1    Q.    And what is your expectation of what
2    the supervisors do when they receive an e-mail
3    from Ms. Allen regarding a call that she received
4    on this line?
5    A.    To check into if they are looking
6    for someone that's sentenced, and we do not have
7    paperwork to check into it; see where their
8    paperwork is, if we can figure out where they are
9    sentenced at to call.
10   Q.    Are those supervisors instructed to
11   inform the managers or inform you when they
12   receive e-mails about these calls?
13   A.    No.
14   Q.    No.
15   A.    Unless there's issues that continues
16   after the fact.
17   Q.    Do you know if the two managers who
18   work under you follow up in any way on calls that
19   the supervisors may have received by way of this
20   line?
21   A.    I'm not sure.
22   Q.    Do you follow up with the managers
23   or with the supervisors about calls that are
24   received on this line?
25   A.    I do not follow up on each call,



GRIFFIN, ANGELA 7/1/2019

1   just that I do randomly ask are you-all keeping
2   up with the calls that come in or if you sent an
3   e-mail to check on them.
4          Q.     So that's just a random question you
5   might ask every so often?
6          A.     Bring it up just to keep them --
7   right.
8          Q.     Okay.  Are the calls logged in any
9   kind of way by Ms. Allen or anyone else?
10          A.     Not that I know of, but I'm not
11   positive.
12          Q.     Do you know if the calls that are
13   received by Ms. Allen by e-mail are saved
14   somewhere?
15          A.     I'm not sure.
16          Q.     How did you first learn about this
17   particular lawsuit being filed?
18          A.     I'm not really sure, but I know I
19   had received some paperwork on the lawsuits.
20          Q.     Okay.  Do you know approximately
21   when that would have been?
22          A.     I don't.  It seems like it's been a
23   while, but I'm not positive.
24          Q.     And, prior to the lawsuit being
25   filed and you receiving the paperwork, whenever

```
1   that was, did you remember anything about these
2   particular plaintiffs and their overdue release
3   dates?
4          A.     Not the individual names.  I mean, I
5   just -- I do remember the problems with Orleans,
6   but not individual offenders, no.
7          Q.     And I'm not asking for any
8   privileged communications with your counsel, but
9   have you spoken with anyone or has anyone spoken
10  to you about this lawsuit since it's been filed?
11         A.     Just Gary and legal, one of the
12  legal, our legal here.
13         Q.     Okay.  Outside of the AG's office or
14  the legal department --
15         A.     Uh-uh (negatively).
16         Q.     -- have you spoken with anyone else?
17         A.     No.
18         Q.     Okay.  What steps did you take to
19  prepare for your deposition today?
20         A.     I did read over the paperwork that
21  was looked over, the cases, kind of looked over
22  them to see if they were overdue and things like
23  that.
24         Q.     And that would be the case files --
25         A.     Correct.
```



```
 1          Q.     -- that we were provided by the
 2     Department of Corrections?
 3          A.     Correct.
 4          Q.     And you were about to say something
 5     else.
 6          A.     Just -- and then just some of the
 7     e-mails.
 8          Q.     Okay.  And is it your understanding
 9     that the documents that you reviewed were things
10     that the department has provided as discovery in
11     this litigation?
12          A.     Yes.
13          Q.     Okay.
14          MS. WASHINGTON:
15               I don't have any further questions
16          for you.  Your counsel might, or if we
17          still have anybody sitting on the phone
18          for the other defendants.
19          MR. EVANS:
20               Shane, have anything?  Twice.  Pete,
21          have anything?
22     EXAMINATION BY MR. EVANS:
23          Q.     All right.  I actually do have just
24     a few follow-up questions, not too many.
25               Ms. Griffin, you talked earlier
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

Page 223

1  about kind of the -- the process when you -- when
2  you would learn generally that whether it be by
3  family member or an ARP or whatever the case may
4  be, that someone may or may not be overdue, there
5  might be a question of it.  You indicated that
6  the first thing your department does is reach out
7  via telephone --
8      A.    Correct.
9      Q.    -- to the -- to the parish, correct?
10     A.    Correct.
11     Q.    Now, tell me what mechanisms the DOC
12  has to -- to make a sheriff provide paperwork.
13     A.    We can't make them provide it.  We
14  just continually call them and try to get it from
15  them, but making them, we can't make them.
16     Q.    Now, do -- do you supervise anybody
17  with any sheriff's office in the State of
18  Louisiana?
19     A.    No.
20     Q.    Do you have the authority to
21  discipline anybody -- any employee of a sheriff
22  of the State of Louisiana?
23     A.    No.
24     Q.    Do you -- do you perform performance
25  reviews of any kind of employees of sheriffs in



GRIFFIN, ANGELA 7/1/2019

Page 224

1    the State of Louisiana?

2         A.    No.

3         Q.    Similar question regarding parish

4    jails, to the extent that they may be separate

5    and apart from the sheriff's office.  Do you

6    supervise any employee of a parish detention

7    center -- detention center or jail?

8         A.    No.

9         Q.    Do you -- do you have the authority

10   to discipline any employee of a parish detention

11   center or jail?

12        A.    No.

13        Q.    Okay.  And then, finally, same --

14   same set of questions for the clerk of court's

15   office.

16             Do you supervise anybody with any

17   clerk of court in the State of Louisiana?

18        A.    No.

19        Q.    Do you have the authority to

20   discipline any -- any employee of a clerk of

21   court in the State of Louisiana?

22        A.    No.

23        Q.    Tell me a little bit about -- to the

24   extent that we can -- just generally what is the

25   formula that exists for computing an offender's

GRIFFIN, ANGELA 7/1/2019

Page 225

