Transcript of the Testimony of

# SHERIFF MARLIN N. GUSMAN

September 4, 2019

JESSIE CRITTINDON, ET AL. C/W EDDIE COPELIN, ET AL v.
MARLIN GUSMAN, ET AL.



C O U R T   R E P O R T I N G   &   L I T I G A T I O N   S U P P O R T

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

Exhibit 11

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


JESSIE CRITTINDON, et al.,     CASE NO.

       Plaintiffs,          3:17-cv-00512-SDD-EWD

VERSUS

MARLIN GUSMAN, et al.,

     Defendants.


C/W


EDDIE COPELIN, et al.,         CASE NO.

     Plaintiffs,          3:17-cv-00602-SDD-EWD

VERSUS

MARLIN GUSMAN, et al.,

     Defendants.

* * * * * * * * * * * * * * * * * * * * *



      Deposition of SHERIFF MARLIN N. GUSMAN,
taken on Wednesday, September 4, 2019, at 11:25
a.m., in the offices of Orleans Parish Sheriff's
Office, 2800 Perdido Street, New Orleans,
Louisiana 70119.

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Case 2:19-cv-01384-NJB-JVM  Document 153-14  Filed 11/14/23  Page 3 of 85
Case 2:19-cv-01384-MLCF-JVM  (NISMAN, SHERIFF PATARLINO)  Filed 4/4/2023  Page 3 of 85

Page 2

```
 1                    I N D E X

 2                                        PAGE

 3    Caption                              1

 4    Appearances                         3-4

 5    Agreement of Counsel                 5

 6    Examination

 7         JAMES W. CRAIG                   6

 8

 9

10    Witness' Certificate                81

11    Reporter's Page                     82

12    Reporter's Certificate            83-84

13              *   *   *   *

14

15    EXHIBITS:

16    Exhibit 75        Inmate Management
                        Applications        33
17

18    Exhibit 76  Record Book             36

19

20

21

22

23

24

25
```


Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    APPEARANCES:
 2         Representing Jessie Crittindon and
           Eddie Copelin, et al.:
 3
           RODERICK & SOLANGE
 4         MACARTHUR JUSTICE CENTER
           4400 South Carrollton Avenue
 5         New Orleans, Louisiana 70119
 6         BY:  JAMES W. CRAIG
                EMILY WASHINGTON
 7
 8
 9
10         Representing Sheriff Marlin N. Gusman:
11         CHEHARDY, SHERMAN, WILLIAMS
           One Galleria Boulevard
12         Suite 1100
           Metairie, Louisiana 70001
13
           BY:  JAMES M. WILLIAMS
14
15
16
           Representing DPS&C, James LeBlanc, Angela
17         Griffin and Perry Stagg:
18         LOUISIANA DEPARTMENT OF JUSTICE
           1885 North Third Street
19         Floor 4
           Baton Rouge, Louisiana 70802
20
           BY:  JAMES GARY EVANS (via telephone)
21
22
23
24
25
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    APPEARANCES CONTINUED:
 2
 3          Representing East Carroll Parish
            Sheriff Wydette Williams, Edward Knight and
 4          Johnny Hedgemon:
 5          USRY, WEEKS & MATTHEWS
            1615 Poydras Street
 6          Suite 1250
            New Orleans, Louisiana 70112
 7
            BY:  SHANE BRYANT (via telephone)
 8
 9
10
11
12
13    REPORTED BY:    Dana Schoultz
                      Certified Court Reporter
14                    #87111
                      State of Louisiana
15
16
17
18
19
20
21
22
23
24
25
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1                S T I P U L A T I O N

 2

 3            It is stipulated and agreed by and

 4   between counsel that the deposition of SHERIFF

 5   MARLIN N. GUSMAN is hereby being taken pursuant to

 6   Notice under the Federal Rules of Civil Procedure

 7   in accordance with the Rules.

 8

 9            The formalities of sealing and

10   certification are hereby waived.  The witness

11   reserves the right to read and sign the

12   deposition.  The party responsible for service of

13   the discovery material shall retain the original.

14

15            All objections are to be made in

16   accordance with the Federal Rules of Procedure.

17

18            Dana Schoultz, Certified Court Reporter

19   in and for the State of Louisiana, officiated in

20   administering the oath to the witness.

21

22

23

24

25
```



```
 1              SHERIFF MARLIN N. GUSMAN,
 2       2800 Perdido Street, New Orleans, Louisiana
 3       70119, after having been duly sworn, was
 4       examined and testified on his oath as
 5       follows:
 6       MR. CRAIG:
 7            We'll get started.  This is the
 8   deposition of Sheriff Marlin Gusman sued in both
 9   his individual and official capacity pursuant to
10   the Federal Rules of Civil Procedure.  Reading and
11   signing is specifically not waived by the
12   plaintiffs.  Sealing, certification and filing is
13   waived.
14   EXAMINATION BY MR. CRAIG:
15       Q.   Please introduce yourself for the
16   record, sir.
17       MR. WILLIAMS:
18            But we also don't waive reading and
19   signing.
20       MR. CRAIG:
21            Very good.
22       THE WITNESS:
23            Marlin Gusman.
24   BY MR. CRAIG:
25       Q.   Have you been deposed before, Sheriff?
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Case 2:19-cv-01384-NJB-JVM   Document 153-14   Filed 11/14/23   Page 8 of 85
Case 2:19-cv-01384-MLCF-JVM   (JISMAN, SHERIFF JAIRLING 4/26/21   Page 8 of 85

Page 7

```
 1        A.   I have.

 2        Q.   About how many times?

 3        A.   I don't recall.  Three, four.

 4        Q.   Okay.  So you've probably heard this

 5   first set of questions before, but they're meant

 6   to kind of put us on the same page about the

 7   process of a deposition.  As you know, we have a

 8   court reporter here, and so physical signs of

 9   answering questions or kind of "uh-huh" kind of

10   answers to questions don't really translate into

11   the transcript.  So we need to ask you to answer

12   questions "yes" or "no" or audibly so that she can

13   take it down.

14            And if I, after an answer of yours,

15   remind you of that rule, I'm not trying to be

16   cheeky or rude.  I'm just trying to make sure that

17   we get your accurate response to my questions.  Is

18   that okay?

19        A.   Uh-huh (affirmative response).

20        Q.   Excellent.  That would be "yes."  We're

21   going to take a second while the sheriff gets a

22   better chair.

23        A.   Elevate my leg, yes.

24        Q.   Very good.  Thank you.  And, as you

25   know, you've just taken an oath for the
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Case 2:19-cv-01384-MLCF-JVM   (NISMAN, SHERIFF DANIEL EDWIN 3/4/2021)   Page 9 of 85

```
 1    deposition.  It's the same oath that you would
 2    take in federal court in this trial or any other
 3    trial.  And you understand that?
 4         A.   Yes.
 5         Q.   We'll be looking for full and complete
 6    answers to my questions today, so if there's any
 7    part of my questions that you don't understand,
 8    will you let me know and tell me as best you can
 9    what part of the question you're not getting?
10         A.   Yes.
11         Q.   You're allowed to take breaks, but what
12    we ask is that if a question is pending, that you
13    answer the question and then we'll take a break.
14    That's pretty much the practice.  Does that make
15    sense to you?
16         MR. WILLIAMS:
17              Objection.  Well, I'll withdraw that.
18    You can answer, Sheriff.  If you have to take a
19    break, we'll take a break.
20         THE WITNESS:
21              Right.  If I have to take a break, I'll
22    take a break.
23    BY MR. CRAIG:
24         Q.   Okay.  Are you taking any medication or
25    have any hardships, like sleep deprivation or
```



866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Case 2:19-cv-01384-MLCF-JVM GUSMAN, SHERIFF MARLIN N. 54/10/3

```
 1    anything else that would prevent you from giving
 2    accurate testimony today?
 3         A.   I'm not a doctor.  I don't know the
 4    answer to that.
 5         Q.   But you know whether or not --
 6         A.   I am taking some medications.
 7         Q.   Okay.  Do they affect your ability to
 8    think clearly?
 9         A.   I don't think so, but I'm not a doctor.
10         Q.   Okay.  Have you spoken to the members of
11    your staff -- actually, in your case it would only
12    be one -- well, no.  There's been several members
13    of your staff who have been deposed in this case
14    previously.
15         A.   No, I haven't.
16         Q.   Before today, what did you do to prepare
17    for this deposition?
18         A.   I looked over the responses to the
19    interrogatories, request for admissions, and I
20    glanced briefly at the deposition of Sheriff
21    Williams.
22         Q.   Anything else you can remember?
23         A.   No.
24         Q.   Did you meet with counsel?  I'm not
25    asking you what was discussed but just whether
```

```
 1    there was a meeting.
 2         MR. WILLIAMS:
 3              Objection.  I'm going to instruct the
 4    client not to answer that.  I think it's
 5    privileged information.
 6         MR. CRAIG:
 7              Your position is that whether a meeting
 8    with counsel happened is privileged information?
 9         MR. WILLIAMS:
10              Yes.
11         MR. CRAIG:
12              Okay.  We disagree with that.
13    BY MR. CRAIG:
14         Q.   Did you do any preparing for the
15    deposition this morning?
16         A.   No.
17         Q.   Okay.  And as I mentioned when we
18    started, you're being sued in both your individual
19    and official capacity.  So do you understand that
20    the questions I'll be asking you will be directed
21    to you both individually and as sheriff of the
22    OPSO?
23         MR. WILLIAMS:
24              I'm going to object to the form of the
25    question.  That depends on the question.  We can't
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1   make a blanket statement that every answer he
 2   gives right now is in his personal capacity and in
 3   his capacity as sheriff.  So that's -- I think
 4   that's something we'll have to determine depending
 5   on the question.  We can't make a blanket
 6   statement that every question is for both.
 7   They're pretty distinct.
 8        MR. CRAIG:
 9             So, Counsel, Federal Rule of Civil
10   Procedure 30(c)(2) instructs that objections must
11   be made concisely and without argumentation or
12   suggestion.  So I would ask if you're objecting to
13   the form of my questions, that you object to the
14   form and give a brief statement of the grounds for
15   the objection and cease from making long
16   statements about your position on the objections.
17        MR. WILLIAMS:
18             Well, I mean, maybe -- and I don't
19   necessarily agree with your interpretation.  Maybe
20   if we were into the substance of his testimony,
21   you might have a point.  But to turn to the
22   Sheriff and say, "Do you realize the questions I'm
23   asking you go for both," there can't possibly be
24   coaching in there.  That is to correct the record
25   so that you don't use his statement to an unfair
```

