**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

JOHNNY TRAWEEK                                    CIVIL ACTION

VERSUS                                            NO. 19-1384-MLCF-JVM

MARLIN GUSMAN, ET AL.                             SECTION: "F" (1)

---

### Opposition to Secretary LeBlanc's Second Motion for Summary Judgment

---

Mr. Traweek filed this lawsuit because he was incarcerated for twenty days past the end of his court-ordered sentence.[1]

This Court denied Secretary LeBlanc's invocation of qualified immunity at the pleading[2] and summary judgment[3] phases. On interlocutory appeal of the denial of qualified immunity on summary judgment, the Fifth Circuit observed that "there is a clearly established right to timely release from prison," and remanded the matter for further findings by the trial court about any "genuine fact dispute as to whether LeBlanc's alleged complicity in Traweek's overdetention was objectively unreasonable in the light of this clearly established law."[4] The circuit court specifically asked this Court to consider whether the Fifth Circuit's decision in *Crittindon* bears on the issues here, given that *Crittindon* "involves similar issues and claims."[5]

In *Crittindon,* the Fifth Circuit held that it was "obvious" at least as early as 2016 that LeBlanc's failure to address "processing delays would lead to unconstitutional overdetentions" for inmates "entitled to immediate or near-immediate release upon conviction."[6] The circuit court held that a "reasonable factfinder could conclude that Defendants' awareness of this pattern of delays and their conscious decision not to address it rises to the level of deliberate indifference."[7]

---

[1] Rec. Doc. 83, Third Amended Complaint.
[2] Rec. Doc. 41 at 23 (holding that the plead facts that "would overcome [LeBlanc's] assertion of qualified immunity.")
[3] Rec. Doc. 129 at 15 (holding that "particularly in light of the Fifth Circuit's signal in <u>Hicks</u> – the Court cannot grant qualified immunity to LeBlanc on the record before the Court.")
[4] *Traweek v. LeBlanc*, 21-30096 (5th Cir. 2022) (unpublished), at *8.
[5] *Id*. at *9.
[6] *Crittindon v. LeBlanc*, 37 F.4th 177, 187-188 (5th Cir. 2022)
[7] *Id*.

1

Now, LeBlanc moves for summary judgment again. He argues that (1) that "the 20-day administrative delay between Traweek's sentencing and release was not unreasonable"; (2) that LeBlanc was not aware of any pattern of overdetention; (3) that the law of his obligation to release inmates when their sentence was complete was not clearly established; and (4) *Heck* should bar Traweek's claims. Each of these points has been repeatedly and thoroughly rejected by federal courts, in *Crittindon* and other cases. LeBlanc's motion should be denied.

## I.     LEGAL STANDARD

"[S]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[8] Summary judgment is only appropriate when the moving party identifies material facts not in dispute, "and the nonmoving party fails to produce or identify in the record summary judgment evidence sufficient to sustain a finding in its favor respecting such of those facts as to which it bears the trial burden of proof."[9] This Court will view "the evidence and all justifiable inferences in the light most favorable to the non-moving party."[10]

## II.     ANALYSIS

**A.     LeBlanc's Motion Should Be Denied Because It Relies on Disputed Facts.**

In order to prevail on summary judgment, the moving party must "demonstrate the absence of any genuine issue of material fact."[11]

Here, Defendant has failed to do so. Defendant relies on several material facts,[12] which Plaintiff has evidence to dispute,[13] including:

- Fact 11, that Traweek's previous attorney gave Ms. DiBenedetto incorrect information about Traweek's sentence;

---

[8] *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).
[9] *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 521 (5th Cir. 1999).
[10] *Vercher v. Alexander & Alexander Inc.,* 379 F.3d 222, 225 (5th Cir. 2004).
[11] *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (1986).
[12] Rec. Doc. 153-1.
[13] Rec. Doc. 157-1.

- Fact 23, that it was Sheriff Gusman who was squarely responsible for "processing and transfer of OPSO inmates to DPSC";

- Fact 36, that Defendant Jones was allegedly "unable to begin processing Plaintiff's pre-class packet on May 18";

- Fact 42 that "[o]ffenders who have been sentenced to parish time . . . are the responsibility of the parish Sheriff";

- Fact 54, that "the release process was started immediately" for Mr. Traweek;

- Fact 57, when an "offender is discovered to be eligible for 'immediate release', the release clearance process begins immediately";

- Fact 67, that Jones was unable to find DNA recordings for Traweek, which were required before he could be released;

- Fact 80, that "[i]t is reasonable for a pre-class packet received on a Thursday to not be completed until the following Tuesday"; and

- Fact 82, stating that Mr. Moroz did not send a copy of the Writ of Habeas Corpus and Motion for Immediate Release to any employee of DPSC.

Despite lengthy stays in discovery limiting Plaintiff's ability to gather information from DPSC, Plaintiff already has evidence to dispute each of these facts as outlined in the Statement of Disputed Facts. And these facts are at the core of the issues in this case – they address the reasonableness and immediacy of Defendants' actions. That is crucial, because as discussed below, the Fifth Circuit held that an inmate should receive "immediate or near-immediate" release upon completion of their sentence.[14] Defendant's motion should therefore be denied.

**B.      LeBlanc is Not Entitled to Qualified Immunity Because LeBlanc's Arguments Are Directly Contrary to the Fifth Circuit's Holdings in *Crittindon*.[15]**

1.      LeBlanc's is wrong that a "20-day administrative delay" was reasonable, because 20 days is 10,000% of what courts have found to be the outside bound of reasonableness.

---

[14] *Crittindon v. LeBlanc*, 37 F.4th 177, 187 (5th Cir. 2022).

[15] There is not sufficient space here to fully brief the issue, but historical evidence has revealed that the doctrine of qualified immunity is contrary to the original text of Section 1983. Specifically, the original version of Section 1983 contained a "Notwithstanding Clause" that does not appear in today's U.S. Code – but still has the force of law. For a fuller explanation, see *Skinner v. Gautreaux*, 20-cv-00595-SDD-SDJ, Rec. Doc. 76 (M.D. La., Oct. 14, 2022) (Brief in Opposition to Motion to Dismiss), at pages 9 *et seq*. LeBlanc's motion should be denied for that reason as well.

In his motion, LeBlanc acknowledges that Traweek served seven months pre-sentencing, and was sentenced to seven months with credit for time served.[16] As a result, his sentence was complete upon sentencing. LeBlanc also acknowledges that it was twenty days before "DPSC received the paperwork, calculated Traweek's sentence, and arranged his release."[17]

But LeBlanc argues that those twenty days of incarceration beyond the expiration of Traweek's court-ordered sentence was an "administrative delay" that was "not unreasonable."[18]

LeBlanc fails to provide any support for that argument. He does not cite any case whatsoever finding that an "administrative delay" of that length is reasonable.

It is not. In *Crittindon,* the Fifth Circuit characterized the entitlement to release as being "**immediate or near-immediate**" following conviction for persons whose sentence is complete.[19] Other courts have also repeatedly held that short periods – on the order of hours or a day or two – can work a due process violation.[20] In none of those cases is there any suggestion that several *weeks* would be permissible. For example, this Court denied summary judgment when it found that a sheriff's policy delayed release by periods ranging from one to seven days.[21]

---

[16] Rec. Doc. 153-2 at 2, 8.

