UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RODNEY GRANT,                       *      Docket No. 17-2797
                                    *
                Plaintiff,          *
                                    *
VS                                  *      March 11, 2020
                                    *
                                    *
MARLIN GUSMAN, ET AL,               *
                                    *
                Defendants.         *      Section G
                                    *

*********************************************************************

        REPORTER'S OFFICIAL TRANSCRIPT OF THE MOTIONS HEARING
        BEFORE THE HONORABLE NANNETTE JOLIVETTE BROWN,
                UNITED STATES DISTRICT JUDGE.

*********************************************************************


**APPEARANCES:**


For the Plaintiff:              Law Office of William Most
                                BY: WILLIAM B. MOST
                                    AMANDA L. HASS
                                201 St. Charles Ave., Ste. 114
                                New Orleans, LA  70170


For the Defendants:             Louisiana Department of Justice
                                BY:  PHYLLIS E. GLAZER
                                1885 North Third St., 4th Floor
                                Baton Rouge, LA  70802




**REPORTED BY:**      Mary V. Thompson, RMR, FCRR
                      500 Poydras Street, Room 275
                      New Orleans, Louisiana  70130
                      (504)589-7783




**OFFICIAL TRANSCRIPT**

**P R O C E E D I N G S**

                                    (Call to order of the court.)

THE COURT:  Good morning.

MS. GLAZER:  Good morning, Your Honor.

10:44:15   THE CASE MANAGER: This morning we have Civil Action
No. 17-2797, *Rodney Grant v Marlin Gusman, Et Al.*

Counsel, please make your appearances for the record.

MR. MOST:  William Most on behalf of plaintiff
Rodney Grant.

10:44:33   MS. GLAZER:  Phyllis Glazer on behalf of defendants
Secretary James LeBlanc and Warden Timothy Hooper.

THE COURT:  Let's see.  I guess we'll go with
plaintiff's motion for sanctions which is scheduled to go first.

MR. MOST:  Good morning, Chief Judge.  May it please
10:44:56   the Court:

This is a motion for sanctions, or, in the alternative,
to compel regarding the Department of Corrections' treatment of
the data in its system.

I think it's helpful to briefly begin with a timeline
10:45:13   of what has occurred in this case, which is starting in 2018 the
Department of Corrections denied that it had any documents
whatsoever showing a pattern of people being held past their
release date.

Then in March of 2019 we found out that was false
10:45:26   because the Department of Corrections' counsel went on TV and

**OFFICIAL TRANSCRIPT**

1   made comments about the problem and a grant application that they

2   had filed with the Department of Justice.

3           THE COURT:  Was that the language of your request?

4           MR. MOST:  I'm sorry?

10:45:39   5           THE COURT:  Was that the language of your request,

6   showing a pattern?

7           MR. MOST:  Yes, Your Honor.  Our request for production

8   asked for documents relating to a pattern of people being held

9   past their release date over the prior ten years.

10:45:52   10          THE COURT:  Well, legally they might disagree with

11  that, and just say, "Well, maybe we have documents regarding X,

12  but we don't think it establishes a pattern."  I would imagine

13  that would be the position they have, and they would not produce

14  it.

10:46:06   15          It's your -- as the plaintiff, it's your burden to

16  prove that there is a pattern and there was a pattern.  I don't

17  understand how you could expect someone to produce documents, if

18  that's how you -- you know, that's how you framed your request.

19          MR. MOST:  Yes.  Certainly, Your Honor --

10:46:23   20          THE COURT:  It would be an admission.

21          MR. MOST:  Certainly, although it's not me saying that

22  that's what these documents prove.  That's their own testimony.

23          So, for example, the Department of Corrections'

24  30(b)(6) witness, Melanie Gueho, we asked, "Is it accurate to

10:46:44   25  describe the 2019 pull document as showing that people waited an

**OFFICIAL TRANSCRIPT**

1    average of 44 days to be released after a judge ordered them free

2    with most of the delay coming while the DOC waited on paperwork?"

3    And Ms. Gueho said that with some exceptions, that that was an

4    accurate way of describing the document.

5            Similarly --

6            THE COURT:  She admitted that it was a pattern?

7            Facts do not -- I mean, look, going through discovery

8    requests and responses are usually handled through magistrate

9    judges, but proceed.  I don't want to belabor the point.

10           But those are -- that -- those are issues that concern

11   me because you're asking for sanctions.  And how lawyers respond

12   to discovery requests are -- a lot of times, whether they're

13   responsive or not has to do with how you ask the question, and

14   whether their responses would be -- some could interpret that

15   differently.

16           MR. MOST:  Certainly.  And even if they could be

17   forgiven for not producing -- identifying the documents in their

18   initial disclosures or producing them in response to discovery,

19   by July of 2019 we had an example of one of these documents.  It

20   was a document from February 2019 that showed all of the people

21   who had been held past their release date in that month.  It was

22   231 people.  And the parties were in agreement that this was a

23   relevant document.

24           On July 31, 2019, DOC's counsel said, quote, "This can

25   give some insight into how many days he was incarcerated past his

**OFFICIAL TRANSCRIPT**

1    legal release date."  So we were in agreement on this data.  Even

2    if we maybe had some disagreement over whether it should be

3    produced or how relevant it was, we were in agreement that it was

4    relevant to this case, and so we presumed it was being preserved

10:48:30   5    as is their legal obligation.

6         It was only once we asked further discovery requests

7    for additional pull documents that they told us on December 13,

8    2019, that the data was being overwritten, was not being stored

9    in an archive, and, quote, "All past information no longer

10:48:47   10   available."

11        At that point we had a serious concern about spoilage

12   and we raised that with them.  We asked for the data itself,

13   access to the data, or for the data to be put into a usable form,

14   in the form of these pull documents.  They agreed to do none of

10:49:05   15   those.  And we deposed their 30(b)(6) witness who confirmed that

16   the data was being lost.

17        We're not saying that they have deleted the database

18   entirely.  What's happening is they have a database called CAJUN.

19   It has lots of information about inmates' sentences, where they

10:49:26   20   are -- all sorts of kinds of information.  And it's an older

21   system, and so when new information is put into it, the old data

22   is overwritten and is not stored electronically anywhere so the

23   further back in time you go, the less accurate it is.  And that

24   was testified to by the 30(b)(6) witness who said that it would

10:49:49   25   be less accurate the further back in time you went.

