UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


BRIAN HUMPHREY, ON
BEHALF OF HIMSELF AND
ALL OTHERS SIMILARLY
SITUATED

                              CIVIL ACTION

                              NO. 3:20-cv-0233

VERSUS


JAMES LEBLANC




          Deposition of SECRETARY JAMES M.
LEBLANC, taken on January 7, 2022, via Zoom
Teleconference.

```
 1    APPEARANCES:
 2    PROMISE OF JUSTICE INITIATIVE
      BY: REBECCA RAMASWAMY, ESQ.
 3    1024 Elysian Fields Avenue
      New Orleans, Louisiana  70117
 4    Phone: (504)529-5955
      Email: rramaswamy@defendla.org
 5        AND
      MOST & ASSOCIATES
 6    BY:  WILLIAM MOST, ESQ.
      201 St. Charles Avenue
 7    Suite 114
      New Orleans, Louisiana  70170
 8    Phone: (504)509-5023
      Email: williammost@gmail.com
 9        AND
      LOEVY & LOEVY
10    BY:  SARAH GRADY, ESQ.
      311 North Aberdeen Street
11    3rd Floor
      Chicago, Illinois  60607
12    Phone: (312)243-5900
      Email: sarah@loevy.com
13        REPRESENTING THE PLAINTIFF
14
15    KEOGH, COX & WILSON
      BY:  ANDREW BLANCHFIELD, ESQ.
16    701 Main Street
      Baton Rouge, Louisiana  70802
17    Phone: (225)383-3796
      Email: ablanchfield@keoghcox.com
18        AND
      JONATHAN RAY VINING, ESQ
19    504 Mayflower Street
      Baton Rouge, Louisiana  70802
20    Phones: (225)342-6728
      Email: jonathan.vining@la.gov
21        REPRESENTING THE DEFENDANTS
22
23    REPORTED BY:
24    Cecilia M. Henderson
      Certified Court Reporter
25
```

```
 1                      EXAMINATION INDEX

 2                                              Page

 3    MR. MOST ...................................5

 4

 5             E X H I B I T   I N D E X

 6                                              Page

 7    Exhibit 6 ................................10
      Exhibit 42 ...............................13
 8    Exhibit 41 ...............................29
      Exhibit 32 ...............................30
 9    Exhibit 31 ...............................33
      Exhibit 36 ...............................36
10    Exhibit 44 ...............................41
      Exhibit 46 ...............................44
11    Exhibit 49 ...............................54
      Exhibit 34 ...............................55
12    Exhibit 43 ...............................95
      Exhibit 35 ...............................95

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

S T I P U L A T I O N

      It is stipulated and agreed by and between counsel that the deposition of SECRETARY JAMES M. LEBLANC is hereby being taken under Federal Rules of Civil Procedure for all purposes in accordance with law;

      That the formalities of filing and certification are hereby waived; that the formalities of reading and signing are hereby specifically not waived;

      That all objections, except those as to the form of the question and/or responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof may be used in evidence.

      *   *   *   *   *   *   *   *

      CECILIA M. HENDERSON, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

```
 1                    SECRETARY JAMES M. LEBLANC, 510
 2   MAYFLOWER STREET, BATON ROUGE, LOUISIANA
 3   70802, AFTER FIRST BEING DULY SWORN IN THE
 4   ABOVE-ENTITLED MATTER, DID TESTIFY AS FOLLOWS:
 5            MR. MOST:
 6                 Drew, can we stipulate that the
 7                 deposition is properly noticed; the
 8                 court reporter is duly qualified and
 9                 there's no objection doing this via
10                 Zoom?
11            MR. BLANCHFIELD:
12                 Yes, we can.
13            MR. MOST:
14                 Thank you very much.
15                   EXAMINATION
16   BY MR. MOST:
17       Q    Good Morning, Secretary LeBlanc, how
18   are you?
19       A    Good morning, William.  Okay.
20   Dealing with COVID, as you can expect.
21       Q    When you say, "Dealing with COVID,"
22   you mean dealing with the general --
23       A    Not me, no.
24       Q    Okay.
25       A    We are the middle of it right now, so
```

```
 1    it's got our attention.  Let me just say that.
 2         Q    Yeah.  I understand.  And I think the
 3    last time we met, there was sort of an
 4    emergency situation brewing and you had to go
 5    meet with GOHSEP.  The same is true today.  If
 6    any emergency scenarios pop up and you need to
 7    pause, you know, just let us know.  We can
 8    work that out.
 9              Secretary, could you give us your
10    full name and title for the record?
11         A    James M. LeBlanc, and my title is
12    Secretary of Public Safety and Corrections.
13         Q    All right.  And this is a question I
14    know the answer to, but you've given several
15    depositions, at least, in the past, correct?
16         A    I have; 20, 30.  I don't know what
17    the numbers are; somewhere in that range.  I
18    would think or more.
19         Q    And so you understand that you're
20    under oath here today?
21         A    I do.
22         Q    That your answers here today have the
23    same force as if we are in a courtroom with a
24    judge and jury?
25         A    Correct.
```

1      Q     Is there anything today that will

2   prevent you from giving me your full attention

3   and truthful and complete answers, whether

4   it's illness, medication, substances or

5   anything else?

6      A     No.

7      Q     And like I said, at any point we can

8   take a break as needed.  Just let me and your

9   counsel know, and we'll take breaks as

10  necessary.  Although, I will tell you in

11  advance that it's my practice to ask you after

12  every break who you talked to and what you

13  talked about during that break; any documents

14  you looked at during that break.  And there's

15  not necessarily the same expectation of

16  confidentiality during those breaks.  So even

17  if you talk to your lawyer, I might ask about

18  it, so just as a forewarning.

19          And one thing I know that you do well

20  is you wait until I'm finished my questions

21  before answering.  And I will try and extend

22  to you the same courtesy of waiting until you

23  finish before I ask the next question.  That

24  way, we'll have a cleaner record or

25  transcript.  All right?

```
 1         A      Okay.
 2         Q      And if I ask a question and you
 3    either don't understand the question or my
 4    question is vague or confusing, will you agree
 5    to tell me that that's the case, rather than
 6    just trying to answer it?
 7         A      Yes.
 8         Q      Thank you.  And, also, because we are
 9    doing the deposition via Zoom, we can't see
10    the entirety of the room that you're in.  Is
11    there anyone in the room with you right now?
12         A      No one.
13         Q      And, similarly, we won't be able to
14    necessarily see if anyone tries to communicate
15    with you during this deposition, via hand
16    signal, by text messages, by whispers or a
17    slipped note or anything like that.  Will you
18    agree now to tell me if anyone tries to
19    communicate with you during this deposition by
20    those means or any other means?
21         A      I will.
22         Q      Thank you.  And approximately when
23    did you begin preparing for this deposition?
24         A      Yesterday, I guess.  You know, I
25    looked at a few documents and things like that
```

1    to prep.

2        Q    And other than your lawyer or

3    lawyers, did you talk to anyone to prepare for

4    today's deposition?

5        A    No.

6             THE COURT REPORTER:

7                 I'm sorry.  What was that

8             response?

9             THE WITNESS:

10                No.

11   BY MR. MOST:

12       Q    And approximately how much time did

13   you spend preparing for this deposition,

14   total?

15       A    Not long, William; probably an hour

16   at the most, off and on a little bit.  As I

17   mentioned, you know, with everything else

18   going on in the department right now, I'm a

19   little bit preoccupied, so I didn't have a

20   whole lot of time to prepare.

21       Q    I understand.  You mentioned that you

22   looked at a couple of documents to prepare for

23   this deposition.  Do you have those documents

24   with you today?

25       A    I do.

1     Q    Could you tell me what those
2  documents are?
3     A    One is our response, the
4  interrogatory response that we submitted to
5  you guys.  And the others are a few notes that
6  I made, just kind of reminding myself of
7  things that we've done and things like that.
8  It's a couple of pages of handwritten notes.
9  That's it.
10     Q    Great.  I'm going the pull up what is
11  labeled Exhibit 6.  Are you able to see this
12  on your screen, Secretary?
13     A    No, I don't see anything, other than
14  what was already up there.
15     Q    You don't see a document up on the
16  screen?
17     A    No.
18     Q    Let me try that again.  Okay.  Does a
19  document pop up now?
20     A    No, I'm afraid not.
21          MR. MOST:
22               That's odd.  Drew, are you able
23          to see this document that I'm
24          sharing?
25          MR. BLANCHFIELD:

```
 1              Yeah, it's on my screen, yeah.
 2   BY MR. MOST:
 3       Q    Secretary LeBlanc, do you see, like,
 4   faces of the people in the Zoom on your
 5   screen?
 6       A    I do.  I see you.  I see myself.  I
 7   see --
 8            MR. VINING:
 9                 Secretary, you want to holler at
10            Miss Debbie to come in there to see
11            if she can figure it out?  Because I
12            can see it.
13            THE WITNESS:
14                 Can I step out?  Is that okay?
15            MR. MOST:
16                 Yeah.  Secretary, while you're
17            at it, will you have her scan the
18            handwritten notes you have there, so
19            we can share those around, while
20            we're at it?
21                 (OFF-THE-RECORD DISCUSSION)
22            MR. MOST:
23                 Okay.  Let's go back on the
24            record.
25
```

 1   BY MR. MOST:

 2        Q    So, Secretary LeBlanc, do you see

 3   what's labeled as Exhibit 6 that I've pulled

 4   up on the screen?

 5        A    I do.  I can see it.

 6        Q    Is this the interrogatory response

 7   you said was the document that you looked at

 8   to prepare for today?

 9        A    I believe it is, yes.

10        Q    So in addition to this document and

11   your handwritten notes, did you look at any

12   other documents to prepare for today's

13   deposition?

14        A    You know, I looked back at and real

15   briefly at my previous deposition in regards

16   to this issue that you and I had.  What was

17   that?  A couple of years ago, maybe?

18        Q    Yeah.

19        A    I looked at that.  That was about the

20   extent of it.

21        Q    In addition to your handwritten

22   notes, interrogatory response and your prior

23   deposition, did you review any documents to

24   prepare for today's deposition?

25        A    No.

```
 1        Q    Thank you.  I'll pull up on the
 2   screen Exhibit 42.  Is this the deposition
 3   transcript you're talking about, the May 2019?
 4        A    I'm sure it is, William.  I can't see
 5   that, but I'm -- yes, that would have to be
 6   it.  I can't imagine it being any other.
 7   Yeah, that's it.
 8        Q    Okay.  Great.  One thing that will, I
 9   think, accelerate today, I'm just going to go
10   quickly through some of your testimony from
11   this one and make sure it's still your
12   testimony today.  I think we can do that to
13   make sure that's your testimony.  This
14   deposition is also your testimony in the case
15   you're here for today.
16             Do you know what case you're here for
17   today, in a general sense?
18        A    In a general sense, I do.  My
19   understating is this is a class action in
20   regards to over-detention.
21        Q    Right.  So I'm just going to begin by
22   confirming that some of your -- well, let me
23   back up.  So you recall giving this deposition
24   in May of 2019?
25        A    I do.
```

1      Q    And your answers during that

2    deposition were truthful and complete answers?

3      A    Yes.

4      Q    And so, generally, unless something

5    has changed in the intervening time, your

6    answers today to those questions would be the

7    same truthful and complete answers?

8      A    Yes.

9      Q    Great.  And so I'm going to go

10   through some of this fairly quickly to confirm

11   your testimony.  As Secretary of the DOC,

12   you're responsible for the inmates that's in

13   the custody of DOC, whether or not they're in

14   a state run facility, a parish run facility or

15   a private facility, correct?

16     A    Yes.

17     Q    When I say, "DOC," I mean the same

18   thing as the Department of Public Safety and

19   Corrections or DPS&C or the Department.  Would

20   you understand me if I use all of those terms

21   interchangeably?

22     A    Yes.

23     Q    And if the DOC has a legal duty to do

24   something with regards to an inmate, it's your

25   job as Secretary to make sure that happens,

