# EXHIBIT B

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 10, 2022

Lyle W. Cayce
Clerk

No. 20-30304

JESSIE CRITTINDON; LEON BURSE; EDDIE COPELIN; PHILLIP DOMINICK, III; DONALD GUIDRY,

*Plaintiffs—Appellees,*

*versus*

JAMES LEBLANC; PERRY STAGG; ANGELA GRIFFIN,

*Defendants—Appellants.*

Appeal from the United States District Court
for the Middle District of Louisiana
USDC Nos. 3:17-CV-512, 3:17-CV-602

Before HIGGINBOTHAM, COSTA, and OLDHAM, *Circuit Judges.*

PATRICK E. HIGGINBOTHAM, *Circuit Judge*:

Jails typically house pretrial detainees, but in Louisiana, the Department of Public Safety and Corrections (DPSC) also regularly engages local parish jails to house convicted state prisoners. Five of the locally housed prisoners brought claims under 42 U.S.C. § 1983 against local jail officials and DPSC officials. They allege that the DPSC officials, in violation of the Fourteenth Amendment, looked away from the administrative failure they

knew was leaving prisoners in jail who had served their sentences. Here, the defendant DPSC officials challenge the district court's denial of qualified immunity. We affirm in part, reverse in part, and remand.

## I.

## A.

As the Orleans Parish Sheriff's Office has more people in its custody than beds in its facility, the Sheriff's Office regularly houses those arrested elsewhere. In September 2015, Orleans Parish entered into an agreement with the East Carroll Parish Sheriff's Office to house Orleans pretrial detainees in East Carroll at the River Bend Detention Center. Although these detainees remained in the legal custody of Orleans Parish, they were in the physical custody of East Carroll Parish.

About once a week, East Carroll Parish transported Orleans inmates to the Orleans Parish Criminal District Court for any necessary trial proceedings. Inmates convicted and sentenced during these proceedings were no longer in Orleans Parish's legal custody. They were rather in the legal custody of DPSC.[1] But DPSC, lacking enough beds to house all its prisoners in state facilities, often did not take physical custody of these prisoners. Instead, Orleans, as the parish of conviction, regularly transferred

---

[1] *See* LA. REV. STAT. § 15:1824(A) ("[A]ny individual subject to confinement in a state adult penal or correctional institutional shall be committed to the Department of Public Safety and Corrections and not to any particular institution within the jurisdiction of the department.").

DPSC-sentenced prisoners back to East Carroll to be housed at River Bend.[2] DPSC then paid East Carroll a daily rate to house each of its prisoners.[3]

But this arrangement, simple in concept, suffered in execution. This, with other difficulties, led to a 1996 settlement that ended over 20 years of court supervision and consent decrees in almost all of Louisiana's jails and prisons.[4] As part of the settlement, the State established a formal partnership with the Louisiana Sheriffs' Association for the housing of DPSC prisoners in local jails. Pursuant to this partnership, the State and Sheriffs adopted the "Basic Jail Guidelines" "designed to assure that the fundamental constitutional rights of [DPSC] offenders housed in local jails would not be jeopardized by such housing arrangements."[5]

DPSC officials, including the Department's Secretary, Assistant Secretary, and Chief of Operations, are responsible for determining the content of the Guidelines, and DPSC employees regularly audit local jails housing state prisoners to ensure compliance. If DPSC discovers a jail's noncompliance with the Guidelines, it must work with the jail to reach compliance; should a jail fail to comply with the Guidelines, DPSC will remove DPSC prisoners from the institution.

---

[2] These prisoners typically have shorter sentences and less complex medical and mental health needs than those housed in state facilities.

[3] Under Louisiana law, DPSC has statutory authority to "enter into a contract with a law enforcement district, municipal, or parish governing authority to house additional prisoners." LA. REV. STAT. § 15:824(D). Such a contract exists between DPSC and East Carroll Parish.

[4] *See Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 368–70 (5th Cir. 1998) (explaining litigation that led to settlement).

[5] The Guidelines became effective on April 1, 1997.

The Guidelines cover an array of correctional operations, including provisions related to the admission, processing, and release of prisoners. One provision is especially relevant here: parish jails housing state prisoners must send pre-classification paperwork to DPSC so that DPSC can enter the prisoner's information into its computer system, calculate the prisoner's release date, and issue the release.[6]

But when Orleans Parish transferred DPSC-sentenced prisoners to East Carroll to be housed there, neither Orleans nor East Carroll Parish immediately sent the prisoner's pre-classification paperwork to DPSC. The two offices differed in their understanding of which parish was responsible for communicating with DPSC about the new DPSC prisoners housed by East Carroll.[7] And DPSC had no system in place to ensure it had pre-classification paperwork from local jails for its newly-sentenced prisoners. DPSC simply waited on the local jail to send the paperwork.[8]

—————————————

[6] Although it is unclear from the Guidelines which parish is responsible for sending pre-classification paperwork to DPSC, DPSC officials testified that the parish of conviction bears responsibility for sending DPSC the paperwork.

[7] According to Orleans Parish officials, its office provided pre-classification paperwork to East Carroll Parish to be sent on to DPSC. But East Carroll Parish officials believed Orleans Parish sent the paperwork directly to DPSC.

[8] Deposition testimony of a DPSC pre-classification specialist, Angela Smith, is telling:

Q:    If a local parish somehow lost or didn't send in the pre-classification paperwork for a newly sentenced DOC inmate, this inmate could sit at that local parish serving their Department of Corrections sentence indefinitely, unless the inmate or their family made a phone call to the Department of Corrections alerting you that there was a delay in time calculation?

A:    Yes.

Q:    And so if pre-classification paperwork is not received by the Department of Corrections, there's no check mechanism to make

No. 20-30304

DPSC officials knew that local jails often transmitted pre-classification paperwork to them in an untimely manner. In 2012, DPSC investigated overdetentions caused by delays in processing sentencing paperwork. Known as the Lean Six Sigma study, DPSC's investigation exposed widespread overdetentions of DPSC prisoners. The Lean Six Sigma study attributed these overdetentions to delays in transmitting local jail pre-classification paperwork and to DPSC's own delays in processing this paperwork on its receipt. DPSC considered placing oversight mechanisms to ensure that local jails timely transmitted pre-classification paperwork to DPSC, but did not to do so. Instead, DPSC chose to address only its own internal workflow problems.

Plaintiffs in this case, Jessie Crittindon, Leon Burse, Eddie Copelin, Phillip Dominick, and Donald Guidry, were among prisoners that suffered the consequences of that decision, lost in the shuffle between Orleans Parish and East Carroll Parish. Each was arrested in Orleans Parish and initially placed in the custody of Orleans. Each was subsequently transferred to East Carroll to be housed at River Bend as Orleans pretrial detainees. Between July and October 2016, each Plaintiff was transferred back to Orleans Parish to enter a plea in Orleans Parish Criminal District Court. Four of the Plaintiffs (Crittindon, Burse, Copelin, and Dominick) were entitled to immediate release upon sentencing.[9] Plaintiff Guidry was entitled to release

---

sure that no inmate sentenced to the Department of Corrections are in existence that you are not performing pre-classification and time calculation for?

A:     Right. If we're not aware of the offender being sentenced to the Department of Corrections, we don't know he's out there until we receive that paperwork.

[9] Crittindon was entitled to release on August 2, 2016, Burse on August 8, 2016, Copelin on October 14, 2016, and Dominick on September 1, 2016.

less than two months after his sentencing.[10] Once their pleas were entered and sentences handed down, they became DPSC-sentenced prisoners and were automatically under the legal custody of DPSC.[11] Orleans Parish then transferred the Plaintiffs back to East Carroll to be housed at River Bend as DPSC-sentenced prisoners. But neither Orleans nor East Carroll Parish promptly sent their pre-classification paperwork to DPSC. Since DPSC did not timely receive this paperwork, DPSC did not timely issue their release, and Plaintiffs remained imprisoned beyond the terms of their sentences.

On November 21, 2016, Crittindon's mother called DPSC about her son, complaining that he had been sentenced in August 2016, was housed in East Carroll at River Bend, and still lacked a release date. The next day, Burse's mother called DPSC, complaining that her son had been sentenced in August 2016, was housed at River Bend, and still lacked a release date.[12] Burse's mother contacted DPSC again on November 28 and December 7. Both Crittindon and Burse had been entitled to immediate release upon their sentencing in August. Perry Stagg, then-Assistant Secretary of DPSC, and Angela Griffin, DPSC's Director of the Pre-Classification Department, were both notified of each of these calls.