```
 1   time?
 2         A.     First, once -- once we find out he
 3   has a hard labor sentence, we have to find out
 4   what -- what kind of sentence -- what his
 5   sentence -- his crime is, depending on if he's a
 6   crime of violence, a sex offense or if he's -- if
 7   he is a crime of violence, does he have a prior.
 8   All of these effect how much time he will serve
 9   in custody and whether he's pro-eligible or not.
10   We have to know -- look up and see what -- if
11   he's pro-eligible, and a lot of times it depends
12   on his -- the date of commit or probation
13   revoked, which one of the crimes -- acts he falls
14   under for good time.
15         Q.     So -- so when somebody is sentenced
16   just for this -- we will just say for a year,
17   right, so that's -- that's kind of a starting
18   point, right, this is their sentence --
19         A.     Right.
20         Q.     -- is that right?
21         A.     Correct.
22         Q.     Now, so -- so what other factors,
23   though, play into whether any particular person
24   or offender will actually serve a year?
25         A.     His -- whether we get the paperwork,
```



GRIFFIN, ANGELA 7/1/2019

Page 226

```
 1    but if -- his crime will depend on if he's going
 2    to serve the year or less.  It's basically what
 3    act he falls under.
 4         Q.    What do you mean by "act"?
 5         A.    The good time act that he would --
 6    if he receives good time, if he doesn't; and that
 7    depends on when he committed the crime, which is
 8    on the bill of information, and we would look up
 9    how much good time he would earn.
10         Q.    Is an offender eligible to earn good
11    time on pretrial custody?
12         A.    Just for clarification, jail credit,
13    anytime he spent in jail prior to sentencing.
14         Q.    Well -- well, we will start with
15    that.
16         A.    Okay.
17         Q.    So -- so generally, is an offender
18    entitled to -- to a reduction of his -- of his
19    normal sentence based off of time previously
20    served?
21         A.    Yes.
22         Q.    Okay.  But that's a different
23    question than good time, correct?
24         A.    Correct.
25         Q.    Okay.  So is an offender -- might an
```


Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond, LA 70404   Fax 985.419.0799

```
 1    offender be entitled to earn good time based on
 2    his -- his time served prior to sentence?
 3         A.    He would earn more credits off his
 4    time once we receive a jail credit letter letting
 5    us know how long he served prior to his sentence
 6    date.  He would get time off of his -- his
 7    sentence.
 8         Q.    Okay.  So all -- all the information
 9    that we have just talked about, when your
10    department computes an offender's time, where
11    does that information come from?
12         A.    From the parish of conviction, the
13    parish jail.
14         Q.    Now, earlier you were asked a few
15    questions about or you -- you looked at some of
16    the e-mails following up on a call from family
17    members, correct?
18         A.    Correct.
19         Q.    And, in those calls, it appeared
20    that the family member indicated some facts that
21    may have indicated that particular offender was
22    overdue.  Do you -- do you recall that?
23         A.    Yes.
24         Q.    Now, can you -- can you compute an
25    offender's time based off of information provided
```

1    by a family member?

2         A.     No.

3         Q.     Why not?

4         A.     Because we need his official

5    sentence, what he was truly sentenced to, and the

6    paperwork from the jail telling us how much time

7    he served and what his sentence was to be able to

8    calculate his release dates.

9         Q.     So -- so at the end of the day, your

10   department cannot compute an offender's time

11   until they receive the proper paperwork?

12        A.     Correct.

13   MR. EVANS:

14        I think that's all I have.

15   MS. WASHINGTON:

16        I have no further questions for you

17        either.   Thank you very much.

18   (The deposition was concluded at 5:27 p.m.)

19

20

21

22

23

24

25

GRIFFIN, ANGELA 7/1/2019

Page 229