```
 1    question to mean that he answers something in his
 2    official capacity that you then try to deem his
 3    personal capacity, when that wouldn't be a proper
 4    blanket statement for the entire deposition.
 5              So before you get into the substantive
 6    questioning, if you're trying to, frankly, I
 7    think, inappropriately, but it's your right to do,
 8    tell the witness I'm going to do this and I'm
 9    going to do that, I don't think that's right.  But
10    we're at the preliminary stage where there is no
11    coaching here.  I'm just saying that's not proper
12    for you to do.
13        MR. CRAIG:
14              The rule specifically says that an
15    objection must be stated concisely, in a
16    nonargumentative and nonsuggestive manner, and I'm
17    going to ask you to comply with the rule in future
18    objections so that we can get through this
19    deposition.
20        MR. WILLIAMS:
21              Sure.  There is nothing to suggest to
22    him because we're not at the substance of his
23    testimony.  So I think your reliance on that rule
24    at this stage, especially with those questions you
25    are posing, is misplaced.
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Case 2:19-cv-01384-MLCF-JVM   Document 153-14   Filed 11/14/22   Page 14 of 85
Case 2:19-cv-01384-MLCF-JVM   Document 153-14   Filed 11/14/22   Page 14 of 85
GUSMAN, SHERIFF MARLIN N. 5/10/19

```
1    BY MR. CRAIG:
2         Q.   You were first elected sheriff in 2004,
3    correct?
4         A.   That's correct.
5         Q.   And you took office when?
6         A.   November of 2004.
7         Q.   Okay.  And you took the oath of office
8    required by Article X, Section 30 of the
9    Constitution, the state Constitution?
10        A.   I'm sure I did.
11        Q.   Which was to support the Constitution
12   and laws of the United States and the Constitution
13   and laws of the State of Louisiana?
14        A.   Yes.
15        Q.   And you've taken that oath again each
16   time that you've entered a new term of office,
17   correct?
18        A.   Yes, sir.
19        Q.   What are your responsibilities as
20   sheriff of Orleans Parish?
21        MR. WILLIAMS:
22             I object to the form.  That's so broad.
23   That's such a broad question.  Subject to the
24   form.
25        THE WITNESS:
```



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond LA 70404     Fax 985.419.0799

 1              I'm responsible for the care, custody
 2    and control of incarcerated subjects in Orleans
 3    Parish, safety and security in the court and
 4    execution of writs and mandates by the court.
 5    BY MR. CRAIG:
 6        Q.    And that includes the Revised Statute
 7    15:704 statement that as sheriff you're a keeper
 8    of the public jail of the parish, correct?
 9        A.    Yes, sir.
10        Q.    Do you agree that no individual can be
11    held in jail in the absence of legal authority to
12    keep him there?
13        A.    Generally, I agree.
14        Q.    And do you agree that an incarcerated
15    person has a right not to be imprisoned beyond the
16    term of their sentence?
17        A.    Yes, sir.
18        Q.    And, as sheriff, you're responsible for
19    ensuring that you only detain those persons you
20    have legal authority to hold; is that correct?
21        A.    I'm not sure I understand your question.
22        Q.    Is there a particular part that you're
23    working under?  Working with?
24        A.    Working under?
25        Q.    Yeah.  Bad phrasing.  Is there a


866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

```
 1   particular part of the question that's confusing?
 2        A.   Well, I know what this case is about.
 3   So legal authority -- I think you're trying to get
 4   me to say that, you know, I'm responsible for what
 5   other people have to do and, in this case, the
 6   Department of Corrections.  So that gives me
 7   hesitancy.
 8        Q.   Okay.
 9        A.   If you ask me a question like am I
10   responsible for bringing people to court --
11        Q.   Are you responsible for bringing people
12   to court?
13        A.   I am.
14        Q.   And you're responsible to hold prisoners
15   pretrial if ordered to do so by a district judge?
16        A.   That is correct.
17        Q.   And you're responsible to release
18   persons in your custody if the judge orders you to
19   do so?
20        A.   Absolutely, yes.
21        Q.   And you're responsible to release
22   persons in your custody who have served their
23   sentence of imprisonment?
24        A.   Not my responsibility.  It's the
25   responsibility of the Department of Corrections if
```

```
 1    they're sentenced to a state time.  If they're
 2    sentenced to municipal time, then that would be
 3    the -- or -- then that would be the responsibility
 4    of the sheriff.
 5         Q.   Okay.  Let's break that out to make it
 6    more clear.  With respect to prisoners serving
 7    municipal time, do you agree that as sheriff
 8    you're responsible for releasing municipal
 9    prisoners after they have served their term of
10    imprisonment?
11         A.   I would, yes.
12         Q.   Okay.  But you do not agree that you, as
13    sheriff of Orleans Parish, are responsible to
14    release persons held physically by you who have
15    served their DOC-sentenced time of imprisonment?
16         MR. WILLIAMS:
17              Object to the form of the question.
18    What do you mean "held physically"?
19         MR. CRAIG:
20              I'll restate it.
21    BY MR. CRAIG:
22         Q.   If a person does the -- as sheriff of
23    Orleans Parish, you have physically in your
24    custody persons who are DOC-sentenced prisoners,
25    correct?
```



Case 2:19-cv-01384-NJB-JVM Document 153-14 Filed 11/14/22 Page 18 of 85
Case 2:19-cv-01384-NJB-JVM GUSMAN, SHERIFF MARLIN N. 3/10/22 Page 18 of 85

Page 17

```
 1        MR. WILLIAMS:
 2             Tell me what you mean by -- what do you
 3   mean "physically in your custody"?  What do you
 4   mean by that statement?  Object to the form of the
 5   question.
 6        MR. CRAIG:
 7             Are you instructing him not to answer?
 8        MR. WILLIAMS:
 9             Well, no.  I'm instructing you to define
10   "physically," because it's an unfair question.  We
11   don't know what you mean by "physically."
12   BY MR. CRAIG:
13        Q.   Do you understand my question, Sheriff?
14        A.   If he doesn't understand it, I don't
15   understand it.  I'm worried.
16        Q.   Okay.
17        MR. WILLIAMS:
18             So maybe you can either define it or use
19   a different word or just tell us what you mean.  I
20   don't want to obstruct your question.
21   BY MR. CRAIG:
22        Q.   So if a prisoner is physically at the
23   Orleans Justice Center serving a sentence of
24   imprisonment that's a DOC sentence of
25   imprisonment, do you agree that you have the
```



```
 1   responsibility to release that prisoner after the
 2   prisoner has served their term of imprisonment?
 3        MR. WILLIAMS:
 4             Object to the form of the question to
 5   the extent that the DOC inmate would be serving
 6   time here.  I think that's part of the problem
 7   with the foundation of your question.
 8   BY MR. CRAIG:
 9        Q.   Does OJC have in its physical custody
10   persons who are serving DOC time?
11        A.   Yes.
12        Q.   So do you, as sheriff of Orleans Parish,
13   have responsibility to release such a person when
14   their term of imprisonment is over?
15        A.   When we get the release from the
16   Department of Corrections.
17        Q.   Okay.  So your testimony would be that
18   in the absence of the release from the Department
19   of Corrections, the sheriff of Orleans Parish does
20   not have responsibility to release a prisoner who
21   has served in your physical custody, as we've
22   already discussed, who has completed their term of
23   imprisonment?
24        MR. WILLIAMS:
25             Objection; asked and answered.  He just
```



Case 2:19-cv-01384-NJB-JVM Document 153-14 Filed 11/14/23 Page 20 of 85
Case 2:19-cv-01384-MLCF-JVM GUSMAN, SHERIFF MARLIN N. 54/107/3 Page 20 of 85

Page 19

```
 1    answered that for you.
 2         THE WITNESS:
 3              Yes.
 4    BY MR. CRAIG:
 5         Q.   Okay.  In this case, Sheriff, all five
 6    of our clients were arrested and charged in
 7    Orleans Parish and were, before trial, sent to the
 8    East Carroll Parish Sheriff's Office to be held
 9    while waiting for trial.  When did Orleans Parish
10    begin sending pretrial detainees to parish jails
11    outside of Orleans?
12         A.   I think it's been a practice for various
13    reasons ever since I became sheriff.
14         Q.   In 2004.
15         A.   Yes, sir.
16         Q.   And was -- how long -- I'm sorry.  When
17    did OPSO begin sending pretrial detainees
18    specifically to East Carroll Parish?
19         A.   I think sometime in 2015 as we were
20    moving into this building.
21         Q.   How did your office request East Carroll
22    to take the pretrial detainees?
23         A.   As I recall, I had conversations and
24    discussions with the Louisiana Sheriffs'
25    Association about suitable facilities that could
```

1  accommodate these pretrial inmates, and, based

2  upon those discussions, East Carroll Parish was

3  one of the places that was recommended.  And I

4  contacted the sheriff, and we started the process

5  of moving some there.

6      Q.   When you spoke with -- and this would be

7  Sheriff Williams, correct?

8      A.   Yes, sir.

9      Q.   When you spoke with Sheriff Williams,

10  did you talk at all about the logistics of how

11  East Carroll Parish would hold those pretrial

12  detainees?

13      A.   Well, I talked in very general terms

14  with the sheriff.  We talked about trying to come

15  up with a rate that would include the

16  transportation of the inmates that had to come

17  here for court appearances so that that would be

18  included in the cost and we wouldn't have to go up

19  there and go back and forth.  And then I basically

20  turned it over to my staff to do the logistics.

21      Q.   Do you remember who on your staff you

22  delegated that to?