[17] Rec. Doc. 153-2 at 20.

[18] Rec. Doc. 153-2 at 8.

[19] *Crittindon* at 187.

[20] *Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001) (jury verdict for plaintiff for half-hour overdetention at court holding cell and two and a half hours at jail after release order ); *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988) (whether 11 hours was reasonable was a question of fact for jury); *Green v. Baca*, 306 F.Supp.2d 903 (C.D.Cal.2004) (12 ½ hour delay not reasonable as a matter of law; summary judgment denied); *Sosa v. Martin County, Florida*, 20-12781 (11th Cir. 2021) (denying qualified immunity for an overdetention claim when jailors "took no action for three days" despite having information such that "a substantial possibility existed" that Sosa should be free); *Arline v. City of Jacksonville*, 359 F. Supp. 2d 1300 at 8 (M.D.Fla. 2005) (two and a half hour detention following acquittal presented jury question); *Jones v. Cochran*, 1994 U.S. Dist. LEXIS 20625 (S.D. Fla. 1994)(3 hours); *Parilla v. Eslinger*, 2005 U.S. Dist. LEXIS 34747 (D. Fla. 2005) (approximately 5 hours after court ordered released and 14 hours after family paid bond); *Muick v. Jasso*, No. 3:02-CV-1089-L, 2003 WL 22054226, at *1 (N.D. Tex. Apr. 3, 2003) (labeling plaintiff's claim for fifty-minute overdetention as nonfrivolous); *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir.1988) ("We recognize that the administrative tasks incident to a release of a prisoner from custody may require some time to accomplish — in this case perhaps a number of hours.")

[21] *Grant v. Gusman,* 17-cv-2797-NJB (denying summary judgment where the Court found that "Plaintiff has identified a promulgated policy that necessarily results in some individuals being detained beyond their legal release date. Specifically, OPSO's written policy of driving pre-classification packets to the DOC headquarters in Baton Rouge once a week necessarily results in the overdetention of inmates who are eligible for immediate release upon sentencing.")

The law is so clear that one court did a wide-ranging search across circuits and reported that it had "been unable to find any case . . . in which the detainment of a properly identified individual for days beyond his scheduled release date was held constitutionally permissible."[22]

This Court, in ruling on the Motion to Dismiss, quoted *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 276 (D.D.C. 2011), holding that "courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon."[23] That case noted that even "a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment."[24]

Thus, LeBlanc's argument that a <u>multiple-week</u> "administrative" delay is permissible is extraordinary. That argument shocked this Court when LeBlanc's counsel argued something similar two years ago,[25] and it is still shocking today.

Because the "administrative delay" LeBlanc claims to be reasonable here is **10,000%** of what courts have held to be the *outside* boundary of time to process an inmate after sentencing,[26] and in no way matches the Fifth Circuit's standard of "immediate or near-immediate" release, LeBlanc's motion should be denied.

2.   <u>LeBlanc's motion should be denied because the Fifth Circuit held in *Crittindon* that LeBlanc was aware of a pattern of overdetention prior to the facts of *Traweek*.</u>

---

[22] *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1354 (N.D. Ga. 2005).

[23] Rec. Doc. 41 at 38.

[24] *Barnes, supra.*

[25] See Ex. A, Transcript of March 11, 2020 Hearing in *Grant v. Gusman*, 17-cv-2797 (E.D. La.) at pg. 31.

> THE COURT: So people are just supposed to accept that? If you have an inefficient system, if you've put into effect a policy that's blatantly unfair, that, you know, your constitutional rights go out the window?
>
> MS. GLAZER: But what policy –
>
> THE COURT: If the agency can't get itself together to get people out of prison on time, as an American citizen you're just stuck with that?

[26] Settlements are not law, but a recent settlement shows how far outside of the norm LeBlanc's argument is. Last month, New York City agreed to pay "as much as $300 million" to compensate detainees whose "release was delayed three hours or more." Benjamin Weiser, <u>*New York to Pay as Much as $300 Million for Release Delays at Rikers,*</u> New York Times (Nov. 29, 2022). Contrast that with LeBlanc's argument that Traweek's three-week delay was reasonable and should not be compensated at all.

LeBlanc argues that "there is no evidence that LeBlanc knew in 2018 of a pattern of similar constitutional violations caused by deficient or missing policies and there is no evidence that LeBlanc's response to that alleged knowledge was unreasonable."[27]

But LeBlanc's newly invented argument is squarely foreclosed by the Fifth Circuit's opinions in both *Crittindon* and this case. The circuit court in deciding this case "note[d] that LeBlanc is also a defendant in *Crittindon*,"[28] specifically found that *Crittindon* and *Traweek* involve "similar issues and claims,"[29] and so directed this Court to assess *Traweek* in light of *Crittindon.* In *Crittindon,* the Fifth Circuit assessed LeBlanc's knowledge and found that LeBlanc had an "awareness of [a] pattern of delays" resulting in overdetention:

> Known as the Lean Six Sigma study, DPSC's investigation exposed widespread overdetentions of DPSC prisoners. The Lean Six Sigma study attributed these overdetentions to delays in transmitting local jail preclassification paperwork and to DPSC's own delays in processing this paperwork on its receipt. DPSC considered placing oversight mechanisms to ensure that local jails timely transmitted pre-classification paperwork to DPSC, but did not to do so. Instead, DPSC chose to address only its own internal workflow problems.
> . . .
> Therefore, in cases like Plaintiffs', where prisoners were entitled to immediate or near-immediate release upon conviction, it was obvious that a failure to address those processing delays would lead to unconstitutional overdetention.[30]

Since the circuit court held that LeBlanc was aware of a pattern of overdetention when DPSC overdetained the Plaintiffs in *Crittindon* in 2016, LeBlanc was therefore already found to have had knowledge of this unconstitutional pattern by the time of DPSC's overdetention of Mr. Traweek in 2018.[31]

Every part of LeBlanc's argument is contradicted by the Fifth Circuit's binding precedent: *Crittindon* held that LeBlanc knew about "widespread overdetentions," *Crittindon* held that LeBlanc knew about those overdetentions before 2018. Further, the circuit court held in *Crittindon*

---

[27] Rec. Doc. 153-2 at 14.
[28] *Traweek v. LeBlanc,* 21-30096 (5th Cir. 2022) (unpublished), at *9.
[29] *Id.*
[30] *Crittindon*, *supra*, at 183, 187
[31] *Id.*, at 183-184.

that "[a] reasonable factfinder could conclude that Defendants' awareness of this pattern of delays and their conscious decision not to address it rises to the level of deliberate indifference." Therefore, LeBlanc's motion should be denied.

3.    <u>LeBlanc's motion should be denied because the Fifth Circuit already defined the clearly-established law relevant here.</u>

In his motion, LeBlanc makes another attempt at arguing that the "contours of the 'right to timely release' were not clearly established" in 2018. He made this argument in his prior motion for summary judgment,[32] and this Court rejected it as to LeBlanc.[33] LeBlanc appealed.