**OFFICIAL TRANSCRIPT**

1         So what we wanted was for them to do traditional
2    preservation.  If the data is being lost over time, degraded over
3    time, preserve it.  And we think the most efficient way to do
4    that would be, once a month, to take a snapshot, which is what
5    these pull documents are.  It's not something that requires
6    hundreds of hours of work.  It would require one person, they
7    testified, eight hours to do one of these snapshots.  And,
8    alternatively, they could have provided us with the data, access
9    to the data, or preserved the data, but doing none of them is not
10   an option.
11        We think that their bad faith is demonstrated by the
12   fact that this isn't just data that we think is relevant for
13   showing the problem, it's data that the DOC itself identified as
14   relevant for showing the problem.  This was because when they
15   asked the Department of Justice for money, this is what they used
16   to show the problem.
17        Quote -- their 30(b)(6) witness was asked:  So the
18   grant application identified the problem, and you put together
19   this pull document to provide some data to show the scope of the
20   problem?
21        Correct.
22        So this is -- was internally identified as the source
23   of data to show the problem of people being held too long, and
24   yet they have refused to produce it or even preserve it, and
25   that's why we're here.

**OFFICIAL TRANSCRIPT**

1      It would be one thing if there had been some

2  degradation of data and once we identified this is relevant, they

3  stopped, but that is not what happened here.  They continued to

4  allow it to degrade without preservation for the entirety of this

*10:51:29*   5  case, even after we explicitly asked them to preserve it and

6  asked them to produce it.

7      And their defense is essentially that it's not lost

8  completely, it's backed up on paper, which may or may not be

9  true.  Their witness testified that she presumed that it was

*10:51:58*   10  backed up on paper.  And maybe that's correct in many instances,

11  but the paper documents are then scanned into a system that is

12  not searchable, so it would be, in their words, enormously

13  laborious to use the paper documents to recreate this data.  If

14  they wanted to do that, we would certainly be open to it, but

*10:52:20*   15  they have declined to do so.

16      So they are taking the position both that they

17  shouldn't be held responsible for sanctions because they

18  preserved the data in paper, but also that the paper is so

19  inaccessible that they won't produce it, and they can't have it

*10:52:36*   20  both ways.

21      And with that, I'll save any questions or comments for

22  rebuttal.

23          THE COURT:  Okay.

24          MR. MOST:  Thank you.

*10:52:46*   25          MS. GLAZER:  Good morning, Your Honor.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Yes.

2          MS. GLAZER:  Thank you for granting our request for

3    oral argument on this motion.  It is not every day that I'm here

4    defending a motion for sanctions.

5          There are a number of issues in plaintiff's motion for

6    sanctions that need to be discussed and considered by Your Honor,

7    one of which is the plaintiff's burden to prove that relevant

8    evidence has been destroyed in bad faith or that it's

9    inaccessible somewhere else.  That burden hasn't been met.

10         The request itself, as evidenced today, is extremely

11   vague.  The request is for all data, and without any specific

12   request for particular information, it was impossible for us to

13   determine what was -- whether any relevant data was requested.

14   We even had to assume that the data that was being requested was

15   electronically stored data as that tiny bit of specificity was

16   not in plaintiff's request.

17         The pull document -- this now infamous pull document --

18   was created one time in connection with a grant application.  The

19   rules of civil procedure do not require a defendant to create

20   documents to respond to discovery requests, and no law has been

21   cited that would say that was a reasonable request.

22         The plaintiff suggests that creating these documents

23   equates to putting the data in a reasonably usable form, but

24   that's not what this means.  A reasonably usable form means

25   converting it from binary code into a readable document in terms

**OFFICIAL TRANSCRIPT**

1    of electronic discovery, not putting it into a spreadsheet so

2    that it's easier to use at trial on the ELMO.  So the law doesn't

3    support a request to create documents.

4           Insofar as what data was requested, the defendants

10:55:39    5    timely objected, and there was no motion to compel filed until

6    the eve of the close of discovery regarding the defendants'

7    responses to those initial requests.  That's really significant

8    when it comes to the plaintiff's allegation of bad faith.

9           Despite the objections to the requests, the defendants

10:56:04   10    allowed a supplementation to the outstanding 30(b)(6) notice and

11    the presentation of an additional 30(b)(6) witness who could be

12    questioned on how that pull document was created, where the data

13    came from, and what would be involved in creating another one.

14           But that still doesn't answer the question of what data

10:56:27   15    has been deleted.  Certainly the plaintiff is not suggesting that

16    all of the records pertaining to the 231 inmates on that list

17    were deleted, because that is certainly not the case, and

18    plaintiff has not identified what data was deleted or overwritten

19    or whether it was relevant.  And the testimony of Ms. Gueho was

10:56:58   20    that no data has been lost.

21           And so the -- you know, the plaintiff's --

22    THE COURT:  Have you produced the information to them?

23    MS. GLAZER:  I'm sorry?

24    THE COURT:  Have you produced the information to them?

10:57:09   25    MS. GLAZER:  No.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Why?

2          MS. GLAZER:  We don't know what information he's

3    requesting.

4          THE COURT:  Didn't he say he printed out a copy and

10:57:15   5    y'all had agreed to a particular document that detailed the

6    information?

7          MS. GLAZER:  The pull -- he was given the pull

8    document.  I mean, he has that, that one -- that one pull

9    document that was created for the grant application along with

10:57:33   10   the grant application itself and whatever else was attached to

11   it.

12          What is not clear is what exactly he's asking for

13   beyond the pull document, because all we've gotten are the

14   requests for all data and for years and years and years, that

10:57:56   15   it -- we don't know what he's asking for.

16          To the extent that he's asking DOC to create new pull

17   documents going back from -- I believe the request was for

18   January of 2012 by month to the present, so a span of over eight

19   years of monthly documents he's asking DOC to create, that

10:58:26   20   request was declined as there is no obligation for us to create

21   such documents.

22          Now, is he asking -- and there's one more thing that

23   needs to be mentioned about this pull document.  It is not a list

24   of offenders who have been overdetained or who were

10:58:48   25   over-detained.  It's not.  And the only person that has been

**OFFICIAL TRANSCRIPT**

1  saying that is the plaintiff, and it is the plaintiff's burden to

2  present evidence to support that that is correct, that the

3  document is what he's saying that it is.  This is not -- but it's

4  not.  It's not a list of offenders who have been overdetained.

10:59:09  5  Now, did Mr. -- did plaintiff's counsel ask DOC for a

6  list of offenders who are being overdetained?  No.  Did he ask

7  for anything like that?  There were no specific requests like

8  that.  They were all extremely vague and overbroad and not

9  relevant.  A span of time over eight years with no explanation as

10:59:39  10  to why that document would be relevant is -- I mean, it's...

11  So the defendants attempted with timely objections to

12  obtain some sort of clarification and narrowing down of their

13  requests, and received no assistance, and then didn't hear

14  anything else about it until the motion for sanctions was filed.