```
 1   correct?
 2       A    Correct.
 3       Q    It's the Department of Corrections'
 4   duty to timely release inmates, correct?
 5       A    Yes.
 6       Q    The DOC is legally bound to release
 7   inmates on their correct release date, agreed?
 8       A    I'm not sure how I answered that the
 9   last time.  Where is that answer?
10       Q    Yeah.
11            MR. BLANCHFIELD:
12                  And let me just object to it to
13            the extent it calls for a legal
14            conclusion.  Object to the form of
15            the question; but, Secretary, can go
16            ahead and answer it.
17   BY MR. MOST:
18       Q    Yeah.  So, Secretary, do you see that
19   in your prior deposition, the question was:
20   "And the Department of Corrections is legally
21   bound to release inmates on their release
22   date, correct?"
23            And your response was, "Yes."  Do you
24   see that?
25       A    Okay.  Now I see it, yes.  Okay.
```

1          MR. BLANCHFIELD:

2                I need to point out that it

3          looks like Mr. Evans agreed, but he

4          objected to the form of the question

5          as well back then.

6    BY MR. MOST:

7        Q    Subject to that same objection, I'll

8    ask the question:  Secretary LeBlanc, the

9    Department of Corrections is legally bound to

10   release inmates on their release date,

11   correct?

12       A    Yes.

13       Q    That is to say, the DOC is legally

14   bound to release inmates when their

15   judge-ordered sentence is complete, correct?

16          MR. BLANCHFIELD:

17                Object to the form.

18          THE WITNESS:

19                Yes.

20   BY MR. MOST:

21       Q    And when we're talking about release

22   date here, we mean the date they should be

23   released when the judge-ordered sentence is

24   taken into account, as well as good time and

25   jail credit, correct?

1       A     Yes.

2       Q     Some people sentenced to the custody

3  of the DOC are eligible for immediate release

4  on the day of their sentencing, correct?

5       A     Yes, that is correct.  And, actually,

6  could be overdue on their day of sentencing.

7       Q     So if it takes a week for the DOC to

8  calculate their sentence for those kinds of

9  people and they're not released until after

10 the DOC calculates their sentence, that person

11 has been held past the end of their sentence

12 for a week, correct?

13      A     Correct.

14      Q     The Department of Corrections has had

15 a problem with immediate releases, correct?

16      A     Well, yeah.

17            MR. BLANCHFIELD:

18                 This Drew Blanchfield.  I'm just

19            objecting to the form.  The Secretary

20            can answer.

21            THE WITNESS:

22                 So would you ask the question

23            again, William?

24 BY MR. MOST:

25      Q     Sure.  Subject to the same objection,

1    the question is:  The Department of

2    Corrections has had a problem with immediate

3    releases, correct?

4        A    Yes.  We've had a problem with

5    immediate releases with the definition of a

6    problem being that getting the appropriate

7    paperwork and documents that we need to

8    discharge people from, either the sheriff, the

9    judge, the clerk of court.  I just want to

10   make that clear that the problem is not just

11   the Department of Corrections, but other

12   agencies involved in the processing of time

13   comp.

14       Q    Yeah.  I understand you, Secretary.

15   And we'll get into more of that throughout

16   this deposition, questions about that.  I hear

17   you.

18            And the problem with immediate

19   releases that the Department has had is that

20   inmates have been held past the end of their

21   sentence, correct?

22       A    Correct -- well, the end of their --

23   not necessarily sentence, but being held past

24   their release date.

25       Q    Do you see on the screen Exhibit 42,

```
 1   page 27.  In your prior deposition, you were
 2   asked, Question:  "And the problem with
 3   immediate releases is that people are being
 4   held past the end of their sentence, correct?"
 5          And the answer is, "Correct."  Do you
 6   see that?
 7       A    I did -- I do see that.
 8       Q    Okay.
 9       A    But I think I stipulated later on in
10   my testimony that -- that, you know,
11   "Sentence" is the incorrect word here, because
12   they haven't finished their sentence.  The
13   majority of these people are on parole,
14   getting out on good time and have more of
15   their sentence to do on parole.
16              MR. BLANCHFIELD:
17                  Let me just point out, William,
18              that if you read the next line, it's
19              the same answer that the Secretary
20              gave in his deposition.  "People are
21              being held past their release date."
22   BY MR. MOST:
23       Q    Secretary, when you say, "Not past
24   their sentence," I think what I hear you
25   saying is:  People are eligible for immediate
```

1  release -- some inmates are eligible for

2  immediate release on the date of their

3  sentence -- on the date of their conviction

4  because of the application of good time,

5  although their full term of their sentence

6  will not yet be complete; is that what you're

7  saying?

8        A    Yes.

9        Q    And when we talked about good time,

10  we're talking about Louisiana statutes that

11  entitle inmates to the shortening of their

12  sentence, unless good time is removed,

13  correct?

14        A    Correct.

15        Q    And the good time statute, that's a

16  legal entitlement to inmates; it's not

17  discretionary.  That's something they're

18  entitled to unless they have good time

19  removed, correct?

20        A    I'm not sure I can answer that

21  question, "Entitled," because they have to

22  earn good time, you know.  It's 35 percent,

23  and they're given that time upfront.  But as

24  you mentioned, I think, in your statement that

25  -- or your question -- that unless it's

1    removed, because it can be removed.

2        Q    Right.

3        A    If they don't earn it -- if they --

4    for various disciplinary reasons, it can be

5    taken.  If that makes sense.

6        Q    It does.  So when we talk about "Good

7    time," that is something that is set up by the

8    state legislature and statute, correct?

9        A    Yes, it is.

10        Q    And so the problem that the DOC has

11    had with immediate releases is that people are

12    being held past their proper release date,

13    correct?

14        A    Correct.

15        Q    And at least by 2012, you learned

16    that the DOC had a systemic problem with

17    people being held past their release dates,

18    correct?

19        A    Correct.

20        Q    And the DOC still has that systemic

21    problem today, correct?

22        A    Well, I think that's a question --

23    "Systemic," that adjective may not -- I mean,

24    I think we've improved what we've done since

25    that date.  We still have issues, as we've

```
 1   already discussed, with the proper paperwork
 2   and those sorts of things that we've dealt
 3   with.  But in a sense, we've done a lot of
 4   reorganization.  We've got a lot of things in
 5   that regard to help move things along a little
 6   bit quicker, so it has improved.  It's not
 7   where it needs to be.
 8        Q    So the systemic problem you learned
 9   about, at least as early as 2012, has been
10   improved but if not solved as of today,
11   correct?
12        A    Correct.
13        Q    It's a problem for one inmate to be
14   held past their release date, correct?
15        A    Yes, agree.
16        Q    And in 2012, you learned -- at least
17   by 2012, you learned that thousands of people
18   in the custody of Department of Corrections --
19   for whatever reasons -- were being held past
20   their release date, correct?
21        A    According to that report that we got,
22   that's what they said in that report, so, yes.
23        Q    Did you at any point learn anything
24   to suggest that that report was inaccurate?
25        A    Not -- no, I don't think "Inaccurate"
```

1    is the word for it.  It didn't talk about the

2    reasons why that people were being held past

3    their release date.  I don't think there was

4    enough said about the issues with the

5    paperwork and those sorts of things, but --

6    no, I have no reason to believe -- you know,

7    that report was okay.

8         Q    And when we talk about that report,

9    we're talking about the Six Sigma report from

10   2012; is that right?

11        A    Yes.

12        Q    So you have -- you never had any

13   reason to doubt the accuracy of that report in

14   the way it characterized the scope of the

15   problem, although it may not have fully -- to

16   your opinion -- characterized the causes; is

17   that your testimony?

18        A    Yeah, that is.  And I think our

19   response to that report is an indication that

20   we thought the report was -- you know, it --

21   you know, in its recommendations, we followed

22   those recommendations and did everything we

23   could to improve that situation.

24        Q    And part of the problem identified in

25   that 2012 report was that:  "Many inmates were

 1    being held past their release dates in part

 2    because it was taking days or weeks for the

 3    sheriffs to bring Pre-class Packets to the

 4    DOC," correct?

 5         A    Yeah.  I'm assuming that's in there.

 6    I'm not looking at the report, William, but

 7    I'm assuming that's part of it.  I mean, you

 8    can't expect me to remember everything in that

 9    report.  I'm sorry.  Yeah, I think that was

10    the gist of it.

11         Q    Okay.  Yeah, and this isn't a pop

12    quiz.  As you need to, we'll be pulling up

13    documents.  I'm not trying to test you.  My

14    question is, primarily -- my understanding is

15    that what this 2012 report identified was not

16    an idiosyncratic problem for this inmate or

17    that inmate; it was a systemic problem that

18    needed systemic solutions, correct?

19         A    Correct.

20         Q    And so then after this Six Sigma

21    report in 2012, the DOC took certain steps to

22    try and improve the problem identified in this

23    Six Sigma report, correct?

24         A    Correct.

25         Q    These are what we refer to as the

1    "Six Sigma Interventions," the recommendations

2    recommended by that report, correct?

3         A    Correct.

4         Q    And so -- and then after the Six

5    Sigma Interventions, the DOC still had people

6    being held in average of about two months past

7    their release date, correct?

8         A    I don't know what those numbers are,

9    William.  But, you know, I would have to

10   assume that -- you know, what you're saying is

11   correct, but I don't know.

12        Q    Sure.

13        A    I honestly don't know the answer to

14   that.

15        Q    So looking at your 2019 deposition

16   here on pages 44 to 45, you see that the

17   question was:  "After the Six Sigma

18   Interventions, we've still got people being

19   held an average of about two months past their

20   release a date, correct?"

21             And your answer was, "Correct."

22   That's your testimony today, as well?

23        A    Yes.  I don't see any reason why that

24   would change.

25        Q    And then in 2019, there were still

1    about 200 people per month being held past

2    their release date for an average of 49 days

3    per person, correct?

4        A    I'm just looking at what you're

5    showing me.  I basically said, "Correct."  So

6    I'm assuming that is correct.

7        Q    So that's your testimony today, as

8    well?

9        A    Yeah, I'm not sure today what that

10   number is.  But at that point in time, that's

11   what the number was.

12       Q    Right.  Okay.

13       A    I don't know whether that average has

14   gone down since that time, but I'm assuming it

15   probably has.

16       Q    Okay.  And to your knowledge, has

17   anyone at the DOC at any time from 2012 to the

18   present been fired, demoted, disciplined, had

19   their pay docked or in any way had any other

20   sort of discipline as a result of this problem

21   of inmates being held past their release date?

22       A    So, I know my answer.  I think, if I

23   remember right, was that I didn't think

24   anybody had.  But I think, as we went on in

25   this process, I think that there were -- there

```
 1   have been some disciplinary action taken in
 2   some regards.  And some of it -- I'm not
 3   exactly sure, William, what that is, but I
 4   think there was some discipline action taken
 5   somewhere along the line.  With -- actually, I
 6   think it was more about releasing too early,
 7   rather than releasing after the release date.
 8   So I don't know that I'm really the person to
 9   answer that.
10        Q    Okay.  Who at the DOC knows that
11   best?
12        A    Probably -- you know, I think Derrick
13   or Seth would be the two people -- you know,
14   they supervise those sections, at the time.
15   Derrick doesn't any more, but did at the time.
16   And I would assume those -- and Angela
17   Griffin, those are the people that manage that
18   section.  I'm assuming they were managing at
19   that time.
20        Q    Okay.  Would that be Derrick Ellis,
21   Seth Smith and Angela Griffin?
22        A    Right.
23        Q    And I think you're right.
24        A    Wait, wait, wait.  William, I'm
25   sorry.  But also you have institutional staff
```

```
 1    at each facility that do the state facility
 2    processing in addition to Wade Correctional
 3    Center, where our north Louisiana processing
 4    facility is.  So you have -- you have those
 5    people that may have been involved if there
 6    was some disciplinary action.  And I don't
 7    know the names of the direct supervisors of
 8    those areas, but the wardens at those
 9    facilities would be ultimately responsible.
10         Q    I think you're right.  I think the
11    DOC did mention that some people had been
12    disciplined for releasing inmates too early.
13    So it's my understanding that you're saying,
14    some DOC staff members may have been
15    disciplined for releasing inmates too early,
16    but you don't know of any discipline of any
17    kind for any DOC inmate for releasing inmates
18    after their correct release date.  Is that
19    true?
20         A    Yeah.  I mean, I don't know of any.
21    So that doesn't mean there hadn't been any,
22    but I don't know of any.
23         Q    Yeah, I got you.  I'm going to pull
24    up Exhibit 41.  Do you recognize this document
25    here; have you ever seen this before?
```

```
1        A    You know, I don't think I have,
2   William.  I don't -- offhand, I don't
3   recognize it.
4        Q    This is a document that we received
5   from the Department of Corrections.  Do you
6   see here on page 2 there's a chart and the
7   yellow line says, "Total sentence length."  Do
8   you see that?
9        A    I do.
10       Q    Do you see that in the upper right
11  there's an arrow that's labeled,
12  "Over-detention"?
13       A    Yes.
14       Q    And do you see that that arrow is
15  pointing to the time in excess of total
16  sentence length?
17       A    Yes.
18       Q    Okay.  And that's incorporating good
19  time.  Do you see that's the red part or
20  orange?
21       A    Right.
22       Q    Okay.  So does this reflect the
23  Department of Corrections' understanding of
24  what over-detention is?
25       A    I really can't answer that.  I mean,
```

```
1   you know, that -- somebody else needs to
2   answer that, William.  I can't.
3        Q    Okay.  Does it reflect your
4   understanding of what over-detention is,
5   which -- by which, I mean over-detention being
6   time an inmate has been incarcerated past the
7   end of their sentence, once good time is
8   incorporated?  Is that your understanding?
9        A    Yes.
10       Q    Okay.  So we're going to go through
11  the timeline a little bit.  We covered it with
12  you some before, but we received more
13  information that fills in the story a little
14  bit, so we'll be asking about that.  I'm going
15  to be pulling up Exhibit 32.  Do you see that
16  that this is one of the early documents from
17  the -- as part of the Six Sigma investigation?
18       A    I really don't recognize that.  I
19  mean, I don't recognize the document.  I mean,
20  you know, like I said, I haven't looked at the
21  Six Sigma document in quite some time.  So if
22  it is part of it, I'm assuming it is.
23       Q    Okay.
24       A    I can't --
25       Q    No reason to think that this is not
```

1    part of the Six Sigma?

2        A    No, no reason.

3        Q    And it's got your name on it as

4    Project Champion.  I understand you don't

5    recall this particular document, correct?

6        A    No.  You know, I think we talked

7    about in the last -- when I did my deposition

8    before that.  Those titles are a little bit

9    simulations that we were okay with the

10   project.  But we didn't -- when I say, "We" --

11   we've got three on there -- you know, we

12   really weren't that involved in this project.

13   They did the project on their own.

14       Q    I understand you weren't involved in

15   the day-to-day grunt work of this Six Sigma

16   Project, but you at least, you know, sort of

17   approved the investigation of the problem and

18   then you saw the results when it was complete,

19   correct?

20       A    Yes.  Let me -- when you say

21   investigation of the problem, that's not what

22   that was.  I want to make that real clear.

23   When they came to me -- "They" being the

24   Division of Administration -- had Six Sigma

25   Projects going on throughout the state.  And

1    they came -- the Six Sigma Project was with

2    Public Safety with State Police.  They

3    finished that project and they came to me to

4    see if there's anything we wanted to look at.

5    And we all know that time comp is a very

6    complicated process.  So I said:  Why don't

7    you look at that area of our department and

8    see how we can improve time computation.

9    Well, that led to where we are today, in a

10   sense, for over-detention.  But that was not

11   an investigation into over-detention.  We had

12   -- that's when it was brought to our

13   attention, that we had that issue going on.

14   So, anyway, I want to make sure everybody

15   understands that.

16        Q    Sure.  So in this document here that

17   we're looking, Exhibit 32, the "Problem

18   Statement," the first sentence says:  "Today,

19   the DOC Pre-class backlog leads to an

20   unacceptable number of immediate releases."

21   Do you see that?

22        A    I do.

23        Q    So part of the problem that the Six

24   Sigma Project was to investigate was the

25   unacceptable number of immediate releases,