On December 8, 2016, DPSC's Pre-Classification Department Manager e-mailed the East Carroll Sherriff's Office, asking for "an updated list of offenders that are housed with [East Carroll] from Orleans parish that

---

[10] Guidry was entitled to release on September 4, 2016.

[11] *See* LA. REV. STAT. § 15:1824(A) ("[A]ny individual subject to confinement in a state adult penal or correctional institutional shall be committed to the Department of Public Safety and Corrections and not to any particular institution within the jurisdiction of the department.").

[12] The record suggests this was not the first time Burse's mother had contacted DPSC about her son.

are DOC without paperwork." Within hours, East Carroll replied with a spreadsheet, naming 57 DPSC prisoners who were transferred from Orleans to River Bend during November but who were not yet in the CAJUN system.[13] The list included Plaintiffs Copelin, Crittindon, and Dominick. On December 27, 2016, DPSC received another list of DPSC-sentenced prisoners held at River Bend from Orleans that were not in DPSC's system. This list named roughly 100 prisoners, including Plaintiff Guidry. Stagg testified that DPSC then "realized we had a systematic problem."

Now aware that many DPSC prisoners were being held in East Carroll without a release date, Stagg testified that he "established a line of communication" with Orleans. Over a month later, DPSC received each Plaintiff's required pre-classification paperwork. On its receipt, DPSC calculated each Plaintiff's (now-past) release date and then discharged them within approximately one day. All told, Plaintiffs were held months beyond their release dates: Crittindon for 164 days, Burse for 156 days, Guidry for 143 days, Dominick for 97 days, and Copelin for 92 days.

**B.**

On August 2, 2017, Plaintiffs Crittindon and Burse filed their § 1983 suit with supplemental state claims against the Orleans Parish Independent Jail Compliance Director, several East Carroll and Orleans officials, as well as three DPSC officials: Secretary James LeBlanc, then-Assistant Secretary Stagg, and Pre-Classification Director Griffin.[14] On August 31, 2017, Plaintiffs Copelin, Dominick, and Guidry brought similar claims against the same officials. The cases were consolidated on October 18, 2017.

---

[13] CAJUN is DPSC's tracking and record software.

[14] Plaintiffs sued the Compliance Director and local jail officials in their individual and official capacities but sued the DPSC officials in their individual capacities only.

All the defendants filed motions to dismiss Plaintiffs' complaints. The district court granted the Compliance Director's motion, finding him entitled to absolute immunity as a quasi-judicial officer, but the court denied the rest of the defendants' motions. After extensive discovery, Plaintiffs moved for summary judgment on a narrow subset of their claims, and the defendants moved for summary judgment as to all of Plaintiffs' claims. As to Plaintiffs' federal law claims, each official claimed that they were entitled to qualified immunity in their individual capacities. The district court disagreed, denying all summary judgment motions. The DPSC Defendants then filed this interlocutory appeal, challenging the district court's denial of qualified immunity.

## II.

The rules attending appellate review of denials of qualified immunity are now rote. "Ordinarily, we do not have jurisdiction to review a denial of a summary judgment motion because such a decision is not final within the meaning of 28 U.S.C. § 1291."[15] However, we may review a denial of qualified immunity under the collateral order doctrine,[16] with review limited to "the materiality of factual disputes the district court determined were genuine."[17] Stated differently, although we lack jurisdiction to consider "whether there is enough evidence in the record for a jury to conclude that certain facts are true," we do have jurisdiction to decide "whether the defendants are entitled to qualified immunity on the facts that the district

---

[15] *Perniciaro v. Lea*, 901 F.3d 241, 251 (5th Cir. 2018) (internal quotation marks omitted) (quoting *Palmer v. Johnson*, 193 F.3d 346, 350 (5th Cir. 1999)).

[16] *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc).

[17] *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019) (en banc).

court found sufficiently supported in the summary judgement record."[18] "Like the district court, we must view the facts and draw reasonable inferences in the light most favorable to the plaintiff and ask whether the defendant would be entitled to qualified immunity on those facts."[19] Within this narrow inquiry, our review is *de novo*.[20]

Qualified immunity shields government officials performing discretionary functions from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."[21] Determining whether an officer is entitled to qualified immunity requires a two-step inquiry. First, "we ask whether the officer's alleged conduct has violated a federal right."[22] Second, "we ask whether the right in question was clearly established at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct."[23]

"In determining what constitutes clearly established law, this [C]ourt first looks to Supreme Court precedent and then to our own."[24] When there is no direct controlling authority, "this [C]ourt may rely on decisions from other circuits to the extent that they constitute a robust consensus of cases of persuasive authority."[25] "Ultimately, the touchstone is 'fair warning': The

---

[18] *Kinney*, 367 F.3d at 347.

[19] *Cole*, 935 F.3d at 452.

[20] *Id.*

[21] *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

[22] *Cole*, 935 F.3d at 451.

[23] *Id.* (internal quotation marks omitted).

[24] *Shumpert v. City of Toledo*, 905 F.3d 310, 320 (5th Cir. 2018).

[25] *Id.* (internal quotation marks and citation omitted).

law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'"[26]

## III.

Plaintiffs proceed against Defendants under two theories, arguing that LeBlanc, Stagg, and Griffin violated the Plaintiffs' clearly established right to timely release from prison by: (1) failing to adopt policies ensuring the timely release of DPSC prisoners; and (2) directly participating in the conduct that caused their overdetention. We first turn to the claim of failure-to-adopt-policies.

### A. Failure-to-Adopt-Policies

Supervisory officials may be liable under § 1983 for their failure to adopt policies if that failure causally results in a constitutional injury.[27] Liability only arises when the officials act, or fail to act, with "deliberate indifference," a "disregard [for] a known or obvious consequence of [their] action[s]."[28] Plaintiffs must introduce evidence that each Defendant had "actual or constructive notice" that their failure to adopt policies would result in constitutional violations.[29] This typically requires showing notice of "[a] pattern of similar constitutional violations" due to deficient policies,

---

[26] *Id.* at 321 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

[27] *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).

[28] *Id.* (internal quotation marks and citation omitted); *see also Southard v. Tex. Bd. of Crim. Just.*, 114 F.3d 539, 551 (5th Cir. 1997) ("[A] supervisory official may be liable under § 1983 if that official, by action or inaction, demonstrates a deliberate indifference to a plaintiff's constitutionally protected rights.").

[29] *Porter*, 659 F.3d at 447.

permitting the inference that Defendants deliberately chose policies causing violations of constitutional rights.[30]

### 1.

Plaintiffs argue that Defendants were deliberately indifferent to their right to timely release by failing to adopt policies that would ensure local jails' timely transmission of pre-classification paperwork to DPSC; that all three officials knew that local jails were failing to timely send paperwork but did nothing, well aware that their policies (or lack thereof) led to overdetentions. They contend that LeBlanc and Stagg, as officials responsible for the content of the Basic Jail Guidelines, should be held liable for failing to require local jails to transmit pre-classification paperwork to DPSC by a stated deadline, and that Stagg and Griffin, as the officials responsible for running DPSC's Pre-Classification Department, should be held liable for their deliberate indifference to the reality that newly-sentenced DPSC prisoners lacked initial time computations and release dates, meaning that they were being jailed unlawfully.

Viewing the evidence in the light most favorable to Plaintiffs, we conclude that a reasonable jury could find that Defendants knew of a "pattern of similar constitutional violations," such that their inaction amounted to a disregard of an obvious risk. DPSC's Lean Six Sigma study revealed that 2,252 DPSC prisoners were annually held past their release date. On average, these prisoners were detained 72 days past the expiration of their court-imposed sentence. The study attributed this overdetention to delays in determining prisoners' release dates, finding that on average, it took 110 days to determine a prisoner's release date after his conviction. This included

---

[30] *Id.*

approximately 31 days for documents to be transmitted from the Clerk of Court to the local jail to DPSC's Pre-Classification Department.[31]

LeBlanc, Griffin, and Stagg were each familiar with the Lean Six Sigma study. Secretary LeBlanc was a "champion" of the project and apprised of its findings. Pre-Classification Director Griffin was a member of the Lean Six Sigma team and helped present its findings and recommendations to DPSC staff. And then-Assistant Secretary Stagg testified that, although he joined DPSC after the study was conducted, he was made aware of the deficiencies it uncovered.