```
 1                    CORRECTION SHEET
 2
 3   PAGE       LINE DESCRIPTION
 4   ____       ____ _____
 5   ____       ____ _____
 6   ____       ____ _____
 7   ____       ____ _____
 8   ____       ____ _____
 9   ____       ____ _____
10   ____       ____ _____
11   ____       ____ _____
12   ____       ____ _____
13   ____       ____ _____
14   ____       ____ _____
15   ____       ____ _____
16   ____       ____ _____
17   ____       ____ _____
18   ____       ____ _____
19
20   WITNESS:   ANGELA GRIFFIN
21   TAKEN ON:  JULY 1, 2019
22   BY:        CHERIE' E. WHITE, CCR (LA NO. 96002)
23              CSR (TX NO 10720)
24              CSR (MS NO. 1514)
25              RPR (NATIONAL NO. 839452)
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond, LA 70404    Fax 985.419.0799

```
1                     WITNESS CERTIFICATE
2
3
4        I, ANGELA GRIFFIN, do hereby certify that
5   the foregoing testimony was given by me, and the
6   transcription of said testimony, with corrections
7   and/or changes, if any, is true and correct as
8   given by me on the aforementioned date.
9
10
11
12   _____    _____
13   DATE SIGNED              (Witness' Signature)
14
15
16
17        Signed with corrections as noted.
18
19        Signed with no corrections as noted.
20
21
22
23
24   DATE TAKEN: July 1, 2019
25
```



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

GRIFFIN, ANGELA 7/1/2019

Page 231

```
 1              REPORTER'S PAGE
 2       I, CHERIE' E. WHITE, Certified Court
 3  Reporter, in and for the State of Louisiana, the
 4  officer, as defined in Rule 28 of the Federal
 5  Rules of Civil Procedure and/or Article 1434(B)
 6  of the Louisiana Code of Civil Procedure, before
 7  whom this sworn testimony was taken, do hereby
 8  state on the record;
 9       That due to the interaction in the
10  spontaneous discourse of this proceeding, dashes
11  (--) have been used to indicate pauses, changes
12  in thought, and/or talkovers; that same is the
13  proper method for the court reporter's
14  transcription of a proceeding, and that dashes
15  (--) do not indicate that words or phrases have
16  been left out of this transcript; also, that any
17  words and/or names which could not be verified
18  through reference material have been denoted with
19  the phrase "(spelled phonetically)."
20
21
22              CHERIE' E. WHITE, CCR(LA NO. 96002)
23              CSR (TX NO 10720)
24              CSR (MS NO. 1514)
25              RPR (NATIONAL NO. 839452)
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond, LA 70404   Fax 985.419.0799

1                    REPORTER'S CERTIFICATE

2

3          This certification is valid only for a

4   transcript accompanied by my original signature

5   and original seal on this page.

6          I, CHERIE' E. WHITE, Certified Court

7   Reporter, in and for the State of Louisiana, do

8   hereby certify that Angela Griffin, to whom the

9   oath was administered, after having been duly

10  sworn by me upon authority of R.S. 37:2554, did

11  testify as hereinbefore set forth in the

12  foregoing 232 pages; that this testimony was

13  reported by me in the stenotype reporting method,

14  was prepared and transcribed by me or under my

15  personal direction and supervision, and is a true

16  and correct transcript to the best of my ability

17  and understanding; that I am not related to

18  counsel or the parties herein, nor am I otherwise

19  interested in the outcome of this matter.

20

21          *Cherie' E. White*

22          CHERIE' E. WHITE, CCR (LA NO. 96002)

23          CSR (TX NO. 10720)

24          CSR (MS NO. 1514)

25          RPR (NATIONAL NO. 839452)