23      A.   I know that the chief deputy at the

24  time, Jerry Ursin, was very much involved with it

25  and helped coordinate a lot of it, but there were

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1    other people involved as well.
2        Q.    Did Mr. Ursin report to you about the
3    logistics that would be employed in sending
4    pretrial detainees to East Carroll Parish?
5        A.    Oh, we had several discussions about it,
6    sure.
7        Q.    Was anything in writing about that?  Any
8    of your discussions?
9        A.    You know, I thought there was, but if
10   there wasn't, I know that we had -- we had an
11   agreement that, you know, we worked on.  I want to
12   say it was something like $30 a day to include
13   transportation, but I didn't get into that part of
14   it.
15       Q.    That would have been other people under
16   your --
17       A.    Yes.
18       Q.    -- command.  Ultimately, the rate to be
19   agreed upon between East Carroll Parish and
20   Orleans Parish was something that you would have
21   to agree to personally as sheriff; is that
22   correct?
23       A.    That's correct.
24       Q.    And Orleans Parish Sheriff's Office
25   received regular billings from East Carroll for

```
 1    housing Orleans pretrial detainees at Riverbend
 2    even before there was a written, signed agreement,
 3    correct?
 4         A.   To the best of my knowledge, yes.
 5         Q.   I'm going to hand you, Sheriff, and also
 6    hand your counsel what's already been marked as
 7    Exhibit 3.  Do you recognize this document?
 8         A.   Yes.
 9         Q.   What is it?
10         A.   It's titled "A Cooperative Endeavor
11    Agreement Between the East Carroll Parish
12    Sheriff's Office and the Orleans Parish Sheriff's
13    Office."
14         Q.   And are you one of the signatories to
15    this agreement?
16         A.   Yes, I am.
17         Q.   When is it dated?
18    MR. WILLIAMS:
19              I object to the form of the question.
20    It doesn't appear to be dated.
21    BY MR. CRAIG:
22         Q.   Do you see there where it says: "To be
23    effective as of November 1, 2016"?
24    MR. WILLIAMS:
25              So -- okay.  So you're withdrawing that
```

```
 1    question.
 2         MR. CRAIG:
 3              I am.
 4         MR. WILLIAMS:
 5              Got it.
 6    BY MR. CRAIG:
 7         Q.   Do you see there in the first paragraph,
 8    Sheriff, where it says --
 9         A.   I see that.
10         Q.   Oh, I'm sorry.  Yeah.  So was this --
11    looking at this agreement, is this the first
12    written agreement between your office and East
13    Carroll Parish Sheriff's Office about the housing
14    of pretrial detainees?
15         A.   I can't say for sure.
16         Q.   Okay.  When would be the -- when would
17    you have entered into a written agreement with
18    East Carroll Parish Sheriff's Office before
19    November 1, 2016?
20         A.   If I had, it would have been when we
21    started bringing inmates there.
22         Q.   Okay.  And that would have been -- that
23    would be a document in the possession of your
24    office, right, if there was one?
25         A.   If there was one.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1        Q.   Okay.
 2        A.   I would think we had one.
 3        Q.   Yeah.  I would just represent to you
 4   that we had been produced two, and there's this
 5   one and the one I'm fixing to show you next.  This
 6   agreement that's Exhibit 3 relates only to
 7   pretrial detainees held at Riverbend from Orleans,
 8   correct?
 9        MR. WILLIAMS:
10             Where does it say that?  Where does it
11   say that?
12        MR. CRAIG:
13             I'm asking the sheriff if he agrees with
14   that statement.
15        THE WITNESS:
16             I'd have to read this whole thing.
17        MR. WILLIAMS:
18             Yeah.  I mean, we'd have to -- it's ten
19   pages.  You want to just take the time now to read
20   it?
21        MR. CRAIG:
22             If that's what he needs to do.
23        MR. WILLIAMS:
24             Okay.  Why don't we do this:  Let's take
25   a little break.  He can walk outside and read it,
```

```
 1   and then we'll come back in.
 2        MR. CRAIG:
 3             No, sir.  I have a question on the
 4   table.  I don't agree to take a break until after
 5   the sheriff has answered my question.
 6        MR. WILLIAMS:
 7             About what -- just the question is --
 8   just so I'm clear, the question is:  Does this
 9   agreement only apply to pretrial?
10        MR. CRAIG:
11             Yes, sir.
12        MR. WILLIAMS:
13             Okay.  The fifth "whereas" says
14   "incarcerated subjects."  It doesn't say anything
15   about pretrial versus post trial.  Is that what
16   you're referring to?
17        MR. CRAIG:
18             I'm talking about the entire agreement.
19   I think -- I mean, it's an agreement the sheriff
20   is a signatory to.  I think it's a fair question.
21        MR. WILLIAMS:
22             It's just not the most clear question.
23   That's why I was trying to get a little direction
24   from you.
25        THE WITNESS:
```



```
 1              My impression of the agreement is that
 2     it includes pretrial inmates, but it could include
 3     anyone who was in our custody at the time.  So we
 4     have people that come here on writs that are DOC
 5     inmates, so it could have been one of them.  I
 6     can't rule them out.
 7     BY MR. CRAIG:
 8          Q.   Okay.  I want you to look at page 3 of
 9     this document.  Section 3 talks about services to
10     be performed by OPSO.  Do you see that?
11          A.   I do see that.
12          Q.   And F talks about -- says one of the
13     obligations is to "Maintain all inmate records and
14     orders received by the Orleans Parish Criminal
15     District Court."
16          A.   I'm sorry.  What paragraph are you --
17          Q.   F, about halfway through.  Do you see
18     where I am now?
19          A.   Uh-huh (affirmative response).
20          Q.   "Maintain"?  "Maintain all inmate
21     records and orders received by the Orleans Parish
22     Criminal District Court relative to OPSO inmates,
23     including bail, release, transport and detainer
24     orders and to provide notification and a copy of
25     such to the ECPSO as necessary to comply with all
```



Case 2:19-cv-01384-MLCF-JVM Document 153-14 Filed 11/14/22 Page 28 of 85
Case 2:19-cv-01384-MLCF-JVM GUSMAN, SHERIFF MARLIN N. 54/16/23 Page 28 of 85

Page 27

1    laws."  Do you see where I was reading from?

2         A.    Yes, I do.

3         Q.    Who at OPSO was responsible for

4    fulfilling this particular obligation?

5         A.    That would be the intake and processing

6    division.

7         Q.    Okay.  And in 2016, was that Major Holt?

8         A.    Major Holt, Sidney Holt, assisted by

9    other people.

10        Q.    Right.  And Sidney Holt had under him

11   Captain Bierria.  I may be mispronouncing her

12   name.

13        A.    Captain Bierria sounds right.

14        Q.    Okay.  I'm handing you Exhibit 4.  I'll

15   hand it also to counsel.  I will again ask you to

16   look at it and tell me if you recognize it.

17        A.    Sure, I recognize it.

18        Q.    What is it?

19        A.    It's a Memorandum of Understanding

20   Between East Carroll Parish Sheriff's Office and

21   the Orleans Parish Sheriff's Office.

22        Q.    So the first document was a Cooperative

23   Endeavor Agreement, and this document is called

24   "Memorandum of Understanding," correct?

25        A.    That's correct.

```
 1        Q.    What's your understanding of -- well, do
 2   you have an understanding of why there was a
 3   separate Memorandum of Understanding from the
 4   Cooperative Endeavor Agreement?
 5        A.    I don't at this time.
 6        Q.    Okay.  Who worked with you in creating
 7   that document?
 8        A.    Probably some legal person in the --
 9   either in the office here or an external lawyer,
10   but I wasn't really involved in drafting it.
11        Q.    So you don't know, sitting here today,
12   why this separate agreement was negotiated and
13   executed?
14        A.    I can't recall.  Can you refresh my
15   memory?
16        Q.    No.  I'm curious to know why it had to
17   be a Memorandum of Understanding.  That's not
18   something I can refresh your memory about if you
19   don't know.
20        MR. WILLIAMS:
21             I do note that the Memorandum of
22   Understanding is signed by Gary Maynard and that
23   the Cooperative Endeavor Agreement may have taken
24   effect -- or may have started, not taken effect --
25   may have been dated before he arrived.  I do note
```

```
 1    that difference.
 2         MR. CRAIG:
 3              Is that an objection, Counsel?
 4         MR. WILLIAMS:
 5              No.  I'm just trying to help the
 6    truth-finding process here.  I thought you
 7    "I was wondering."  The sheriff didn't know.  As I
 8    looked at it, I said, "Well, maybe that's it."
 9    But if you don't like it -- I just thought you
10    wanted information.
11         MR. CRAIG:
12              Would you like to take the oath and be
13    deposed after Sheriff Gusman?
14         MR. WILLIAMS:
15              If you want to, I'll do it if you do it.
16         MR. CRAIG:
17              I don't have any discoverable
18    information.
19         MR. WILLIAMS:
20              Well, neither do I.
21         MR. CRAIG:
22              Then I would ask you to confine your
23    statements to objections permitted under Rule
24    30(c)(2).
25         MR. WILLIAMS:
```



Case 2:19-cv-01384-MLCF-JVM Document 153-14 Filed 11/14/22 Page 31 of 85
Case 2:19-cv-01384-MLCF-JVM GUSMAN SHERIFF MARLIN N. 34/10/22 Page 31 of 85

Page 30

```
 1              I mean, I think that's permitted.  It
 2    was searching for the truth.  It wasn't coaching.
 3    It wasn't helping.  He had already answered.  You
 4    had already said.  As an officer of the court, I
 5    happen to know this information.  You know,
 6    lawsuits are not gains -- I can send you the case
 7    site for this.  Lawsuits are not gains in which
 8    technicalities are supposed to triumph over actual
 9    justice.  I thought that you might have wanted
10    that information.  I'm sorry I gave it.
11         MR. CRAIG:
12              I will say that if there is another
13    speaking objection outside the realm of Federal
14    Rule 30(c)(2), we will seek to call the magistrate
15    and have this deposition taken the way that the
16    rules, as revised, require them to be taken.
17         MR. WILLIAMS:
18              I believe this deposition is proceeding
19    the way the rules allow them to be taken.  I think
20    everything that has happened on the record here is
21    absolutely proper.  In this particular instance,
22    you're dwelling more on it now with this than me.
23    I just pointed out a difference that nobody
24    noticed, including you and the sheriff.  So it's
25    not like I was coaching.  He answered first.
```

Case 2:19-cv-01384-MLCF-JVM Document 153-14 Filed 11/14/23 Page 32 of 85
Case 2:19-cv-01384-MLCF-JVM GUSMAN, SHERIFF MARLIN N. 3/14/073 Page 32 of 85

Page 31

```
 1        MR. CRAIG:

 2             It doesn't matter whether you're

 3   coaching him, and I'm not arguing about it.  The

 4   rule says what your role is as defending counsel,

 5   and if you're not willing to comply with it, then

 6   we'll ask Judge Wilder-Doomes if I'm right or

 7   you're right.

 8        MR. WILLIAMS:

 9             Okay.  Asking judges who's right is what

10   we do.

11        MR. CRAIG:

12             What's the next exhibit number?

13        MS. WASHINGTON:

14             75.

15        MR. WILLIAMS:

16             Are you premarking the case?  Is that

17   what this is?

18        MS. WASHINGTON:

19             We have been doing continuing numbering

20   of exhibits in the deposition, so we are on 75.

21   (EXHIBIT 75 MARKED FOR IDENTIFICATION)

22        MR. WILLIAMS:

23             Got it.

24        MS. WASHINGTON:

25             I would like to say it cuts down on
```



```
1    paper, but it does not.
2        MR. WILLIAMS:
3            But it certainly helps with
4    organization.
5    BY MR. CRAIG:
6        Q.    Sheriff, this is a collection of five
7    documents received by us in response to a public
8    records request to your office in June 2017, and I
9    represent to you that there's one for each of the
10   plaintiffs in this case.  Do you recognize these
11   as coming from --
12       MR. WILLIAMS:
13           Finish your question.
14       MR. CRAIG:
15           Okay.  Let the record reflect Counsel's
16   arm is extended out towards his client.  I don't
17   know why.
18       MR. WILLIAMS:
19           Oh, it is extended so that I can ask him
20   to not answer until I say what I'm going to say on
21   the record, so that there's no confusion about why
22   my arm's extended.
23   BY MR. CRAIG:
24       Q.    Okay, thank you.  Do you recognize the
25   form of this first page of Exhibit 75 as being
```


Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Case 2:19-cv-01384-MLCF-JVM Document 153-14 Filed 11/14/22 Page 34 of 85
Case 2:19-cv-01384-MLCF-JVM GUSMAN, SHERIFF MARLIN N. 5/24/2018 Page 34 of 85

Page 33

```
 1   generated by AS400, the Orleans Parish's inmate
 2   jail management system?
 3        MR. WILLIAMS:
 4             So let the record reflect that Exhibit
 5   75 is actually five different documents, as
 6   Counsel suggested, and those five documents -- and
 7   I want to put this on the record, because they are
 8   not sequentially numbered -- have the Bates
 9   Numbers Crittindon1376, Crittindon1382,
10   Crittindon1380, Crittindon1418 and Crittindon1406.
11   You can answer, Sheriff.
12        THE WITNESS:
13             It looks like it came from the Orleans
14   Parish Sheriff's Office inmate inquiry system.
15   BY MR. CRAIG:
16        Q.   And that's a system that's generated and
17   that the entries are made by employees of the
18   OPSO?
19        A.   Yes.
20        Q.   So this first page which talks about
21   Leon Burse, who's one of the plaintiffs, do you
22   see there the line "Released:  Amacker C
23   8/08/2016"?
24        A.   I do.
25        Q.   And then underneath it there's a line
```



```
 1   that says: "Reason:  Released to ECP as DOC
 2   inmate"?  Do you see that line?
 3        A.   I do.
 4        Q.   What does the term "released to ECP as
 5   DOC inmate" mean?
 6        A.   It seems that we released this inmate to
 7   East Carroll Parish, and he had already been
 8   sentenced.  So he was a DOC inmate, no longer a
 9   pretrial inmate, is my understanding.
10        Q.   And do you know when persons who were
11   convicted in Orleans Parish first were released to
12   East Carroll Parish as DOC inmates in the manner
13   of this document, Exhibit 75?
14        MR. WILLIAMS:
15             Object to the form of the question.  I
16   don't understand.  What do you mean?  When this
17   practice first started happening?  What are you --
18   what's your question?
19        MR. CRAIG:
20             When did -- well, I'll break it into two
21   questions.
22        MR. WILLIAMS:
23             Okay.
24   BY MR. CRAIG:
25        Q.   First of all, without regard to East
```

```
 1    Carroll, has it been a practice of Orleans Parish
 2    Sheriff's Office to release DOC-sentenced
 3    prisoners to other parish jails or non-DOC
 4    facilities?
 5         A.   I'm sure it's happened.  I can't, you
 6    know, put my finger on it, but I'm sure we've
 7    released transferred DOC inmates to other
 8    parishes.
 9         Q.   And, to your memory, had that been
10    happening since the time that you had started as
11    sheriff?
12         A.   Yes, sir.
13         Q.   Now, specifically with respect to East
14    Carroll Parish --
15         A.   Excuse me.
16         Q.   Yes, sir.
17         A.   I'm not trying to be -- I'm in a little
18    discomfort.
19         Q.   Yes.
20         A.   I had surgery --
21         Q.   I appreciate that.
22         A.   -- three weeks ago, so bear with me.
23         Q.   I will.  Do you need to take a break
24    now?  We're actually between questions.
25         A.   No.  I'm okay right now.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        Q.   Okay.  Yeah, I appreciate that.  I
 2   didn't take that as anything, so you're fine.  Let
 3   me hand you -- this will be Exhibit 76.  I'm
 4   giving you the ones with the real stickers,
 5   Sheriff, and I'll give your counsel a different
 6   one.  And, Sheriff, I would represent to you that
 7   this is a photocopy of a record book that we were
 8   given by your counsel in the course of discovery
 9   in this case.  And, obviously, the photocopy's not
10   in color, so it doesn't look like it may look like
11   in real life, but it has on the top of it
12   "Pre-class Packets" and a start and an end date.
13   (EXHIBIT 76 MARKED FOR IDENTIFICATION)
14        MR. WILLIAMS:
15             So before the end of it there's also a
16   page that says "DOC packets."  Does that mean this
17   is two books or what?  I mean, your question --
18   the pages aren't numbered sequentially, but I know
19   you represented that this was one book.  This
20   might be two.  Is it?  Do you know?
21        MS. WASHINGTON:
22             Yes.
23        MR. WILLIAMS:
24             So it really is two books, not one.
25        MR. CRAIG:
```



```
 1              Okay.  I tell you what:  At the end of
 2    page --
 3         MR. WILLIAMS:
 4              You can't number it like that.  Maybe we
 5    ought to take a pen and number them?
 6         MR. CRAIG:
 7              Hang on.  Hang on.  So we've already
 8    marked this and stapled it, so I don't want to do
 9    anything to the physical exhibit itself.  But what
10    I want to ask you about is actually just on the
11    first page.
12         MR. WILLIAMS:
13              Are you comfortable if I number these
14    pages so we know what we're talking about?
15         MR. CRAIG:
16              Yeah.  I'm only going to ask a couple of
17    questions about them, frankly.  I don't know if
18    that's going to be necessary.  It could be.  I
19    don't know.
20    BY MR. CRAIG:
21         Q.   So, Sheriff, if you'd just look at the
22    first page of this.
23         A.   (Indicating.)
24         Q.   Yes, sir.
25         A.   I'm looking at it.
```

```
1          Q.   Are you at all familiar with these
2    logbooks?
3          A.   No.
4          Q.   Okay.  So you don't know what this
5    particular logbook is about?
6          A.   Not really.  I can guess at it but --
7          Q.   I don't want you to guess.
8          A.   No.
9          MR. WILLIAMS:
10              Neither do I.
11   BY MR. CRAIG:
12         Q.   Have you read Mr. Amacker's deposition?
13         A.   No, I haven't.
14         Q.   Okay.  Was there a time which -- we've
15   talked about generally that it was not uncommon to
16   release Orleans prisoners as DOC inmates to other
17   local jails, that it did happen occasionally from
18   the time that you started as sheriff.  Am I
19   remembering your testimony correctly?
20         A.   That's correct.
21         Q.   Okay.  Was there a time when, in
22   particular, Orleans Parish began releasing
23   prisoners to East Carroll Parish?
24         A.   Yes.  We went over that.  We went over
25   about how I contacted the sheriff.  We were moving
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Case 2:19-cv-01384-NJB-JVM Document 153-14 Filed 11/14/22 Page 40 of 85
Case 2:19-cv-01384-MLCF-JVM GUSMAN, SHERIFF MARLIN N. 5/4/1973 Page 40 of 85

Page 39

```
 1    out of the tents, moving into this building.
 2         Q.   Yes.  I don't mean to interrupt you but
 3    -- I really don't mean to interrupt you, but just
 4    in the interest of time, I'm talking about
 5    releasing them to East Carroll as DOC inmates, not
 6    the -- you were talking about, if I'm not
 7    mistaken, where I interrupted you, which I
 8    apologize for, was referring to pretrial inmates,
 9    pretrial prisoners, correct?
10         A.   Correct.  And then when they got
11    sentenced, some of them would be transferred, as
12    you looked on here, or released pretty synonymous
13    with us to East Carroll Parish if they were there.
14         Q.   Can you explain what you mean by "if
15    they were there"?
16         A.   If they had been there prior to their
17    sentencing.
18         Q.   I see.  So if a pretrial detainee was
19    being housed at East Carroll Parish, as you have
20    previously testified after your discussions with
21    Sheriff Williams -- if a pretrial detainee in that
22    category was sentenced to DOC time, then OPSO
23    would release that prisoner or transfer that
24    prisoner back to East Carroll Parish as a DOC
25    inmate?
```

```
 1          A.   I can't say for sure.
 2          Q.   Okay.
 3          A.   What I can tell you is that if East
 4    Carroll Parish transported them down for a court
 5    appearance, they would probably be transported
 6    back after their court appearance.  And that court
 7    appearance could include sentencing, at which time
 8    they would become a DOC inmate, but I can't say
 9    for sure.
10          Q.   Okay.
11          MR. WILLIAMS:
12               Do you need a break, Sheriff?
13          THE WITNESS:
14               I'm all right.
15    BY MR. CRAIG:
16          Q.   I'm handing you and your counsel Exhibit
17    56.  Do you recognize it?
18          A.   Yes.
19          Q.   What is it?
20          A.   This is a policy on the transfer of
21    inmates to DOC facilities.
22          Q.   And the authorizing authority is the
23    sheriff of Orleans Parish, correct?
24          A.   Correct, yes.
25          Q.   And on page 7 of this document, you
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    approved it with your signature, correct?

 2         A.   Yes, sir.

 3         Q.   And on the fist page and then again on

 4    the seventh page, it references the chief of

 5    corrections.  Who was the chief of corrections in

 6    July of 2016?

 7         A.   Carmen DeSadier.

 8         Q.   And did that chief report directly to

 9    you as sheriff?

10         A.   Yes.

11         Q.   And then did the -- we talked about

12    Major Holt, the director of intake and processing.

13    In July of 2016, would Major Holt have reported to

14    Chief DeSadier?

15         A.   Yes.

16         Q.   And this policy is signed by you on

17    July 22, 2016, correct?

18         A.   Yes.

19         Q.   And you were the final authority

20    authorizing this policy, correct?