On appeal, the Fifth Circuit held that the "the district court correctly observed in its order denying LeBlanc's motion to dismiss [that] 'there is a clearly established right to timely release from prison.'"[34]

This Court and the Fifth Circuit, requested that the Parties consider the application of both *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) and *City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021). In those cases, the "Supreme Court has twice reaffirmed the importance of the principle that clearly established law for qualified immunity purposes must be defined with specificity."[35] In *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8-9 (2021), the Supreme Court denied qualified immunity on an excessive force claim because Plaintiff failed to "identify a case that put Rivas-Villegas on notice that his specific conduct was unlawful" when an officer responded "to a serious alleged incident of domestic violence possibly involving a chainsaw" and he had a knife protruding from his pocket leading an officer to place his knee on the plaintiff's back for eight seconds. The Supreme Court explained that immunity was granted because specificity is especially important in the Fourth Amendment context, and there was no case to provide the

---

[32] Rec. Doc. 107-1 at 10 ("the contours of the Fourteenth Amendment right to timely release from prison are not so clearly defined as to put reasonable subordinate administrative officers on notice").
[33] Rec. Doc. 129 at 22 ("The plaintiff's constitutional claims, negligence claim, and respondeat superior claim against James LeBlanc shall remain for trial.")
[34] *Traweek* (5th Cir. 2022) at *8.
[35] *French v. Merrill*, 24 F.4th 93, 97 (1st Cir. 2022).

officer with fair notice that his use of force was excessive to help clear the "hazy borders between excessive and acceptable force." *Id.* (citation omitted). In *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (citation omitted), the Supreme Court also emphasized that "specificity is 'especially important in the Fourth Amendment context[.]'" In *Rivas-Villegas*, the Supreme Court contrasted an "obvious case" where a Plaintiff can show a right was clearly established without referring to "a body of relevant case law."[36] Here, not only is this an obvious case arising under the Fourteenth Amendment, and outside of the "hazy" Fourth Amendment context, there is also "a body of relevant case law" showing the right to timely released is clearly established.[37]

In the circuit court,  after holding that the right at stake is "clearly established" and defined properly as the "right to timely release from prison[,]'" the circuit court remanded the case to this Court to assess whether there is a "genuine fact dispute as to whether LeBlanc's alleged complicity in Traweek's overdetention was objectively unreasonable **in the light of this clearly established law**."[38]  Thus, the Fifth Circuit affirmed that this Court has already stated the parameters of the clearly-established law that the parties are working within. The Fifth Circuit did <u>not</u> permit the parties to re-litigate the contours of what is clearly-established law. The motion should be denied.

4.     <u>A factfinder could conclude that LeBlanc's actions were objectively unreasonable in light of the clearly established law.</u>

---

[36] *Id.* at 8 (citation omitted).

[37] *See, e.g., Whirl v. Kern*, 407 F.2d 781, 784, 791 (5th Cir. 1968) (damages action "for false imprisonment under Texas law and for deprivation of civil rights under 42 U.S.C.A. § 1983," "where the jailer [kept] a prisoner beyond the lawful terms of his sentence"); *Bryan v. Jones*, 530 F.2d 1210, 1211 (5th Cir. 1976) (en banc) ("damage action based on theory of false imprisonment" brought pursuant to § 1983); *Douthit v. Jones*, 619 F.2d 527, 529 (5th Cir. 1980) (denying qualified immunity to sheriff and deputy sheriff in action "seeking damages for [plaintiff's] allegedly wrongful incarceration by defendants under 42 U.S.C. §§ 1983, 1988 and the Texas common law tort of false imprisonment"); *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) ("There is a Clearly Established Right to Timely Release from Prison"); " *Hicks v. LeBlanc*, 832 F. App'x  836, 840 (5th Cir. 2020) (unpublished) ("[t]he Fourteenth Amendment Due Process Clause is violated where a prisoner remains incarcerated after the legal authority to hold him has expired."; *Crittindon v. LeBlanc*, 37 F.4th 177 (5th Cir. 2022) ("This Court has recognized the 'clearly established right to timely release from prison.'").

And the Fifth Circuit recently reaffirmed the vitality of the older cases holding that jailors cannot wait passively to receive information and plead ignorance. In *Harris v. Clay Cnty.*, 47 F. 4th 271 (5th Cir. 2022), the court noted that "[a]s we said long ago of another sheriff's defense to a prolonged detention claim—he argued that his ignorance of a court's ordering the defendant's release excused him from liability —if that were the law then 'nine months could easily be nine years, and those nine years, ninety-nine years, and still as a matter of law no redress would follow.'" Citing *Whirl v. Kern,* 407 F.2d 781, 792 (5th Cir. 1968).

[38] *Id.* (emphasis added).

The task for the parties and the Court now is to assess the *factual* question of whether LeBlanc's actions and inactions were objectively unreasonable. Most of the material facts identified by Defendants, R. Doc. 153-1, that are disputed by Plaintiff in his Statement of Disputed Facts, are regarding the reasonableness of the delays in processing Mr. Traweek's release, and LeBlanc's responsibility for those delays. So what are the facts of LeBlanc's actions and inactions? This Court previously recognized in this case the "staggering volume of factual evidence of incompetence and indifference in the Department headed by LeBlanc."[39] The Court held that the "disturbing nature and sheer weight of this 'pattern evidence' is compelling and has led several courts to deny LeBlanc qualified immunity in similar cases."[40] What is that evidence? It includes the following:

- In 2012 year, the DOC had a team of a dozen of its staff perform a "Lean Six Sigma"[41] review of its inmate time calculation processes.[42] Secretary LeBlanc was a "champion" of the project.[43] The Lean Six Sigma review found a widespread pattern of people being held past their legal release date. Specifically, it found that when the DOC calculated the release date of inmates, 83% were eligible for "immediate release . . . due to an earlier release date."[44]

- By the DOC's own admission, this 83% of inmates were all being "overdetained."[45] Some of the delay came from the time it took to receive documents from the clerks' and sheriffs' offices. But it was primarily because the DOC was taking approximately seventy-nine days

---

[39] Rec. Doc. 129 at 13.

[40] *Id.*, *citing Crittindon v. Gusman*, 2020 WL 1862467, at *15 (M.D. La. Apr. 13, 2020) ("The state of affairs at the DOC, where DOC's staff were passive and essentially flying blind unless contacted by a concerned family member, evinces a reckless disregard for the likelihood of overdetention in the DOC system."); *Grant v. Gusman*, 2018 WL 3869494, at *11 (E.D. La. Aug. 14, 2018) (denying LeBlanc qualified immunity where plaintiff's alleged facts made it "plausible that Secretary LeBlanc engaged in a policy of unconstitutionally over-detaining persons and that policy was the driving force behind" the plaintiff's alleged constitutional injury).

[41] "Lean Six Sigma is a team-focused managerial approach that seeks to improve performance by eliminating waste and defects." Will Kenton, *Lean Six Sigma*, Investopedia.com (Feb. 5, 2018).

[42] Rec. Doc. 114-6 (DOC's Six Sigma Report).

[43] *Id.* at 3.