11:00:05  15  But still the question for Your Honor is whether any

16  data has been deleted or overwritten or lost, and the evidence

17  does not support that.  Therefore, there are no grounds for

18  sanctions against the department.

19  I'm sorry, did -- I thought you were going to ask a

11:00:26  20  question.

21  THE COURT:  Huh-uh.

22  MS. GLAZER:  Let's see.  Back to, I believe, the first

23  issue that was brought up.

24  A pattern, as Your Honor has noted, is a legal term,

11:00:46  25  and it is one element of the legal standard that governs the

**OFFICIAL TRANSCRIPT**

1    plaintiff's claims against Secretary LeBlanc.  The plaintiff must

2    show a pattern of similar constitutional violations, and requests

3    for evidence of a, quote, unquote, pattern were essentially an

4    end run around the requests for admission, and there were plenty

5    of requests for admission that have been propounded in this case.

6    Over 80, I believe.

7         And the defendants again responded.  There has been a

8    huge amount of discovery conducted in this case, and the

9    defendants have participated to the best of their ability using

10   the most liberal and broad definition of "relevance" for purposes

11   of production that they could possibly use in order to avoid any

12   question that they were not participating in discovery to the

13   best of their ability and in accordance with their obligations.

14   And of course up until this point, after six sets of discovery,

15   this is the first motion accusing the department of not

16   fulfilling its obligations.

17        But if there -- if you have any questions about what it

18   is the plaintiff asked us for or the defendants' response to it,

19   or anything else, I have one minute left.

20        THE COURT:  Did you cover that in your memo?

21        MS. GLAZER:  What?

22        THE COURT:  Did you cover that in your opposition?

23        MS. GLAZER:  I'm sorry.  Yes, of course.  Thank you.

24        MR. MOST:  If I may briefly.

25        I would like to note that, with respect, many of the

**OFFICIAL TRANSCRIPT**

1  things that Ms. Glazer said are contradicted by the DOC's

2  testimony.  I'll take -- for example, this is Rec Doc 178-1 at

3  Page 71.  This is the 30(b)(6) deposition of Ms. Gueho.

4         Ms. Glazer said that no evidence -- or no data has been

11:03:04  5  overwritten.  Ms. Gueho testified to the contrary.

6         The question was:  Just to clarify regarding

7  overwritten, so I'm understanding you correctly, Melanie, data is

8  overwritten within CAJUN, correct?

9         Answer:  Well, I consider it being updated with the new

11:03:19  10  information that is coming in about the offender for that record.

11         Question:  So the old record is no longer in CAJUN and

12  has been replaced by new data in some circumstances within CAJUN,

13  correct?

14         Answer:  Correct.

11:03:30  15         So the testimony is that information is being

16  overwritten.

17         The next question, then, is whether it's relevant, and

18  Ms. Glazer testified that it is not.

19         THE COURT:  She just told the Court that she doesn't

11:03:42  20  know what you're asking for.

21         MR. MOST:  Sure.

22         THE COURT:  Why can't y'all sit at a table -- before

23  you start filing these motions, you should get together and see

24  if you can articulate to her -- and not just the spoliation.  I

11:03:58  25  mean, just sit in a meeting with her to try to figure out what it

**OFFICIAL TRANSCRIPT**

 1  is that you are looking for and if they can produce it.

 2          MR. MOST:  Yes, Your Honor.  And we had extensive

 3  meet-and-confers about that issue.  We have been very -- we've

 4  tried to be very, very precise about our requests.

 5          I'll give you an example.  Request to Production 33 is

 6  not big.  It says, "Request for a pull document like the one

 7  attached here as Exhibit D", which we provided.  We showed them

 8  exactly what we are looking for, "but for each of the six months

 9  preceding Mr. Grant's sentencing and for each of the months from

10  March 2019 to August 2019."  So we asked for specific months.

11          THE COURT:  Why can't you respond to that?

12          MS. GLAZER:  Well, we did, Your Honor.  He is asking

13  for the department to create new documents that they do not

14  create.

15          THE COURT:  Because why?

16          MS. GLAZER:  I'm sorry?

17          THE COURT:  Because why?  Because you override these

18  documents?

19          MS. GLAZER:  No.  Because they're not -- these are not

20  documents that are normally created and maintained.

21          THE COURT:  So that document that he has, the pull

22  document, she's telling you that they created that to get a

23  grant, right?

24          MS. GLAZER:  Correct.

25          THE COURT:  They don't create that.  So you don't

**OFFICIAL TRANSCRIPT**

11:04:12
11:04:31
11:04:45
11:04:53
11:05:03

1  believe her?

2       MR. MOST:  No, I don't think they have other documents

3  like this.  We want anything they can give us.  We've asked for

4  the data to allow us -- like the data that's in this for other

11:05:17  5  months or for them to create this document.

6       THE COURT:  So you know you can't make them create a

7  document?

8       MR. MOST:  Well, there are rules --

9       THE COURT:  If they don't keep it in their normal

11:05:27  10  course.

11       MR. MOST:  Certainly, although Federal Rule of Civil

12  Procedure 34 does allow that, if necessary.  If there's a request

13  for electronically stored information, it is proper to, quote,

14  request "after translation by the responding party into a

11:05:40  15  reasonably usable form."  So we would be perfectly okay if they

16  were to give us the raw data itself from CAJUN.  We've asked for

17  that.

18       THE COURT:  Can you do that, the raw data?

19       MS. GLAZER:  I believe they asked for actual access to

11:05:57  20  the database --

21       MR. MOST:  We asked for that in the alternative.

22       MS. GLAZER:  -- which is not --

23       THE COURT:  They can say "no" or they can provide you

24  the data.

11:06:07  25       MS. GLAZER:  Right.  There were additional objections.

**OFFICIAL TRANSCRIPT**

1  All data -- "all data" was broad so the document itself -- and

2  it's in -- it's in the record from today's -- has actual data

3  points.  The offender's name, his incarceration date, and things

4  like that.

11:06:33

5         THE COURT:  And when he was released?  That's what you

6  are looking for?

7         MS. GLAZER:  Yes.

8         THE COURT:  You gave that to him?

9         MS. GLAZER:  No, because he didn't ask for it.

11:06:40

10        THE COURT:  You didn't ask for it?

11        MR. MOST:  We did ask for it.

12        THE COURT:  He said he asked for it, and if that was

13 his request, it is pretty specific.  If you don't keep the

14 document in that form, he wants the underlying data for specific

11:06:53

15 months.

16        MS. GLAZER:  For every offender who has been released

17 from custody during those months, that is the request, and then

18 we get to --

19        THE COURT:  How many --

11:07:03

20        MS. GLAZER:  -- relevance and over --

21        THE COURT:  Is it one particular facility you are

22 talking about?