```
 1   correct?
 2        A    Once they determined that that
 3   existed, yes.
 4        Q    Okay.
 5        A    That was part of their process.
 6             THE COURT REPORTER:
 7                  I'm sorry.  You're talking about
 8             the Six -- what --
 9             MR. MOST:
10                  We're saying the words, "Six,"
11             like the number six, S-I-X.  And then
12             we're saying, second word, "Sigma."
13                  Is that your understanding as
14             well, Secretary?
15             THE WITNESS:
16                  Yes.
17             THE COURT REPORTER:
18                  Thank you.
19   BY MR. MOST:
20        Q    Now, we're going to move forward in
21   time to 2014.  We're looking at Exhibit 31.
22   Can you see that, Secretary LeBlanc?
23        A    Yes.  I can't read the print, the
24   small print, but I see it.
25        Q    Yeah.  We'll zoom in as necessary.
```

1    Do you see that this is a Louisiana

2    Performance Review from 2014?

3         A    Yes.

4         Q    Is this a document that you're

5    familiar, this kind of document?

6         A    Not really.  I'm not sure what that

7    is.  It says, "Health and Hospitals," so I

8    don't know --

9         Q    Yeah.  If we go down, it also covers

10   the Department of Public Safety and

11   Corrections.  Do you see this?

12        A    Yeah.

13             MR. BLANCHFIELD:

14                  Can we identify this document?

15             I don't see a Bates stamp, so I

16             didn't produce it.  Do you know where

17             it came from?

18             MR. MOST:

19                  I think y'all did produce it.

20             It's Exhibit 31.  We can track down

21             where it came from, certainly.  I'm

22             pretty sure it came from production

23             in Humphrey.  I don't know why it's

24             not Bates stamped.

25             MR. BLANCHFIELD:

```
 1                    We don't send out documents
 2              without a Bates stamp.  But it looks
 3              pretty -- it looks fairly genuine.
 4              MR. MOST:
 5                    I can guarantee I did not
 6              generate this document.  I can tell
 7              you that.
 8    BY MR. MOST:
 9        Q    Does the Department of Public Safety
10    and Corrections participate in periodic
11    performance review with other agencies like
12    this, Secretary?
13        A    You know, if we do, I'm not aware of
14    it.  Performance Review, is that by the
15    legislative auditors?  I'm not sure where
16    that's coming from, honestly.
17        Q    Okay.
18        A    I don't recognize it.  It's probably
19    a statewide document, because it has all the
20    agencies on there.  I assume.
21        Q    Yeah.  Do you see lower down on
22    page 1 under "Department of Public Safety and
23    Corrections," one of the issues here is
24    identified as "Stricter adherence to inmate's
25    good time rerelease dates."  Do you see that?
```

```
 1        A     Yes.
 2        Q     So assuming this is a document that
 3   DOC had input on, does this document suggest
 4   that adherence to inmate's good time release
 5   dates were still an issue in 2014?
 6        A     I would assume it would, yes.
 7        Q     I'm pulling up Exhibit 36 here.  Do
 8   you see this document that says at the top
 9   "Governor's time calculation talking points"?
10        A     I do.
11        Q     Is this a document that you're
12   familiar with?
13        A     No, I'm not.  Maybe I should be, but
14   I'm not.  It's probably something that we
15   prepared at some point in time for the
16   governor in relation to -- you know, our
17   communication staff put together for the
18   governor at some upon with his staff.
19        Q     Okay.
20        A     I assume.  I'm not sure.
21        Q     Yeah.  You see at the bottom of
22   page 1 and page 2, it talks about the process
23   for releasing inmates?
24        A     I assume it does, William.  I'm
25   struggling seeing.
```

```
 1      Q    Yeah.  At any point today, if you
 2  can't read it, will you just tell me to zoom
 3  in.  Would you agree to do that?
 4      A    Yeah.  I need you to zoom in where
 5  you're referring to.  Is that the shaded area?
 6      Q    Yeah.  Do you see the shaded area?
 7      A    I do.
 8      Q    Do you see it talks about the steps
 9  of releasing an inmate.  And then it says,
10  quote:  "Once all these steps are completed,
11  the Certificate of Release is issued and then
12  the offender may be released, which may take
13  up to 90 days."
14      A    Yeah.  Just from my standpoint --
15  and, look, I'm not in weeds with this,
16  obviously.  You know, 90 days -- you know, if
17  it is an average of 90 days, we get a lot of
18  people in our department that have a lot of
19  time to do.  And, you know, they may get put
20  on the side, and we're dealing with these
21  immediate releases and all the things that
22  have to happen today.  And some of that
23  average may -- that has an impact on the
24  average, I would think.  That's kind of an
25  overall average and doesn't necessarily mean
```

1   that everybody that's immediate release is

2   over 90 days.  I'm trying to make myself clear

3   here.

4           We figure time for a lot of people,

5   obviously.  We've got a lot going on.  We're

6   releasing a lot of people.  We're bringing in

7   a lot of people and there's a lot of stuff

8   going on.  It's not just those ones that are

9   immediate releases that we're talking about

10   here in this case.

11       Q   I understand.  And so this may not be

12   an average, but at least the DOC anticipates

13   that may take up to 90 days for at least some

14   of inmates.  That's sort of the ballpark that

15   the DOC anticipates for processing release for

16   at least some inmates, correct?

17       A   Yeah, I mean -- but, again, it's not

18   the time that it takes.  When an immediate

19   release hits us, we're working on it every

20   day.  It's not the same.  But anyway.

21       Q   Do you have a sense of how long it

22   takes when an immediate release hits the DOC?

23       A   Again, I refer back to some of the

24   people that you probably already deposed or

25   going to depose; people that are in that

1   department that are in the -- you know, I

2   don't know what that number is today.  I

3   don't.

4        Q    Have you asked for any assessment of

5   what that number is today or recently?

6        A    Not recently, William.  Again, I've

7   been dealing with COVID for two years.  I've

8   got a lot going on in this department right

9   now.  We're giving this priority.  We're doing

10  a lot of different things.  I'm not going to

11  get in all the weeds with you on all of the

12  things we're working on for this issue.  We

13  understand the issue.  And we are working hard

14  on getting us where we need to be.  I can't

15  say more than that.  That's my priority is

16  getting us where we need to be.

17       Q    It's your testimony that it's your

18  priority to get it to the point where inmates

19  are released on their release date?

20       A    Correct.  I think that's all our

21  priority.  I don't think there's any question

22  about that.  We all need to be there.  But

23  there's a lot of work to do to get us there

24  with these other agencies that are also

25  involved in this issue.

1    Q    And we will go -- during this
2  deposition, we'll go through some of the
3  things that the DOC says it has done to try to
4  get there.  But it's safe to say that the DOC
5  is not there yet in terms of systemically
6  releasing inmates on their release date,
7  correct?
8    A    I think, as I said earlier, I'm not
9  sure systemic is still the definition of the
10  problem that we have.  Because I think it has
11  improved.  No, we're not where we need to be.
12    Q    And when you say, "We're not where we
13  need to be," is it fair to say the DOC is not
14  currently consistently releasing inmates who
15  are eligible for immediate release upon
16  sentencing within a day or two days of their
17  sentencing; is that fair to say?
18    A    I'm not sure if one or two days is
19  the -- you know, if I can say that or not.  I
20  can say that we still have issues with
21  immediate releases, so -- I mean, I don't know
22  what the day number is.  But I know they work
23  on it every day.  If there's an issue with a
24  case, they are working on that case every day.
25    Q    Moving to 2015, do you see that this

1   is email correspondence between you and Raman

2   Singh.  This is Exhibit 44.

3        A    Yeah, I see it.

4        Q    And do you see that on April 1st,

5   2015, Dr. Singh wrote to you talking about

6   release of inmates saying, "So many times many

7   of them become eligible for an immediate

8   release once all the credits are computed.

9   Not sure how they will be held back for

10  medical testing."  Do you see that?

11       A    Number 2?

12       Q    Yeah.  And he's talking about testing

13  inmates for diseases before they're released

14  from DOC custody, correct?

15       A    I'm not sure which testing he's

16  talking about.  I'm not sure if this wasn't in

17  the middle the Hep C project, which was --

18  yeah, "Hepatitis panel," see that at the top?

19       Q    Yeah.

20       A    That's Hep C testing.  That something

21  that -- to elimination of Hep C for the state,

22  which was a statewide project outside of the

23  Department of Corrections to include the

24  Department of Corrections.  So testing at the

25  state level was easy enough.  But testing at

```
 1    the local level on discharges was going to be
 2    challenge for us there.  We're not even there
 3    yet.  COVID has pretty much put that project
 4    on hold until we get -- the testing part is
 5    for Hep C.
 6         Q    So testing was done of inmates before
 7    they were released for at least Hep C,
 8    right -- or was that the plan?
 9         A    Yeah.  That was the goal, to get
10    everybody tested before they released and
11    treated upon -- if they're released, then
12    treated on the outside to cure Hep C.
13         Q    And so in April of 2015 Dr. Singh was
14    saying there's a problem because so many
15    inmates are immediately eligible for release,
16    it's hard to test them for Hep C before they
17    are released?  Is that what he's trying to
18    communicate?
19         A    Yes, that's right, which means we
20    need to look at the parole option.  When they
21    get out on parole, then we need to know that
22    they need to be tested when they hit parole in
23    the private sector.
24         Q    So this immediate release problem
25    that had been identified was not only an issue
```

1    of finances and liberty; it was also a public

2    health issue, as well, agreed?

3         A    You know, I don't know I would agree

4    with that.  This is an issue that's been

5    ongoing since the beginning of time.  Nothing

6    has really changed.  Everybody at the local

7    level is discharging without testing currently

8    and then, period.  This is an improvement on

9    what we were doing.  So immediate releases --

10   you know, you can look at it either way.  I

11   mean -- you know, it would -- immediate

12   release has become a challenge, a challenge

13   that we would address to test them when they

14   get to the parole -- get to their parole

15   office and working out that testing when

16   they -- you know, in the private sector

17   through Medicaid or Medicare.

18        Q    Okay.  Is it fair to say that this

19   immediate release problem at least caused

20   challenges with regard to public health that

21   had to be addressed?

22        A    Yeah.  I mean, I think that Hep C is

23   a public health challenge for everyone.

24   Curing Hep C in the state is a challenge.  I

25   don't know that I would intermingle immediate

```
 1    releases with a public health issue, in my
 2    opinion.
 3         Q    Well, it seems that Dr. Singh was
 4    indicating that there were public health
 5    implications of the immediate release problem,
 6    agreed?
 7         A    That was his opinion, but he doesn't
 8    understand the process of what we can do to
 9    meet that challenge.  That's on me.
10         Q    It's on you to address the challenge
11    of immediate releases, is that what you're
12    saying?
13         A    Immediate releases and that they get
14    tested on parole, because the Parole Division
15    is under me.  If I may, this is with
16    pretrials.  Same difference.  So it's a
17    challenge on all aspects of prison population
18    getting out, no matter where you are.
19         Q    Okay.  I'm pulling up here Exhibit
20    46.  Do you see that this was correspondence
21    between you and -- in 2016 -- between you and
22    directorlaclerks@yahoo.com.
23         A    I don't know what -- I have no idea
24    what that is.
25         Q    Maybe I can refresh your
```

1    recollection.  Do you recall that in 2016 you

2    met with Debbie Hudnall, who is the Director

3    of the Clerk of Court's Association?

4        A    Yes, I don't when it was, but I do

5    know that I met with her more than once.

6        Q    And you discussed with her issues

7    surrounding inmates being released after the

8    release dates and the DOC trying to get the

9    paperwork to speed that up; is that correct?

10       A    Yes.

11       Q    And with that sort of refreshed

12   recollection, does this appear to be an email

13   you sent to Debbie Hudnall following that

14   meeting?

15       A    It looks like it is, yes.  The reason

16   why it throws me off, because that format is

17   different than what I'm used to seeing on my

18   emails.  But, anyway, go ahead.

19       Q    Yeah.  I understand you.  Do you see,

20   Secretary, under Number 2 in your email here,

21   you wrote:  "We will look at the feasibility

22   of receiving the UCO and Bill of Information

23   documents electronically from the Clerks"?

24       A    Yes.

25       Q    Did the DOC investigate the

1    feasibility; did they do any sort of

2    feasibility report on that?

3        A    You know, we looked at that.  And I

4    think when we started looking at it, my

5    understanding -- and, again, staff were doing

6    that.  I wasn't doing it.  My understanding is

7    that everybody was in such -- you know, on

8    such different -- each of Clerk of Court -- I

9    think some of them were similar, but the

10   majority of them were different -- different

11   software systems that they were using at their

12   facilities, which -- the electronic part made

13   it almost impossible to accomplish that -- I

14   think -- I don't remember the date of the

15   application for the grant, but that was part

16   of my application is to go to a web-based

17   process and that would be a lot easier to do.

18   I think ultimately that's what came out of

19   that, is that promoting a web-based process

20   that we could use to communicate -- not just

21   with the Clerk of Courts, but with the

22   sheriffs and anyone else that's involved in

23   the process; but mainly the Clerk of Courts

24   and the sheriffs and the judges.  But, again,

25   we didn't get the award for the grant -- I

1   forget how much it was.  But, I mean -- and
2   that's something we're continually looking at
3   to do.  Hopefully, we'll get that.
4        Q    Okay.  So in 2016, it was suggested
5   that one way things could be speeded up is
6   that the Clerk of Courts to send documents
7   electronically to the DOC, right?
8        A    Yes.
9        Q    And you're saying that to respond to
10  that suggestion, the DOC applied for a grant
11  from the U.S. Department of Justice?
12       A    I'm not sure if that's who it was.
13  It was -- I'm not sure who we applied for.  It
14  could have been Justice.
15       Q    But it was to the federal government,
16  right?
17       A    Yes.
18       Q    So to respond to this proposal of
19  sending documents electronically, the DOC
20  applied for a grant to the Federal Government,
21  correct?  And that was in 2019?
22       A    Yes.  Somewhere in that neighborhood.
23  I don't know the date.
24       Q    So after the suggestion was made in
25  2016, a couple of years went by, and then the