Defendants concede that, because of the study, they each knew that on average, it took a month for DPSC to receive the paperwork necessary to begin calculating a prisoner's release date after his conviction. Defendants also knew that some prisoners would be entitled to immediate release upon conviction. Therefore, in cases like Plaintiffs', where prisoners were entitled to immediate or near-immediate release upon conviction, it was obvious that a failure to address those processing delays would lead to unconstitutional overdetentions. Despite this awareness, years after the Lean Six Sigma project, Defendants have not pointed to a single effort that any of them took to identify immediate releases more quickly during that month-long delay. And this is despite the fact that LeBlanc and Stagg were responsible for the Basic Jail Guidelines, while Stagg and Griffin were responsible for running DPSC's Pre-Classification Department. They were each in a position to adopt policies that would address this delay.

Defendants persist that they are insulated from liability because the Lean Six Sigma study was aimed at investigating DPSC's internal—not

---

[31] It is not entirely clear from the study what amount of delay is attributable to the Clerk of Court and to the local jail, but it appears that both entities account for some delay.

external—delays in processing prisoner paperwork. Defendants contend because the study focused on internal processes, that it did not reveal a "pattern of similar constitutional violations" to those Plaintiffs complain of here, overdetentions caused by delay from the local jails.[32] But this misses the point; Defendants cannot avoid the evidence that the study exposed unlawful detentions of prisoners. A reasonable factfinder could conclude that Defendants' awareness of this pattern of delays and their conscious decision not to address it rises to the level of deliberate indifference.

## 2.

So, we turn to whether a reasonable factfinder could find that Defendants' conduct was objectively unreasonable in light of clearly established law. This Court has recognized the "clearly established right to timely release from prison."[33] Of course, "timely release" is not the same as instantaneous release: it is reasonable for jailers to have some administrative delay in processing an inmate's discharge.[34] While courts have declined to define the amount of delay that is reasonable,[35] it is without question that holding without legal notice a prisoner for a month beyond the expiration of

---

[32] *See Connick v. Thompson*, 563 U.S. 51 (2011).

[33] *Porter*, 659 F.3d at 445.

[34] *See Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968) (concluding that a jailer does not commit "an instant tort at the moment" the prisoner is entitled to release; instead, a jailer's "duty to his prisoner is not breached until the expiration of a reasonable time for the proper ascertainment of the authority upon which his prisoner is detained.").

[35] *See Berry v. Baca*, 379 F.3d 764, 771 (9th Cir. 2004) ("Courts have not settled on any concrete number of permissible hours of delay in the context of post-release detentions.").

his sentence constitutes a denial of due process.[36] Indeed, Defendants knew not just of delay, but that there was, on average, a month-long delay in receiving paperwork from the local jails. Therefore, they had "fair warning" that their failure to address this delay would deny prisoners like Plaintiffs their immediate or near-immediate release upon conviction.[37] We conclude that because a reasonable jury may find that Defendants' inaction was objectively unreasonable in light of this clearly established law, they have failed to show they are entitled to qualified immunity on these claims.[38]

## B. Direct Participation

Plaintiffs next contend that each official should be liable for directly participating in the violation of their rights. A supervisory official may be held liable if he "affirmatively participates in the acts that cause the constitutional deprivation."[39] A plaintiff must show the defendant's deliberate indifference to plaintiff's constitutional rights. This requires evidence that an official "disregarded a known or obvious consequence of [their] action[s]."[40] Although Plaintiffs brought direct participation claims against all three DPSC officials, only Griffin and Stagg have moved for summary judgment on the basis of qualified immunity on these claims.

### 1.

---

[36] *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980) ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.").

[37] *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

[38] *See Porter*, 659 F.3d at 446.

[39] *Porter*, 659 F.3d at 446.

[40] *Porter*, 659 F.3d at 446–47, quoting *Connick*, 563 U.S. at 61.

Defendants assert that they are entitled to qualified immunity on Plaintiffs' direct participation claims because once they became aware of a risk that these five Plaintiffs were being overdetained, they took prompt action, and therefore, they did not *disregard* a known risk. As to Plaintiffs Dominick, Copelin, and Guidry, this argument is well taken, as we will explain.

First, there is no evidence that Defendants were ever specifically aware of the risk that Dominick was being overdetained, as he was released before Defendants discovered the "River Bend Fiasco" and there is no evidence of any inquiries directed to DPSC about his release date prior to his actual release. Thus, Dominick was released before his overdetention was a known risk.

Second, as to Plaintiffs Copelin and Guidry, Defendants only became aware of the risk that they were being overdetained in the wake of the "River Bend Fiasco." Copelin's name appeared on the original spreadsheet from River Bend listing prisoners that were not in CAJUN. Guidry's name only appeared on a later spreadsheet that River Bend sent to DPSC on December 27, 2016. The district court found that once Defendants became aware of the "River Bend Fiasco," they appropriately responded as "the record demonstrates that after they became aware of the issue, Defendants communicated with the relevant parties to obtain the necessary paperwork, calculate a release date, and release the Plaintiffs."[41] Therefore, because Defendants promptly contacted Orleans after learning of the risk of

---

[41] Although not explicit, this finding likely relied on evidence of Defendants' communication with Orleans's Classification Manager Amacker in the wake of the River Bend Fiasco.

overdetention to Plaintiffs Copelin and Guidry, their conduct as to these Plaintiffs does not support a finding of deliberate indifference.

However, viewing the evidence in the light most favorable to the Plaintiffs, neither Griffin nor Stagg acted promptly in responding to the risk of overdetaining Plaintiffs Crittindon and Burse. On November 21, Griffin and Stagg were notified that Crittindon's mother called about her son, who was detained in River Bend. The next day, they were notified that Burse's mother called about her son, who was also detained in River Bend. Both mothers complained that their sons were sentenced in August and that nearly three months later they still did not have release dates. Both Crittindon and Burse were entitled to immediate release upon their sentencing, due to time served in pre-trial detention. There is evidence that Griffin and Stagg discussed this amongst themselves, but there is no evidence that they took any further action until 17 days later, on December 8, when they finally e-mailed River Bend, asking if it was housing any persons without release dates. A reasonable factfinder could find that their conduct sums to deliberate indifference to Crittindon and Burse's overdetention.

With regards to Dominick, Copelin, and Guidry, Defendants did not disregard any known risk and cannot be found to have acted with deliberate indifference. With regards to Crittindon and Burse, a jury could reasonably conclude that Defendants disregarded a known risk and could be found to be deliberately indifferent to this risk.

**2.**

We next ask whether Defendants' inaction, with regards to Crittindon and Burse, was objectively unreasonable in light of clearly established law. As we have explained, there is a clearly established right to a timely release from prison, which "establishes that a jailer has a duty to ensure that inmates are

timely released from prison."[42] Due to the mothers' phone calls, Defendants knew that Crittindon and Burse were at risk of overdetention. Nonetheless, despite their knowledge that the two had been illegally held for three months, for 17 days they failed to address this risk.[43] They had "fair warning" that their failure to address this delay would result in the illegal detention of Crittindon and Burse.[44] Because a factfinder may find that Defendants' inaction in response to the risk of overdetention was objectively unreasonable in light of this clearly established law, Defendants have failed to show they are entitled to qualified immunity on these claims.[45]

## IV.

Finally, we turn to the dissent of our colleague. With respect, we cannot agree that Plaintiffs' overdetention claims are barred by *Heck* and *Edwards*, a contention no party makes.[46] The Supreme Court recently reminded us that our task is not to come up with arguments the parties should have made, but to decide the ones they make.[47] When it comes to *Heck* in particular, our court and others have recognized that it is a defense a party

---

[42] *Porter*, 659 F.3d at 445; *Douthit*, 619 F.2d at 532.

[43] After defendants Griffin and Stagg took action on December 8, it was over a month until Crittindon and Burse were actually released, on January 13, 2017 and January 11, 2017, respectively. However, at this point, defendants had taken reasonable action to effectuate their releases.

[44] *See Hope*, 536 U.S. at 741.

[45] *See Porter*, 659 F.3d at 446.

[46] *Heck v. Humphrey*, 512 U.S. 477 (1994); *Edwards v. Balisok*, 520 U.S. 641 (1997).

[47] *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (emphasizing that "we rely on the parties to frame the issues for decision and assign to courts the rule of neutral arbiter of matters the parties present" (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008))).

must assert as opposed to some sort of jurisdictional bar.[48] In any event, *Heck* does not bar this suit: The *Heck* defense "is not . . . implicated by a prisoner's challenge that threatens no consequence for his conviction or the duration of his sentence."[49] Here, the parties agree that Plaintiffs were held in excess of their sentences and Plaintiffs do not challenge their underlying conviction nor the length of their sentence.