21         A.   Yes.

22         Q.   And this written policy, did it

23    memorialize what the pre-classification deputies

24    were already doing, or was it meant to give them

25    new instruction?
```

```
 1         A.   I'm not sure I understand the question.
 2         Q.   Let me ask it this way:  I'll withdraw
 3    that and ask you a different way.  What prompted
 4    the creation of this policy in July of 2016?
 5         A.   I think we were reviewing all of our
 6    policies, and we had a manual already.  I think
 7    they were redoing the policies, and that's what it
 8    was.
 9         Q.   Okay.
10         A.   I don't know any deeper than that.
11         Q.   You don't remember any particular reason
12    why this particular policy would have been issued
13    in July of 2016?
14         A.   No, I don't remember.
15         Q.   Okay.
16         A.   They probably had a bunch of them
17    issued.
18         Q.   Okay.  So the purpose of this policy,
19    according to Section 1, is to provide trained
20    deputies assigned to the Department of Corrections
21    pre-classification section with the information
22    they need to accurately process inmates for
23    transfer to DOC facilities, correct?
24         A.   Exactly what it says.
25         Q.   Very good.  And the deputies in the
```

1    pre-classification section, according to page 2,

2    are assigned responsibility for the collection and

3    preparation of information for all inmates being

4    transferred to DOC.  Do you want to look at page 2

5    and confirm that?

6         A.   I looked at it already.  Yes.

7         Q.   Yeah.  Very good.  And this policy is

8    meant to direct the pre-classification section so

9    that they will pre-classify DOC-sentenced

10   prisoners correctly; is that right?

11        A.   That's correct.

12        Q.   And if we look at page 3, it's your

13   policy to train the deputies in the DOC

14   pre-classification section on the proper manner of

15   providing information on DOC-sentenced prisoners

16   to DOC?

17        A.   That's our policy.

18        Q.   And the point of that training is to

19   ensure that the pre-classification section

20   deputies followed this policy, right?

21        A.   That's correct.

22        Q.   Because there's no point in having a

23   written policy if it's not followed by your

24   deputies, right?

25        MR. WILLIAMS:



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1              Objection; argumentative, asked and
 2    answered.  He already said the purpose of it is to
 3    -- so you don't have to answer an argumentative
 4    question, Sheriff.
 5         MR. CRAIG:
 6              That's actually not correct.
 7    Argumentative is a form-of-the-objection question,
 8    so you do have to answer it.
 9         MR. WILLIAMS:
10              I disagree.
11         THE WITNESS:
12              What was the question?
13         MR. WILLIAMS:
14              Yeah, what's the question?
15    BY MR. CRAIG:
16         Q.   Is there any point in having a written
17    policy if your deputies don't follow it?
18         MR. WILLIAMS:
19              Is there any point?  Object to the form
20    of the question.  I don't even understand it,
21    frankly.  Is there a point to having it if the
22    deputies don't follow it?
23         MR. CRAIG:
24              Right.
25         THE WITNESS:
```



```
 1            We want our deputies to follow the
 2   policy.
 3   BY MR. CRAIG:
 4        Q.    Thank you.  What steps do you take to
 5   ensure that your deputies do follow the policy?
 6        A.    We have training, we have supervisors,
 7   managers that look over that process, and we also
 8   are subject to audits from the Department of
 9   Corrections.  So those things.
10        Q.    And specifically with respect to this
11   policy, what does your office do to ensure that
12   deputies are following this policy, this policy on
13   DOC pre-classification?
14        A.    You know, I recall that we were having a
15   lot of discussions at the time about the transfer
16   of sentenced inmates and the amount of time that
17   it took us to collect the information needed in
18   this pre-classification packet, because we had to
19   get information from other sources, not just
20   generated on our own.  So my oversight was pretty
21   limited to the average amount of time that it took
22   to get all of this done and not reviewing any
23   individual deputy's work product but just saying,
24   "Hey, did you get that done?"
25        Q.    Had it been brought to your attention
```

```
 1   that there had been a problem with respect to
 2   collecting information needed for the
 3   pre-classification packet?
 4        A.   That's a little too general for me to
 5   answer.  I'm not sure.
 6        Q.   Yeah.  And I appreciate that.  I'll
 7   withdraw it.  I was following up on your
 8   testimony, actually, and so -- about the policy
 9   directing the pre-classification staff with
10   respect to collecting the documents from sources
11   outside of your department, if I remember what you
12   said correctly.  And so my question was:  Had a
13   problem with respect to the collection of those
14   documents been brought to your attention?
15        A.   I don't think it was a problem that was
16   brought to my attention but just a -- I would call
17   it more of a concern that we wanted to make sure
18   we got the fingerprints done, that we had the
19   order from the court, certified order, those kind
20   of things, and making sure that -- you know, every
21   once in a while someone would tell me as I walked
22   through the jail that "Hey, I haven't been
23   fingerprinted yet," and I would get them
24   fingerprinted, you know, but -- and then another
25   thing that would happen is that -- I was thinking
```

1    about this -- that I would get reports on how many

2    people were sentenced in a week, and it could be

3    sometimes 30, 40, 50 people sentenced in a week.

4    So with that volume, it was something that I

5    followed to see how -- you know, that we were

6    doing what we were supposed to do.

7         Q.   Okay.  So looking at page 3 still of

8    this policy, it talks about the pre-classification

9    section being responsible.  This is on A-2, little

10   A.  "Processing inmates sentenced to state prison,

11   including the collection of information and

12   completion of tasks requested and required by the

13   DOC."  So that's the information that you were

14   just testifying about; am I correct?

15        A.   Well, some of those tasks are tasks that

16   we do ourselves.

17        Q.   Okay.

18        A.   But the information -- the collection of

19   information is what I was referring to from

20   outside sources.

21        Q.   Yes.  And then there would be, as you

22   said, for example, fingerprints that would be

23   required that would not be from an outside source;

24   is that correct?

25        A.   That's correct.

1  Q.  And then it says: "Compiling the weekly
2  transfer list to the DOC for the inmates whose DOC
3  packets have been completed."  What's your
4  understanding of that part?
5  A.  Well, again, I would get reports on a
6  weekly basis on -- we would do a Hunt run Tuesday.
7  Hunt's the receiving center for DOC.  And that
8  would mean all of the packets, all the information
9  for everybody on that Hunt run had been completed
10  and we were sending them off.
11  Q.  And I think on the top of this page,
12  page 3, talks about the things that are required
13  in the DOC packet; is that correct?
14  A.  Yes.
15  Q.  On page 2 of the policy it refers to the
16  Basic Jail Guidelines.  What are those?
17  A.  Basic Jail Guidelines are promulgated by
18  the Department of Corrections, the Department of
19  Public Safety and Corrections, and we get audited
20  on the Basic Jail Guidelines.
21  Q.  I'm going to hand you what's been marked
22  previously as Exhibit 48.  And I will not be
23  asking you about this entire document, but it was
24  used in another deposition.  And this I would
25  represent to you is the Basic Jail Guidelines that

```
 1    were in effect at the time of the events that are
 2    talked about in the complaint.  There's been a
 3    revision, which is another deposition exhibit
 4    which we're not going to talk about today because
 5    it doesn't really bear on your testimony.  So I
 6    would ask you to turn to page 17.
 7              And, actually, this is a section --
 8    yeah, I'm fine.  It starts on page 17 and goes to
 9    page 18.  And then do you see -- this is Section
10    2-A-8.  Do you see in the middle of page 18 it
11    talks about the following shall be collected and
12    forwarded to the DPS&C pre-class coordinator for
13    the area in which the facility is located?
14         A.   Yes.
15         Q.   And these -- this list of documents is
16    the same as the list of documents that you define
17    as the DOC packet in your policy, Exhibit 56,
18    correct?
19         A.   Yes.
20         Q.   So if the DOC pre-classification section
21    completes the responsibilities assigned to them
22    through your policy, then that would provide the
23    documentation required by DOC in the Basic Jail
24    Guidelines, right?
25         A.   It sounds right.
```

Case 2:19-cv-01384-MLCF-JVM Document 153-14 Filed 11/14/22 Page 51 of 85
Case 2:19-cv-01384-MLCF-JVM GUSMAN, SHERIFF MARLIN N. 9/16/19 Page 51 of 85

Page 50

```
1       Q.   Is there a part of it that's not right?
2       A.   I'm not sure what you said.
3    MR. WILLIAMS:
4            Don't answer unless --
5    MR. CRAIG:
6            I'm going to ask it again.
7    MR. WILLIAMS:
8            Yeah.  Because the question wasn't --
9  BY MR. CRAIG:
10      Q.   I'll ask it again.  If your
11 pre-classification deputies follow the OPSO policy
12 that we've been looking at, Exhibit 56, then that
13 would comply with the requirement of the Basic
14 Jail Guidelines we just looked at, 2-A-8, on the
15 documents that the DOC requires for
16 pre-classification?
17      A.   Yes.  And that was certainly our
18 intention.
19      Q.   Let's go back to your policy again, so
20 keep the guidelines close.  I want to take you to
21 subsection 9-A-10, which is all the way on page 6.
22      A.   Can you give me that citation again?
23      Q.   Sure.  It's subparagraph 10.
24      A.   Okay.
25      Q.   Where it says: "The pre-classification
```

Case 2:19-cv-01384-NJB-JVM Document 153-14 Filed 11/14/22 Page 52 of 85
Case 2:19-cv-01384-MLCF-JVM SHERIFF MARLIN N. GUSMAN 34/2015 Page 52 of 85

Page 51

1    deputy" and then a colon.  It says that "The
2    pre-classification deputy adds the inmate's name
3    to the preliminary transfer list once his or her
4    packet has been completed and sent to DOC
5    headquarters."  Can you explain that for me?
6         A.   When we transfer people to DOC
7    headquarters or the receiving center, the packet
8    had to be completed before we could send them
9    there.
10         Q.   And then on the next page where it's
11    subsection D, it says: "Once a transfer list has
12    been approved by the Department of Corrections" --
13    and this is still referring to the
14    pre-classification deputy -- "completes a final
15    transfer list on the Hunt run list or the list of
16    DOC offenders for transfer list as appropriate for
17    the inmates' destinations."  Do you see where I
18    was looking at?
19         A.   Yes.
20         Q.   Great.  So the Hunt run I think you've
21    already testified about, correct?  The Hunt run --
22    I think you said on Tuesdays you would transfer
23    DOC-sentenced prisoners to Hunt for receiving?
24         A.   Yes, sir.
25         Q.   Yeah.  And the DOC offenders for

1    transfer list is a list sent to DOC for

2    transferring DOC-sentenced prisoners to a local or

3    parish jail outside of Orleans, correct?

4         A.    That's correct.

5         Q.    Under this policy, no DOC-sentenced

6    offender is to be transferred from OPSO until DOC

7    has approved the transfer list, correct?

8         A.    That's correct.

9         Q.    And only then, looking at subsection G,

10   does the DOC pre-classification deputy release the

11   inmates from the active inmate list; is that

12   correct?

13        A.    Once they've been transferred.

14        Q.    Right.  And then when we're talking

15   about releases the inmates from the active inmate

16   list, is that the same as the term "released" that

17   we saw in Exhibit 75?

18        A.    Yes.

19        Q.    Okay.  So let's look back at the Basic

20   Jail Guidelines again and stay on page -- you've

21   got them right here.  Oh, sorry.  Yeah.  So if we

22   look again at the Basic Jail Guidelines, page 18

23   and 19, the first bullet point on page 19 -- you

24   have it there?