[44] *Id.* at 4

[45] Rec. Doc. 114-12 (DOC 30(b)(6) Deposition) at 17-18:

    Q.   I use the word "overdetention" to describe someone who should have been released in the past but
         wasn't. Will you understand me if I use that term?
    A.   Yes.
    Q.   So these people who were found to have an earlier release date, they were being overdetained, right?
    A.   By your definition of overdetention, yes.
    Q.   So this investigation found that 83.44 percent of these cases, once their time was computed, were
         found to have been overdetained, correct?
    A.   By your definition, yes.

to calculate an inmate's sentence after receiving their documents.[46]

- The DOC Six Sigma review found that it was overdetaining **2,252 inmates per year**, with an average of **71.69 "Overdue days" per inmate**.[47] This was, as the DOC concedes, "a lot of overdetention."[48]

- The DOC did not fix the overdetention problem. It did not even set for itself a *goal* of fixing the problem. The goal the DOC set for itself was to overdetain <u>only</u> 450 persons per year by an average of 31 days per person.[49]

- The DOC implemented interventions that "modestly improved," but did not eliminate the problem.[50]

- After the DOC Six Sigma team's interventions, the number of these overdetained persons was reduced from 2,252 per year to 1,612, and the average number of overdue days was reduced from 71.7 to 60.52 days.[51]

- The DOC did take some steps to try to improve things after that. They centralized their PreClass department, and made "some adjustment and updates to the Uniform Commitment Order."[52] In 2015 the "department did attempt an offender [electronic records] management system, which was not a success. It never went into full production. It was tested for a bit and then found to be inoperable."[53] As a result, the "functional processes" around the transmission of documents "remain as antiquated as they were in 1996."[54]

- Instead of continuing to try to find a solution, the DOC accepted and institutionalized the problem into its public-facing identity. On its website, the DOC posted a statement: "If a person has recently been sentenced to DOC custody, it can take up to 12 weeks to calculate a date as the Department has to receive official paperwork from the sentencing court in order to calculate the offender's release date."[55] The DOC put on its voicemail an audio statement that it "takes at least 90 days after sentencing" for the department to calculate how much time a person must serve.[56]

- In 2017, the DOC did an internal investigation and confirmed that overdetention was

---

[46] *Id.* at 33 ("Q. So this approximately 79-day number represents the DOC's, to the best of its knowledge in 2012, about how long it was taking for documents to wait at the DOC to be calculated? A. Correct.") *See also* Rec. Doc. 114-13 (DOC Frequently Asked Questions) ("If a person has recently been sentenced to DOC custody, it can take up to 12 weeks to calculate a date as the Department has to receive official paperwork from the sentencing court in order to calculate the offender's release date.")

[47] Rec. Doc. 114-6 at 18, 20; *see also* 114-16 at RFA 69 ("It is admitted that the 2012 Lean Six Sigma found an average of 71.70 'overdue days' for inmates found to be eligible for immediate release upon time calculation."), RFA 70 ("It is admitted that the 2012 Lean Six Sigma project found that approximately 2252 inmates per year were eligible for immediate release upon time calculation.").

[48] Rec. Doc. 114-12 at 20.

[49] Rec. Doc. 114-6 at 5; Rec. Doc. 114-12 at 18. That would be 38 years of overdetention per year (450*31/365).

[50] Rec. Doc. 114-12 at 33.

[51] Rec. Doc. 114-6 at 18.

[52] Rec. Doc. 114-14 at 22.

[53] *Id.*

[54] *Id.* at 29.

[55] Rec. Doc. 114-13 at 3. Secretary LeBlanc testified that this "12 weeks is ridiculous" and "just absurd." Rec. Doc. 114-11 at 90.

[56] Rec. Doc. 114-14 (DOC 30(b)(6) Deposition) at 12-13

ongoing. In a grant application to the U.S. Department of Justice, the Louisiana DOC disclosed that in 2017, it "had an average of **200 cases per month** considered an 'immediate release' due to these deficiencies."[57]

- According to the DOC, these people were held an "average of 49 days past the end of their sentences."[58]

- The problem still has not been solved. The most recent large-scale, non-confidential data the DOC has released is from February 2019. In that month, according general counsel for the Department of Corrections, "231 people across the state were affected. Those people waited an average 44 days to be released after a judge ordered them free."[59]

- Despite all this, there has not been a single example of "discipline or adverse employment activity for DOC employees who have incorrectly computed sentences or release dates, from 2000 to the present."[60]

- The DOC's own counsel has admitted to the DOC's pattern of overdetention. On March 8, 2018, Attorney General Jeff Landry wrote an op-ed conceding that there "is a layer of incompetence so deep that the Corrections Department doesn't know where a prisoner is on any given day of the week or when he should actually be released from prison."[61]

As a result of all of the above, it is routine in Louisiana for the DOC to hold people like Johnny Traweek past their release date. In fact, the DOC testified that it is "rare" for them to be released on time.[62] The head of the DOC's Pre-Class department testified that she "can't say positively" if she has *ever* seen someone like that released on the date of the end of their sentence.[63]

Secretary LeBlanc personally presided over all of this. He has been Secretary of the Department of Public Safety & Corrections since 2008.[64] He admits that in 2012, through the Six Sigma process, he learned that thousands of people in his custody were being overdetained:

---

[57] Rec. Doc. 114-15 at 4 (emphasis added); Rec. Doc. 114-14 at 31-32 (testifying that it is true that in "2017, DPS&C had an average of 200 cases per month considered an 'immediate release' due to these deficiencies.")

[58] Rec. Doc. 114-14 at 34, 38 ("Q. So it's a true statement that the DOC found that in 2017 it had an average of 200 inmates per month held an average of 49 days past the end of their sentence, correct? A. Yes.")

[59] Rec. Doc. 114-17 at 5. *See also* Rec. Doc. 114-16 at RFA 76 ("It is admitted that in February of 2019, 231 people were found to be held past the release date, with an average of 44 days waiting for release.") The list of 231 inmates is Rec. Doc. 114-7, with names redacted.

[60] Rec. Doc. 114-18 at Int. 17; *see also* Rec. Doc. 114-9 at 48-49 (no employee was fired, demoted, docked pay, or reprimanded as a result of the discovery that 'thousands of people . . . were being held past their release date.")

[61] Sen. John Kennedy and Atty. Gen. Jeff Landry, *Criminal justice reform actually hurting public safety*, The Advocate (Mar. 8, 2018) (emphasis added).

[62] Rec. Doc. 114-2 at 30-31.

[63] Id. at 31.