23        MS. GLAZER:  No, Your Honor.  He's talking about

24 statewide, state custody.  You know, state prisons and parishes,

11:07:16

25 every offender who has been released.

**OFFICIAL TRANSCRIPT**

1          MR. MOST:  Your Honor, I'll point to Rec Doc 123-19

2    which reflects a meet-and-confer we held.

3          It says:  Asked that the DOC would provide us the data

4    that would enable us to recreate data pulls for past or current

5    months.  Ms. Glazer said the DOC would not.

6          I asked if the DOC would provide us access to the

7    database so that we could create the data pulls.  Ms. Glazer said

8    the DOC would not.

9          I asked if the DOC would create its own data pulls on a

10   monthly basis.  Ms. Glazer said the DOC would not.

11         We are okay with any way they want to produce this to

12   us.  However, the data is being lost.  It is being degraded.  The

13   further back -- the further that time goes forward, the more data

14   is being overwritten.  Not all of it, but some of it to the

15   extent where Ms. Gueho testified that the further back in time

16   you go, the less accurate the data is.

17         And so we would be comfortable with any way that they

18   were seeking to preserve this data, whether it's through -- just

19   as with ESI, often it's recorded on back-ups, or if this was

20   recorded into an Excel file -- and they did and we know they can

21   do it because they did it once -- or if they were to provide us

22   with data on an ongoing basis, provide us with access.

23         The one thing that we contend cannot happen is for it

24   not to be preserved, not to be produced, and to be degraded over

25   time.  And that's why after, frankly, we've spent hours on the

11:07:35

11:07:46

11:08:03

11:08:22

11:08:39

**OFFICIAL TRANSCRIPT**

1    phone and in person --

2              THE COURT:  Did you file a motion to compel?

3              MR. MOST:  This is a motion to compel in the

4    alternative.

11:08:51   5              THE COURT:  And I'm hearing it instead of the

6    magistrate judge.

7              MR. MOST:  I'm sorry?

8              THE COURT:  I said I'm hearing it instead of the

9    magistrate judge.

11:08:56  10              MR. MOST:  Yes, Your Honor.

11              THE COURT:  All right.

12              MR. MOST:  Thank you.

13              THE COURT:  All right.  Let me take this under

14    advisement.  All right.  Thank you.

11:09:24  15              All right.  So plaintiff's motion for summary judgment.

16              MR. MOST:  Yes, Your Honor.  This is plaintiff's motion

17    for summary judgment against defendant Secretary LeBlanc at the

18    Department of Corrections.

19              What this case is about, in large part, is respect of

11:09:44  20    the judiciary.  It is Fifth Circuit black letter law that there

21    is a clearly established right to timely release from prison.  I

22    say "black letter law."  I mean that literally because it's the

23    header in *Porter v Epps*.  It's in bold type and capitalized.

24              It is black letter law that it is both well settled

11:10:05  25    that the termination of a sentence is made by the trial judge,

**OFFICIAL TRANSCRIPT**

1  not the defendants' custodian.  So it's up to the judiciary to

2  decide how long someone should be in prison once they are

3  sentenced.

4          However, the Department of Corrections has decided that

11:10:21  5  they, not a judge, get to decide how long someone's sentence

6  lasts.  I found this personally shocking.  This can be found in

7  Rec Doc 127-17 at 36 to 39.  The DOC's 30(b)(6) witness testified

8  that, in their opinion, someone's sentence lasts until they do

9  the time computation regardless of how long that takes.  And in

11:10:47  10  Mr. Grant's case --

11          THE COURT:  But in the factual background of this case,

12  wasn't it that Judge Buras was not clear in her order?  I mean, I

13  remember this case.

14          MR. MOST:  Yeah.

11:10:55  15          THE COURT:  She was not clear.

16          MR. MOST:  No --

17          THE COURT:  She actually changed -- she went back and

18  she added some clarity to her order.

19          MR. MOST:  Yes, Your Honor.  She did amend her

11:11:05  20  sentence, but not because it wasn't clear.  It was because it

21  wasn't being executed.  So on --

22          THE COURT:  Well, if it just wasn't being executed, she

23  wouldn't have had to change the language, she just would have had

24  to -- you know, she just would have had to hold them in contempt.

11:11:20  25          MR. MOST:  Well, sure.

**OFFICIAL TRANSCRIPT**

1          She initially, on June 30th, sentenced him to one year
2    with credit for time served, and it's undisputed that she gave
3    him thousands of days of credit for time served.  So it's
4    undisputed what his initial sentence was.  The sheriff then took
11:11:39
5    seven days to get the paperwork to the DOC.  The DOC then waited
6    to actually compute his time until the 26th.  And during that
7    time, the judge had asked the sheriff to expedite the process.
8    She was clear she wanted him to be released immediately.
9          So on the 18th she called everyone back in.  The first
11:11:55
10   words out of her mouth were, "Tell me he's out," and his lawyer
11   said "no."  And so she resentenced him on the 18th to time
12   served.  That's it.  Right?  She made it crystal clear so there
13   could be no confusion, and yet that didn't result in his release,
14   either.
11:12:14
15         The DOC even testified that at that point he had no
16   sentence.  And, quote, after July 18th, when she did this
17   resentencing, quote, no longer a DOC offender as of the 18th.
18   This was the DOC's 30(b)(6) witness testifying.  "As of -- as far
19   as 7-18, we're not even the custodian over him anymore and
11:12:36
20   there's no sentence anymore."  This is Rec Doc 129-17 at 65 to
21   66.  And yet they held him for another nine days after that.
22         And so at the very least, the simplest, I think, claim
23   to rule on in this motion is the motion for false imprisonment,
24   which is a state law claim that only has two elements.  It has
11:12:59
25   the element of was the person incarcerated, which there is no

**OFFICIAL TRANSCRIPT**

1    dispute he was, and did they have the legal authority to hold

2    him, which they -- the DOC's testimony is that he had no sentence

3    at that point.  And so the very simplest, clearest-under-

4    Fifth-Circuit-precedent way to rule in this case is to grant

*11:13:23*   5    false imprisonment.  And we know that that is proper because the

6    Fifth Circuit has told us to do so.

7          In *Whirl v Kern*, the Fifth Circuit ordered that if

8    someone is held past their legal release date, the district court

9    should issue, quote, a directed verdict as to liability and leave

*11:13:43*  10    for the jury only the issue of damages.  And that's what we have

11    here.  It has been established that his release date was the date

12    of his sentencing.