```
 1  DOC applied for a grant and did not get it,
 2  correct?
 3      A    Yes.  In addition to trying to get
 4  everybody on the same page with a Uniform
 5  Commitment Order, I think was part of it, too.
 6  And that, we passed a statute.  I don't know
 7  what the date of that was, that everybody has
 8  to use the Uniform Commitment Order.  But,
 9  again, judges have a tendency not to want to
10  use the Uniform Commitment Order, for whatever
11  reason.
12      Q    Do you see on Exhibit --
13      A    I guess my point is, William, is that
14  I don't want you to think that from 2016 to
15  2019, we thought about it again.  Because
16  that's not the case.  There's a lot of work
17  going on trying to improve this and, you know,
18  just to pull out certain segments here and
19  make it look like -- to me, anywhere -- it
20  makes it look like:  Well, 2016, we had his
21  meeting, but then in 2019, we applied.  That's
22  not exactly how that worked.  There was a lot
23  going on in between that time.
24      Q    I understand, Secretary.  And we'll
25  go through your interrogatory response that
```

1   summarizes all the things that you've done to

2   mitigate this.  Certainly, you'll have an

3   opportunity to go through all the things you

4   think have been done in an attempt to mitigate

5   this problem.  But let me ask you this:

6   Specific to this proposal to electronically

7   transmit documents from clerks to the DOC, was

8   anything done between 2016 and the grant

9   application in 2019?

10       A     Yeah, I think, you know -- we were

11  trying to working with Debbie Hudnall on --

12  y'all say we have problems.  Where are the

13  problems.  She said, what parishes?  And very

14  honestly, they -- I mean, they were difficult

15  to work with.  And I don't know whether just

16  because it's so many different players in this

17  Clerk of Courts thing.  But very difficult to

18  work with.  I don't know why.  I can't answer

19  that.  That's a better question for them.  I

20  don't know why they're not at this table

21  sitting here with me.  But, anyway, we did

22  everything within our means to get -- to

23  communicate and try to get this right.  And,

24  you know, to establish -- and I think

25  ultimately we did find out the Parish -- the

```
 1   clerks that were our biggest problems, and we
 2   sent that to them.  And my understanding,
 3   again, is that we never heard back from them
 4   until, you know, way after our request, if we
 5   did hear back from them.  Again, I'm not the
 6   weeds with that.  I wish I could be a better
 7   respondent to that.  At this point, I know our
 8   staff is working hard on trying to make things
 9   meet our obligations here.  It's not like we
10   ignored it.
11       Q    Do you see on Exhibit 46 under 3, you
12   wrote about -- that you would develop an
13   action plan?
14       A    For the ten parishes; is that the one
15   you're talking about?  Yeah, that's what I was
16   just referring to.
17       Q    Okay.  Did you --
18       A    That's the part I'm talking about is
19   trying to identify those with the biggest
20   problem.  And to do that -- the problem was
21   between the sheriffs and the clerk of courts,
22   because they go to them.  So we had to go
23   through the sheriffs to get -- I mean, it's
24   just real complicated.  I mean -- I wish I
25   could explain it better, but I can't.  You've
```

1    got the sheriffs, the check of courts and

2    you've got the judges, and all three of team

3    -- I said that in my testimony, I believe in

4    the last time we did this.  I have no control

5    over these people.  I do everything I can.  I

6    met with them.  You know, I don't know what

7    else we can do.  We send the committees.

8    We've been to the legislature.  We've had task

9    force.  You know, we've done all that.  And it

10   goes nowhere.  But here I am.  Here the

11   Department is.

12       Q    And I think I understand --

13       A    I'm frustrated.

14       Q    Yeah, I hear your frustration.  I

15   understand the mechanics of this.  I

16   understand that a sentence is issued by a

17   judge.  It's recorded by a clerk of court.

18   It's --

19       A    A judge that won't use a Uniform

20   Commitment Order, a clerk of court has

21   resistence in even correspondence with us, for

22   whatever reason.  And then the sheriffs who --

23   you know, we do everything we can to work with

24   them.  A lot of times it's not their fault

25   because they can't get the documents to send

52

1    to us.  Just the jail credit letter for the

2    sheriffs is their problem.  But, anyway, yes.

3        Q    So the documents go from the judge to

4    the clerk to the sheriff to the DOC under the

5    way it's currently set up.  And you're saying

6    because of that, it's kind of out of the DOC's

7    hands to improve the situation; is that your

8    testimony?

9        A    Without -- you know, it's part of my

10   testimony, in that sense.  But at the same

11   time, you know, we met with all of those

12   parties in trying -- just from this

13   document -- trying to get people moving in the

14   right direction.  And we have made some

15   progress.  But, again, as we're already talked

16   about, we have a ways to go.

17       Q    So under Section 3 here in your email

18   in Exhibit 46, it talks about developing --

19   the DOC developing an action plan.  Do you see

20   that?

21       A    Yes.

22       Q    Did the DOC ever develop that action

23   plan?

24       A    I'm not sure.  I know that Angela in

25   my office -- Whitaker -- was working on it.  I

1  think we did determine what areas were the

2  problems with ten parishes.  Where we went

3  from there, I'm not real sure.  I think COVID

4  probably got us a little disoriented, maybe

5  distracted, to some extent here.  But I don't

6  know the answer to that.  I know we were

7  getting responses on finding parishes that --

8  the clerks that were the biggest problems.

9      Q    I pulled up Exhibit 47.  Do you see

10 that this is a response from your counsel to

11 request to produce the action plan and the

12 response is that:  "There are no responsive

13 documents to the request to produce the action

14 plan."

15     A    And what is that the date of that?

16     Q    2020, October 23rd, 2020.

17     A    Okay.  So I guess there isn't any.

18 Who responded to that?

19     Q    Phyllis Glazer.

20     A    Okay.

21     Q    So you don't know of any action plan

22 that was created -- as you described in your

23 2016 email to Debbie Hudnall, correct?

24     A    No.  I don't know of any action plan

25 that was created.  That was my answer.  I

1   thought we got to the bottom line of where we

2   thought the bigger issues were, but maybe we

3   didn't do that, either.

4        Q    Moving forward -- this is Exhibit 49.

5   Moving forward to 2020.  Do you see this is --

6   does this appear to be an email that you sent

7   in February of 2020?

8        A    It looks like it is.

9        Q    And in this email, it refers to a

10  meeting you had about paperwork processes?

11       A    Uh-huh.

12       Q    And you asked for numbers related to

13  immediate releases and the cost of

14  over-detention?

15       A    Yes.

16       Q    So this reflects that in February of

17  2020, you understood that there was still a

18  problem with the DOC's over-detention, right?

19       A    Yes.  I mean, I guess I was looking

20  for how big is the problem at that point in

21  time?  I'm not sure.  Do you have the answer,

22  too?

23       Q    We do.  Response was -- someone

24  asking if this information had been provided?

25  And then I'll show you Exhibit 50, which are

1   responses to -- do you see that this is us

2   asking for -- this is plaintiff's counsel

3   asking for any documents responsive to your

4   request in that February 2020 email?  The

5   response is:  "There were no documents."  Do

6   you see that?

7       A    I do.

8       Q    Okay.  So it appears that you did not

9   actually obtain answers to those questions in

10  your email, correct?

11      A    Evidently not.

12      Q    And you didn't follow up to get those

13  answers subsequently, did you?

14      A    Must not have.

15      Q    So shifting gears a little bit, I

16  want to talk about the Basic Jail Guidelines.

17  Are you familiar with what those are?

18      A    Yes.

19      Q    I'm looking at Exhibit 34 here, I've

20  pulled up.  This is Basic Jail Guidelines

21  dated April 25, 2019.  Is this the current

22  version of the Basic Jail Guidelines?

23      A    I'd have to say it is.  I'm not sure.

24      Q    And the Basic Jail Guidelines are a

25  contract between the Department of Corrections

```
 1   and the sheriffs across Louisiana, correct?
 2        A     Yes -- no.  It's not a contract.
 3   It's just guidelines.
 4        Q     Right, they're guidelines for -- if
 5   the sheriffs are going to hold DOC inmates in
 6   their local prisons, they have to adhere to
 7   these guidelines, correct?
 8        A     Correct.
 9        Q     And if they don't adhere to these
10   guidelines, they can't hold DOC inmates,
11   correct?
12        A     That's not exactly correct.  I mean
13   -- yeah, that's correct.
14        Q     Okay.  So these guidelines
15   essentially reflect a deal that the DOC has
16   with the sheriffs, that you can hold DOC
17   inmates and be paid for it, but you have to
18   follow these guidelines, correct?
19        A     Yes.
20        Q     And the DOC pays the local sheriffs
21   for each day they hold an inmate who's been
22   sentenced to the custody of the DOC, correct?
23        A     Correct.
24        Q     Turning to page 17 of these Basic
25   Jail Guidelines, do you see that this --
```

```
 1        A     I can't see that.
 2        Q     Sure.  Let me zoom in.  Do you see
 3   this page 17, Section 2-A-0008?
 4        A     Yes.
 5        Q     And do you see that this section of
 6   the Basic Jail Guidelines discusses that
 7   sheriffs are to transmit Pre-class paperwork
 8   to the DOC?
 9        A     Yes.
10        Q     But I don't see anything that talks
11   about a timeline for when the sheriffs are
12   required to do so, do you?
13        A     No.
14        Q     The DOC could put a provision in
15   these Basic Jail Guidelines requiring the
16   sheriffs to provide the Pre-class Packets
17   according to a certain timeline, correct?
18        A     Yeah, we could.  But I'm not sure,
19   you know, like a Bill of Information and court
20   minutes, we can put a timeline on them, but
21   then they've got the issues with the courts.
22        Q     Okay.
23        A     Hen we get into the issue of who's at
24   fault here.  And you start deducting from the
25   pay.  That becomes an issue.  But anyway.
```

1      Q    Okay.  It sounds like what you're

2  saying is you could put a timeline into these

3  Basic Jail Guidelines and deduct from

4  sheriffs' pay if they don't adhere to it,

5  although you then have to figure out whether

6  it was ultimately their fault, correct?

7      A    Correct.

8      Q    But you haven't put that in the Basic

9  Jail Guidelines, have you?

10     A    No.

11     Q    In fact, when you were asked about

12 this at a deposition, you said there was no

13 reason why you couldn't do it, correct?

14     A     No, I don't think there's any reason,

15 other than what I just said.

16     Q    Putting such a timeline into the

17 Basic Jail Guidelines would -- could help

18 mitigate the problem of people being held past

19 their release dates, correct?

20     A    I'm not sure it would, because I

21 don't know -- I mean, the problem is with the

22 judges and the clerk of courts.

23     Q    At the very least, it would

24 incentivize the sheriffs to speed up their

25 process, correct?

1        A     The jail credit letter.

2        Q     Putting in a timeline with

3   consequences for the sheriffs for not adhering

4   to the time lime, would it -- at the very

5   least, it would help speed up the whatever

6   part the process the sheriffs are responsible

7   for, would you agree with that?

8        A     You'd have to ask the sheriffs that.

9        Q     You don't think it would do any good

10  at all to include a timeline in the Basic Jail

11  Guidelines?

12       A     I think that would cause -- when you

13  do something like that, then you've got to

14  determine:  Well, who hadn't submitted?  Who

15  submitted?  Did they submit?  You've got

16  accounting issues.  It becomes a nightmare to

17  try to enforce that.  We already have enough

18  to do.  So, I mean, now we're going to create

19  another problem of deciding who hadn't

20  submitted; did they submit.  Is it their fault

21  or is it the judge's fall?  Have the judges

22  sentence gotten -- you know, there's a lot of

23  issues with that, William, that it's not that

24  simple.  I wish it were, but it's not.  I just

25  think that would be creating another problem

 1    for us to deal with.  It wouldn't cure it, the
 2    issue.
 3         Q    You don't think it would mitigate the
 4    issue?
 5         A    I don't.
 6         Q    But at the very least, the DOC does
 7    have influence over the way the sheriffs
 8    handle Pre-class paperwork, because the DOC
 9    sets the terms of how that works in the Basic
10    Jail Guidelines, correct?
11         A    Yeah, I mean, we -- that's right.  We
12    go in and do our audits, our annual audits.  I
13    haven't seen any reports to say that they
14    aren't keeping up as best they can.  You know,
15    if you have a file that's -- like the one you
16    just referenced, that file doesn't have
17    anything in it that they're supposed to, what
18    they're going to say is:  The judge hadn't
19    sent it to us.  You know, we don't have those
20    documents yet.  So -- yeah, I mean, we can do
21    the best we can and try to enforce that.  It's
22    an issue with the other parties involved,
23    which is two; clerk of courts and the judges.
24         Q    You talked about not seeing any
25    audits saying the sheriffs had timeliness