With respect, we believe that our colleague misreads our qualified immunity analysis, one that poses a question that looks to a complete review of the record. The dissent's treatment of the record elides the underlying fact that the Plaintiffs were detained months past their release date. Defendants were fully aware knowledge of a systemic failure to calculate release dates and that Crittindon and Burse had been held for months after serving their sentence, yet Griffin and Stagg did nothing for 17 days. When they finally did "pick up the phone" the Plaintiffs were released within 24 hours.

Each defendant was aware of the delays in processing identified by the Lean Six Sigma Study.[50] The Lean Six Sigma Study found that it took, on average, 110 days to process a release date, including approximately 31 days for documents to be transmitted from the local jail to DPSC's Pre-Classification Department. The Lean Six Sigma Study also revealed an 83.44% occurrence of immediate release upon processing "due to an earlier release date." DPSC considered whether to put oversight mechanisms in

---

[48] *See, e.g., Scribner v. Dillard*, 141 F App'x 240, 241 n.1 (5th Cir. 2005); *Topa v. Melendez*, 739 F. App'x 516 (11th Cir. 2018) (reversing dismissal of complaint when court raised *Heck* sua sponte at the Rule 12 stage); *Polzin v. Gage*, 636 F.3d 834, 838 (7th Cir. 2011) (explaining that Heck is not jurisdictional and thus may be forfeited).

[49] *Muhammad v. Close*, 540 U.S. 749, 751 (2004); *Bourne v. Gunnels*, 921 F.3d 484, 490–1, n.3 (5th Cir. 2019).

[50] *Supra* at 12.

place to ensure that local jails transmitted pre-classification paperwork to DPSC in a timely manner, but it decided not to do so. Instead, the Department chose to address only its own internal workflow problems, but each defendant here was well-aware that the majority of this delay was due to the local jails' failure to timely transmit pre-classification paperwork. The relevance of the Lean Six Sigma Study is obvious—that the defendants were each keenly aware of the flaws of the system that failed to timely release prisoners.

The dissent's description of the relationship between DPSC and the local jails is inaccurate. DPSC is responsible for the local jails once they house DPSC prisoners. DPSC enters into contracts with local jails to house DPSC's prisoners. Specifically, this contract states: "If, in the determination of [DPSC], the Sheriff fails to fulfill in a timely and proper manner its obligations to operate and maintain the Jail Facility in accordance with [the Basic Jail Guidelines], the Department shall have the right to terminate this contract. . . ."[51] Through the promulgation of the Basic Jail Guidelines and DPSC's audits of local parish jails, there is ample evidence that these DPSC officials had power to control the facilities in which DPSC housed its prisoners. The Basic Jail Guidelines are not "irrelevant."[52] The content of the Guidelines is determined by defendants LeBlanc and Stagg. According to LeBlanc, even jails without DPSC contracts were required to comply with the Guidelines as long as they housed DPSC prisoners. DPSC would regularly audit these local facilities to ensure their compliance, and when a jail was not in compliance, DPSC helped the facility reach compliance. Stagg

---

[51] Furthermore, DPSC has the right to inspect, review, and audit all of East Carroll's books and records. All work by subcontractors also needs prior written approval by DPSC.

[52] Dissent at 15.

testified that in rare scenarios DPSC-sentenced prisoners would be pulled from a jail if the local facilities did not comply with the Guidelines. Through the promulgation of the Basic Jail Guidelines and DPSC's audits of local parish jails, there is ample evidence that these DPSC officials had power to control the facilities in which DPSC housed its prisoners.[53]

Finally, our colleague questions if any policy could be put in place to avoid overdetentions, given the current requirements imposed by Louisiana law.[54] Our colleague misreads the demands of both due process and Louisiana law. First, the suggested thirty-day deadline would still likely result in deprivations of due process. This Court recognizes that overdetention by thirty days is a per se deprivation of due process.[55] Four of the five plaintiffs were entitled to immediate release on the day they were sentenced. A statutory deadline requiring the sheriff's office to turn in pre-classification paperwork to DPSC within thirty days would not prevent unconstitutional overdetentions. Furthermore, under section 15:566(B), a thirty-day deadline only applies when the prisoner is being delivered to a "state correctional institution." But when "the prisoner is retained in the parish pursuant to R.S. 15:824(B)," the thirty-day deadline does not apply. This is the exact scenario here, as La. Rev. Stat. § 15:824(B) controls when prisoners are kept in the custody of a local parish because the DPSC is "unwilling or unable to

---

[53] Alternatively, what our colleague does is to analyze the sufficiency of evidence supporting a fact dispute identified by the district court below: whether DPSC has authority to control local sheriffs' offices. This Court lacks jurisdiction to consider such a dispute, as it may not review a denial of qualified immunity that "rests on the basis that genuine issues of material fact exist." *Amador v. Vasquez*, 961 F.3d 721, 726 (5th Cir. 2020) (internal quotations and citation omitted).

[54] Dissent at 14.

[55] *See Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980) ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.").

take physical custody of prisoners sentenced to hard labor." There was no statutory directive or DPSC policy that directed jails to submit pre-classification paperwork to DPSC by a given deadline.

Although the determination of qualified immunity must be made at the earliest stage determinable, reading the record before us, we cannot say now that these Defendants have qualified immunity, however the case may develop in further trial proceedings.[56]

\* \* \* \*

We AFFIRM in part, REVERSE in part, and REMAND for proceedings consistent with this opinion.

---

[56] *Melton v. Phillips*, 875 F.3d 256, 260 (5th Cir. 2017).

ANDREW S. OLDHAM, *Circuit Judge*, dissenting:

Across the five plaintiffs in this case, DPSC was responsible for an average of *less than one day's delay*. Nonetheless, the majority concludes three DPSC defendants violated plaintiffs' clearly established right to timely release from prison and denies them qualified immunity. It reaches that conclusion by faulting DPSC for actions by parties not before us on appeal and over which DPSC exercises no authority or control.

That approach is deeply flawed for two reasons. First, plaintiffs' claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). And second, even if plaintiffs' claims are not *Heck*-barred, the DPSC defendants are entitled to qualified immunity.

I.

*Heck v. Humphrey* bars plaintiffs' § 1983 claims. That's because (A) plaintiffs' claims sound in habeas, so they have no § 1983 claim for damages. And (B) the majority's counterarguments are meritless.

A.

Both the federal habeas statute, 28 U.S.C. § 2241, and the Civil Rights Act of 1871, 42 U.S.C. § 1983, create causes of action for prisoners with constitutional claims. But the remedies offered by those two statutes—and Congress's limitations on them—differ radically.

The habeas statute offers prisoners a singular equitable remedy: release from custody. *See, e.g.*, *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1969 (2020) ("The writ [of habeas corpus] simply provide[s] a means of contesting the lawfulness of restraint and securing release."). As powerful as the habeas remedy is, however, it comes with numerous severe limitations. *See, e.g.*, The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.

Like the habeas statute, § 1983 offers equitable relief. *See* 42 U.S.C. § 1983. But § 1983 goes further and *also* offers money damages and attorney's fees. *See id.* §§ 1983, 1988. What's more, § 1983 comes with none of AEDPA's strictures. So if a prisoner could simply choose which statute to use for his constitutional claims, every prisoner in his right mind would choose § 1983; he could use it to get out of jail, get money damages, and get attorney's fees—all without having to confront AEDPA and the numerous common-law restrictions on habeas.

*Heck* recognized this "potential overlap between" habeas and § 1983, and it cut off access to the latter in cases where the prisoner's claim sounds in the former. *Heck*, 512 U.S. at 481 (holding the *Heck* bar eliminates "the potential overlap between these two provisions"). The upshot is that, where a prisoner can obtain relief through habeas, he cannot sue under § 1983: "Congress has determined that habeas corpus is the appropriate remedy for state prisoners *attacking the . . . length of their confinement*, and that specific determination must override the general terms of § 1983." *Preiser v. Rodriguez*, 411 U.S. 475, 490 (1973) (emphasis added); *see also Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005) ("[A] prisoner in state custody cannot use a § 1983 action to challenge the fact or duration of his confinement . . . He must seek federal habeas corpus relief (or appropriate state relief) instead." (quotation omitted)); *Damond v. LeBlanc*, 552 F. App'x 353, 354 (5th Cir. 2014) (per curiam) ("[H]abeas petitions are the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release, even though such a claim may come within the literal terms of § 1983." (quotation omitted)).[1]

---

[1] The only way around the *Heck* bar is by way of the "favorable-termination requirement." To bring a claim that would otherwise be barred, a "§ 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by

The five plaintiffs in this case are challenging the fact and duration of their confinement. And they sought immediate or speedier release. They were in jail, and they wanted to get out. That means their *only* remedy lies in habeas. And the *Heck* doctrine plainly bars them from ignoring the specific terms of the habeas statute, which "*must* override the general terms of § 1983." *Preiser*, 411 U.S. at 490 (emphasis added).