25        A.    Uh-huh (affirmative response).

```
 1          Q.    Yeah.  It's Section 2-A-9.  The first
 2   bullet point on page 19 says:  "It's the
 3   responsibility of the sending facility to send
 4   notification to DOC of transfers of DOC-sentenced
 5   inmates from one parish jail to another," correct?
 6          A.    Uh-huh (affirmative response).
 7          Q.    I'm sorry.  This is the first time I've
 8   had to ask you to say "yes" or "no."
 9          A.    Yes.
10          Q.    Thank you.  So, again, comparing the
11   Basic Jail --
12          MR. WILLIAMS:
13                Well, object to the form.  And you can
14   tell me if it makes a difference.  Your sentence
15   is in the middle, but the beginning says: "All
16   transfers of DPSC to other than DPSC facilities."
17   So is that --
18          MR. CRAIG:
19                Yes.
20          MR. WILLIAMS:
21                All right.  Go ahead.
22   BY MR. CRAIG:
23          Q.    Let's back up and make sure I'm getting
24   this correct.  So this part of the Basic Jail
25   Guidelines is not talking about the Hunt run
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Case 2:19-cv-01384-NJB-JVM    Document 153-14    Filed 11/14/22    Page 55 of 85
Case 2:19-cv-01384-MLCF-JVM    Document 153-14    Filed 11/16/23    Page 55 of 85

MUSMAN, SHERIFF - MARLIN N. GUSMAN, SHERIFF - MARLIN N. 54/10/23

Page 54

1    prisoners, correct?

2          A.    That's correct.

3          Q.    It's talking about prisoners who are

4    being transferred to a non-DOC facility as DOC

5    prisoners.

6          A.    That's correct.

7          Q.    Okay.  And in that respect, the

8    provision states that it's the responsibility of

9    the sending facility to give the notification to

10   the DOC.

11         A.    That's correct.

12         Q.    And if the pre-classification deputy

13   follows the provisions of the OPSO policy, Exhibit

14   56, then that would meet the requirements of the

15   Basic Jail Guidelines to a nine, correct?

16         A.    I think I answered already that our

17   intention was certainly -- when we drafted the

18   policy -- to be in compliance with the Basic Jail

19   Guidelines.

20         Q.    You did answer it, Sheriff, and that was

21   with respect to -- I'm really just asking a

22   similar question about this part of your policy

23   dealing with transfers.

24         A.    Well, my answer is similar, then.

25         Q.    Okay.  Do you agree that a failure by

```
 1   Orleans Parish's DOC pre-classification section to
 2   follow the OPSO policy could result in a
 3   DOC-sentenced prisoner not having their time
 4   calculated by DOC?
 5        A.   I think the purpose of the policy, Basic
 6   Jail Guidelines, is to make sure that DOC has the
 7   information so that they can properly compute, and
 8   if the information doesn't get there, then it's a
 9   problem.
10        Q.   And one of the problems is that DOC will
11   not have the information needed to calculate the
12   prisoner's time?
13        A.   I think that's what I said.
14        Q.   Okay.  And I had asked you about the
15   failure.  You would agree with me also that the
16   delay of OPSO's pre-classification staff to follow
17   the OPSO policy could result in a delay in the
18   DOC-sentenced prisoner getting their time
19   calculated?
20        MR. WILLIAMS:
21            And, again, we're saying "could."
22   You're talking, like, in a general sense, not in a
23   specific, like --
24        MR. CRAIG:
25            Yes.  I'm talking about in general.
```

```
 1        MR. WILLIAMS:
 2             There's theoretical violations and then
 3    there could be --
 4        THE WITNESS:
 5             Could you repeat that?  Because you said
 6    "delayed" a couple times.
 7    BY MR. CRAIG:
 8        Q.   Yes.  So previously, just a couple of
 9    seconds ago, we were talking about failure.
10    Because I know some of these questions sound the
11    same, but there are parts that are changed to make
12    sure that I understand your testimony.  We were
13    talking about what happens if a pre-classification
14    staff just fails to do what your policy requires.
15    So now I'm asking if the pre-classification staff
16    -- if there's a delay in complying with the OPSO
17    policy, that that could result in a delay in the
18    DOC-sentenced prisoner having their time
19    calculated by DOC?
20        A.   We obviously did not want to have any
21    delays in your -- I think what you're saying is
22    right, that a delay could result in not having
23    information necessary to compute the release.
24        Q.   And would you agree that failures or
25    delays in DOC having the information needed to
```

Case 2:19-cv-01384-MLCF-JVM Document 153-14 Filed 11/14/22 Page 58 of 85
Case 2:19-cv-01384-MLCF-JVM GUSMAN, SHERIFF MARLIN N. 54/10/23 Page 58 of 85

Page 57

```
 1    calculate time could result in a prisoner being
 2    held after his release date had passed?
 3         A.    I think that's what I just said.
 4         Q.    Okay.  And so who was responsible in
 5    2016 to you to ensure that this policy and its
 6    procedures were followed?
 7         A.    Well, the chief of corrections and Major
 8    Holt, Captain Bierria.  All of the people that
 9    worked with them.
10         Q.    Had you met Corey Amacker before this
11    case was filed?
12         A.    I had met him, yes.
13         Q.    Did you know during -- did you have
14    reasons to interact with him in your --
15    professionally while he was working as the
16    pre-classification manager?
17         A.    I try to interact with all of the
18    employees, all of the deputies, yes.
19         Q.    Okay.  So what did you do as sheriff to
20    ensure that these policies -- this particular
21    policy was followed after it was implemented?
22         A.    I impress upon everybody to do their job
23    to the best of their ability.  And certainly if I
24    thought that someone wasn't doing their job, I
25    would take action against that, instruct the
```

1    supervisor to either remove them or discipline
2    them but to get the job done.  And as I mentioned
3    before, the information that I was getting did not
4    indicate that we were having a problem.
5         Q.   And would you get information regularly
6    from the -- about pre-classification through Major
7    Holt and, when Carmen DeSadier was chief, from the
8    chief?
9         A.   Yes, I would.  I would get information
10   on how many people were transferred, and that
11   meant how many packets were completed and how many
12   people were sentenced.
13        Q.   And was that a particular kind of
14   report, like a written report?
15        A.   Staff meeting they would report on it.
16        Q.   Okay.
17        A.   I'd write it down.
18        Q.   So how often are there staff meetings?
19        A.   Every week.
20        Q.   And who attends the staff meeting?
21        A.   The managers of the different
22   departments.
23        Q.   So in this particular case it would
24   include Major Holt?
25        A.   It would include Major Holt, that's

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    correct.
 2         Q.    Would it have included Captain Bierria
 3    or just Major Holt from that division?
 4         A.    I think at the time it was just Major
 5    Holt, but I can't be sure.
 6         Q.    I understand.  But you are sure that
 7    Major Holt would be present?
 8         A.    I'm sure.
 9         Q.    I mean, he would be required to be
10    present.  Maybe he's not there every day but --
11         A.    I am sure about that.
12         Q.    Yeah.  And Major Holt was tasked with
13    reporting in the staff meeting about
14    pre-classification and sentencing in general?
15         A.    Yes.
16         Q.    And he did that orally, not in written
17    form?
18         A.    Yes.
19         Q.    But you took notes on it?
20         A.    Uh-huh (affirmative response).
21         Q.    Yes?
22         A.    Yes.
23         Q.    And in what -- do you keep a regular
24    notebook or a log or file system?
25         A.    I have a notebook.
```



```
 1        Q.   And is the notebook -- like, there must
 2   be more than one notebook by now since 2004,
 3   right?
 4        A.   A bunch of them.
 5        Q.   I'm sure.  So where are the notebooks
 6   kept after they're completed?
 7        A.   I keep some in my office.  I toss some.
 8        Q.   And so they're physically kept in your
 9   own office; is that correct?
10        A.   Yes.
11        Q.   Did you make it clear to Major Holt that
12   pre-classification of DOC-sentenced offenders
13   needed to be done according to the written policy?
14        A.   That's why we had a written policy.
15        Q.   Is that a yes?
16        A.   Yes.
17        Q.   And did you expect that Major Holt would
18   have reported to you if there had been any
19   problems in implementing the policy?
20        A.    I would have expected that I would have
21   gotten information about it.  Depending upon the
22   severity of it, I would have.
23        Q.   So, as you know, Sheriff, this lawsuit
24   is particularly about DOC-sentenced prisoners at
25   Riverbend sentenced in Orleans in 2016 for whom no
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

Case 2:19-cv-01384-NJB-JVM Document 153-14 Filed 11/14/23 Page 62 of 85
Case 2:19-cv-01384-MLCF-JVM GUSMAN, SHERIFF MARLIN N. 5/4/2073 Page 62 of 85

Page 61

```
1    DOC pre-classification paperwork had been provided
2    to DPS&C.  Is that your understanding of what this
3    case involves?
4         MR. WILLIAMS:
5              Allegedly.  You mean those are the
6    allegations?
7         MR. CRAIG:
8              Yeah.
9         THE WITNESS:
10             Yeah.  I understand that's what the
11   allegations are, yes.
12   BY MR. CRAIG:
13        Q.   Okay.  And is it your understanding, in
14   terms of the actual fact, that there were
15   DOC-sentenced prisoners at Riverbend in 2016 who
16   had been sentenced in Orleans Parish for whom no
17   DOC pre-classification paperwork had been provided
18   to DPS&C?
19        A.   I can't say with specificity about your
20   statement.  What I can say is that I certainly
21   became aware of a problem, and as soon as I became
22   aware of the problem, I said, "Look, we've got to
23   take care of this immediately."  And, you know, we
24   had a lot going on, but we dispatched one of our
25   staff to go up there -- I think maybe it was more
```

1    than one staff to go up there and -- to East
2    Carroll Parish and to resolve this as quickly as
3    we could.  So as soon as it came to my attention,
4    I was like, "Look, let's take care of this."  You
5    know, this is not something we wanted to do by
6    phone, so we just immediately took care of it.
7    That's my recollection.
8         Q.   Okay.  So we've talked a little bit
9    about -- generally about the release or transfer
10   of DOC-sentenced prisoners from OPSO to East
11   Carroll.  How was DOC pre-classification supposed
12   to be accomplished for those individuals?
13        A.   Well, I testified before that the
14   situation that we had here was that we were very
15   limited in our space.  We were under a zoning
16   issue where we had to close all of our other
17   facilities.  We had demolished the tents.  East
18   Carroll Parish was holding this group of inmates.
19   They came down, they brought them back.  And in
20   this -- these cases, these isolated cases, it
21   looks to me like what happened is that instead of
22   us retaining custody of a sentenced inmate, they
23   went back to where they were being housed, and
24   that caused the confusion of not having the
25   paperwork and not notifying DOC.  So I think

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    that's what happened.  But, like I said, as soon

2    as I found out about that, you know, we took

3    immediate steps to rectify it.

4         Q.   Okay.  Before you found out there was a

5    problem, how was the pre-classification paperwork

6    supposed to be done for these people who came in

7    from East Carroll, had their sentence and then

8    went back to East Carroll this time as a DOC

9    inmate?

10        A.   It was supposed to be done according to

11   the policy.  And I said that a minute ago, that,

12   you know, we didn't do it according to the policy

13   in each instance, it looks like.  That's what it

14   looks like.

15        Q.   Okay.  Which includes the OPSO

16   pre-classification deputies collecting the

17   information needed for the pre-classification

18   packet?

19        A.   That's correct.

20        Q.   And the OPSO pre-classification deputies

21   sending the packet to DPS&C headquarters in Baton

22   Rouge?

23        A.   I'm not sure I understand that.

24        Q.   Okay.

25        MR. WILLIAMS:



```
 1              Let's take a break for a few minutes.
 2         MR. CRAIG:
 3              I'm not going to approve of taking a
 4    break.
 5         MR. WILLIAMS:
 6              We finished your question.  We're going
 7    on to another one.  He said -- he answered your
 8    question.
 9         MR. CRAIG:
10              He said he didn't understand it.
11         MR. WILLIAMS:
12              Right.  So the question's over.
13         THE WITNESS:
14              Look, my leg's hurting me anyway, so I
15    have to walk around.
16         MR. CRAIG:
17              Okay.  How long do you want to go?
18         THE WITNESS:
19              I need --
20         MR. WILLIAMS:
21              Five minutes now and then --
22         THE WITNESS:
23              Well, I need to do something at 1:00.
24    So do you want me to come and break again at one
25    or --
```



```
 1        MR. WILLIAMS:
 2             Or do you want to take lunch now?  Or
 3   how do you want to do it?
 4        MR. CRAIG:
 5             No.  Let's -- if you need five minutes
 6   now, let's do ten minutes, and we'll take a break
 7   and come back.
 8        MR. WILLIAMS:
 9             Okay.
10   (RECESS)
11        MR. CRAIG:
12             So we have counsel for the other parties
13   on the phone.
14   BY MR. CRAIG:
15        Q.   Sheriff, will you get Exhibit 56 in
16   front of you again?  That's your policy, the
17   pre-class policy.  I want you to turn to page 4,
18   if you will.  And just to start, make sure I
19   understood what you testified to previously,
20   prisoners who were pretrial detainees who were
21   housed at Riverbend who came to Orleans and got
22   sentenced would go back to East Carroll that same
23   day?
24        A.   I think that's what happened.  I'm not
25   sure, though.
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

```
1        Q.    Okay.

2        A.    It depends if it was -- it might be

3   later that -- it might be the next day --

4        Q.    Okay.

5        A.    -- depending upon when court ended.  I

6   can't say with any accuracy on that.

7        Q.    Okay.  Looking at the procedures part,

8   preparing the inmate paperwork for transfers to

9   DOC in your policy, and starting at paragraph 4 on

10  the bottom, it talks about having escort deputies

11  or transportation deputies bring the inmate to the

12  intake area.  Do you see where I'm looking at?

13       A.    Yes.

14       Q.    I'm not going to read the whole thing.

15  You've got it there in front of you.  And then the

16  next section, just saying, for example, 6, the

17  pre-classification deputy seats inmates in front

18  of the Bureau of Identification area to be

19  interviewed and from there they do the DOC master

20  form.  Do you see where I'm looking at there at 6?

21       A.    Yes.

22       Q.    And then 6-D talking about doing the

23  fingerprints for AFIS.  Would you agree with me

24  that the policy contemplates that the

25  pre-classification staff would be collecting this
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Case 2:19-cv-01384-MLCF-JVM Document 153-14 Filed 11/14/22 Page 68 of 85
GUSMAN, SHERIFF MARLIN N. 54/2023   Page 68 of 85

Page 67

```
 1   information from the inmate in the presence of the
 2   inmate?  In the physical presence of the inmate?
 3        A.   Yeah.  Each inmate is interviewed.
 4        Q.   Right.  In person.
 5        A.   Yes.
 6        Q.   And then they're fingerprinted by the
 7   pre-classification staff?
 8        A.   That's correct.
 9        Q.   If prisoners who had been in East
10   Carroll were convicted based on a plea agreement
11   in Orleans and then went back to East Carroll, how
12   would you expect that this part of your policy
13   would be followed for those inmates?
14        A.   Well, first of all, if they were
15   convicted, they're still the responsibility of the
16   parish.  It's not until they're sentenced.  Now,
17   once they're sentenced -- and again, I think I
18   said earlier that the volume that we were dealing
19   with, as well as the physical restraints, probably
20   is why things didn't happen exactly according to
21   the policy, and that's what happened.
22        Q.   For inmates who were coming from East
23   Carroll, pretrial inmates who were coming from
24   East Carroll sentenced in Orleans and then in a
25   short time going back to East Carroll, there was
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1   no way for the policy, as written, to be applied,
 2   correct?
 3        A.   I didn't say that, no.
 4        Q.   Okay.  So please explain.
 5        A.   I just said that perhaps that's why
 6   there were some lapses in not following the
 7   policy --
 8        Q.   How would --
 9        A.   -- and we corrected it.
10        Q.   Which I'm going to come to.  But how
11   would you have expected the pre-classification
12   staff to have handled that group of inmates?
13        A.   Well, the proper thing, looking back on
14   it, would have been to have them remain in our
15   custody --
16        Q.   Okay.
17        A.   -- until all the work was finished.
18        Q.   Okay.  You testified, I think, in the
19   earlier session that there was a point at which it
20   came to your attention that there were a problem
21   with inmates who had been released to East Carroll
22   as DOC inmates without pre-classification work
23   being completed, correct?
24        A.   That's correct.
25        Q.   And then you talked about what was done
```



Page 69

1     in response to that.  What my question now is:
2     Did you undertake any kind of review, or did you
3     look into the reasons why this happened separate
4     and apart from this lawsuit?  I'm just saying in
5     real time, when you realized what had happened.
6          A.   Well, we certainly remedied the problem
7     and changed what we were doing so it wouldn't
8     happen again, and I think we worked with East
9     Carroll Parish to ensure that it didn't happen
10    again.  We were still under some housing
11    constraints, but we were able to make sure that
12    this problem didn't recur again.  So I'm -- I
13    think I'm being responsive to what you're saying.
14         Q.   Yeah.
15         A.   We took action.
16         Q.   Did you hold any particular member of
17    your staff responsible for the fact that OPSO
18    released inmates to ECP without the
19    pre-classification packets being sent?
20         A.   I don't recall if anybody was
21    disciplined or reprimanded for that, but that
22    would have been the responsibility of the chief of
23    corrections, Major Holt, and who supervised them
24    at the time.
25         Q.   Who was chief of corrections by the time

```
1    we got to December 16th or January 17th, if you
2    remember?
3         A.   I don't remember.
4         Q.   That's fine.
5         A.   We may not have had one.
6         Q.   Yeah, that's fine.  With the information
7    you have -- I had asked you this in terms of the
8    past -- did you hold anybody responsible.  With
9    the information that you have currently, is there
10   any particular person on your staff who you do
11   hold responsible for the fact that OPSO released
12   inmates to East Carroll without pre-classification
13   packets being sent to DOC?
14        A.   Everybody in the chain is responsible
15   and, you know -- everybody's responsible.
16        Q.   Okay.  So when you say "the chain," that
17   would start with Mr. Amacker?
18        A.   From all the way up.
19        Q.   Including you?
20        A.   Including me.
21        Q.   Okay.  You have been talking about steps
22   that you have taken to correct the situation.
23   Please explain what you mean by that.  Well,
24   actually, it probably divides out into different
25   categories.  So, in the first place, I think
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
1   you've already given us your testimony about this,
2   but if you haven't, what did you do or what did
3   your office do when you found out that this
4   problem existed?
5        A.   I already gave you the testimony, but I
6   said that we --
7        MR. WILLIAMS:
8             Objection; asked and answered.
9        MR. CRAIG:
10            Yeah, that's fine.  You know --
11       THE WITNESS:
12            We dispatched one of our employees up to
13  East Carroll Parish to make sure all of the issues
14  were handled and that we were working together.
15  BY MR. CRAIG:
16       Q.   With East Carroll Parish?
17       A.   With East Carroll Parish to avoid
18  anything like this.
19       Q.   Okay.  And then you said you've taken
20  steps to be sure this doesn't happen again.  Can
21  you explain what those steps are?
22       A.   To follow the policy.  Ensure that they
23  follow every aspect of the policy.
24       Q.   And how is that done?
25       A.   Well, that someone wouldn't be
```



```
 1    transferred without making sure all of these items
 2    were going to be accomplished.
 3         Q.   And who is responsible for being sure
 4    that that happens?
 5         A.   The record room.  The intake and
 6    processing center.
 7         Q.   Okay.  And is that different from the
 8    situation that existed in July -- June and July of
 9    2016?
10         A.   Well, it's different people there.
11         Q.   Okay.  Are you getting different types
12    of reports about transfers and releases to jails
13    as DOC inmates?
14         A.   The same, but we're not experiencing
15    anywhere near the volume that we had before.
16         Q.   Why would you think that is in terms of
17    the volume?
18         MR. WILLIAMS:
19              You mean -- you're asking him why the
20    volume of -- I mean, that's not within his
21    control.
22         MR. CRAIG:
23              Well, do you have -- yeah.  I'm not
24    saying it is.  I'm just asking him what do you
25    think is driving that.  I'm interested.
```