[64] Rec. Doc. 114-11 (Dep. of James LeBlanc) at 91-92.

```
Q.   But you learned that thousands of people in
     the custody of the Department of
     Corrections for whatever reason were being
     held past their release date, correct?
A.   I did.                                      65
```

Even after the Six Sigma interventions, he understood that the DOC still had "people being held an average of about two months past their release date."[66] Secretary LeBlanc agrees this was "a big problem."[67] But he did not fire anyone. He did not demote anyone. He did not dock anyone's pay. He did not even reprimand anyone.[68]

Secretary LeBlanc admits that five years after the Six Sigma project, overdetention was still "a problem."[69] He testified that in 2017, it was "costing the state $239,022 per month" to hold "people who should be out."[70] As of 2019, Secretary LeBlanc testified that there was still a problem.[71] He acknowledges that even now, "once the DOC gets the documents, it takes an average of ten days to process the release."[72]

Furthermore, in 2016 Debbie Hudnall, Executive Director of the Louisiana Clerks of Courts Association, met with Secretary LeBlanc and proposed the solution that clerks of court could email documents directly to the DOC.[73] Her proposal was rejected on the premise that the DOC did not have "the capability to receive the documents via email" because it "might cause more work for them."[74]

Secretary LeBlanc furthermore admitted that a concrete thing the DOC could do "to mitigate the problem of people being held past their release date"[75] would be for the DOC to

---

[65] *Id.*, Deposition of Secretary LeBlanc, at 48.
[66] Rec. Doc. 114-11 at 45; *see also id.* at 27 ("Q. Right, and the problem with immediate releases is that people are being held past the end of their sentence, correct? A. Correct.")
[67] *Id.* at 41.
[68] Id at 48-49.
[69] *Id.* (Dep. of Secretary LeBlanc) at 58.
[70] *Id.* at 58-59, 60.
[71] *Id.* at 77.
[72] *Id.* at 81.
[73] Rec. Doc. 114-5 (Deposition of Debbie Hudnall) at 26-28.
[74] *Id.* (Deposition of Debbie Hudnall) at 26-28.
[75] Rec. Doc. 114-11 (Deposition of Sec. LeBlanc) at 100-101.

"actually go out and get the paperwork," rather than waiting for sheriffs and clerks to bring it to them.[76] Under Secretary LeBlanc, the DOC has never tried that.[77]

Most of the prior information was presented in Traweek's opposition to LeBlanc's 2020 summary judgment motion in this case. Subsequent investigation has found additional evidence, including the following:

- In January 20, 2015, Judge Doggett of the 9th JDC wrote an email that was forwarded to Secretary LeBlanc. Judge Doggett complained that an inmate had been held past his release date by nearly two months, "in spite of several phone calls from Judge Randow for his release."[78]

- On April 1, 2015, Dr. Raman Singh, head of DOC medical, wrote an email to James LeBlanc that noted that "So many times, many of the [inmates receiving good time credits] become eligible for an 'immediate release' once all the credits are computed."[79] He noted this was a problem because it left a very short window for infectious disease testing before release.

- On January 28, 2016, a state legislator's office reached out to Secretary LeBlanc about an inmate who had obtained "an order of immediate release" more than two weeks prior, and was "still being detained and has been given no explanation of the delay."[80]

- In August 2018, DOC staffers created an Excel spreadsheet titled "Avg Days Overdue" which revealed an average of **38.6 "days overdue**."[81]

- That 2018 analysis also showed that there was still an average of a 12-day delay from when the DOC "receive[d] paper work to the time of actual release."[82]

- Post Six-Sigma, LeBlanc has approved a series of strategic plans for the department. But not one of those strategic plans ever included a single goal of addressing overdetention.[83]

- Two times LeBlanc promised, under oath, to amend the DOC's strategic plan to add goals about mitigating overdetention.[84] But he did not.

---

[76] *Id.* at 80.

[77] *Id.* at 80.

[78] Ex. F at 3-4.

[79] Ex. F at 7.

[80] Ex. F at 10.

[81] Ex. E.

[82] Ex. D

[83] Ex. G (2022 Deposition of Secretary LeBlanc) at 97 (discussing 2019 testimony about absence of goals in strategic plan); *id.* at 98 (when asked about whether current strategic plan contains goals about overdetention, LeBlanc responds "I'm sure it doesn't.") *See also* Ex. H (FY 2020-2021 TO 2024-2025) (containing no goals whatsoever about mitigating overdetention).

[84] *Crittindon*, Rec. Doc. 111-19, Deposition of James LeBlanc, at pg. 96 ("Q. So it wouldn't surprise you to be told that there's nothing in -- that I found nothing in the strategic plan addressing for the problem of -- A. Amen.

- By contrast, LeBlanc has set goals of maintaining "the adult offender institution population at a minimum of 99% of design capacity."[85] And "Provide 100% on-time deliveries by 2025."[86] This shows he knows how to set goals for timeliness – but has chosen not to for prisoner release.

- In November 2016, LeBlanc also said that he would do a feasibility study and create an action plan regarding overdetention.[87] But he did not.

- LeBlanc testified that there is "no reason why" his department could not set a timeframe for sheriffs to submit documents to the DOC.[88] But he never set such a timeframe.

- LeBlanc's department provided talking points to the governor that say that the process of releasing an inmate "may take up to 90 days."[89]

LeBlanc points out that after Traweek was released and this litigation commenced, it was discovered that Traweek had actually been sentenced to Orleans Parish custody, rather than the DOC. But the minute entry indicated he was in the DOC's custody – and so as a factual matter, all agencies treated him as a DOC inmate.[90] LeBlanc concedes this in his memorandum, noting that the "DPSC received the paperwork, calculated Traweek's sentence, and arranged his release."[91] This Court already rejected that issue as relevant to the case, finding that "there is certainly a chance that a reasonable factfinder could deem LeBlanc's acts and omissions - as the head of a department that had significant (if not dispositive) say in when Traweek was released from Orleans Parish Prison – to have been 'substantial factor[s]' in Traweek's overdetention."[92]

Relevant here, the Fifth Circuit in *Crittindon* looked at a subset of this evidence and concluded that by 2016, LeBlanc had "fair warning" that his "failure to address" the delays in

---

Q. -- timely preclassification paperwork? A. Amen. Q. If you were king or queen for a day, would the strategic plan have that information? A. It would, and it will. So we're working on -- in fact, I asked for a delay in submitting the current year one.")

[85] Ex. H at pg. 13.

[86] *Id.* at pg. 36.

[87] Ex. B (Corr. from LeBlanc to Hudnall).

[88] *Crittindon*, Rec. Doc. 111-19, Deposition of James LeBlanc, 69:13-23

[89] Ex. C.

[90] The sheriff's office referred to him as a "DOC inmate" and said they had "no authority" to release Mr. Traweek without approval from the DOC. Rec. Doc. 114-4. And the DOC put Mr. Traweek through their "normal process" for processing and release. Rec. Doc. 107-1 (Plaintiff subject to the DOC's "normal process" for "release processes"); see also Rec. Doc. 107-2 (detailing DOC's release processes applied to Mr. Traweek).

[91] Rec. Doc. 153-2 at 20.

[92] Rec. Doc. 129 at 17.