13          We get this from the DOC's own testimony.  Their

14    30(b)(6) witness testified that someone's release date is their

*11:13:58*  15    date of sentencing if they had -- were granted credit for time

16    served and that credit for time served is more than their

17    sentence, which makes sense.  If you were sentenced to a year and

18    you have multiple years of credit for time served, you have an

19    immediate release date.  They testified to that.  That's

*11:14:21*  20    Rec Doc 129-13 at 30 to 31.  They concede in their undisputed

21    facts that he got thousands of days of jail credit.  So the false

22    imprisonment tort has been -- all the elements have been met.

23          We see the simplicity of the analysis -- this case, of

24    course, isn't binding on this Court, but recently on

*11:14:45*  25    February 18th in a very similar case, *McNeal v Department of*

**OFFICIAL TRANSCRIPT**

1 *Public Safety and Corrections*, a Court granted plaintiff's motion

2 for summary judgment on the tort of false imprisonment for

3 exactly the same reasons.  Once it had been established that the

4 person should have been released and they weren't, then summary

5 judgment should issue.

6 　　　　The other claim we have in this case is deliberate

7 indifference, and that is related to the constitutional rights.

8 And here is where the whole history of what happened here, prior

9 to Mr. Grant, is relevant because what we have established and

10 learned through discovery is that Secretary LeBlanc personally

11 learned in 2012 that they were holding thousands of inmates in

12 DOC custody past their release date each year.  He testified that

13 he personally learned that in 2012 because they did this -- it's

14 called a Six Sigma investigation, which is a business school

15 methodology that the DOC used to look at its processes, and they

16 discovered they were holding thousands of people past their

17 release date.

18 　　　　It was typically because at that time they had two

19 primary problems.  They had a backlog of 1400 cases waiting to

20 have their time computed, and then they also had a long delay by

21 which it took a long time for the documents to get from the court

22 to the sheriff to the DOC, and then DOC would sit back and wait

23 for it to come in before ever getting around to calculating

24 someone's time.  And that problem continued.

25 　　　　Secretary LeBlanc testified it was a big problem, but

**OFFICIAL TRANSCRIPT**

1  he didn't fire anyone, demote anyone, or reprimand anyone.  Over

2  the course of the next eight years the problem continues.  He was

3  reminded several times by state legislators and judges reaching

4  out to him to complain about the problem.  In 2017 they did

11:16:43  5  another study and found that the problem was continuing.  They

6  had about 200 people per month who were held past their release

7  date.

8  Secretary LeBlanc testified that he didn't ask other

9  states how they fixed the problem.  I mean, there are 50 states

11:17:00  10  in this Union plus the District of Columbia.  You know, many

11  territories.  Everyone else has figured this out besides

12  Louisiana.

13  And so what they did is, rather than fixing the

14  problem, they turned it into their standard operating procedure.

11:17:16  15  They put on their website that it would take up to 12 weeks to

16  calculate someone's time and they put on their voicemail that it

17  would take up to 90 days.  And it's the DOC's testimony that what

18  happened to Mr. Grant flowed from the decisions and policies

19  established by Secretary LeBlanc.

11:17:35  20  If you look at Exhibit M to the motion for summary

21  judgment at Page 114, their DOC witness testified that, quote,

22  "The actions that people in the PreClass department took with

23  regard to Mr. Grant flowed from the DOC policies approved by

24  Secretary LeBlanc."

11:17:53  25  And so under controlling Fifth Circuit precedent, this

**OFFICIAL TRANSCRIPT**

1  is a constitutional violation.  Mr. Grant was eligible for

2  immediate release on the date of his sentencing.  He was held for

3  another 27 days.  The DOC received his documents on the 7th.  The

4  DOC's explanation, their excuse, is that they needed to find out

11:18:21    5  if he was a parole violator, which is a completely reasonable

6  thing to want to figure out.  However, they answered that

7  question on the 8th.  There -- a person from their time

8  computation department, Janille Townsel, reached out to probation

9  and parole, which is another department in the DOC.  She sent

11:18:41    10  them an e-mail, and probation and parole confirmed this is an

11  older sentence, it's not a violation of his parole, and yet they

12  continued to hold him.

13       So their whole explanation for why they were holding

14  him was to figure out if he was violating his parole.  They

11:18:58    15  figured that out on the 8th, and yet they held him until the

16  27th, a full 19 days thereafter.

17       And so looking to Fifth Circuit case law, we see that

18  there's a whole line of Fifth Circuit cases controlling.  In

19  *Whirl* in 1968, the Fifth Circuit holds that a jailer's functions,

11:19:17    20  quote, "include not only the duty to protect a prisoner, but also

21  the duty to effect his timely release, and there is no privilege

22  in a jailer to keep a prisoner in jail beyond the period of his

23  lawful sentence."

24       The Court reiterates this in *Bryan v Jones* in 1976.

11:19:35    25  Quote, "If a jailer negligently establishes a recordkeeping

**OFFICIAL TRANSCRIPT**

1   system in which errors of this kind are likely, he will be held

2   liable."

3         *Douthit v Jones*, which is what the Department of

4   Corrections says is the case most closely on point, it goes over

*11:19:53*   5   the same thing.  And in *Douthit* it says that the -- that --

6   reiterates the *Bryan v Jones* holding that if someone sets up a

7   system or allows a system to continue by which these errors are

8   common, that jailer will be held liable under constitutional law.

9         And we know that is exactly what happened here because

*11:20:23*   10   Secretary LeBlanc was quite candid in his deposition.  I was

11   impressed by his candor.  He admitted that since 2012 he had

12   known that thousands of people were being held past their release

13   date.  He admitted this was a problem.  And the problem continued

14   through Mr. Grant's experience and through the last real data

*11:20:48*   15   point he have, which is February 2019, which is when 231 people

16   were held past when a court ordered them released.  That's the

17   DOC's testimony, not just my interpretation.

18         So this is pretty important.  There are, as best we can

19   tell, thousands of people being held in Louisiana each year past

*11:21:15*   20   their release date.  According to the most recent data, it's

21   44.68 days per person past their release date for about 2700

22   people per year.

23         And this is costing the state an enormous amount of

24   money.  According to their own internal evaluations, the state is

*11:21:37*   25   spending -- initially they said they could save $3.8 million per

**OFFICIAL TRANSCRIPT**

1    year if they cut the problem in half.  According to more recent

2    data, they are spending $2.8 million a year on housing costs

3    alone.  And this all speaks to the deliberate indifference, that

4    there is a problem, they have known there is a problem, they

5    haven't fixed the problem, and it resulted in Mr. Grant being

6    detained past his release date by 27 days, and nine days past the

7    point when they said there was no sentence at all.