```
 1   problems.  Does the DOC audit --
 2        A    Not timeliness problems; problems
 3   that their files weren't complete.  In other
 4   words, when we go in and audit, we look at the
 5   files.  We look at their files.  They have to
 6   have files on these guidelines, each
 7   guideline.  So they go to the file and see if
 8   they have what they're supposed to have in it
 9   for that inmate.  If that's not in there,
10   chances are, what their response is going to
11   be is, they don't have it.  I hadn't gotten it
12   yet.  So, you know, there may be a comment in
13   the audit that says that, but I haven't seen
14   any of that.  I try to read all the audits as
15   best I can.  There's 104 jails out there that,
16   you know -- we try -- I try to keep up with as
17   best I can.
18        Q    But there's no auditing of how
19   quickly the process moves with the sheriffs
20   handling Pre-class paperwork, because there's
21   no timeline --
22        A    No.
23        Q    Right.  Okay.  I'm going to pull up
24   Exhibit 6 here.  Do you see this document
25   here, Secretary?
```

1          A     I can't read it.  Okay.  Yeah.  Okay.

2          Q     Is this the same document that you've

3     got in front of you on the table?

4          A     Yes.

5          Q     That way you can follow along with

6     the document in front of you --

7          A     Okay.

8          Q     -- which may be easier.  Turning to

9     page 3.  Do you see that Interrogatory Number

10    10 asks:  "Identify all steps you've taken

11    since be January 1st, 2012 to mitigate or

12    prevent the risk that prisoners in the custody

13    of DOC will be detained beyond the date on

14    which the DOC's legal authority to detain a

15    prisoner expires."  Do you see that?

16         A     Yes.

17         Q     And on the next page, you give your

18    answer to that, right?

19         A     Correct.

20         Q     And interrogatories like this need to

21    be verified, i.e., the witness has to say

22    under oath that they're truthful and complete.

23    I don't think we got the verification page for

24    this.  So would you look at that page with

25    your answer and see if it looks truthful and

```
 1   complete to you?
 2       A    Actually, as I read through this, the
 3   one part -- during the '21 session, I'm not
 4   sure if they're two separate bills.  I'm only
 5   aware of one bill, which is House Bill 603,
 6   which didn't make it.  And that was
 7   Representative James who actually substituted
 8   for a task force, which we never caught.  So
 9   if there's another one, I'm not aware of it.
10   There may be.  I'm just not aware of it.  As
11   far as completeness, there are other things
12   that we have done that aren't on here -- that
13   I think we've done, anyway, that -- so it's
14   not -- it's completed.  I don't know if we get
15   a chance to resubmit it or how you want to do
16   it, but --
17       Q    Yeah.  We can go through it today and
18   make sure we've have a complete set.  I want
19   to make sure I understand a complete set of
20   all the things that you believe you and your
21   department have done to mitigate this problem.
22   I want to make sure we've got a complete set.
23   First, let's at least say, the only inaccuracy
24   you see in this response is that it talks
25   about two bills in 2021, and you only know of
```

```
 1   one, right?
 2       A    I only know of one.  Again, I may be
 3   wrong.  I only know of one.
 4       Q    And I only know of one, as well.  I
 5   was going to ask you about what that second
 6   bill is.  I think that may be in error.
 7            That's the only inaccuracy you see,
 8   right; aside from incompleteness, correct?
 9       A    Yes.  Well, wait.  Wait.  So CIPRS --
10   it's not spelled right.  And MI-Case, I
11   don't -- I don't think MI-Case is spelled
12   right.  We can check on that.  That's minor
13   stuff.
14       Q    So CIPRS, that might be sort of a
15   phonic of C-I-P-R-E-S.  Is that what you're
16   referring to?
17       A    Yeah, I think CIPRS is C-Y-P-R-I-S.
18   It's the appropriate document -- you know, the
19   acronyms that represent the new system coming
20   on.
21       Q    Aside from the spelling of CIPRS,
22   MI-Case and the two bills at issue, is there
23   any other inaccuracy?
24       A    No, that's good.
25       Q    So what's incomplete about this?
```

```
 1   What are the mitigation measures that -- to
 2   keep people from being held past the end of
 3   their proper release time that's not on here?
 4        A    You know, the notes that you have
 5   from me --
 6        Q    Uh-uh.
 7        A    -- the handwritten note are things
 8   that we have done.  So I think if you --
 9   without taking up the whole day here, there
10   are things on that list that are not on this
11   list, which I think are things that we have
12   done.
13        Q    So just running through your list
14   real quickly, we've got Number 1 is the Lean
15   Six Sigma Project itself, right?
16        A    Yeah.  That's 13 and 14.  That's kind
17   of covered in that first statement.
18        Q    And Number 2 is --
19        A    Go ahead:  "Working closely with
20   judges," yeah.  So I don't know if that's on
21   here or not.
22        Q    And that refers to --
23        A    It goes down at the bottom.  Yes,
24   it's covered.  So 2 is covered.  "Passing a
25   statute on the Uniform Commitment Order," I
```

1    don't know if that's in here or not.  That's

2    Number 3 for me.  We -- it's a statute

3    requiring the judges to use Uniform Commitment

4    Order.  Yeah, 17.  That's in that second to

5    last paragraph, I guess, in the Uniform

6    Commitment Order, but I don't know if it

7    mentions the fact that it's not statute.

8         Q    So to add to this response, the

9    statute about the UCO?

10        A    Uh-huh.

11        Q    You chaired a Justice Reform

12   Committee, Number 4?

13        A    Right, which recommended a felony

14   class task force to develop a felony class

15   system, which was done and presented to the

16   legislature, which fell on deaf ears for

17   whatever reason.  I think the DAs had a little

18   bit to do with that, which would have assisted

19   with the complexity of time computation.

20        Q    Number 5, you had meetings with

21   judges and clerks of court?

22        A    Yeah, DAs, clerk of courts

23   addressing -- that's probably on here

24   somewhere.  I did this before.  I'm not sure

25   if that's -- yeah, that's in that second to

1   last paragraph.  We -- that's fine.  That's

2   covered.

3       Q    Six is the new CIPRS system that's

4   reflected in this answer?

5       A    No, six is actually what we actually

6   tried to do somewhere between Six Sigma and --

7   I don't know what the dates were, but we

8   developed a new system, a custom system, a

9   case management system for the whole

10  department, which when turned on, just

11  completely failed.  I think we spent 2 million

12  doing that.  That was a big time-consuming

13  issue.  And I put the note currently building

14  on the new system, CIPRS.  So we did that once

15  and it failed.

16      Q    Right.  So that's the 2015 computer

17  system that failed?

18      A    Right.  I guess that was the date.  I

19  don't know the date when I made a note on this

20  yesterday.

21      Q    Seven is opening a reception center

22  at Raymond Laborde; is that right?

23      A    Correct.  Yes, and, again, we talked

24  a little bit about that, I believe, in my

25  first deposition where we talked about for

```
1    Orleans and Jefferson, you know, that -- when
2    they come into us and then to process, we have
3    to have the paperwork, so we chase the
4    paperwork from there at those reception
5    centers, which helps improve -- in my
6    opinion -- helps improve the system.
7    Everybody had to go --
8         Q    So if --
9         A    Excuse me?
10        Q    Go ahead.
11        A    I was going to say just that, if
12   everyone had to go to a state reception
13   center, it with make things a lot easier for
14   us, but unfortunately, they don't.  Again, I
15   think it was something we talked about in my
16   first deposition, where they go -- if they get
17   sentenced that day, they can stay right there
18   in that local jail or get sent to another
19   local jail.  They don't come into us, which is
20   a challenge.  That's part of the reasons why
21   we have the challenges that we do have in the
22   state.  And state is MI-Case, M-I-C-A-S-E.
23   That's mentioned in that -- right after the
24   CIPRS comment, the new software, which is
25   not -- and I said estimated November.  It's
```

1   going to take until November of this year to
2   complete that software, which will tie into
3   the CIPRS system to figure time.
4       Q    And then Number 19 is something about
5   the training of Pre-class people?
6       A    Yeah, that's -- you know, we created
7   and implemented a training manual and classes
8   for our Pre-class Division.  I don't know if
9   that's in here or not.  It may be.  They had
10  the positions and they tend to establish the
11  new positions in Pre-class to improve quality
12  control, quality assurance.
13              THE COURT REPORTER:
14                  I'm sorry, sir.  I'm having a
15              problem hearing you.
16              THE WITNESS:
17                  I'm saying that's already in
18              there.  That's the bottom line.  It's
19              in the response for the
20              interrogatory.
21  BY MR. MOST:
22      Q    Eleven is provide training --
23      A    Provide training at sheriffs and
24  wardens' conference on the paperwork process,
25  helping them understand the importance of it.

```
 1   That's an annual thing.  COVID has kind of
 2   slowed that down.  They didn't -- I'm not sure
 3   if they had the conference this year.  I
 4   believe they did.  They haven't had it in the
 5   last two years.
 6       Q    Number 12 appears to be the grant
 7   that's reflected in your answer here.
 8       A    Yes.
 9       Q    Is that right?
10       A    Right.
11       Q    Thirteen is HR CR-1, which is the
12   2021 bill that you described; is that right
13   oh, no.  That's the study committee.
14       A    Study committee by Representative
15   Katrina Jackson.  Sorry.
16       Q    Did the DOC suggest that study
17   committee?
18       A    We did.  Actually, I asked them to do
19   it personally, and she did.  And we did -- you
20   know, we had PowerPoints.  We did a
21   presentation.  We went through all that with
22   the legislature with that group.  She moved
23   over to the senate; and not much happening
24   from there, honestly -- that I'm aware of,
25   anyway.
```

```
 1       Q    Okay.  So by my count, a complete
 2  answer to what things have you done since 2012
 3  to mitigate the risks that inmates are held
 4  beyond the end of the DOC's legal authority to
 5  hold them would be the things reflected in
 6  this interrogatory response, plus the UCO
 7  substitute, the proposal for the felony class
 8  system, the 2015 computer system that failed,
 9  the Raymond Laborde intake center, some
10  training of Pre-class staff members and
11  training to -- or meetings with the sheriffs
12  and others about the importance of Pre-class
13  documents.  Is that accurate statement?
14       A    It's really not meeting.  It's
15  training at the sheriffs and wardens
16  conference.  It's not that big of deal.
17       Q    So with that clarification, that's
18  the universe of things you've done to try
19  mitigate or solve this problem since 2012,
20  correct?
21       A    Correct.
22       Q    Looking at the last page of your
23  handwritten notes here --
24       A    Yeah.  That's just -- you know,
25  that's some of the issues that -- you know,
```

```
 1    what are all the issues; delaying paperwork,
 2    Uniform Commitment audit from clerks, jail
 3    credit letters from the sheriffs, you know,
 4    those are the delays and, of course, overdue
 5    immediately upon sentencing by the judge.
 6    That's just notes I made for myself.
 7         Q    So part of the problem is, some
 8    people are eligible for immediate release upon
 9    sentencing, but there's not a system in place
10    to get them quickly released, correct?
11         A    Correct.
12         Q    And your first thing here, your
13    understanding of the delay in the paperwork is
14    caused, in part, by the clerk's not using the
15    UCO and the sheriffs not quickly providing the
16    jail credit letters; is that right?
17         A    Right.
18         Q    Would it be fair to say that the
19    Department of Corrections is at least -- at
20    the very least -- responsible for the time
21    after it receives all the Pre-class documents;
22    is that fair?
23         A    Yeah, I would agree with that.  I
24    think, if you look at Number 5 at the
25    bottom --
```

1      Q      Uh-huh.

2      A      -- "law enforcement keeping up with

3    the arrests and detainers at the local level,"

4    you know, we end up having to chase detainers

5    and arrests that haven't been -- that aren't

6    in the system and we have to chase it down

7    because we cannot -- anybody with -- if we

8    release people with detainers and something

9    happens, then they're on me for allowing

10   people to get out with a detainer.  Those

11   files aren't up to date.  That's other issue

12   with figuring time that's not talked about a

13   lot, but that exists.

14      Q      So at the bottom of this page, these

15   Items 1 through 6, are these sort of your

16   proposed solutions to the problems; what are

17   these?

18      A      It is, you know.  If I had a magic

19   wand mandating the use of the UCO, legislature

20   -- you know, as far as -- we made an attempt

21   at trying to require the paperwork be sent to

22   us within the time constraints.  That's part

23   of the legislation that we recommended that's

24   not gone anywhere; do it by statute -- which

25   would help us a lot; a web portal between all

1  parties involved, which is the sheriffs, the
2  clerks and the judges, CIPRS and MI-Case
3  software.  And five is law enforcement keeping
4  up with the rest on detainers at the local
5  level.  And then the last is felony class
6  system.
7      Q    Did I hear you say something about
8  CIPRS being done in November?  Did you say
9  something about that?
10     A    MI-Case.
11     Q    MI-Case.
12     A    We'll be able to implement the
13  software before CIPRS is completed, is my
14  understanding.  So we can begin that in
15  November or December, in that timeframe with
16  software that will figure time for us.
17  MI-Case is the company that's working on it,
18  as I understand it, I believe.
19     Q    So by December of 2022, there will a
20  system in place that will automatically do
21  time computation?
22     A    Correct.
23     Q    Will that have the functionality of
24  allowing clerks of court or sheriffs to
25  electronically submit documents?