The district court misunderstood the *Heck* doctrine. All of the defendants raised this issue in their summary-judgment motions and argued that plaintiffs' claims are *Heck*-barred. The district court mistakenly held otherwise. Why? Because, the district court found, plaintiffs are not challenging their sentences; they're instead complaining about overdetention *beyond* their sentences.

The Ninth Circuit previously committed this precise legal error. *See Balisok v. Edwards*, 70 F.3d 1277 (9th Cir. 1995) (mem.). In *Edwards*, an inmate brought a § 1983 suit challenging the validity of prison procedures used to deprive him of good-time credits. The Ninth Circuit concluded *Heck* didn't apply because the prisoner did not challenge the sentence imposed by his convicting court; he instead challenged the State's failure to let him out in a timely fashion based on his good-time credits. *Ibid.* (citing *Gotcher v. Wood*, 66 F.3d 1097, 1099 (9th Cir. 1995)).

The Supreme Court reversed. *Edwards v. Balisok*, 520 U.S. 641 (1997). It explained that a win for the prisoner would "necessarily imply the

---

executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486–87. Unless and until a § 1983 plaintiff satisfies that requirement, *Heck* stands in his way. *See Randell v. Johnson*, 227 F.3d 300, 301 (5th Cir. 2000) (per curiam) (explaining that a § 1983 plaintiff who "has not satisfied the favorable termination requirement of *Heck* . . . is barred from any recovery.").

invalidity of the deprivation of his good-time credits" and get him out of prison 30 days sooner. *Id.* at 646; *see also Colvin v. LeBlanc*, 2 F.4th 494, 498 (5th Cir. 2021) (noting the § 1983 claim in *Edwards* was *Heck*-barred because "the reinstatement of good-time credits" would "change the duration of [the prisoner's] incarceration"). Because success on the prisoner's claim would entitle him to speedier release, the Court concluded habeas was the exclusive remedy available to him, and his claim was not cognizable under § 1983. *Edwards*, 520 U.S. at 648. The key takeaway from the *Preiser-Heck-Edwards* line is that any action challenging the length of confinement—or legality of continued confinement—lies in habeas corpus rather than § 1983. *See Preiser*, 411 U.S. at 489.

Here, plaintiffs challenged their continued confinement after their release dates, so they were eligible to seek relief through habeas. And if any doubt remains that plaintiffs here *could* have sought habeas relief, it's eliminated by the fact that some of them *did*. Counsel for plaintiffs Crittindon and Copelin filed petitions for writs of habeas corpus in the Orleans Parish Criminal District Court on January 12, 2017. After both plaintiffs were released from custody *the very next day* on January 13, 2017, both petitions were voluntarily dismissed. That is the beginning and the end of the *Heck* bar: The fact that plaintiffs' claims were cognizable in habeas means they're non-cognizable in § 1983.[2]

---

[2] All this remains true even though plaintiffs are no longer in jail. The *Heck* bar applies uniformly to inmates currently in prison and to litigants who have been released. *Heck* itself set out this rule, noting "the principle barring collateral attacks—a longstanding and deeply rooted feature of both the common law and our own jurisprudence—is not rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated." 512 U.S. at 490 n.10; *see also Randell*, 227 F.3d at 301 (per curiam) (reaffirming this rule despite contrary dicta in subsequent Supreme Court concurring and dissenting opinions).

## B.

The majority disputes none of this. Instead, it declines to reach the *Heck* issue because (it says) the DPSC defendants forfeited it.[3] *See ante*, at 17. That's wrong for three reasons.

## 1.

First, if the *Heck* bar applies, plaintiffs lack a cause of action under § 1983. *See Heck*, 512 U.S. at 489 (denying "the existence of a cause of action . . . unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus."); *see also Colvin*, 2 F.4th at 498–99; *Johnson v. McElveen*, 101 F.3d 423, 424 (5th Cir. 1996) (per curiam). And if the plaintiffs lack a cause of action, we should say so and no more. *See Angulo v. Brown*, 978 F.3d 942, 954 (5th Cir. 2020) (Oldham, J., concurring in part); *see also Elhady v. Unidentified CBP Agents*, 18 F.4th 880, 884–85 (6th Cir. 2021) (Thapar, J.). That's because Article III prohibits courts from deciding "questions that cannot affect the rights of litigants in the case before them or giv[ing] opinions advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quotation omitted). And here, the entirety of the majority's analysis "is hypothetical [because plaintiffs] can't sue." *Elhady*, 18 F.4th at 885.

We should be especially careful about deciding hypothetical cases where, as here, "the cause-of-action-lacking plaintiff wants us to answer a *constitutional* question." *Angulo*, 978 F.3d at 954 (Oldham, J., concurring in

---

[3] We have an obligation to consider jurisdictional questions *sua sponte*, but this court has recently clarified that the *Heck* doctrine is not jurisdictional. *See Colvin*, 2 F.4th at 498–99 ("*Heck* implicates a plaintiff's ability to state a claim, not whether the court has jurisdiction over that claim.").

part). To reach the conclusion it does today, the majority ignores *Heck* and analyzes whether there was a constitutional violation. That flips the order of operations: Normally we "will *not* decide a constitutional question if there is some other ground upon which to dispose of the case." *Escambia Cnty. v. McMillan*, 466 U.S. 48, 52 (1984) (per curiam) (emphasis added). Indeed, we normally will decide "an antecedent statutory issue, *even one waived by the parties*, if its resolution could preclude a constitutional claim." Adrian Vermeule, *Saving Constructions*, 15 Geo. L.J. 1945, 1948–49 & n.20 (1997) (emphasis added).

When this case goes back to the district court, the defendants will obviously re-raise their *Heck* defenses, and those defenses will obviously bar plaintiffs from recovering anything. Perhaps the district court will recognize that its first *Heck* ruling was plainly wrong; perhaps the district court will adhere to it, and we'll reverse it in the officers' next appeal. But either way, today's decision will prove no less advisory than the opinion the first Supreme Court refused to give President Washington in 1793. *See Correspondence of the Justices*, *in* R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 50–52 (7th ed. 2015).

2.

Second, officers asserting qualified immunity can't forfeit the argument that *Heck* bars plaintiffs' claims. That's because qualified immunity is no "mere defense to liability"—it's an "immunity from suit." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (quotation omitted). And once officers have asserted the qualified-immunity defense, it's plaintiffs' burden to negate that assertion. *See King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016). That means plaintiffs must overcome any and all antecedent hurdles before they can subject the immunity-asserting officers to suit.

And the question whether plaintiffs have a cause of action is obviously antecedent to the qualified-immunity question. In that respect, it's no different from *Bivens*. *See Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017); *Angulo*, 978 F.3d at 948-49 n.3 (*Bivens* question is "an antecedent matter" to qualified immunity); *Egbert v. Boule*, --- S. Ct. ---, --- n.3 (2022) (*Bivens* defendant "is not limited to the precise arguments he made below" and cannot forfeit an argument that would "foreclose applying *Bivens*" (citing *Oliva v. Nivar*, 973 F.3d 438, 443 n.2 (5th Cir. 2020))). Plaintiffs who lack a cause of action under § 1983 cannot sue state officers—just as plaintiffs who lack a cause of action under *Bivens* cannot sue federal officers. So where the plaintiffs have no cause of action, we should never even get to the qualified immunity question. *See Elhady*, 18 F.4th at 884 (discussing *Bivens*) ("Why analyze qualified immunity when it is an utterly unnecessary exercise?"). True, that means the officers get the benefit of *Heck* without invoking that doctrine. But longstanding precedent often requires dismissal of official-action suits where the officers fail to argue *anything*. *Cf. Cass v. City of Abilene*, 814 F.3d 721, 733 (5th Cir. 2016) (per curiam) (plaintiffs failed to satisfy their burden to "show that the defendant is not entitled to qualified immunity" even though defendant "entirely failed to argue that [the constitutional] right was not clearly established" (quotation omitted)).