```
 1        THE WITNESS:
 2             Less sentences.  More serious offenses,
 3   less sentences.
 4   BY MR. CRAIG:
 5        Q.   Has there been retraining on this policy
 6   that we've talked about, your policy, Exhibit 56?
 7        A.   We always constantly are making sure
 8   we're following the policies.
 9        Q.   Okay.  So I take it that it is still
10   true that OPSO releases pretrial prisoners after
11   they're sentenced to other parish jails as DOC
12   inmates?
13        A.   No.
14        Q.   Oh, they don't do that at all?
15        A.   Not anymore.
16        Q.   I see.
17        A.   Not to the best of my knowledge.
18        Q.   That's fine, yeah.  I accept that.  And
19   so that's different, correct?
20        A.   Right.  This was a temporary arrangement
21   that we had with East Carroll Parish.
22        Q.   Yeah.  And so where are the prisoners
23   going now?
24        A.   We send them directly to the Elayn Hunt
25   Correctional Center, the receiving center.
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1        Q.   Do you send some to Raymond Laborde, or
 2   do you know?
 3        A.   I don't know that.  I don't think that.
 4   But I'm not on that level too.
 5        Q.   Yeah, yeah, yeah.  I was just asking
 6   what you personally know.  Is it your
 7   understanding that Mr. Amacker has been
 8   transferred to the training academy?
 9        A.   That's my understanding.
10        Q.   Would you consider that a promotion?
11        A.   No.
12        Q.   It's a lateral move?
13        A.   I would think, yes.
14        Q.   Was any part of it related to what
15   happened with the prisoners who were released to
16   East Carroll as DOC inmates?
17        A.   First, I didn't make the transfer.  I
18   don't work at that level.  And then, secondly, to
19   the best of my knowledge, there was no
20   relationship with it.
21        Q.   Okay.  May I just rephrase that, make
22   sure I understand it?  You're saying the transfer
23   of Mr. Amacker, because we've been talking about
24   transfers, that you wouldn't have anything to do
25   with the transfer of Mr. Amacker.  That's not --
```

Case 2:19-cv-01384-NJB-JVM Document 153-14 Filed 11/14/22 Page 76 of 85
Case 2:19-cv-01384-NJB-JVM GUSMAN SHERIFF MARLIN N. 5/4/1073 Page 76 of 85

Page 75

```
 1   that's something somebody under you does, things
 2   like that.
 3         A.    That's correct.
 4         Q.    Okay.  But, in any event, to your
 5   knowledge, that was that -- the transfer to the
 6   training center of Mr. Amacker was not related to
 7   the prisoners who had been released to East
 8   Carroll?
 9         A.    To the best of my knowledge, no.
10   MR. CRAIG:
11         That's what I thought you were saying.
12   Let's take -- if we can take a very short break.
13   I want to confer with my co-counsel and see
14   exactly where we are.
15   MR. WILLIAMS:
16         Okay.
17   MR. CRAIG:
18         We're moving along very well.
19   (BRIEF RECESS)
20   MR. CRAIG:
21         We're back on the record.
22   BY MR. CRAIG:
23         Q.    You were aware, Sheriff, that habeas
24   corpus petitions were filed by attorneys to secure
25   release of the DOC inmates at Riverbend who were
```



Case 2:19-cv-01384-MLCF-JVM  Document 153-14  Filed 11/14/22  Page 77 of 85
Case 2:19-cv-01384-MLCF-JVM  Document 153-14  Filed 11/14/22  Page 77 of 85
MUSMAN, SHERIFF MARLIN N. GUSMAN

Page 76

```
 1    incarcerated, according to the petitions, beyond
 2    their release dates?
 3         A.    Yeah.  I think that's what -- I'd have
 4    to have my memory refreshed, but I think that was
 5    what prompted and gave me the information.  I
 6    hadn't heard before about it.  Once I had heard
 7    about it, we immediately took action.  I think
 8    that's what it was.
 9         Q.    Okay.
10         A.    I don't know if it was a phone call or
11    what, but I do remember some discussion about the
12    writs.  I don't remember if I was served
13    personally with them or anything.
14         Q.    Yeah.  So I want you to exclude any
15    conversations or meetings with attorneys in this
16    next question, please.  Do you recall any meetings
17    or emails or communications between you and your
18    staff about the habeas corpus petitions?
19         A.    I don't recall anything specifically
20    about the habeas corpus petitions.  I do know that
21    -- I do remember that we had -- I had some oral
22    conversation and said, "Y'all got to get this
23    done.  Handle it immediately.  This isn't
24    something that can wait."
25         Q.    So let me represent to you -- and if
```

```
 1    it's a problem, we can pull a couple of documents
 2    on this.  But let me represent to you that Corey
 3    Amacker went up to East Carroll around December
 4    27th, sometime after Christmas.  We have emails
 5    from him about that.
 6         A.   December 29th.
 7         Q.   Oh, okay.  Very good.  But the habeas
 8    corpus petitions were filed after that, I think,
 9    on January 11th.  So maybe it was something other
10    than the petitions that brought it to your
11    attention?
12         A.   Like I said, I really didn't remember
13    the petitions.  What I remember, there was a
14    problem, and we sent some people up to take care
15    of it.
16         Q.   Yeah.  How do you have such a good
17    memory of when Mr. Amacker went to East Carroll?
18         A.   I guess it was because it was around the
19    holidays and it was unusual.
20         Q.   Yeah.  When did you first hear about
21    this lawsuit?  When did you first learn about it?
22         A.   I don't recall.
23         Q.   And, again, I want you to exclude from
24    this question any meetings or communications with
25    attorneys.  Do you recall any conversations or
```



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    meetings or emails between you and your staff
 2    about the filing of the complaint?
 3        A.    I remember we discussed, you know, the
 4    complaint and -- I don't remember.  I just, you
 5    know, looked again to know -- to make sure we're
 6    not doing this -- that this isn't, you know, isn't
 7    something that will keep on happening, that kind
 8    of discussion.
 9        Q.    Yeah.  Did you talk to Sheriff Williams
10    in East Carroll after the complaint was filed?  I
11    mean about the complaint.  I'm sure you may have
12    had other conversations with him.
13        A.    Not particularly.
14        Q.    Okay.  What about with anybody from the
15    Department of Corrections?
16        A.    Not particularly that I can recall.
17        Q.    I want to make sure that I have this
18    factual point correct.  You knew about the
19    existence of the problem at East Carroll, which is
20    what we've been talking about, before Mr. Amacker
21    went on December 29th to East Carroll, correct?
22        A.    Yes.
23        Q.    I just wanted to make sure I --
24        A.    To the best of my knowledge, I knew
25    about it before, and that's why he went up there.
```

1    Q.   Okay.  Have you looked through your
2    files, emails or other places where you keep
3    information to see if you have any discoverable
4    information that relates to this lawsuit?
5    A.   My lawyers did that.
6    Q.   Okay.  You gave your lawyers access to
7    that material?
8    MR. WILLIAMS:
9        Objection.  I mean, I think he's
10   answered it.  I don't want to talk any further
11   about what he did or gave or told his lawyers.
12   MR. CRAIG:
13       Okay.  So that's the end of my
14   questioning, subject to I get to ask again if
15   other people ask questions.  And I'm sure you
16   realize what works, as we've got lawyers from East
17   Carroll, lawyers from DOC on the phone, and your
18   counsel is also entitled to ask you questions.  I
19   don't know which direction -- which way we want to
20   go.
21       I think probably other counsel asks
22   first, and then that gives Mr. Williams a chance,
23   if he wants to, to respond to any questioning by
24   other counsel.  So who wants to go first between
25   the two of you?

```
 1        MR. EVANS:
 2             Yeah.  This is Gary.  I have no further
 3   questions.
 4        MR. CRAIG:
 5             Okay.  Shane?
 6        MR. BRYANT:
 7             This is Shane.  I also have no
 8   questions.
 9        MR. CRAIG:
10             All right.  So we tender to you, Mr.
11   Williams.
12        MR. WILLIAMS:
13             I have no questions.
14        MR. CRAIG:
15             Well, that means we're done with the
16   deposition.  Thank you very much, Sheriff.  I
17   appreciate your time.  Hope you get better soon.
18
19                  *   *   *   *   *
20        (End of deposition at 2:02 p.m.)
21                  *   *   *   *   *
22
23
24
25
```



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1              WITNESS'S ATTESTATION

 2

 3        I have read or have had the foregoing

 4   testimony read to me and hereby certify that it is

 5   a true and correct transcription of my testimony,

 6   with the exception of any attached corrections or

 7   changes.

 8

 9

10

11

12

13

14

15              _____

16                   SHERIFF MARLIN N. GUSMAN

17

18   (CHECK ONE)

19

20   (      )   NO CORRECTIONS

21   (      )   CORRECTIONS; ERRATA SHEET (S)

22    ENCLOSED

23

24

25
```



```
 1           R E P O R T E R ' S   P A G E
 2
 3           I, DANA B. SCHOULTZ, Certified Court
 4      Reporter in and for the State of Louisiana, the
 5      officer, as defined in Rule 28 of the Federal
 6      Rules of Civil Procedure and/or Article 1434 (B)
 7      of the Louisiana Code of Civil Procedure, before
 8      whom this proceeding was taken, do hereby state on
 9      the Record:
10           That due to the interaction in the
11      spontaneous discourse of this proceeding, dashes
12      (--) have been used to indicate pauses, changes in
13      thought, and/or talkovers; that same is the proper
14      method for a Court Reporter's transcription of
15      proceeding, and that the dashes (--) do not
16      indicate that words or phrases have been left out
17      of this transcript;
18           That any words and/or names which could not
19      be verified through reference material have been
20      denoted with the phrase "(spelled phonetically)."
21
22                      _____

                                DANA B. SCHOULTZ
23                              Certified Court Reporter
24
25
26
```



```
 1                 C E R T I F I C A T E

 2

 3          This certification is valid only for a

 4     transcript accompanied by my original signature

 5     and original stamp on this page.

 6          I, DANA B. SCHOULTZ, Certified Court

 7     Reporter in and for the State of Louisiana, as the

 8     officer before whom this testimony was taken, do

 9     hereby certify that SHERIFF MARLIN N. GUSMAN,

10     after having been duly sworn by me upon authority

11     of R.S. 37:2554, did testify as hereinbefore set

12     forth in the foregoing eighty (80) pages;

13          That this testimony was reported by me in

14     the Stenotype reporting method, was prepared and

15     transcribed by me or under my personal direction

16     and supervision, and is a true and correct

17     transcript to the best of my ability and

18     understanding;

19          That the transcript has been prepared in

20     compliance with transcript format guidelines

21     required by statute or by rules of the Board;

22          That I am informed about the complete

23     arrangement, financial or otherwise, with the

24     person or entity making arrangements for

25     deposition services;
```



1            That I have acted in compliance with
2    the prohibition on contractual relationships as
3    defined by Louisiana Code of Civil Procedure
4    Article 1434 and in rules and advisory opinions of
5    the Board;
6            That I have no actual knowledge of any
7    prohibited employment or contractual relationship,
8    direct or indirect, between a court reporting firm
9    and any party litigant in this matter, nor is
10   there any such relationship between myself and a
11   party litigant in this matter;
12           That I am not related to counsel or to the
13   parties herein, nor am I otherwise interested in
14   the outcome of this matter.
15
16                              _____
17                              DANA B. SCHOULTZ, #87111
                                Certified Court Reporter
18                              State of Louisiana
19
20
21
22
23
24
25