DOC's pre-classification system would "deny prisoners . . . their immediate or near-immediate release upon conviction."[93] The circuit specifically looked at the Six Sigma study, and noted that LeBlanc's "DPSC considered placing oversight mechanisms to ensure that local jails timely transmitted pre-classification paperwork to DPSC, but did not to do so. Instead, DPSC chose to address only its own internal workflow problems."[94] The circuit court noted that the "relevance of the Lean Six Sigma Study is obvious—that the defendants were each keenly aware of the flaws of the system that failed to timely release prisoners."[95]On that evidence, the circuit held that "a reasonable jury may find that Defendants' inaction was objectively unreasonable in light of this clearly established law," and LeBlanc was not entitled to qualified immunity.[96]

That holding should necessarily result in the denial of the motion at issue here, because Mr. Traweek's evidence is stronger than *Crittindon* for at least three reasons. First, because Traweek was overdetained in 2018 – which means there were two additional years of inaction after the facts of *Crittindon* from which a jury could conclude deliberate indifference. Second, because Mr. Traweek presents buttressing evidence here that was not before the courts in *Crittindon*, including the 2018 spreadsheet summary of data, emails from judges, and LeBlanc's promises about strategic planning. And third, because by 2018, LeBlanc was put on further notice of the overdetention problem – because he was being repeatedly sued for it.[97]

As shown by the material facts in dispute, the overdetention of Mr. Traweek was a direct result of this pattern of overdetention – no DPSC employee began to process Mr. Traweek's release for two weeks after learning he was overdetained, even after receiving his paperwork DPSC employees failed to process the paperwork on a Thursday and instead set it aside until the next

---

[93] *Crittindon*, 37 F.4th at 188
[94] *Id.* at 183.
[95] *Id.* at 191.
[96] *Id.* at 188.
[97] *Grant*, 17-cv-2797-NJB, (E.D. La.), *Thomas*, 17-cv-01595 (M.D. La.), *Crittindon*, 17-cv-00512 (M.D. La.), *Copelin*, 17-cv-00602 (M.D. La.), *Parker*, 18-cv-01030 (M.D. La.), *Babineaux*, 18-cv-00233 (W.D. La.), *Frederick*, 18-cv-00682 (M.D. La.), *McNeal*, 18-cv-00736 (M.D. La.),

Tuesday,[98] and despite DPSC's paralegal receiving a copy of a Writ of Habeas Corpus for Mr. Traweek's release – he still was not released until the next day.[99]

Accordingly, this Court should take the question the Fifth Circuit put to it – evaluating whether there is factual evidence that LeBlanc's "alleged complicity in Traweek's overdetention was objectively unreasonable" – and conclude that reading the evidence in the light most favorable to the non-moving party, there is such evidence. LeBlanc's motion should be denied.

4.   LeBlanc's motion should be denied because his "we relied on sheriffs" argument is squarely contradicted by binding Fifth Circuit precedent.

LeBlanc argues he did not cause Traweek's delayed release because "it was not unreasonable for LeBlanc to rely on the parish sheriffs to fulfill their mandatory statutory duties to collect and transmit documents regarding the individuals in their custody.[100] He repeats this argument over and over again in his brief.[101] Plaintiff disputes the facts relied on to underpin this argument in R. Doc. 157-1 (Sheriff Gusman was not "squarely" responsible for processing and transfer of inmates to DPSC, and "[o]ffenders who have been sentenced to parish time" are not just "the responsibility of the parish Sheriff[.]").

LeBlanc also made this argument in *Crittindon*. And he lost. The Fifth Circuit in *Crittindon* noted that LeBlanc's department "considered placing oversight mechanisms to ensure that local jails timely transmitted pre-classification paperwork to DPSC, but did not to do so."[102] And so the Fifth Circuit affirmed the trial court's order, which held that:

> The proverbial buck stops with the DOC. While the established process and workflow was such that DOC relied upon the parishes of conviction to send preclassification packets, **DOC cannot simply passively wait around for the packets to be sent.** DOC compensates local Sheriffs for holding DOC-sentenced inmates; surely that money could be made to talk.[103]

---

[98] Rec. Doc. 158-21, Disputed Facts 36, 54, 57, and 80.
[99] [99] Rec. Doc. 158-1, Disputed Fact 82.
[100] Rec. Doc. 153-2 at 12.
[101] Rec. Doc. 153-2 at 13 ("it is not unreasonable for LeBlanc to rely on the sheriff, who has actual custody and absolute authority over the inmate, to compile and transmit paperwork about him to DPSC."); *id.* ("It is not unreasonable for LeBlanc to rely on the parish sheriffs to fulfill their duties under state law.")
[102] *Crittindon, supra,* at 183.
[103] *Crittindon*, 17-cv-512, Doc. 168, *27 (M.D. La., Apr. 13, 2020) (emphasis added).

In a subsequent 2022 opinion, the Fifth Circuit reaffirmed that jailors cannot rely on ignorance of court orders to excuse them from liability. The court held:

> "As we said long ago of another sheriff's defense to a prolonged detention claim— he argued that his ignorance of a court's ordering the defendant's release excused him from liability—if that were the law then 'nine months could easily be nine years, and those nine years, ninety-nine years, and still as a matter of law no redress would follow.'"[104]

Additionally, Secretary LeBlanc testified that as Secretary he is "responsible" whether or not an inmate is in "a state-run facility, a parish-run facility, or private-facility."[105] And Angela Griffin, head of the DOC's pre-class department, signed an affidavit swearing that: "Once an offender is sentenced, DPSC is responsible for . . . timely release after completion of said sentence."[106] Angela Griffin signed another affidavit swearing that: "Once an offender is sentenced on a felony conviction, DPSC is responsible for ensuring that said offender serves the sentence imposed upon them by the Court, as well as timely released after completion of said sentence."[107]

Thus, because LeBlanc's "rely on sheriffs" argument was rejected by the Fifth Circuit and is contrary to his own testimony, this Court should deny his motion.

## C.     LeBlanc's Arguments About State Law Torts Are Barred by the Law-of-The-Case Doctrine Because This Court Already Ruled on Them.

LeBlanc also argues for summary judgment on Plaintiff's state law claims of negligence and respondeat superior. But he already brought a summary judgment motion on those claims.[108] This Court assessed the elements of negligence,[109] reviewed evidence of LeBlanc's involvement,[110] and concluded that "the undisputed facts in the record reveal that Traweek has a viable negligence claim against LeBlanc that cannot be short-circuited at the summary judgment

---

[104] *Harris v. Clay County*, 47 F. 4th 271, 278 (5th Cir. 2022), *citing Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968).
[105] *Grant v. Gusman*, Rec. Doc. 129-11, (Dep. of James LeBlanc) at 13.
[106] *Id.*, Rec. Doc. 165-2 at para. 6 (Affidavit of Griffin)
[107] *Babineaux v. Garber*, 18-cv-00233 (W.D. La.), Rec. Doc. 58-3 Filed 12/18/19 (Affidavit of Angela Griffin).
[108] Rec. Doc. 107-1 at 21 et seq.
[109] Rec. Doc. 129 at 15-16.
[110] *Id.* at 17-18.

stage."[111] Regarding respondeat superiror, the Court concluded that it was "satisfied that, at least at this stage, Traweek has a viable claim that LeBlanc could be held liable for any "damage" proximately caused by the work-related acts of those conceivably under his command."[112] LeBlanc did not appeal the negligence or respondeat superior portions of the ruling.[113] Accordingly, that argument is barred by the law of the case doctrine.[114] LeBlanc is not permitted to file repeated motions for summary judgment on the same issue. Nor did this Court give LeBlanc permission to do so: in its August 17, 2022 order, the Court directed LeBlanc to "file a motion for summary judgment addressing the qualified immunity issue, the Fifth Circuit's Order, and the cases cited therein."[115] It made no mention of negligence or respondeat superior. The motion should be denied.