8         Thank you.

9         MS. GLAZER:  Your Honor has already held that the

10   Department of Public Safety and Corrections is not a person

11   capable of being sued under 1983, and that's all we've heard,

12   "the department."  The department has been violating

13   constitutional rights; the department has been acting with --

14        THE COURT:  His summary judgment is against

15   James LeBlanc.

16        MS. GLAZER:  Right.  And yet the personal involvement

17   of Secretary LeBlanc in the constitutional violations is not

18   proven.  In order to prove a constitutional violation against a

19   supervisor, the law is very clear the plaintiff must prove a

20   pattern of similar constitutional violations.  The Fifth Circuit

21   and the United States Supreme Court are very strict on what

22   "pattern of similar constitutional violations" means.  It does

23   not mean pattern of constitutional violations.  So even if we

24   were to assume that every alleged overdetention is a

25   constitutional violation, which it is not, then it's still not

**OFFICIAL TRANSCRIPT**

1  good enough.

2         For example, Mr. Most referenced the *Bryan v Jones* case

3  which talked about errors in paperwork.  There was no error here.

4  Nobody miscalculated Mr. Grant's release date so how many of

11:23:57  5  these people is he talking about who were there as a result of

6  errors?

7         THE COURT:  Well, it's hard to know since you won't

8  produce the data.

9         MS. GLAZER:  Well, Your Honor --

11:24:08  10        THE COURT:  I mean, this is a motion in the same case,

11  and now I'm losing patience because I see his point.  Maybe he is

12  entitled to an adverse inference if the very data -- you said he

13  can't prove his case because he can't show a number of defendants

14  particularly have been overdetained, but you have that

11:24:32  15  information and you don't want to give it to him --

16        MS. GLAZER:  Well --

17        THE COURT:  -- in any form.

18        MS. GLAZER:  Your Honor -- hold on.  We're talking

19  about two different things.  The number of offenders who have

11:24:43  20  been overdetained has clearly been produced.

21        THE COURT:  Okay.

22        MS. GLAZER:  Okay?  Hence the fact that the numbers

23  have been given to you repeatedly throughout these pleadings.

24        THE COURT:  So then what are you saying?  So he can

11:24:58  25  demonstrate that there are a number of people that are

**OFFICIAL TRANSCRIPT**

1    overdetained?

2         MS. GLAZER:  That one instance of overdetention needs

3    to be the same -- for the same reason as the other, and that has

4    not -- that information has not been requested nor -- and it's

5    not -- we -- Your Honor, the defendants are saying that the law

6    is very, very clear that that's what's needed to prove the

7    plaintiff's case against the secretary, a pattern of similar

8    constitutional violations.

9         Now, there has been extensive discovery in this and in

10   other cases involving the same attorneys, and we are at the same

11   point.  For example, Mr. McNeal.  Mr. McNeal, who

12   Judge deGravelles granted plaintiff's summary judgment on false

13   imprisonment, the facts of his case are laid out very clearly in

14   Judge deGravelles' opinion and they are not even remotely the

15   same as what happened here.

16        In fact, what happened with Mr. McNeal, as articulated

17   by Judge deGravelles, based on evidence presented by the

18   plaintiff in his motion for summary judgment, was that Mr. McNeal

19   was convicted and sentenced to spend a period of time in jail,

20   that the Department of Corrections calculated his time well in

21   advance of his release date, they transmitted a release paper to

22   the facility where McNeal was at the time that they calculated

23   his sentence, McNeal was subsequently transferred to a different

24   facility, and that paperwork did not follow him.  As a result,

25   McNeal got lost.  And as a result, not --

11:25:16
11:25:36
11:26:02
11:26:19
11:26:40

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Here we are where a judge sentenced
2    Mr. Grant to time served.  The paperwork was --
3          MS. GLAZER:  Preliminarily the judge sentenced him to
4    one year at DOC with credit for time served.
11:26:57    5          THE COURT:  There was that window.  He's talking about
6    false imprisonment of at least nine days.
7          MS. GLAZER:  Right.  So Mr. Grant was convicted of a
8    felony.  He was convicted of a felony while he was on parole.
9    The question the DOC had to answer was whether he committed that
11:27:16   10    felony while on parole.  The documents that were transmitted --
11          THE COURT:  He said y'all knew the answer to that early
12    on, the eight days in.
13          MS. GLAZER:  The evidence that Mr. Most has offered to
14    prove that fact is all hearsay.  It is e-mails between
11:27:34   15    non-parties.  Not to mention the fact that the department
16    representative testified that they needed confirmation from
17    official court records.
18          Now, state law is unequivocal.  The bill of information
19    or an indictment must be transmitted with that initial paperwork
11:27:53   20    by the sheriff's office to DOC, and it wasn't.  And it wasn't.
21    And so the day Mr. Grant was released was the day that the
22    department received that paperwork.
23          THE COURT:  So --
24          MS. GLAZER:  And that's in accordance with state
11:28:10   25    statute.

**OFFICIAL TRANSCRIPT**

1        THE COURT:  Do you have any response on that?

2        They kept him without the proper paperwork, is that

3   what you're saying?  So they held him without the proper

4   paperwork?

*11:28:19*

5        MS. GLAZER:  They held him because they didn't have the

6   proper paperwork.  They didn't have all the paperwork that they

7   were required to have under state law.

8        THE COURT:  So they didn't have the proper paperwork to

9   hold him under state law, correct?

*11:28:32*

10       MS. GLAZER:  No.  They didn't have the proper paperwork

11  to release him.  They didn't have the proper paperwork to release

12  him because they didn't have confirmation that the crime he

13  committed was committed before his parole started.

14       And, I mean, with somebody with a long record, that's

*11:28:57*

15  not surprising.  Mr. Grant has been arrested twice since suit was

16  filed, and for the same crime as it happens.  The DOC needed the

17  bill of information that coordinated with his arrest, that

18  coordinated with his charges.

19       Now, if Your Honor says that that's not reasonable, and

*11:29:15*

20  it may not be, that is a legal conclusion for purposes of

21  qualified immunity.  We gave you the state law and the testimony

22  of the department's witnesses that explain it.

23       There is no dispute that state law required that bill

24  of information be transmitted to the department.  There is also

*11:29:35*

25  no dispute that he was released the day it was received.

**OFFICIAL TRANSCRIPT**

1      THE COURT:  How long are y'all going to try to put this

2   wall up that it's okay to hold people?

3      I mean, it seems like, you know -- if you have

4   something on your website and you have something on your message,

*11:29:54*   5   that pretty much tells me you're not going to get out on time.

6   How do you deal with that as an agency just from a practical

7   standpoint?

8      MS. GLAZER:  Well, those issues, Your Honor, aren't

9   relevant to this case.