```
 1        A     No.  We still have that problem.
 2        Q     Okay.  And the actual math of the
 3   time computation is not really the problem for
 4   immediate releases, right?
 5        A     Not really, no.  But it -- to me, it
 6   frees up time to really -- you know, to do
 7   things -- working on high priority stuff.  So
 8   figuring time is -- I'm not sure how much
 9   you're involved in that.  I'm not -- I've been
10   clear about that.  It's very complicated.  I
11   know our attorneys have been working heavily
12   with MI-Case and I think they realize how
13   complicated Louisiana statutes are to figure
14   time, too.  So anyway.
15        Q     The people who are subject to
16   immediate release upon sentencing, their time
17   computation is pretty simple, right?  It's
18   comparing --
19        A     Yeah.  The other thing I didn't
20   mention here -- if I can add -- Number 7 would
21   be to pass a statute that will eliminate good
22   time for jail credit.
23        Q     So if we just held people in prison
24   longer, it would make it easier to do the
25   calculations?
```

1      A    Well, it would.  It would help us.
2   Because when we get it, they're overdue.
3   Because a year is what?  Three months.  And if
4   we get a year, they're already overdue, if
5   they had been a year in the jail.
6      Q    Is that a solution you've advocated
7   for?
8      A    No, not really.  It's not anything
9   I've advocated for, but it would help.  As you
10  know, that is against my -- the principals of
11  the things we're trying to do in this
12  department for reform.
13     Q    Yeah, I would be surprised to hear
14  you would were advocating for that.  So all of
15  these potential solutions you've described
16  here, none of them are specific to a
17  particular inmate; they're all systemic
18  solutions, right?  Broad solutions.
19     A    Correct?
20     Q    They're broad solutions to process
21  these, because what you have here is a broad
22  processes problem, correct?
23     A    Yeah, I mean, I have to agree with
24  that.
25     Q    In your response here, you talk about

```
 1    you hired five additional compliance
 2    specialists in the Time Computation Division.
 3    Do you know roughly when that was, what year?
 4        A    I don't.  I really don't, I mean, I
 5    have no idea.
 6        Q    Was it -- do you know if it was
 7    before COVID or after COVID?
 8        A    I want to say it was probably before
 9    COVID; maybe a little after; in that
10    timeframe.  Last couple of years.  I could be
11    wrong.
12            MR. BLANCHFIELD:
13                And, William, let me just tell
14            you that issue was covered earlier
15            this week by Rebecca.
16            MR. MOST:
17                Great.  Thank you.
18    BY MR. MOST:
19        Q    I'm pulling Exhibit 6 back up, again,
20    here.
21        A    I can't read it.
22        Q    Yeah.  That's okay.  I'll zoom in
23    here.  We're looking at page 4 of Exhibit 6
24    here.  Do you see that one, two, three, four
25    -- fourth paragraph down, second sentence, it
```

1   says:  "Efforts are made with the local

2   partners and the clerks of court to get time

3   computation packets quicker."

4        A    Yes.

5        Q    What are those efforts?

6        A    You know, that's a question for the

7   ones that are working that section.  I don't

8   -- I'm assuming they're calling and they're

9   doing everything they can to get the

10  information.  But other than that, I'm not --

11  I mean, somebody else needs to answer that.

12       Q    So you're talking about sort of

13  informal ad hoc efforts, not any sort of

14  policy or systemic effort, correct?

15       A    Not that I'm aware of.

16       Q    One of the -- so the 2021 bill that

17  the DOC attempted to have introduced, you were

18  involved with the request for that

19  legislation, correct?

20       A    Yes.

21       Q    Okay.  And that legislation proposed

22  some timelines on the order of weeks for the

23  clerk to provide documents to the sheriff and

24  the sheriff to provide documents to the DOC,

25  correct?

```
 1       A     I don't remember the exact timeframe,
 2  but, yeah.
 3       Q     And included in it was a limitation
 4  of liability, that the DOC could not be held
 5  liable for people being held past their
 6  release date within up to about 45 days,
 7  correct?
 8       A     I'm sure you're looking at the
 9  document.  I'm not.  I would assume that's
10  correct.
11       Q     But you know that there was a request
12  for a limitation of liability, right?
13       A     Yes, right.
14       Q     So one of the things that you asked
15  for in the context of people being held past
16  their release dates was for the legislature to
17  say your department couldn't be held liable
18  for it, correct?
19       A     For issues that involve -- in other
20  words, yeah.  I mean, not liability when
21  somebody else is at fault.
22       Q     Because fundamentally, you don't
23  think that you are at fault for all these
24  people being held past their release date; is
25  that correct?
```

1      A    I think -- no, I don't think we're at

2  fault.  I think we're doing everything we can

3  on our end to make it work.  I mean, it's not

4  like -- as I said earlier, we're not ignoring

5  this.  We're doing things that we think we

6  need to do make this a better system.  Just

7  like everything else that we do in this

8  bureaucracy.  It doesn't always happen in the

9  timeframe that you want it to.

10     Q    One of the central things that can

11 make this process better is for documents to

12 go electronically straight from the courts

13 straight to the DOC, right?

14     A    I would think that would help, sure.

15     Q    That's the idea behind the web

16 portal, right?

17     A    Right.

18     Q    The web portal, you don't expect it

19 to be online this year, 2022, right?

20     A    No.  I don't think that's the web

21 portal, 2022.  You're talking about MI-Case

22 now right?

23     Q    Well, I'm asking the functionality --

24 let me back up.  The DOC is trying to develop

25 a system to have the functionality to receive

1    documents electronically.  It's trying to

2    build that, right?

3         A    I'm not sure that -- again, what's

4    going on with CIPRS right now is a lot more

5    complicated than I could explain.  I don't

6    think that's the issue with having access to

7    the clerks of courts or the judges.  That's

8    something that we're doing separately.  But

9    I'm not sure where we are with that.

10        Q    Okay.  So setting aside what -- the

11   web portal thing.  You at least understand

12   that it would dramatically improve things if

13   clerks of court could just send documents --

14   Pre-class documents -- straight to the DOC,

15   correct -- electronically?

16        A    Right, yes.

17        Q    That's what you talked to Debbie

18   Hudnall about in 2016, correct?

19        A    Correct.

20        Q    And that would have been obvious in

21   2012 with the Six Sigma report as well,

22   correct?

23        A    I don't know if it was that obvious

24   at that time.  But I think as we get into this

25   and learning where the issues are, you know,

1    we realize how dysfunctional clerk of courts

2    are.

3         Q    Okay.  And you still haven't

4    developed a system for the clerks of court to

5    send documents electronically to the DOC,

6    correct?

7         A    No.

8         Q    Do you have any current plans to

9    develop that system?

10        A    We don't have any current written

11   plans, no, not that I'm aware of.  Certainly,

12   we want -- that's something that we're going

13   to -- you know, we're working on, but I'm not

14   sure exactly where we are with it.

15        Q    So you're working on it, but you have

16   no written plan; it's like an idea that's been

17   talked about?

18        A    Well, yeah.  It's been talked about.

19   It's been requested through grants.  It's been

20   -- you know, every which way, you know, we

21   figured out.  You know, we don't have the

22   funding to pay for the clerk of courts to have

23   web.

24        Q    What about email, Secretary LeBlanc?

25   Why can't they just email documents to you?

1        A    Well, that's something that Judge

2    Schlegel has come up in our last judges'

3    liaison meeting.  That's over my head,

4    William.  You know, I'm not able to have that

5    kind of conversation in, you know, a

6    deposition, because I'm just not that involved

7    in the weeds with that stuff.  But I know

8    they're working on it.  Judge Schlegel is

9    helping us.  He's very up -- he knows what's

10   going on with the automated side of things and

11   I think he thinks there's ways we can do this

12   that are not that difficult.  But, again, I'm

13   not in a position to elaborate on that,

14   because I don't know enough about it at this

15   point.

16       Q    Yeah.  Okay.  But at least, it's now

17   ten years after the Six Sigma and you think

18   there's discussions and talking and ideas

19   about electronic transmission of documents to

20   the DOC, but there's, you know, no written

21   plans to put that into place; is that a fair

22   summary?

23       A    Yeah.

24            MR. MOST:

25                 Okay.  Looking at the document

```
 1              in front of you on the screen -- this
 2              is Exhibit 38.  Let me just pause
 3              here.  It's 11:30.  Does anybody need
 4              a break; either break for water,
 5              restroom, the bathroom or lunch or
 6              anything like that?
 7         MR. BLANCHFIELD:
 8              No.
 9         MR. MOST:
10              We will power through.
11    BY MR. MOST:
12         Q    We're looking at Exhibit 38.  Do you
13    see this document here, Secretary?
14         A    Yes.
15         Q    This appears to be a memo from you
16    from February 2020; is that right?
17         A    A memo?
18         Q    What would you call that?
19         A    I don't know what it is.  I'm not
20    sure what I'm looking at.
21         Q    Let's see on page 2 in the upper
22    left-hand corner, it says:  "DPS&C monthly
23    report, February 2020."
24         A    That's the governor's monthly report,
25    I guess.  I don't know.  Yeah, I guess that's
```

1    what it is.  I assume.

2        Q    So this is a monthly report to the

3    governor?

4        A    That's a monthly report.  I'm not

5    sure if that's the one that we sent to the

6    governor or where -- yeah.

7            MR. BLANCHFIELD:

8                Could you page down to the end

9                and see is this signed or is it --

10   BY MR. MOST:

11       Q    So sections are "Community

12   supervision, health care, reentry, security

13   operations."

14       A    Yeah.  That's a monthly report that

15   we submit to the governor's office.

16       Q    Okay.  So this monthly report -- I'm

17   sorry.  This is a monthly report from you to

18   the governor's office; is that right?

19       A    I assume it is.  You know, it's hard

20   to say.  I don't know.  Where did you get it?

21       Q    We got it in discovery requests.  We

22   did the search for key words, and this is a

23   document that popped up.  And it's got your

24   name at the top, "James M. LeBlanc,

25   Secretary."  It's dated February 2020.  So --

1    I don't have any secret knowledge about this
2    document that I'm withholding from you.  I'm
3    asking you.
4         A    I'm assuming it is, but I can't tell
5    without a cover, you know, if that's what went
6    to the governor in February 2020 or is this a
7    monthly report.  Normally, that looks like a
8    report that goes to the governor's office, but
9    I can't swear to that, looking at it.
10        Q    Sure.  So your office sends monthly
11   reports from the Secretary of DOC to the
12   governor as a general practice; is that right?
13        A    Yes.
14        Q    Okay.  And this looks to you --
15   you're not sure.  You don't recognize this
16   particular one.  But this looks like one of
17   those monthly reports to you, correct?
18        A    Yes.
19        Q    And it begins, "The lawsuits filed
20   last year relative to claims of over-detention
21   continue to be an area of focusing attention.
22   A recent brief filed by the attorney in these
23   cases has brought significant media attention
24   to the issue.  I continue to work with our
25   criminal justice partners statewide, as this

1    is a systems problem complicated not only by

2    complex Louisiana law and paper processes, but

3    depending on all facets of the justice

4    system."  Do you see that part?

5         A    Yes.

6         Q    So in February of 2020, this reflects

7    that you understood that over-detention was

8    still a systems problem facing the Department

9    of Corrections; is that right?

10        A    Yes.

11        Q    And at the bottom of that paragraph,

12   it says:  "Staff are also working towards

13   opportunities to automate the time computation

14   process."  Do you see that part?

15        A    Correct.

16        Q    So in 2020, your staff was working

17   towards automated systems, right?

18        A    Yes.

19        Q    And now almost two years later,

20   they're still working towards that, right?

21        A    Yes.  Like I say, it's going to be

22   probably another two or three years before

23   they finish.

24        Q    But they're not currently working

25   towards an automated system for electronically

```
 1    receiving documents, right?  That's just an
 2    idea at this stage?
 3        A    A case management system, CIPRS that
 4    we're working on.  Believe me, the timeframe
 5    for getting anything like that done in this
 6    department -- or any department, I would
 7    imagine.  Ours is more complicated.  We're
 8    bringing in Probation and Parole from their
 9    case management system into a unified system,
10    in addition to the MI-Case that I mentioned,
11    which is a software.  That will be completed
12    by the end of the year.  But the CIPRS system
13    is just -- it's a long, long process.  I think
14    we have seven, eight people from the Division
15    of Administration assigned to this department
16    working on it.  You know, I wish I could speed
17    it up, but I can't.  So this -- I mean,
18    they've been working on it since 2020 --
19    probably before that.  And it's going on for
20    another two or three years, according to what
21    I understand.
22        Q    Will the CIPRS system -- is it going
23    to have functionality to electronically
24    receive documents from the clerks of court to
25    DOC?
```