Longstanding Supreme Court precedent likewise requires this approach in other areas. For example, the Court directs us to "consider an issue antecedent to and ultimately dispositive of the dispute before [us], even an issue the parties fail to identify and brief." *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (quotation omitted); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains independent power to identify and apply the proper construction of

governing law."); *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990) (recognizing that only "two questions were presented" to the Court, but nonetheless reaching and deciding "another question antecedent to these and ultimately dispositive of the present dispute"). And both of my esteemed colleagues have recognized this rule before. *BP Expl. & Prod., Inc. v. Claimant ID 100315902*, 774 F. App'x 169, 171–72 (5th Cir. 2019) (Costa, J., joined by Higginbotham, J.) (quoting *U.S. Nat'l Bank of Oregon*, 508 U.S. at 447); *see also id.* at 172 ("[A] court might look past forfeiture . . . when the proper resolution is beyond any doubt and when injustice might otherwise result." (quotation omitted)). I see no basis for departing from it here.

3.

Finally, fairness. The collateral-order doctrine provides our jurisdiction to review the summary-judgment order denying qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). But our jurisdiction in this posture is "significantly limited." *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc). We have jurisdiction "only to the extent that the denial of summary judgment turns on an issue of law." *Ibid.* (quotation omitted). Over and over, we restate the rule the Supreme Court gave us in *Johnson v. Jones*, 515 U.S. 304, 313–14 (1995): We're permitted to "examin[e] the *materiality* of factual disputes the district court determined were genuine." *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019) (en banc) (emphasis added). But we "lack jurisdiction to review the *genuineness* of a fact issue." *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc) (quotation omitted).

Our court has been inconsistent about whether we have jurisdiction to address *Heck* issues in this posture. *See Poole v. City of Shreveport*, 13 F.4th 420, 426 (5th Cir. 2021) (highlighting inconsistencies); *compare Sappington v. Bartee*, 195 F.3d 234, 236 (5th Cir. 1999) (per curiam) (holding a "denial of a

summary judgment is reviewable and subject to reversal if the claim is barred under *Heck*"), *with Southall v. Arias*, 256 F. App'x 674, 676 (5th Cir. 2007) (per curiam) (no jurisdiction to "review the applicability of *Heck*" on interlocutory appeal), *and Latham v. Faulker*, 538 F. App'x 499, 500 (5th Cir. 2013) (per curiam) ("The district court has dismissed [the] claim as precluded by the *Heck* doctrine," but "we have no jurisdiction of that in this interlocutory appeal." (quotation omitted)). Only recently—and well after the briefing in this case was completed—has our court attempted to cure this conflict by stating that *Heck* issues are reviewable on interlocutory appeal from a denial of qualified immunity. *See Poole*, 13 F. 4th at 426 (concluding that *Sappington* controls under our rule of orderliness).

Despite the confusion in this circuit, the prevailing approach in our sister circuits has been to say that *Heck* issues are *not* reviewable on interlocutory appeal. *See Dennis v. City of Philadelphia*, 19 F.4th 279, 287 (3d Cir. 2021) ("Accordingly, although we have jurisdiction in this interlocutory appeal to consider the District Court's denial of the detectives' qualified immunity defense, we do not have jurisdiction at this time to consider their arguments under *Heck*."); *Sayed v. Virginia*, 744 F. App'x 542, 547–58 (10th Cir. 2018) ("The *Heck* analysis does not bear on the qualified immunity inquiry, and because *Heck* issues are effectively reviewable on appeal while the denial of qualified immunity is not, courts generally decline to exercise jurisdiction over *Heck* issues raised on interlocutory appeal from the denial of qualified immunity."); *Harrigan v. Metro Dade Police Dept.*, 636 F. App'x 470, 476 (11th Cir. 2015) (per curiam) ("The district court's *Heck* ruling is not a final decision and, unlike its order denying qualified immunity, does not fall within the collateral order doctrine."); *Norton v. Stille*, 526 F. App'x 509, 514–15 (6th Cir. 2013)) ("[T]he district court's holding on the *Heck* issue is not independently reviewable under the collateral order doctrine," and the court cannot exercise pendent appellate jurisdiction over it.); *Limone v.*

*Condon*, 372 F.3d 39, 50–51 (1st Cir. 2004) (declining interlocutory review of *Heck* issue); *Cunningham v. Gates*, 229 F. 3d 1271, 1285 (9th Cir. 2000) ("[W]e lack jurisdiction to review the district court's denial of defendants' motion for summary judgment pursuant to *Heck v. Humphrey*.").

At the time this case was filed, our circuit's most recent statement on the question indicated quite clearly that we don't have jurisdiction to review *Heck* issues on interlocutory appeal. *Latham*, 538 F. App'x at 500 ("The district court has dismissed [the] claim as precluded by the *Heck* doctrine," and "we have no jurisdiction of that in this interlocutory appeal." (quotation omitted)). And we have not hesitated to admonish government officials who ask us to resolve issues that cannot be resolved under our understanding (right or wrong) of the collateral-order doctrine. *See, e.g.*, *Fuentes v. Riggle*, 611 F. App'x 183, 189–90 (5th Cir. 2015) (per curiam) (dismissing interlocutory appeal raising factual disputes and faulting defendant for "attempt[ing] to circumvent our jurisdictional limitations"); *Juarez v. Aguilar*, 666 F.3d 325, 332–33 (5th Cir. 2011) ("Our jurisdiction does not permit us to consider several issues raised by Appellants . . . . Appellants' attempt to avoid this jurisdictional limitation is unavailing."); *Reyes v. City of Richmond*, 287 F.3d 346, 351 (5th Cir. 2002) (dismissing interlocutory appeal challenging genuineness of factual disputes and faulting officer for merely "giving lip service to the correct legal standard" while raising issues outside the court's limited jurisdiction); *cf. United States v. Contreras-Rojas*, 16 F.4th 479 (5th Cir. 2021) (per curiam) (urging litigants "not to damage their credibility with this court" by pressing arguments our court has made clear will fail (quotation omitted)).

So, perhaps understandably, defendants in this case did not brief this issue on appeal. But they did brief it below. And the district court spent multiple pages discussing whether plaintiffs' claims are *Heck*-barred. There's no unfair surprise to plaintiffs if we consider arguments they pressed

thoroughly and successfully before the district court. Nor is there any reason to make these defendants proceed in district court on claims that are obviously barred. Nor is there any reason to adjudicate constitutional questions in the face of an obvious and insurmountable hurdle to plaintiffs' claims.

In short, the majority faults defendants for failing to brief an issue our precedent told them not to brief. We've since clarified that we have jurisdiction to review this issue in this procedural posture. But rather than recognize that we ourselves caused the problem, the majority faults *the defendants* for failing to predict our jurisdictional switcheroo; then it renders an advisory constitutional decision in the face of the insuperable *Heck* bar; and then it says that the whole thing is somehow compelled by the forfeiture doctrine. That, with deepest respect, is wrong.

## II.

Even assuming plaintiffs' claims are not *Heck* barred—or assuming, as the majority does, that we can't reach the issue—the majority's qualified-immunity analysis is also wrong.

When analyzing claims of qualified immunity, we must assess each defendant individually. *See Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018) ("In cases where the defendants have not acted in unison, qualified immunity claims should be addressed separately for each individual defendant." (quotation omitted)); *Joseph v. Bartlett*, 981 F.3d 319, 325 & n.7 (5th Cir. 2020) (clarifying that "[t]o the extent [*Darden*] could be read as suggesting that collective analysis is appropriate for defendants acting in unison, we don't read it that way"). Here, however, the majority fails to engage in the required defendant-by-defendant analysis, instead faulting three DPSC employees for actions by other parties over which DPSC had no authority or control. Assessing each defendant separately compels the

conclusion that none violated the plaintiffs' constitutional rights under (A) the failure-to-adopt-policies theory or (B) the direct-participation theory. And in any event, (C) the defendants did not violate clearly established law.

## A.

The majority denies qualified immunity to LeBlanc, Stagg, and Griffin because, it says, they were "deliberately indifferent" in failing to adopt policies that would ensure plaintiffs' timely release. *Ante*, at 10–14. Neither the plaintiffs nor the majority, however, can show that (1) the DPSC defendants were deliberately indifferent about anything. And (2) the majority's various attempts to blame the DPSC defendants rests on a fundamental misunderstanding of who's who; it turns the three DPSC defendants into scapegoats for the State's problems writ large.