**D.    LeBlanc's motion should be denied because his _Heck_ argument is foreclosed by binding Fifth Circuit precedent.**

LeBlanc has filed a motion for summary judgment, not a motion for reconsideration.[116] Nevertheless, his motion asks for reconsideration of the October 2019 Order on LeBlanc's Motion to Dismiss, an Order he chose not to appeal.[117]   Specifically, LeBlanc notes that "Judge Feldman previously found that this suit is not _Heck_ barred" but asks this Court to "reconsider" that over three-year-old ruling "in light of the thorough discussion of _Heck_ principles in the _Crittindon_ rulings."[118]

That is a truly bizarre request. In _Crittindon_, the Fifth Circuit issued a published, binding opinion underline rejecting the _Heck_ argument in the context of an overdetention claim. In that case, the Fifth Circuit held that "_Heck_ does not bar this suit: The _Heck_ defense 'is not . . . implicated by a

---

[111] _Id_. at 18.
[112] _Id_. at 20.
[113] _See Traweek_ (5th Cir. 2022) at 5 (noting that "LeBlanc now appeals the district court's denial of summary judgment on his qualified immunity defense.") _See also_ Appellant's Brief in _Traweek_ at page 24 ("Only the federal and state constitutional claims are at issue in this appeal.").
[114] _See Loumar, Inc. v. Smith_, 698 F.2d 759 (5th Cir. 1983) ("The law of the case doctrine is closely related to the principle of res judicata. The latter prevents collateral attack on the result of a completed lawsuit between the same parties; the former prevents collateral attacks against the court's rulings during the pendency of a lawsuit.")
[115] Rec. Doc. 150 at 2.
[116] Rec. Doc. 153 ("Second Motion for Summary Judgment").
[117] Rec. Doc. 153-2 at 21.
[118] _Id._

prisoner's challenge that threatens no consequence for his conviction or the duration of his sentence.'"[119] And since the Fifth Circuit specifically found that *Traweek* and *Crittindon* involved "similar issues and claims[,]" for the same reasons, *Heck* should not apply here.[120]

Thus, what LeBlanc is asking this Court to do is to upset its previous *Heck* ruling in this case "in light" of the Fifth Circuit's ruling similar case in which <u>he lost</u> on that issue.[121] That doesn't make any sense.

In any event, LeBlanc's *Heck* argument is wrong. In *Heck v. Humphrey*, the Supreme Court held that the question of "whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence" is significant in a Section 1983 damages suit.[122] If the judgment would necessarily imply the invalidity of the plaintiff's conviction or sentence, "the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."[123] But "if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed" unless there is another bar to suit.[124]

In subsequent years, the U.S. Supreme Court and the Fifth Circuit reiterated that the key for applying *Heck* is assessing whether a plaintiff challenges the validity of their <u>conviction</u> or <u>sentence</u>. For example, in *Muhammad v. Close,* the Court held that the *Heck* defense "is not . . . implicated by a prisoner's challenge that threatens no consequence for his conviction or the duration of his sentence."[125] Likewise, in *Bourne v. Gunnels* and *Mosley v. White*, the Fifth Circuit noted that the *Heck* defense turns on whether a plaintiff's success would "affect the validity of

---

[119] Crittindon v. LeBlanc, 37 F.4th 177, 190, quoting Muhammad v. Close, 540 U.S. 749, 751, 124 S.Ct. 1303, 158 L.Ed.2d 32 (2004).
[120] *Traweek v. LeBlanc,* 21-30096 (5th Cir. 2022) (unpublished), at *9.
[121] LeBlanc clearly prefers Judge Oldham's minority dissent to the majority opinion in *Crittindon;* he cites the dissent six times in his brief. Rec. Doc. 153-2 at pgs. 12, 13, 17, 18, 19. But it is the panel opinion, not a single judge's dissent, that is binding law "absent an intervening change in the law, such as a statutory amendment or a decision from either the Supreme Court or our en banc court." *Thompson v. Dall.City Att'y's Off.*, 913 F.3d 464, 467 (5th Cir. 2019)
[122] 512 US 477, 487 (1994).
[123] *Heck v. Humphrey*, 512 US 477, 487 (1994).
[124] *Id.*
[125] 540 U.S. 749, 751 (2004).

[his] underlying conviction or the duration of his sentence."[126] In *Humphries v. Various Federal USINS Employees*, this Court put a finer point on it: "*Heck* itself provides for preclusion of <u>only</u> those claims that, if proven, would necessarily imply the invalidity of a conviction or sentence."[127]

Here, we have an overdetention case – a case where Plaintiff is not challenging his conviction or sentence, but rather seeking damages for being imprisoned past the end of his judge-ordered sentence. So how is Secretary LeBlanc raising *Heck* as a defense to a case that does not challenge a conviction or sentence?

LeBlanc does so by misrepresenting to this Court the holding of *Heck*. Specifically, LeBlanc cites footnote four of *Heck* for the proposition that an "unsuccessful habeas petitioner cannot receive § 1983 damages for unlawful confinement."[128] But *Heck* does not say that. It says this:

> An unsuccessful federal habeas petitioner cannot, therefore, consistently with the habeas statute, receive § 1983 damages for unlawful confinement. That is not to say, however, that a state prisoner whose request for release has been (or would be) rejected by state courts or by a federal habeas court is necessarily barred from seeking any § 1983 damages for violations of his constitutional rights. If a § 1983 judgment in his favor would not demonstrate the invalidity of his confinement he is outside the habeas statute and may seek damages for a constitutional violation even without showing 'favorable termination.'[129]

The footnote LeBlanc cites to thus specifically contemplates a state prisoner seeking damages, even after losing a habeas claim. LeBlanc cites it for the *opposite* holding, however.

LeBlanc also cites to language about prisoners not using Section 1983 to challenge "duration of confinement."[130] But the "duration of confinement" language was <u>not</u> the holding of *Heck*. That was how the Court in *Heck* summarized the holding of a different case, *Preiser v. Rodriguez*, 411 U. S. 475 (1973). The *Heck* Court noted that *Preiser* addressed situations where a

---

[126] *Bourne*, 921 F.3d 484, 490–1, n.3 (5th Cir. 2019), *Mosley*, 464 F. App'x 206, 210-11 (5th Cir. 2010) (per curiam).
[127] 164 F.3d 936, 945-46 (5th Cir. 1999) (emphasis added).
[128] Rec. Doc. 153-2 at 21.
[129] *Heck*, supra, at fn. 4.
[130] Rec. Doc. 153-2.

prisoner "challenges the fact or duration of his confinement."[131] But the *Heck* Court held that where a plaintiff "seeks not immediate or speedier release, but monetary damages," then that case would be "clearly not covered by the holding of *Preiser*."[132] That point was made explicit in *Preiser,* which explained:

> If a state prisoner is seeking damages, he is attacking something other than the fact or length of his confinement, and he is seeking something other than immediate or more speedy release—the traditional purpose of habeas corpus. In the case of a damages claim, habeas corpus is *not* an appropriate or available federal remedy. Accordingly, as petitioners themselves concede, a damages action by a state prisoner could be brought under the Civil Rights Act in federal court without any requirement of prior exhaustion of state remedies.[133]

Thus, the holding of *Heck* is limited to actions that "would necessarily imply the invalidity of [a] conviction or sentence."[134] The "duration of confinement" language is used as shorthand for the holding of *Preiser* – a case which by its own terms does not apply to Section 1983 claims.[135]

An overdetention case definitionally does not challenge a conviction or sentence, because it is based on the premise that a person was imprisoned *after* their conviction and their sentence was complete. Because overdetention and *Heck* so clearly do not fit together, district courts have repeatedly rejected the *Heck* defense as applied to overdetention cases. They have done so at least ten times in Louisiana the last four years alone.[136]

---

[131] *Heck* at 481.