*11:30:04*   10      THE COURT:  But it's a common sense sort of practical

11   kind of information if you're -- I mean, you know, you live in a

12   real world, and this is something that you have to -- you know,

13   you have to deal with.

14      MS. GLAZER:  The amount of time that it takes to

*11:30:21*   15   calculate a sentence on average is going to be on average for

16   every offender in the department, so it's not just --

17      THE COURT:  So people are just supposed to accept that?

18   If you have an inefficient system, if you've put into effect a

19   policy that's blatantly unfair, that, you know, your

*11:30:42*   20   constitutional rights go out the window?

21      MS. GLAZER:  But what policy --

22      THE COURT:  If the agency can't get itself together to

23   get people out of prison on time, as an American citizen you're

24   just stuck with that?

*11:30:54*   25      MS. GLAZER:  But, Your Honor, I think we're getting --

**OFFICIAL TRANSCRIPT**

 1          THE COURT:  No, I'm trying to get you to look at the
 2    big picture because --
 3          MS. GLAZER:  The big picture, Your Honor, is that there
 4    are thousands of inmates in DOC custody, and not all of them are
 5    sentenced to time served or in this case given an illegal
 6    sentence under state law which DOC is required to follow, which
 7    gave him credit for time served on a different crime, and so he
 8    got thousands of days of jail credit for a crime he committed
 9    five or six years after the one he was convicted of.  That's what
10    happened with Rodney Grant.
11          But on the flip side, you're going to have somebody
12    that's convicted and sentenced to 15 or 20 years in custody, and
13    if it takes 30 days to 44 days to calculate his sentence, that is
14    not indicative of a constitutional violation.
15          THE COURT:  Well, you, as a lawyer and as an officer of
16    the Court, to stand in this courtroom and say that, like it's
17    nothing, it's very clear to me you haven't spent any time in
18    jail.  I mean, you're saying 44 extra days -- if that's how much
19    it takes to calculate --
20          MS. GLAZER:  Your Honor, what I'm talking about is if
21    it takes 44 days to calculate the release date of an inmate who
22    was just sentenced to 20 years, that is not indicative of a
23    constitutional violation.
24          So we have to look at what happened in this case.
25          THE COURT:  I get that.

**OFFICIAL TRANSCRIPT**

1       MS. GLAZER:  And in this case, the facts are very
2  clear.  This is not -- there was no 44-day delay in calculating
3  the sentence of this offender.  There wasn't.
4       THE COURT:  So what about the false imprisonment claim?
5       MS. GLAZER:  The false imprisonment claim -- well, as I
6  said, the facts that supported the *Whirl* and the *McNeal* cases are
7  not at all remotely close to what happened here.  What we're
8  saying here is that the department had legal authority to hold
9  Mr. McNeal as a possible parole violator.
10      THE COURT:  For how long?
11      MS. GLAZER:  The law -- state law doesn't say how long,
12 and the plaintiff has not given any state law to say when he
13 should have been released.
14      The plaintiff is arguing that there is a per se false
15 imprisonment claim that is actionable the moment his sentence
16 expires -- I'm sorry, the moment his sentence to prison expires.
17 Just to be clear, Mr. Grant, in this particular case, when
18 sentenced to time served, had completed his sentence, but he
19 still had a different sentence out there.  There was a
20 possibility that Mr. Grant owed years more in custody because of
21 his parole.  He had been -- he had years left on it, and the
22 department had the legal authority to hold him.
23      Now, the notion of a parole hold is well-established.
24 If the question is whether or not the amount of time it took for
25 the department to confirm that he was not a parole violator by

11:32:32
11:32:53
11:33:15
11:33:34
11:33:59

**OFFICIAL TRANSCRIPT**

1  receipt of that document -- if the question is whether or not

2  that was reasonable or not under state law, that's a question for

3  the jury and this is a summary judgment.  And that is the

4  question.

11:34:19   5          There is no dispute that the department had a good -- I

6  can't remember what the words used were.  It was reasonable for

7  them to determine whether or not he was a parole violator, and

8  the question is how long they had to do it.  That's a question

9  for the jury.

11:34:34  10          And if it's a question of whether the department

11  acted -- well, excuse me, whether Secretary LeBlanc personally

12  acted objectively unreasonably by following state law which

13  required that he get that document, that's a question of law.

14          I'm not sure how much time I have.

11:35:00  15          THE COURT:  How much time does she have?  Because we

16  need to wrap it up.

17          THE CASE MANAGER:  You are there.

18          MS. GLAZER:  I'm sorry.  I didn't see your hands go up.

19          There's my motion.

11:35:12  20          Do you have time left for rebuttal?  I'm sorry.  No.

21          THE COURT:  No.

22          MS. GLAZER:  Okay.  The last motion, Your Honor --

23          MR. MOST:  I'm sorry, are we going to do rebuttal on

24  this?

11:35:26  25          THE COURT:  Just quickly do it.  I'm where I need to be

**OFFICIAL TRANSCRIPT**

1  on this.

2           MR. MOST:  I'll just be very brief.  A couple of

3  points.

4           Counsel referred to state law requiring all the

11:35:40   5  documents.  Article 892 of the Louisiana Code of Criminal

6  Procedure says if they don't have the documents, they are

7  required to refuse acceptance of the inmate.  So state law sets

8  out a procedure; if they don't have the documents, they don't

9  take the inmate.  That isn't what happened here.

11:35:56   10          I would also note that they did not begin calculating

11  his sentence until the 27th of July, and that's at Exhibit N to

12  our motion at 82.

13          She referenced they have a lot of inmates in the

14  system.  *Douthit* explicitly addresses that.  It says that a large

11:36:16   15  number of people in the system is not an excuse.

16          Finally, I'll just note that what they are

17  fundamentally arguing is that they have the authority to hold

18  people indefinitely until they determine whether they're a parole

19  violator even when, as here, they knew factually that he was not.

11:36:32   20  On July 8th they got information from probation and parole that

21  said he's not a parole violator, and yet they held him anyway.

22          Thank you.

23          MS. GLAZER:  Finally we're going to talk about

24  qualified immunity.  Thank you again, Your Honor, for hearing

11:36:54   25  these motions.

**OFFICIAL TRANSCRIPT**

1    I don't believe that there is anything else that needs

2    to be said at the moment on the false imprisonment claim.  I will

3    note that, in addition to a false imprisonment claim, the

4    plaintiff did make a claim under Louisiana's Constitution which

11:37:12    5    is included in the argument on qualified immunity.

6    The -- there is no question that the plaintiff is suing

7    Secretary LeBlanc -- oh, I'm sorry.  The first thing that we need

8    to talk about is standing, the plaintiff's standing to sue for

9    prospective injunctive relief.