```
 1      A    No.
 2      Q    That functionality at this stage is
 3  just an idea without actually any steps to
 4  implement it, correct?
 5      A    Yes.
 6           THE COURT REPORTER:
 7                Can we take about a five-minute
 8           break?  I need a restroom break,
 9           please.
10           MR. MOST:
11                Yeah, of course.  We'll
12  reconvene at 11:40.
13           (BRIEF RECESS)
14           MR. MOST:
15                Let's go back on the record.
16  BY MR. MOST:
17      Q    Okay.  I pulled back Exhibit 42,
18  which is your deposition from 2019.  Do you
19  see that, Secretary?
20      A    Yeah.
21      Q    This is a deposition you and I took
22  on May 23, 2019, right?
23      A    Yeah.
24      Q    Going down to pages 100 to 101.  Do
25  you see -- the question was:  "So one of the
```

```
 1    things you mentioned today that the DOC could
 2    do to mitigate the problem of being held past
 3    the release date is for the DOC to go out and
 4    get the paperwork itself, rather than just
 5    waiting to receive it?"  And your answer was:
 6    "Yes," correct?
 7         A    Yes.
 8         Q    That's still your testimony; that's
 9    one thing the DOC could do to mitigate it,
10    right?
11         A    Yeah.
12         Q    And on page 31, you describe to me
13    that:  "Ultimately, we're bringing on seven or
14    eight more parishes come to July 1st.  So
15    we're going to get 70 to 80 of our local
16    prison population by the end of the next
17    fiscal year."
18              Then the question was:  So the idea
19    there is the Department of Corrections won't
20    wait for the sheriff to bring them an inmate's
21    paperwork; they'll go out and get it
22    themselves.  Is that right?"  And you
23    answered:  "Basically, that's right.  Yeah."
24    Do you see that?
25         A    Yeah.
```

1      Q    So in 2019, you were saying that you
2  were going to be implementing a system by the
3  end of the next fiscal year, by which the
4  Department of Corrections would go out and get
5  the paperwork rather than waiting to receive
6  it, correct?
7      A    Correct.
8      Q    And that would cover, at least by the
9  end of the next fiscal year, 70 to 80 percent
10  of the prison population, correct?
11      A    Yes.
12      Q    The end of the next fiscal year being
13  the end of 2020, correct?
14      A    Correct.
15      Q    Did you implement that system?
16      A    No.  We didn't because of the COVID.
17  We didn't because -- actually, the facility,
18  which is a testing facility at Raymond
19  Laborde, is still under construction.  We're
20  doing that with Justice reinvestment money.
21  And so we had to build a facility to
22  accommodate the testing and so forth.  So all
23  that is, you know, that's -- there's a lot to
24  go with that.  And we're trying to work on
25  that, but we haven't gotten to where we are.

```
 1   I think COVID probably has a lot to do with
 2   that at this point.  Things have slowed down
 3   quite a bit on all angles of our department.
 4       Q    So at least hypothetically, the idea
 5   is that the DOC could set up a system where it
 6   goes out and gets the paperwork rather than
 7   waiting to receive it, right?
 8       A    Yes.  That's the intention of the new
 9   -- which we're hoping for.  We do that for
10   Orleans and Jefferson now.  But we haven't
11   gotten to the other four, five, six parishes
12   that we were talking about in that particular
13   time.
14       Q    Okay.  So the DOC has a model for how
15   it could go out and get the Pre-class
16   paperwork, rather than waiting passively to
17   receive it.  And the DOC has implemented for
18   some parishes, but not statewide, correct?
19       A    Yes.  I mean, when you say:  "Go out
20   and get it," I mean that's an issue of -- when
21   they come into us, we've got to have the
22   appropriate paperwork to do the processing.
23   And, you know, that's a matter of chasing the
24   paperwork.  And, you know, I don't know that
25   anybody is physically going to that parish and
```

 1  getting the paperwork.  But that's helped.  I

 2  mean, that's not a cure.  Believe me.  That is

 3  not a cure.

 4      Q    Okay.  But at the very least, there's

 5  a model by which, rather than the DOC waiting

 6  passively for other system actors to bring the

 7  paperwork to the DOC, the DOC alternatively

 8  could affirmatively go out and get the

 9  paperwork itself that it needs to compute

10  people's time, correct?

11      A    Yes.

12      Q    And that model has not implemented

13  statewide, you say, because of funding and

14  because of COVID; is that correct?

15             THE COURT REPORTER:

16                  Was there an answer?

17             THE WITNESS:

18                  Yeah, that's correct.

19             THE COURT REPORTER:

20                  Thank you.

21  BY MR. MOST:

22      Q    Do you have any sort of estimate of

23  when that system will be in place statewide,

24  ballpark?

25      A    No, at this point, I don't want to

94

```
 1    commit to anything, because then if I don't
 2    meet the deadlines, then I'll be responsible
 3    for that.  I'm going to hold on that at this
 4    point.  I'm not sure.
 5         Q    So you haven't set a deadline or a
 6    target for that, correct?
 7         A    No, I haven't.
 8         Q    That project is more or less paused
 9    for the current period of time?
10         A    I'm sorry?
11         Q    Is that project more or less paused
12    currently?
13         A    Yes.
14         Q    So shifting -- and we're getting
15    close to the end, Secretary.  Shifting gears a
16    little bit.  I want to talk about strategic
17    planning.  So every few years the Department
18    of Corrections develops a strategic plan,
19    correct?
20         A    Correct.
21         Q    And you participate in that process
22    of developing this strategic plan, correct?
23         A    Yeah, to some extent.  I try to do
24    the best I can to participate in it.  I think
25    our undersecretary handles submitting that
```

1    strategic plan, which we're required to do.

2    I'm not sure how often it's done.  It's five

3    years, so I assume it goes on every five

4    years.

5        Q    So your staff handles much of the

6    details of it, but you're involved at least in

7    the setting goals and priorities within the

8    strategic planning process, correct?

9        A    Yes.

10       Q    And the strategic plan sets the goals

11   and priorities for the Department of

12   Corrections, correct?

13       A    Yes.

14       Q    And so this current strategic plan

15   was submitted in September of 2019; is that

16   correct?

17       A    Yes.

18       Q    And that was Exhibit 43 we were

19   looking at, the strategic plan.

20            I'm turning to Exhibit 35.  This was

21   a deposition you took in July of 2019

22   regarding the Crittindon case.  Do you recall

23   this deposition?

24       A    Not really, no.

25       Q    This was the case that -- my

```
 1    understanding is some inmates were sort of
 2    bypassing intake and kind of got lost at
 3    Riverbend.  Do you remember that case?
 4         A    Lost at Riverbend?  Is that Orleans?
 5         Q    Yeah.  They were sort of coming from
 6    Orleans, bypassing DOC intake and going
 7    straight to Riverbend and kind of getting lost
 8    in the system there.  I'm not asking you to
 9    testify about it.  That's my big-picture
10    understanding of that case.
11         A    I'm not sure about the term, "Lost."
12         Q    Fair enough.  But you know what case,
13    generally, I'm talking about?
14         A    Yes.
15         Q    And any reason to think this isn't
16    the transcript of a deposition you did in July
17    of 2019?
18         A    No, no reason.  I think it is.  I
19    assume it is.
20         Q    I'm turning to page 95 here.  I read
21    this deposition, and it seems like you were
22    expressing some dissatisfaction with the
23    strategic plan in place at that time.  At the
24    top of this page, you testify:  "I have a
25    reason I'm smiling because I just had a
```

1    one-on-one with my undersecretary about the

2    strategic plan that I'm not real happy with."

3          Do you see that?

4       A    I do.

5       Q    Do you recall feeling some

6    dissatisfaction with the strategic plan that

7    was in place in July of 2019?

8       A    Not really.  I mean, I'm sure it had

9    something to do with what we were talking

10   about.  I don't recollect exactly what that

11   was all about.

12      Q    Okay.  So turning to page 97.  You

13   were asked:  "So it wouldn't surprise you to

14   be told that there's nothing -- that I found

15   nothing in the strategic plan addressing --

16   for the problem of timely Pre-classification

17   paperwork?"  Do you see that?

18      A    Yes.

19      Q    And your answer was:  "Amen."

20      A    Yeah, I see that.

21      Q    Is this ringing any bells, this

22   testimony?

23      A    Yeah, it kind of does, yeah.

24      Q    So you were asked:  "If you were king

25   or queen for the day, would the strategic plan

```
 1    have that information?"
 2            You responded:  "It would and it
 3    will."
 4       A    Yeah, I guess so.  I see it, yeah.
 5       Q    So you were testifying in July of
 6    2019 that the strategic plan would have
 7    information about the timely submission of
 8    Pre-classification paperwork; is that what you
 9    were saying then?
10       A    I think I was trying say that, yeah.
11       Q    So that was July of 2019.  A few
12    months later, you issued the five-year
13    strategic plan for the Department of
14    Corrections, right?
15       A    Yeah.
16       Q    Do you know if this has anything in
17    it about timely Pre-classification paperwork?
18       A    I'm sure it doesn't.  I'm sure that's
19    where he's going.
20       Q    Yeah.  I can't find anything in here
21    about that.  And it doesn't sound like you
22    know of it anywhere in there.  Agreed?
23       A    Yeah, agreed.  I don't know if CIPRS
24    is in there.  Is any of that in there?  I
25    mean, again, without going through it, I don't
```

1  know if there may be something in there that

2  would relate to the issue with -- what we're

3  talking about.

4       Q    Yeah.  You certainly don't recall --

5  currently recall that this has any sort of

6  goals or priorities of timely

7  Pre-classification paperwork and timely inmate

8  release, correct?

9       A    Correct.

10      Q    Can you recall that this has anything

11  in it at all about inmates being released on

12  time being a priority?

13      A    No.  I mean, without having to look

14  at the document, I don't know.  I really don't

15  know if it has anything in it or not, to be

16  honest with you.  So, I mean, it's --

17      Q    This isn't a trick question.  I can't

18  find anything in here.  I'm just asking for

19  your recollection.

20      A    Okay.  Well, I guess there isn't

21  anything in it, then -- which is my fault.

22  Not because we're ignoring it.  I can assure

23  you of that.

24      Q    At least to your recollection, it's

25  not reflected in the Department of Corrections

1  strategic plan, right?

2      A    I'm assuming you're right, without

3  having to go through the document.

4      Q    The strategic plan does set, however,

5  goals and priorities of timeliness for other

6  things; like, provide 100 percent on-time

7  deliveries by 2025 on page 6.  Do you see

8  that?

9      A    Yes.

10     Q    And this is deliveries of Prison

11 Enterprises' products to customers?

12     A    I'm not sure.

13     Q    Going up to page 35.  You see this is

14 under "Prison Enterprises"?

15     A    Okay.

16     Q    So Prison Enterprises uses inmate

17 labor to create products and ship them to

18 customers, right?

19     A    Yeah.  You can look at it that way.

20 We look at it as a training program.

21     Q    The Department of Corrections

22 receives money for that?

23     A    Department of Corrections receive

24 money?  No.

25     Q    Prison Enterprises does, though?

1     A     Yeah.

2     Q     So it was -- in your strategic plan,

3    you set a goal of providing 100 percent

4    on-time deliveries of Prison Enterprises'

5    Products to customers, right?

6     A     Right.  By 2025.

7     Q     Yeah.  By 2025.  So you set a goal --

8    set a year-out target so that your staff would

9    make it a priority and create a plan to

10   achieve that goal by that date, right?

11    A     Right.

12    Q     You did not, however, do that in this

13   document for the timely release of inmates,

14   correct?

15    A     Correct.  I guess.  I mean, you're

16   telling me -- you've read it.  I haven't

17   looked at it.  I mean, I say I haven't looked

18   at it recently, so I don't know.  If it's not

19   addressed, then it's not.  I will do an

20   amendment to our five-year strategic plan if

21   it's not.

22    Q     Okay.  When will you do that by?

23    A     I'll have to talk to my

24   undersecretary, because he prepares the

25   document.  I'll see how long it takes.  I'll

1    let you know.
2        Q    Turning to page 13, you have as a
3    goal here to maintain the adult offender
4    institution population of state prisons at a
5    minimum of 99 percent of designed capacity
6    through 2025, right?
7        A    Right.
8        Q    So you're setting as a goal to keep
9    the prisons full through 2025, at least
10   99 percent capacity, right?
11       A    Yeah.  But you don't quite understand
12   what that means, I guess.  In the sense that
13   empty beds at the local level, when we reduce
14   our population -- which we've done by almost
15   15,000 -- those vacancies are at the local
16   level and they move into state prison.  As
17   they're discharged in state prisons, we move
18   local levels to our state prisons.  So it's
19   not as you're indicating that we're going to
20   maintain our prisons at 100 percent.  That's
21   not what we mean at all.
22       Q    Okay.  I guess -- it's not a trick
23   question about this.  I guess my point is, you
24   know how to set specific goals with timelines
25   and specific criteria to head, right?  You

1    know how to do that in a strategic plan,

2    correct?

3        A    I certainly do.  When I have control

4    and I have the resources and I'm not -- it's

5    not involving a statewide judges, clerk of

6    courts and sheriffs, I can set some goals.

7        Q    So you don't think you can set goals

8    about the timely release of inmates?

9        A    I can set goals, but then I'll be

10   sitting with you again wondering why I hadn't

11   met them when I'm depending on somebody else

12   to make them.  That's part of the problem, as

13   you know.  I mean --

14       Q    So you don't think it's even worth

15   setting goals?

16       A    No, I didn't say that.  I did not say

17   that at all.  I said I would do an amendment.

18   But when I set goals, I'm going to be

19   depending upon a lot of different people and

20   resources for a budget to meet those goals.

21       Q    Okay.  So I do know of one goal you

22   set, turning back to Exhibit 42 at page 36.

23   So we talked about -- I'm looking at page 43

24   of Exhibit 42.  We talked about -- there was a

25   goal on the Six Sigma Project to reduce

```
 1   immediate releases down to 450 per year.  Do

 2   you recall something about that generally?