### 1.

As in all qualified-immunity cases, our inquiry should start with the Constitution. It's not immediately obvious which constitutional provision is implicated by plaintiffs' "deliberate indifference on a failure-to-adopt-policies" theory. It appears to be an amalgamation of the Fourth and Fourteenth Amendments. Neither the majority nor the parties pause to explain how either part of the Constitution, standing alone or combined with some other part, says anything to urge prison officials to adopt particular policies with particular alacrity. The majority and the parties likewise point to no Supreme Court precedent that requires any of the DPSC defendants to do anything at any time. Everyone instead points only to our precedent.[4]

---

[4] The Supreme Court has never said that we can hold executive officers liable under § 1983 for violating the commands of *our* precedent (as opposed to theirs). *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam) (assuming without deciding that "controlling Circuit precedent clearly establishes law for purposes of § 1983"). For

Our precedent, in turn, requires two things. First, plaintiffs must show that defendants had "actual or constructive notice" of a constitutional violation. *Porter v. Epps*, 659 F.3d 440, 447 (5th Cir. 2011). Second, there must be an "obvious" causal link between the failure to adopt a *particular* policy and that same constitutional violation. *See id.* at 446 ("A failure to adopt a policy can be deliberately indifferent when it is *obvious that the likely consequences* of not adopting a policy will be a deprivation of constitutional rights." (emphasis added) (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992))).

First, notice. As to our three DPSC defendants, their only conceivable "notice" of a constitutional problem is the 2012 Lean Six Sigma study. *See ante*, at 12. That study found that DPSC added 7.27 days on average to prisoners' processing time—and hence created a 7.27-day delay for releasing prisoners entitled to immediate release upon sentencing. But the district court denied summary judgment in this case in 2019—*seven years after* the Lean Six Sigma study. In those intervening seven years, DPSC all but eliminated its portion of the delay: It's undisputed that DPSC was responsible for an average of *less than one day's delay* across the five plaintiffs in this case. It's downright bizarre to (1) ignore the undisputed fact that DPSC all but eliminated its portion of the problem and then (2) pretend the DPSC defendants did *nothing* after receiving "notice" of the 2012 Lean Six Sigma study. If the majority were to acknowledge the actual facts in the actual summary judgment record, where would it find that these three DPSC defendants were on "notice" of a constitutional problem *in 2019*? On that

---

purposes of the present discussion, I'll assume that our precedent can "clearly establish" the meaning of the relevant constitutional provisions.

question, which is the only relevant one, the summary judgment record and the majority opinion are equally and deafeningly silent.

Second, the purportedly "obvious" causal link. The majority says "it was obvious that a failure to address [the] processing delays [identified in the Lean Six Sigma study] would lead to unconstitutional overdetentions." *Ante*, at 12. But how can anyone say the DPSC defendants failed to address the Lean Six Sigma study? They absolutely addressed it. They reduced DPSC's average delays from 7.27 days (in 2012) *to less than one day* (in 2019). The majority appears to hold that anything short of absolute, 100% complete perfection—that is, a reduction from 7.27 *to zero*—is an "obvious" violation of the Constitution. The majority can cite nothing to support that breathtaking conclusion. It has no basis in law or logic.

### 2.

In its attempts to avoid these conclusions, the majority offers three arguments. Each is meritless.

The majority first faults LeBlanc and Stagg for not amending the Basic Jail Guidelines to require "local jails to transmit pre-classification paperwork to DPSC by a stated deadline." *Ante*, at 11. This makes no sense because the plaintiffs concede that Louisiana state law *already imposes* such a deadline on the sheriffs. If the sheriffs are ignoring a stated deadline that already exists, why does the majority think that it would change anything if DPSC added a second deadline for the sheriffs to ignore?

The plaintiffs conceded that state law obliges the sheriff of the parish of conviction to deliver a prisoner to the state correctional institution designated by DPSC *within thirty days* of the sentence. La. Rev. Stat. § 15:566(B). At the time of delivery, the sheriff is required to provide DPSC with certain documentation. Those documents include (1) the indictment; (2) the Uniform Sentencing Commission Order; (3) the sheriff's jail credit

No. 20-30304

letter showing the amount of pre-trial credit the inmate earned for time awaiting sentencing; (4) the basic interview form containing the inmate's personal information; and (5) fingerprints. *See* LA. CODE CRIM. PRO. art. 892(C). This is the information DPSC uses to calculate release dates. Given that the sheriffs already have a statutory obligation to turn over this material in a timely manner, it's not at all "obvious" that LeBlanc and Stagg's decision not to add a duplicative deadline to the guidelines "causally result[ed] in the constitutional injury." *Porter*, 659 F.3d at 446. So if anything is obvious, it's that the sheriffs are ignoring *concededly binding* deadlines,[5] and DPSC's failure to add another one for the sheriffs to ignore did nothing to cause plaintiffs' injuries.

Next, the majority faults Stagg and Griffin for failing to adopt processes aimed at identifying "newly-sentenced DPSC prisoners lack[ing] initial time computations and release dates." *Ante*, at 11. But these aren't "DPSC prisoners"; they're *sheriffs'* prisoners in local jails. Louisiana state law is undisputedly clear that a sheriff has "absolute authority over [such an] inmate without any control whatsoever exercised by the DPSC." Bl. Br. 11; *see Harper v. State, Dep't of Pub. Safety & Corr.*, 679 So.2d 1321, 1323 (La. 1996) (citing *Cooley v. State*, 533 So.d 124, 126 (La. App. 4th Cir. 1988)). And

---

[5] The parties agree these deadlines already exist. *See, e.g.*, Bl. Br. at 12 ("Under Louisiana law, it is the duty of the sheriff of the Parish of conviction (in this case, the OPSO) to deliver the prisoner to the state correctional institution designated by DPSC within thirty days of the date upon which sentence to imprisonment at hard labor has been imposed (with exceptions not relevant here). The sheriff must also provide DPSC with certain documentation at the time he delivers the inmate to DPSC."); Oral Arg. at 21:45–21:53 (Q: "Do you dispute that the sheriffs' office has a statutory obligation to provide this information?" Plaintiffs' counsel: "We do not dispute that."). I do not understand how the majority can purport to countermand these representations and suggest the thirty-day deadline does not apply. *See ante*, at 21. And in any event, regardless of how the plaintiffs in this case were detained, their central contention is that the sheriffs were ignoring statutory deadlines that apply more generally.

state law is equally clear that sheriffs are independently elected parish officers who are in no way accountable to DPSC.

It's true that DPSC and the Louisiana Sheriffs' Association jointly adopted the "Basic Jail Guidelines" to protect the constitutional rights of criminals in the sheriffs' custody. It's also irrelevant. The majority cites nothing to suggest that DPSC has any power whatsoever to unilaterally amend the jointly-adopted Guidelines. And it cites nothing to suggest that such a unilateral DPSC amendment, even if possible, would have caused any sheriff to do anything to help any prisoner. To the contrary, the undisputed record evidence shows that when local jails fail to adhere to the Guidelines, all DPSC can do is "work with them" to try to "get them in compliance"—something DPSC does "on a fairly regular basis." That's far from deliberate indifference. And it's far from "obvious" that DPSC failed to do anything that caused any plaintiff to suffer any injury.

Third and finally, the majority commits the tell-tale mistake that courts make when all else fails to deny qualified immunity: It lumps the defendants together. For example, the majority says that the three DPSC defendants were "aware[] of this pattern of delays" and made a "conscious decision not to address it," *ante*, at 13—without saying anything about which defendant knew what at what time, and without explaining how we can infer anything about any particular defendant's consciousness. The law squarely prohibits such group pleading. *See, e.g.*, *Bartlett*, 981 F.3d at 325; *cf. Yang v. Nobilis Health Corp.*, 2021 WL 3619863, at *2 (5th Cir. Aug. 13, 2021) (per curiam) ("Our review is particular to each defendant."). What's worse, the majority lumps the three DPSC defendants together with others—like the sheriffs—who are not before us. *See ante,* at 18. That's the only way the majority can fault our three defendants for delays that were undisputedly caused by others. Our precedent squarely forecloses this entire enterprise to impose joint-and-several liability under § 1983.

## B.

The plaintiffs' second constitutional theory is that Griffin and Stagg were deliberately indifferent to their overdetention because they "directly participated" in it. This theory is even weaker than plaintiffs' "deliberate-indifference-for-failure-to-adopt-policies" theory.