[132] *Id.*

[133] *Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973) (emphasis added).

[134] *Heck, supra*, 512 U.S. at 487.

[135] The other cases cited by Defendant in support of his Heck theory do not apply here because they involved challenges to the length of time a plaintiff legally should have served in custody. None of them address the situation in which a plaintiff was held longer than that legally-required length of time. In *Preiser v. Rodriguez*, a pre-*Heck* case, state prisoners sought restoration of good-time credits that would have resulted in immediate release or shortening of their maximum sentences. 411 U.S. 475 (1973). Similarly, in *Edwards v. Balisok*, a state prisoner challenged his loss of good-time credit in disciplinary proceedings; because success on the claim would necessarily imply the invalidity of the punishment imposed, the Supreme Court determined the suit was not cognizable under Section 1983. 520 U.S. 641 (1997).

[136] *Grant v. Gusman*, 17-cv-2797 *32 (E.D. La. March 27, 2018) ("In this case, Plaintiff does not argue that his conviction or sentence were invalid. . . . Therefore, *Heck v. Humphrey* is not applicable to this case."); *Traweek v. Gusman*, No. 19-cv-1384, 2019 WL 5430590 at *5 (E.D. La. Oct. 23, 2019) (holding that "the reasoning underlying *Heck's* favorable termination prerequisite is simply not implicated"); *Thomas v. Gryder*, 2019 WL 5790351 at *3-4 (M.D. La. Nov. 6, 2019) ("[T]he Court finds that Plaintiff's claims are not *Heck* barred."); *Hicks v. Department of Public Safety & Corrections*, 2020 WL 428116, 19-cv-108 at *12 (M.D. La. Jan. 27, 2020) ("Plaintiff maintains that he does not, in any way, challenge his underlying conviction or sentence . . . Plaintiff is correct."); *McNeal v. Louisiana*

The throughline connecting all of the Supreme Court, Fifth Circuit, and district court decisions is that when a plaintiff is challenging his conviction or challenging how long his sentence <u>should be</u>, the *Heck* bar applies. When a plaintiff accepts his conviction and sentence, but challenges whether jailors held him <u>longer</u> than the sentence, the *Heck* bar does <u>not</u> apply.[137]

This case is the second kind of case: where a plaintiff accepts his conviction and sentence, but challenges whether jailors held him longer than that sentence. if Plaintiff proves that he was held past the end of his court-ordered sentence, it would not imply the invalidity of his conviction one iota. It would not imply the invalidity of his sentence one iota. And so this case falls under the

---

*Dept. of Public Safety & Corrections*, 2020 WL 798321, 18-cv-736 (M.D. La. Feb. 18, 2020) ("*Heck* does not apply because Plaintiff does not challenge his conviction or his sentence."); *Crittindon v. Gusman*, No. 17-cv-512 at *21 (M.D. La. Apr. 13, 2020) ("*Heck* is neither a bar to the suit nor a defense to the Plaintiffs' Motion for Summary Judgment."); *Frederick v. LeBlanc*, 18-cv-682 at *9 (M.D. La. May 4, 2020) ("[T]he Court finds that *Heck v. Humphrey* does not bar Plaintiff's claims relating to his alleged overdetention."); *Grant v. Gusman*, 17-cv-2797 *10 (E.D. La. March 30, 2021) ("[T]he Court finds that *Heck* is not applicable to this case."); *Frederick v. LeBlanc*, 18-cv-682 at *7 (M.D. La. Sept. 28, 2021) ("As to Defendants' argument that Frederick's claims are barred by *Heck*, their Motion is DENIED."); *Hicks v. Department of Public Safety & Corrections*, 19-cv-108 at *8 (M.D. La. March 30, 2022) ("The Court stands by its analysis and finds that the reasoning and holding in *Frederick* regarding *Colvin* applies equally to the facts of the present case.") There was, however, one district court case in which one judge found *Heck* to be a bar to an overdetention claim. *Bryant v. DPS&C*, 19-cv-10324 at *6 (E.D. La., Oct. 25, 2019).

[137] For more than a half century, this Court has reviewed Section 1983 damages actions involving false imprisonment, including cases about the overdetention of lawfully-sentenced prisoners. These cases have proceeded under Section 1983 both before and after *Heck* was decided. For example:

- *Whirl v. Kern*, 407 F.2d 781, 784, 791 (5th Cir. 1968) (damages action "for false imprisonment under Texas law and for deprivation of civil rights under 42 U.S.C.A. § 1983," "where the jailer [kept] a prisoner beyond the lawful terms of his sentence");

- *Bryan v. Jones*, 530 F.2d 1210, 1211 (5th Cir. 1976) (en banc) ("damage action based on theory of false imprisonment" brought pursuant to § 1983);

- *Douthit v. Jones*, 619 F.2d 527, 529 (5th Cir. 1980) (denying qualified immunity to sheriff and deputy sheriff in action "seeking damages for [plaintiff's] allegedly wrongful incarceration by defendants under 42 U.S.C. §§ 1983, 1988 and the Texas common law tort of false imprisonment");

- *Porter v. Epps*, 659 F.3d 440, 444 (5th Cir. 2011) (§ 1983 action "alleging that [plaintiff] was falsely imprisoned for fifteen months beyond the expiration of the sentence imposed upon him by the Mississippi trial court");

- *Crittindon v. LeBlanc*, 37 F.4th 177 (5th Cir. 2022) (allowing § 1983 suit to proceed for overdetained inmates); and

- *Harris v. Clay County*, No. 21-60456 (Fifth Cir., as substituted on panel rehearing on August 24, 2022) (allowing § 1983 suit to proceed for plaintiff who "challenges his years-long detention when there was no basis to hold him.")

clear holding of the U.S. Supreme Court: that where a plaintiff's case "even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed."[138] LeBlanc's motion should be denied.

## CONCLUSION

LeBlanc's Second Motion for Summary Judgment should be denied.

Respectfully submitted,

*/s/ Casey Denson*_____
Casey Rose Denson (La. Bar. No. 33363)
3436 Magazine Street, Unit #7005
New Orleans, LA 70115
Telephone: (504) 224-0110
Email: cdenson@caseydensonlaw.com

/s/ *William Most*_____
Most & Associates
William Most (La. Bar No. 36914)
williammost@gmail.com
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
T: (504) 509-5023

---

[138] *Heck* at 487.