11:37:38    10   So the plaintiff is suing Secretary LeBlanc for

11   injunctive relief with regard to the department's policies and

12   stuff regarding to sentence calculations.  Now, the plaintiff was

13   not incarcerated at the time suit was filed.  He has since been

14   reincarcerated.  However, standing is determined at the time suit

11:38:00    15   is filed.  And as we argued in our reply -- well, in our motion

16   and our reply, the "capable of repetition" they are admitting on

17   here.  Also it needs to be determined at the time suit is filed.

18   And there must be an actual imminent danger that the

19   plaintiff is going to sustain the same injury again, and the

11:38:23    20   possibility of a conviction and another lenient sentence and

21   immediate release and time calculation are all too speculative.

22   And the plaintiff bears the burden of proving that he

23   had standing at the outset of this case and again all the way

24   through it.  So that's specifically for the claims for injunctive

11:38:44    25   relief.

**OFFICIAL TRANSCRIPT**

1          Now, as to the claims for money damages against
2    Secretary LeBlanc, I think Your Honor's aware that
3    Secretary LeBlanc is not an employer of the department employees,
4    the state is.  In other words, a judgment in this case cannot be
5    executed -- a judgment in the case against somebody else, a
6    department employee, cannot be executed against
7    Secretary LeBlanc.
8          Also there is no statutory obligation for
9    Secretary LeBlanc personally to indemnify a subordinate officer.
10   The state has that obligation.  And there is no dispute that the
11   state is providing representation, that's why I am here, and
12   identification of the claims for money damages.
13          Now, qualified immunity.
14          Secretary LeBlanc is sued personally under 1983 as a
15   supervisory official.  The plaintiff's first obligation is to
16   prove Secretary LeBlanc was personally involved in the
17   constitutional violation and then that the defendants' actions
18   were unreasonable in light of clearly established law.
19          In *Douthit*, the case that has been discussed quite a
20   bit this morning, and then again by Your Honor in the motion --
21   the ruling on the motion for summary judgment regarding
22   Sheriff Gusman, whether or not the Fourteenth Amendment is
23   violated depends on the facts and circumstances of the individual
24   case.
25          With that in mind, we have to look at *Monell* and the

**OFFICIAL TRANSCRIPT**

11:39:04
11:39:18
11:39:40
11:40:02
11:40:21

1  cases that allow for a supervisor to be held personally liable,

2  even when he wasn't directly involved in the constitutional

3  violation.

4      There are multiple elements of a claim for supervisory

11:40:45  5  liability, and it is the plaintiff's burden of proving each one,

6  not only to overcome qualified immunity, but to meet his

7  fundamental burden of proof.

8      The plaintiff has to prove that the secretary failed to

9  train, supervise, or implemented constitutionally deficient

11:41:05  10  policies.  Stating that there are policies that are

11  unconstitutional is conclusory and not sufficient to meet his

12  burden of proof.  The plaintiff has to articulate what the

13  policies are and how they are implemented by the secretary.

14      With regard to failure to train or supervise, that

11:41:22  15  claim was alleged in the complaint but it does not appear to be

16  the issue in this case as there are no -- the allegations seem to

17  be that the lower-level officers followed the policies

18  implemented by the secretary, not that they weren't trained to

19  follow the policies.

11:41:43  20      So training doesn't seem to be an issue in this case,

21  but it doesn't matter because the rest of the test is the same

22  regardless of whether the claim is regarding training or policy

23  implementation.

24      There has to be a causal link between the policies and

11:41:58  25  the constitutional violation.  So, for example, if the policy is

**OFFICIAL TRANSCRIPT**

1    that it takes 44 to 60 days to calculate the sentence, the

2    plaintiff has to prove that it took 44 to 60 days to calculate

3    the plaintiff's sentence or otherwise how the policy caused the

4    constitutional violation here.

11:42:19    5        And finally that the implementation of the policy

6    amounts to deliberate indifference.  Now, deliberate indifference

7    in this context is not like it is in a medical case where you

8    have got an individual who was personally involved in medical

9    treatment, knew about the offender's condition, and disregarded

11:42:38   10    it.  The United States Supreme Court and the Fifth Circuit have

11    made it very clear that in order to prove deliberate indifference

12    by a supervisor in a claim of supervisory liability, the

13    plaintiff must prove a pattern of similar constitutional

14    violations, not a number.

11:42:56   15        Justice Scalia in a concurrence in a case that came out

16    of the Fifth Circuit involving District Attorney Harry Connick,

17    *Connick v Thompson*, Scalia said that absent proof of a pattern of

18    similar constitutional violations, the law of *Monell* turns into

19    the law of large numbers.  Large numbers may be compelling and

11:43:26   20    they may be tangentially relevant to the overall claim, but the

21    issue of the individual violations is what's important.

22        THE COURT:  If you have something to add that's not in

23    your brief, just continue to add it.

24        MS. GLAZER:  No, I'll just save the rest of the time if

11:43:42   25    you have any questions.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Okay.  All right.

2          The same with you, Mr. Most.  If you have something to

3     add that is not in your brief --

4          MR. MOST:  Yes.  Just one, I think, thing that is not

11:43:50
5     addressed in our brief.  I double-checked this last night.

6          The DOC's motion for summary judgement only addresses

7     the constitutional claim.  It does not address the state law

8     torts of false imprisonment for negligence which we've pled.

9     They bring up false imprisonment in their reply, but it's not

11:44:06
10    addressed in their main motion.  So even if their motion were to

11    be granted, Mr. Grant's state law claims should continue.

12          And I think that's the only thing that I've got that is

13    not addressed in the brief.

14          THE COURT:  Do you want to respond to that?

11:44:19
15          MS. GLAZER:  No, Your Honor.

16          THE COURT:  He's right?

17          MS. GLAZER:  Oh, I'm not sure that there is a

18    negligence claim.  I don't know how there could be a negligence

19    claim in this case.

11:44:30
20          In terms of the state law claims, the state law claims

21    were addressed in the defendants' motion.  They were also

22    addressed in plaintiff's opposition to defendants' motion; thus,

23    they were addressed in the reply as well.

24          THE COURT:  Okay.  I'm going to take your motions under

11:44:47
25    advisement.

**OFFICIAL TRANSCRIPT**

1          MS. GLAZER:  Thank you.

2          MR. MOST:  Thank you, Your Honor.

3          THE COURT:  Thank you.

4                              (Proceedings adjourned.)

5

6                    *  *  *  *

7                    CERTIFICATE

8

9          I hereby certify this 25th day of March, 2020, that the

10   foregoing is, to the best of my ability and understanding, a true

11   and correct transcript of the proceedings in the above-entitled

12   matter.

13

14                              /s/ Mary V. Thompson

15                              Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**