 3        A    I recall that from my deposition.

 4        Q    Yeah.  Did you ever set a goal lower

 5   than that for immediate releases, lower than

 6   450 per year?

 7        A    I mean, our goal is zero.

 8        Q    Where is that goal reflected?

 9        A    I mean -- do you really need to

10   reflect it in writing?

11        Q    So that's the goal in your head is

12   what you're saying?

13        A    That should be the goal of our

14   department or any department in this business.

15        Q    Right.

16        A    You don't want any one person being

17   held past their release date.  I mean, that's

18   simple.

19        Q    Right.  That should be the goal --

20        A    (INAUDIBLE).

21             THE COURT REPORTER:

22                  I'm sorry.  I did not hear what

23             the witness said.  I have:  "I mean,

24             that's simple."  And then the

25             question is:  "That should be" -- and
```

```
 1                   there was something that was said.
 2                   There was overtalk and I didn't get
 3                   what the witness was saying.
 4                   THE WITNESS:
 5                        I guess I said that's our goal,
 6                   to get to zero.  I mean --
 7     BY MR. MOST:
 8          Q    Right.  Because that should be the
 9     goal of any Department of Corrections to not
10     hold any inmates past their release date,
11     correct?
12          A    Correct.
13          Q    Is there any document you know of,
14     whatsoever, that communicates that goal to the
15     staff of the Department of Corrections?
16          A    No, not that I'm aware of.
17          Q    The staff of the Department of
18     Corrections don't just know what your goals
19     are.  They learn your goals and priorities
20     through the strategic plan and other
21     documents, correct?
22          A    Well, not necessarily just our
23     strategic plan, believe me.  We meet monthly
24     with leadership.  We meet monthly with
25     management team.  They hear from me on a
```

1   monthly basis.  If I depended on that

2   strategic plan to drive everybody to work, I

3   don't know that everybody has one of those on

4   their desk, to be honest with you.  You know,

5   we could all -- you know, it's a good thought

6   process, but it doesn't -- I don't think, in

7   my opinion, it doesn't drive people to do what

8   we need to do to get our job done.

9        Q    Do you recall any meetings where you

10   told people the goal is to get down to zero of

11   people being held past their release dates?

12        A    I'm sure I said it before, William,

13   but I can't tell you exactly when, what month

14   and what meeting I said it.

15        Q    Do you recall the most recent time

16   you said that?

17        A    No, I don't.

18        Q    Do you recall any specific time --

19   any specific time you said that to anyone

20   between 2012 and the present?

21        A    No.  I do not recall any specific

22   time or date.

23        Q    Last time we -- when we met for a

24   deposition in 2019, I asked you whether you

25   talked to the heads of other Departments of

1    Corrections to see how they addressed these

2    problems, and your answer, I think, was just

3    you only asked them what software they used.

4    Is that still your testimony?

5         A    I'm not sure if it's still my

6    testimony.  I know that the other states don't

7    have the same issues that we have.  I don't

8    know if I said that in this testimony or not.

9    But they don't keep prisoners in local jails

10   the way we do.  Nobody does.  Kentucky, I

11   think I mentioned -- I think still is --

12   second with four or five thousand.  But they

13   end up in a state prison before they're

14   discharged.  They're not discharging people

15   out of their local jails as we are.  They

16   don't have anything in common with what we're

17   doing.

18        Q    So you're saying Louisiana has a

19   unique problem with this because Louisiana

20   system is unique?

21        A    Yes.

22        Q    I don't totally understand.  In what

23   way is Louisiana system unique?

24        A    We have half of our prison population

25   in parish jails.  Nobody does that.

1      Q    Right.  The Department of Corrections

2   has chosen to contract out with local jails

3   the incarceration of inmates sentenced to the

4   custody of Department of Corrections; is that

5   right?

6      A    That's right, in the '80s.

7           THE COURT REPORTER:

8                In the what?

9           THE WITNESS:

10                In 1980-'90s is when the

11           Department decided to move in that

12           direction.

13   BY MR. MOST:

14      Q    So the thing that is unique by

15   Louisiana is the choice by the Department of

16   Corrections to set up this system by which

17   inmates withheld in local jails, correct?

18      A    It's a choice by the State of

19   Louisiana.  I don't know if it's the

20   Department of Corrections.  We can go back in

21   time with the federal courts and the system

22   and how that all was established as -- the

23   Basic Jail Guidelines was established through

24   the federal courts in order to house prisoners

25   at the local level.  All of that was done well

```
 1   before my time.  But it was done, and here we
 2   are.
 3        Q    And when you're talking about this
 4   unique aspect of inmates being held in jails,
 5   you're talking about inmates serving out their
 6   sentence in parish facilities, rather than
 7   state facilities, right?
 8        A    Correct.
 9        Q    So I don't see how that is
10   particularly relevant to the people who are
11   eligible for immediate release upon
12   sentencing.  That doesn't seem related to the
13   people who are eligible for release upon
14   sentencing to me at all.  Is it somehow
15   related?
16        A    Well, it's related because they're in
17   a parish jail, rather than in a state prison,
18   I guess.  I mean, you're talking about on the
19   sentencing date?
20        Q    Right.
21        A    On the sentencing date, they're
22   pre-trial and they become a state inmate
23   immediately.  And that goes back to what we're
24   saying the problem is.  The uniqueness of them
25   being in a local jail is that 80 to 90 percent
```

```
 1   that discharge, discharge out of local jails,
 2   not a state prison.  Very -- you know, the
 3   percentages are -- I mean, I think we
 4   discharge 15,000, and 12,000 of those out of
 5   local jails.  That's a lot of work out of
 6   local jails, rather than a state facility.  I
 7   mean, it just -- the logistics of that become
 8   very -- in my opinion, become a lot more
 9   complicated.  So on the sentencing day, I
10   mean, it may not have direct relationships,
11   but I think it makes a difference, you know,
12   as far as -- I think we know the answer to
13   that is the web portal and what we've talked
14   about, anyway.
15        Q    I guess that's my point.  In every
16   state, inmates are held at a jail at the time
17   of sentencing and they -- if they're sentenced
18   to the custody of the state, then they become
19   state inmates.  That process is no different
20   in Louisiana than it is in any other state, is
21   it?
22        A    I'm not sure.
23        Q    Have you looked into that?
24        A    No.
25        Q    So do you know of any way Louisiana
```

1    is unique with regard to the inmates who are

2    eligible for immediate release upon

3    sentencing?

4         A    No.

5         Q    Have you made any efforts to find out

6    whether -- how other states have solved the

7    problem of dealing with inmates who are

8    eligible for immediate release upon

9    sentencing?

10        A    I think staff have.  I haven't,

11   personally.  I think our staff have looked at

12   other states, Georgia -- a few other states

13   that I think we got MI-Case from and some of

14   that kind of stuff.  I haven't personally done

15   it, but staff has.

16        Q    The Department of Justice is

17   currently be -- scratch that.  The department

18   of Corrections is currently being investigated

19   by the U.S. Department of Justice for -- about

20   allegations holding inmates past their

21   released date, correct?

22        A    Yes.

23        Q    Are you involved in providing

24   information to the USDOJ about that

25   information?

```
 1        A     Yes.
 2        Q     Do you know that some spreadsheets
 3   have been created in my litigation about
 4   inmates who are subject to immediate release?
 5        A     What's the question?
 6        Q     Sure.  So Melanie Gueho created 12
 7   spreadsheets covering the months of April 2019
 8   to May 2020, assessing immediate releases;
 9   spreadsheets -- like the 2019 Pull document.
10   Are you familiar with those new spreadsheets
11   Melanie has produced?
12        A     No.
13        Q     Have you recently asked your staff
14   for any sort of assessment on whether the
15   problem with immediate releases is getting
16   better, getting worse or staying the same?
17        A     I don't think I have recently.  I
18   think we addressed that earlier.  But I think
19   that was --
20        Q     So other than that email from 2020
21   that we looked earlier, you don't recall the
22   time you've asked subsequent to that, correct?
23        A     No.
24        Q     So I want sum up with a couple of
25   questions.  In 2016, you told Debbie Hudnall
```

1    that you created an action plan about inmates

2    being held past their release date, right?

3        A    I think I said we would create an

4    action plan.  I don't remember exactly that

5    was, William.  You can show me the email.

6        Q    But you don't -- you didn't create an

7    action plan, did you?

8        A    Well, I had to get the information to

9    create an action plan.  I think we've already

10   been through this.  And I think Angela -- we

11   figured out where the issues were.  I'm not

12   sure where all that is.  Believe me, I wish

13   this was the only thing I had to work on in

14   the Department.  It's not.  You know, I have a

15   lot of going on.  It's been two years of

16   COVID.  You know, everything is shut down,

17   nobody is moving.  All that kind of stuff.

18   I've got to worry about that more than I do

19   anything else right now.  That's where I am.

20   I'm not sure if Angela and them had worked on

21   that.  I thought we were with an action plan

22   or if there was one developed, I'm not aware

23   of.

24       Q    At no point in your tenure as

25   Secretary of Department of Corrections, have

114

```
1    you ever made releasing inmates on their
2    release date a priority or a goal in any
3    strategic plan; agreed, to your recollection?
4        A    In any written strategic plan, no.  I
5    don't think I have, according to what you just
6    showed me.  But I haven't looked at every
7    strategic plan or plan that may not be in that
8    strategic plan that we may have had or
9    developed that I'm not aware of.
10       Q    In 2019 you told me, by the end of
11   the next year, you'd have a system in place to
12   go out and get the documents, rather than wait
13   to receive them.  That system is not in place,
14   agreed?
15       A    You're talking about with those seven
16   parishes?  What are you talking about,
17   William?
18       Q    In 2019, you told me that by the end
19   of next fiscal year, there would be a system
20   in place for 70 or 80 percent of inmates to --
21   the DOC to go out and get in documents, rather
22   than wait passively to receive them, and that
23   system is not currently in place, agreed?
24       A    Agreed.
25       Q    At no point have you put a timeline
```

```
 1    into the Basic Jail Guidelines for the
 2    provision of the Pre-class documents to the
 3    Department of Corrections, agreed?
 4        A    Agreed.
 5             MR. MOST:
 6                  Let's take a five-minute break.
 7             I'm going to consult my papers here.
 8             And then if Drew may -- has the
 9             option to ask you questions
10             afterwards.  And if there's none,
11             we'll wrap it up.  We'll reconvene at
12             12:20.
13             MR. BLANCHFIELD:
14                  Okay.
15                  (BRIEF RECESS)
16             MR. MOST:
17                  We can go back on the record.
18             Secretary, that's all the questions
19             I've got, unless I have any followup
20             after Drew.
21                  Drew, do you have any questions
22             to ask?
23             MR. BLANCHFIELD:
24                  I do not, William.  Thank you.
25             MR. MOST:
```

1          Secretary, again, thank you for
2      your time.  I know there's a lot on
3      your plate and I appreciate you're
4      taking the time to talk to with me.
5          Thank you to Drew and Jonathan
6      and Cecilia and everybody.
7              *       *       *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    WITNESS' CERTIFICATE

2

3          I, SECRETARY JAMES LEBLANC, do

4     hereby certify that the foregoing testimony

5     was given by me, and that the transcription of

6     said testimony, with corrections and/or

7     changes, if any, is true and correct as given

8     by me on the aforementioned date.

9

10

11    Dated: _____  Signed:_____

12                        SECRETARY JAMES LEBLANC

13

14

15    _____  Signed with corrections as noted.

16

17    _____  Signed with no corrections noted.

18

19

20

21    DATE TAKEN: January 7, 2022

22

23

24

25

1               C E R T I F I C A T E

2

3          I, CECILIA M. HENDERSON, Certified
   Court Reporter, in and for the State of
4  Louisiana, as the officer before whom this
   testimony was taken, do hereby certify that
5  SECRETARY JAMES M. LEBLANC  after having been
   duly sworn by me upon authority of R.S.
6  37:2554, did testify as hereinbefore set forth
   in the foregoing 117 pages; that this
7  testimony was reported by me in the stenotype
   reporting method, was prepared and transcribed
8  by me or under my personal direction and
   supervision, and is a true and correct
9  transcript to the best of my ability and
   understanding; that the transcript has been
10 prepared in compliance with transcript format
   guidelines required by statute or by rules of
11 the board, that I have acted in compliance
   with the prohibition on contractual
12 relationships, as defined by Louisiana Code of
   Civil Procedure Article 1434 and in rules and
13 advisory opinions of the board; that I am not
   related to counsel or to the parties herein,
14 nor am I otherwise interested in the outcome
   of this matter.

15

16      Dated this 31st day of January, 2022

17

18

19

20      CECILIA M. HENDERSON, CCR
        CCR #84099
21      STATE OF LOUISIANA

22

23

24

25