To find deliberate indifference, there must be evidence that particular defendants "disregarded" a "known or obvious consequence of his action"—namely, that particular plaintiffs would be overdetained. *Porter*, 659 F.3d at 446–47; *accord Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotation omitted). Here, the majority points to two plaintiffs—Crittindon and Burse—and says two defendants—Griffin and Stagg—deliberately and directly participated in 17 days of overdetention by disregarding phone calls from the inmates' mothers, the known or obvious consequence of which was their overdetention. But the majority cites no evidence Griffin and Stagg knew anything about any risk that Crittindon and Burse could be overdetained. And even if there *were* evidence they knew of that risk, there is nothing to suggest they disregarded it. To the contrary, as soon as Griffin and Stagg learned that Crittindon's and Burse's family members called DPSC, they acted promptly and reasonably to identify the inmates, calculate their release dates, and ensure their release.

First, the phone calls did not make it "known or obvious" to these particular defendants that these particular plaintiffs were being (or would be) overdetained. *Porter*, 659 F.3d at 446–47. The message Griffin and Stagg received regarding Crittindon informed them that he had "been in Riverbend DC since July of 2014," "was sentenced in August of 2016," that he could not be found in the CAJUN system, and that his mother had called regarding "her son's time not being calculated." That alerted them that he might be a DPSC offender missing paperwork. It did not make it "obvious" that he was

being detained past his released date. So too with plaintiff Burse: Griffin and Stagg were on notice that he "was sentenced August 8, 2016 and ha[d] no DOC number or time calculated as of yet." That did nothing to alert anyone that this particular plaintiff was being overdetained.

And even if family members had called and explicitly claimed that Crittindon and Burse were being detained past their release dates, that would not make it "obvious" that they were in fact being overdetained. DPSC had no way of verifying plaintiffs' release dates until they obtained the preclassification paperwork. The only way to lay the fault at the feet of Griffin and Stagg is to make those two officials responsible for *the entire State's* contribution to this problem. That is, we'd have to presume that Griffin and Stagg were aware of each link in the causal chain that caused overdetention in Louisiana; that both had control over every link (or should bear joint-and-several liability with those who did); and that two phone calls put them on such obvious notice that they were "deliberately indifferent" for not snapping their fingers and releasing Crittindon and Burse immediately. We have zero basis for presuming such omniscience, omnipotence, or omniliability.

Second, even if we presume that Griffin and Stagg were both omniscient and omnipotent, they *still* behaved reasonably. They took prompt and reasonable steps as soon as they were made aware of the phone calls from plaintiffs' mothers. Even the district court recognized this, noting the "evidence in the record demonstrates that after they became aware of the issue, Defendants communicated with the relevant parties to obtain the necessary paperwork, calculate a release date, and release the Plaintiffs." And of course, it's undisputed that as soon as DPSC was able to obtain the preclassification packets for Crittindon and Burse, DPSC released both plaintiffs within *one day*.

## C.

For all those reasons, it's absurd to charge Griffin and Stagg with 17 days of deliberate indifference. But let's say, for the sake of argument, that Griffin and Stagg knew their actions could cause 17 days of overdetention. Even still, defendants are entitled to qualified immunity, because it is not clearly established that it violates the Constitution to hold a prisoner for 17 days while employing reasonable efforts to verify his sentence and calculate his release date.

To show a violation of clearly established law, plaintiff must "identify a case—usually, a body of relevant case law—in which an officer acting under similar circumstances was held to have violated the Constitution." *Bartlett*, 981 F.3d at 330 (quotation omitted). Whether the challenged conduct was unlawful must be obvious and without doubt: "[E]xisting precedent must squarely govern the specific facts at issue, such that only someone who is plainly incompetent or who knowingly violates the law would have behaved as the official did." *Id.* at 337 (quotation omitted); *see also Aschroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). An official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2013). It is not sufficient to define "clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742.

The majority makes *precisely* that mistake, concluding "there is a clearly established right to a timely release from prison." *Ante*, at 16; *see also Porter*, 659 F.3d at 446 ("[A] jailer has a duty to ensure that inmates are timely released from prison."). That general rule of law is undisputed—and

gets us nowhere. What matters here is when release is sufficiently "timely," because as the majority concedes, "'timely release' is not the same as instantaneous release." *Ante*, at 13. That's why we held more than fifty years ago that a jailer's "duty to his prisoner is not breached until the *expiration of a reasonable time* for the proper ascertainment of the authority upon which his prisoner is detained." *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968) (emphasis added).

So where's the line between timely (no constitutional violation) and untimely (constitutional violation)? Is 17 days reasonable or unreasonable? Courts have declined to draw a bright line. *See Berry v. Baca*, 379 F.3d 764, 771 (9th Cir. 2004) ("Courts have not settled on any concrete number of permissible hours of delay in the context of post-release detentions."). Without a bright line, we're left to infer from precedent. And in considering that precedent, we can consider *only* holdings. *See Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019) ("[C]learly established law comes from holdings, not dicta.").

In the majority's *only* case, we held that detaining a prisoner for "thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process." *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980). Just as a case regarding the unreasonableness of (say) ten taser strikes says nothing about the reasonableness of (say) one, so too does *Douthit*'s 30-day holding say nothing about our 17-day case. Moreover, *Douthit* says nothing about DPSC's efforts during those 17 days to obtain plaintiffs' preclassification paperwork. *Douthit* is, in a word, irrelevant.

But once again, all of this is beside the point because even if a precedent involving a 30-day overdetention somehow renders unconstitutional a 17-day overdetention, there is no conceivable basis for

saying that result is "obvious." At very most, the majority can say that it wants to extend the 30-day case to give future plaintiffs the benefit of its new 17-day shot clock. But the whole point of qualified immunity is that, when courts change the law like that, it cannot fault the defendants before it with failing to predict the change. Section 1983 does not require officers to be Nostradamus. *See Greenberg v. Kmetko*, 922 F.2d 382, 385 (7th Cir. 1991) (Easterbrook, J.) ("Governmental employees must obey the law in force at the time but need not predict its evolution, need not know that in the fight between broad and narrow readings of a precedent the broad reading will become ascendent.").

\*　　\*　　\*

A frequent criticism of our qualified-immunity doctrine is that it leaves some plaintiffs without a meaningful remedy for constitutional violations. That concern is irrelevant here. These plaintiffs had an obvious habeas remedy, as discussed in Part I. And even though the DPSC defendants are entitled to qualified immunity as discussed in Part II, the plaintiffs have viable claims against other defendants—namely the sheriffs. The district court denied the sheriffs' motions for summary judgment, and the sheriffs did not appeal. That means that *regardless* of what happens with the DPSC defendants here, these plaintiffs will get to go to trial and litigate their claims against officials at the Orleans Parish Sheriff's Office and the East Carroll Parish Sheriff's Office who *actually* caused their overdetention.

That makes the majority's decision all the more inexplicable. I respectfully dissent.

# United States Court of Appeals
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

June 10, 2022

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

            No. 20-30304    Crittindon v. LeBlanc
                            USDC No. 3:17-CV-512
                            USDC No. 3:17-CV-602

Enclosed is a copy of the court's decision.  The court has entered
judgment under Fed. R. App. P. 36.  (However, the opinion may yet
contain typographical or printing errors which are subject to
correction.)

Fed. R. App. P. 39 through 41, and 5th Cir. R. 35, 39, and 41
govern costs, rehearings, and mandates.  **5th Cir. R. 35 and 40
require you to attach to your petition for panel rehearing or
rehearing en banc an unmarked copy of the court's opinion or order.**
Please read carefully the Internal Operating Procedures (IOP's)
following Fed. R. App. P. 40 and 5th Cir. R. 35 for a discussion
of when a rehearing may be appropriate, the legal standards applied
and sanctions which may be imposed if you make a nonmeritorious
petition for rehearing en banc.

<u>Direct Criminal Appeals</u>.  5th Cir. R. 41 provides that a motion
for a stay of mandate under Fed. R. App. P. 41 will not be granted
simply upon request.  The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court.  Otherwise, this court may deny
the motion and issue the mandate immediately.

<u>Pro Se Cases</u>.  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
<u>certiorari</u> in the United States Supreme Court, you do not need to
file a motion for stay of mandate under Fed. R. App. P. 41.  The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

<u>Court Appointed Counsel</u>.  Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order.  If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for
rehearing and certiorari**.  Additionally, you MUST confirm that
this information was given to your client, within the body of your
motion to withdraw as counsel.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Charles B. Whitney, Deputy Clerk

Enclosure(s)

Mr. Andre' Charles Castaing
Mr. James W. Craig
Ms. Phyllis Esther Glazer
Ms. Elizabeth Baker Murrill
Mr. Jay Remington Schweikert
Mr. Benjamin William Wallace
Ms. Emily M. Washington